Reid W. Lambert, #5744
Scarlet R. Smith, #15024
**STRONG & HANNI, P.C.**
102 S. 200 E. Suite 800
Salt Lake City, UT 84111
Telephone: (801) 532-7080
Email: rlambert@strongandhanni.com
Email: ssmith@strongandhanni.com

*Attorney for the Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| CHRISTOPHER C. FUCCI,  et. al<br>Plaintiffs<br><br>v<br><br>WILLIAM BOWSER, et. al<br><br>Defendants. | **PLAINTIFFS' RESPONSE TO MOTION TO DISMISS BY FIRST AMERICAN TITLE INSURANCE COMPANY AND KIRSTEN PARKIN**<br><br>Case No. 2:20-cv-00004<br>Judge: David Barlow |

Plaintiffs Christopher C. Fucci, et. al (collectively, "Plaintiffs") submit the following response to the Motion to Dismiss filed by Defendants First American Title Insurance Company and Kirsten Parkin.  (The "FA Motion").

i

# TABLE OF CONTENTS

RELIEF SOUGHT AND GROUNDS FOR RELIEF…………………………………………………1

INTRODUCTION……………………………………………………………………….………1

STATEMENT OF RELEVANT FACTS……………………....……….…..……………….…….…...........3

LEGAL STANDARD…………………………………………………………………….…...6

ARGUMENT……………………………………………………………………….…....7

I.      The Complaint States a Claim for Breach Of Fiduciary Duty Based On the FA
        Defendants' Mishandling Of Funds In Escrow…………………………...............…………...7

        A. The FA Defendants Owed Plaintiffs a Fiduciary Duty as Escrow Agents....……...….…8

        B.  The Complaint alleges facts establishing a breach of fiduciary duty………………...12

        C.  The Complaint adequately alleges causation and damages…………………..…...13

II.     The Complaint States A Claim for Aiding and Abetting Tortious Conduct.  …………13

        A.  The Complaint Alleges A Proper Claim for Aiding And Abetting Fraud.……....…15

        B. The Complaint Adequately Alleges A Claim For Aiding And Abetting Breach Of
           Fiduciary Duty…………….…………………………………………………...17

        C. The Complaint Adequately Alleges A Claim For Adding And Abetting
           Conversions……………………………………………………………….…18

III     The Allegations Support A Claim For Civil Conspiracy…..……………………………19

IV.     The Complaint Adequately States A Claim For Materially Aiding In A Violation
        Of State Securities Laws……………………………………………………………20

V.      The Complaint States A Viable Claim For Unjust Enrichment Against The FA
        Defendants………………………………………………………………………22

VI.     The Complaint Alleges A Proper Claim For Abuse Of Vulnerable Adults…………….…23

VII.    The Complaint, When Properly Amended, Will Properly State Claims For Personal
        Liability Against Parkin…………………………………………………………24

CONCLUSION………………………………………………………………………...25

## <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*Alleco Inc. v. Harry & Jeanette Weinberg Found., Inc.*,
   665 A.2d 1038 (Md. 1995) .................................................................................. 17

*American State Bank v. Adkins*,
   458 N.W.2d 807 (S.D. 1990) ................................................................................ 11

*Bennett v. Huish*,
   2007 UT App 19 ............................................................................................... 24-25

*Berry v. McLeod*,
   604 P.2d 610 (1979) ............................................................................................. 11

*Bowe v. Palmer*,
   102 P. 1007 (Utah 1909) ...................................................................................... 18

*Cattani v. Drake*,
   2018 UT App 77, 424 P.3d 1131 .......................................................................... 17

*Chang v. JPMorgan Chase Bank, N.A.*,
   845 F.3d 1087 (11th Cir. 2017) ........................................................................... 18

*Cooper Enters., PC v. Brighton Title Co., LLC*,
   2010 UT App 135, 233 P.3d 548 .......................................................................... 11

*Coroles v. Sabey*,
   2003 UT App 339, 79 P.3d 974 ....................................................................... 16-17

*Dahl v. Gardner*,
   583 F.Supp. 1262 (D. Utah 1984) ........................................................................ 14

*d'Elia v. Rice Development*,
   2006 UT App 416, 147 P.3d 515 .......................................................................... 24

*Fidelity National Insurance Co. v. Worthington*,
   2015 UT App 19, 344 P.3d 156 ............................................................................ 15

*Freegard v. Western Nat'l Bank*,
   738 P.2d 614 (Utah 1987) ........................................................................... 8, 10-11

*Gabriel Capital, LP v. NatWest Fin., Inc.*,
   94 F.Supp.2d 491 (S.D.N.Y. 2000) ...................................................................... 16

*Gildea v. Guardian Title Co.*,
   970 P.2d 1265 (Utah 1998) .................................................................................. 16

*Gorsha v. Clark*,
   2019 WL 4917096 (S.D. Ohio 2019) ................................................................... 10

*Gray v. Oracle Corp.*,
   2005 WL 3132344 (D. Utah 2005) ......................................................................... 6

*Grossman v. Novell, Inc.*,
   120 F.3d 1112 (10th Cir. 1997) ............................................................................. 7

*Hal Taylor Assocs. v. Unionamerica, Inc.*,
   657 P.2d 743 (Utah 1982) ...................................................................................... 8

*Hardin v. Manitowoc-Forsythe Corp.*,
   691 F.2d 449 (10th Cir. 1982) ............................................................................... 7

*Harvey v. Ute Indian Tribe of Uinta & Ouray Reservation*,
  2017 UT 75, 416 P.3d 401 ................................................................. 19
In *In re First Alliance Mortgage Co.*,
  471 F.3d 977 (9th Cir. 2006) ......................................................... 17-18
*Jenkins v. Security Sav. Bank of Mich.*,
  1993 WL 669270 (10th Cir. 1994) ........................................................ 7
*Johnson v. Riddle*,
  305 F.3d 1107 (10th Cir. 2002) ......................................................... 16
*Khalik v. United Air Lines*,
  671 F.3d 1188 (10th Cir. 2012) ........................................................... 7
*Lone Star Industries, Inc. v. Horman Family Trust*,
  960 F.2d 917 (10th Cir. 1992) ......................................................... 10
*Lynch v. MacDonald*,
  367 P.2d 464 (Utah 1962) ............................................................... 16
*Mecham v. Benson*,
  590 P.2d 304 (Utah 1979) ............................................................... 25
*Meridian Title Corp. v. Pilgrim Financing, LLC*,
  947 N.E.2d 987 (Ind. App. 2011) ..................................................... 11
*Orlando Millenia, LC v. United Title Services of Utah, Inc.*,
  2015 UT 55, 355 P.3d 965 ............................................................... 8-9
*Pyper v. Reil*,
  2018 UT App 200, 437 P.3d 493 .................................................. 11-12
*Rabo Agrifinance, Inc. v. Bliss*,
  227 F.Supp.3d 1249 (D. Utah 2017) ............................................. 15-16
*Ruiz v. McDonnell*,
  299 F.3d 1173 (10th Cir. 2002) ......................................................... 6
*S.E.C. v. Nacchio*,
  614 F.Supp.2d 1164 (D. Colo. 2009) ............................................... 18
*S.E.C. v. Woodruff*,
  778 F.Supp.2d 1073 (D. Colo. 2011) ............................................... 14
*Saad v. Rodriguez*,
  506 N.E.2d 1230 (Ohio Ct. App. 1986) ........................................... 10
*Schoepe v. Zions First Nat'l Bank*,
  750 F.Supp. 1084 (D. Utah 1990) ............................................... 10-12
*Shaw Res. v. Pruitt, Gushee & Bachtell*,
  2006 UT App 313, 142 P.3d 560 ....................................................... 8
*Steward Title Guar. Co. v. Summit Escrow & Title Agency*,
  *LLC*, 2012 WL 2368214 (D. Utah 2012) .......................................... 10
*Wardley Better Homes and Gardens v. Cannon*,
  2002 UT 99, 61 P.3d 1009 ............................................................... 25
*Wells Fargo Bank v. Arizona Laborers*,
  38 P.3d 12 (Ariz. 2002) ............................................................... 16-17

## Statutes

Ohio Rev. Code. §1707.43 (A) ................................................................. 21
California Corporations Code §25403 ..................................................... 21
Utah Code Ann. §7-22-101(1)(a) ............................................................ 15
Utah Code Ann. § 76-5-111 (9)(a) .......................................................... 24
Utah Code Ann. § 7-22-108(2) ............................................................... 11

## Rules

Fed. R. Civ. P. 9(b) ................................................................................ 22
Fed. R. Civ. P. 15 (a)(2) ......................................................................... 11

## Other Authorities

17A Am.Jur.2d Contracts § 11 ............................................................... 10
18 Am.Jur.2d *Conversion* § 59 ....................................................... 14, 19
28 Am.Jur.2d *Escrow* § 5 ..................................................................... 10
28 Am.Jur.2d *Escrow* § 6 ..................................................................... 10
Restatement (Second) of Agency §§ 13, 387 (1958). ............................. 8
Restatement (Second) of Agency § 389 (1958) ..................................... 11
2 Title Ins. Law, *Title companies duties as escrow and closing agents, §20.9 (2019 ed.).* ......... 10
BLACK'S LAW DICTIONARY 702 (9th ed. 2009) ..................................... 8
1 Lender Liability Law, Prac. & Prevention § 6.4 (Mar. 2020 update) ...................................... 17

## RELIEF SOUGHT AND GROUNDS FOR RELIEF

Plaintiffs request that the Court deny the FA Motion in full, because the Complaint adequately states claims against First American Title Insurance Company ("First American") and Kirsten Parkin ("Parkin")(collectively, the "FA Defendants").  If the Motion is not denied in all respects, Plaintiffs request leave to amend.

Plaintiffs submit that Complaint states facts that, when taken together with the reasonable inferences to be drawn therefrom, establish a claim that the FA Defendants breached a fiduciary duty to Plaintiffs when they disbursed money from escrow before the construction for which the money was intended had even begun.  The Complaint likewise states proper claims for aiding and abetting tortuous conduct, civil conspiracy, materially aiding violations of state securities laws, unjust enrichment, and abuse of vulnerable persons.

By separate Motion to be filed after disposition of the FA Motion, Plaintiffs intend to amend their Complaint to name Parkin as a party defendant on the Fourth, Sixth, and Seventh Claims for Relief.  By error of counsel, Parkin's name was omitted from the list of defendants on these claims.

## INTRODUCTION

This case arises from the FA Defendants' participation in a fraud scheme perpetrated primarily by Rockwell Debt Free Properties, Inc. ("Rockwell") and Noah Corporation ("Noah"). For several years, Rockwell sold tenant in common ("TIC") interests in event venue facilities leased to Noah (the "Noah TIC Program").  At some point, Rockwell began selling the TIC interest before the venues were built.  This was problematic, however, because many of the buyers were investing money from 1031 exchanges.  Under applicable rules, 1031 investors were required to purchase only property where construction was actually completed and were required to close within a 180-day window.  Rockwell thus developed the "Construction TIC" program,

1

under which all TIC investment for a given property would be held in escrow and disbursed only as construction was completed.  For a given property, 1031 money was pushed to the front of the queue so that it could be applied to the earliest construction expenses and thus be paid out within the 180-day window.  Non-1031 money was pushed to the back of the queue and used to pay later expenses.  The Plaintiffs, who all invested in Construction TIC properties, relied on assurances that their money would be safe in escrow until construction was complete.

The FA Defendants occupied the critical role of escrow agent in the Construction TIC program.  Rockwell and its salespeople identified First American by name, and Plaintiffs relied on First American to ensure proper use of their money.  Unfortunately, the FA Defendants were not up to the task.  At some point, Rockwell disregarded the Construction TIC plan, and sought to take the money immediately after closing.  Although the Construction TIC plan—and indeed, the very purchase and sale agreements ("PSA") for each Plaintiff (FA Motion, Exhibits 1-45)—required that the funds be "used to reimburse Seller for costs it has incurred in constructing improvements on the Property" (PSA ¶ 3.2), the FA Defendants instead released all the TIC investment money to Rockwell immediately upon receiving it, and often before even having recordable deeds.  Rockwell then took an exorbitant share of the money and passed the remaining amount to Noah, where it was quickly consumed in the Noah Ponzi scheme.

Not surprisingly, Plaintiffs losses were substantial, totaling over $20.0 million dollars. The Plaintiffs were left with only unbuilt lots, encumbered by liens for unpaid taxes, mechanics liens, owners association fees, and burdensome use restrictions.  This lawsuit, including the claims against the FA Defendants, is the Plaintiffs' effort to recover their losses.

The FA Motion is based primarily on the bold assertion that the FA Defendants owed no duty to Plaintiffs.  That assertion misstates the law.  Under Utah law, the FA Defendants owed a fiduciary duty to Plaintiffs, and are liable for any defalcation or mishandling of Plaintiffs'

escrowed funds.  The balance of the FA Motion invites the Court to draw inferences that the FA Defendants did not understand the Noah TIC Program, did not participate in any meaningful way, did not have any relationship with the Plaintiffs, and did not know that there were problems with the Noah TIC Program.  On a Motion to Dismiss, however, the Court cannot accept that invitation.  Plaintiffs submit that the Complaint pleads facts supporting inferences that are precisely opposite: the FA Defendants understood the Noah TIC Program thoroughly; they took the actions that ultimately caused Plaintiffs' losses; they assumed and abused their fiduciary relationship as escrow agent for the Plaintiffs; and they knew that Noah's business and the Noah TIC Program were improper and failing.  The Motion to Dismiss should be denied to allow adjudication of all claims on the merits.

## STATEMENT OF RELEVANT FACTS

The FA Defendants preface their argument with a brief recital of facts, including only a smattering of references to the Complaint and omitting entirely any discussion of inferences to be drawn.  Their summary begins with the assertion that the Complaint contains "*no allegations that any FA Defendant did anything more than provide routine title and escrow services related to the purchase and sale of real estate.*" (emphasis in original).  Plaintiffs disagree.  The Complaint alleges that the FA Defendants were an willing and indispensable part of an illegal scheme that stole 20 million dollars from the Plaintiffs.

The Complaint alleges a long-term and close working relationship between the FA Defendants and Rockwell, supporting reasonable inferences that the FA Defendants understood Rockwell's business, understood the Noah TIC Program, and understood the TIC transactions (of which they closed over 500).  (Complaint, ¶¶ 119, 404(b)).[1]  When Rockwell purchased land, (¶

---

[1] Unless otherwise indicated, all references in this section are to the Complaint.

3

4), the FA Defendants closed the transaction.  When Rockwell sold the land to TIC Buyers a few days later at an exponentially higher price, (¶ 102), the FA Defendants closed that transaction as well.  When a Plaintiff paid the purchase price for a TIC interest, First American took the money. (¶ 118). When Rockwell sought to take money before construction began, First American gave it to them.  (¶ 389 (b)).  It is fair to say that the FA Defendants' unexpected and unauthorized release of Plaintiffs' money marks the event when Plaintiffs first suffered a loss.  (¶¶ 389, 392).

The Complaint describes the Noah TIC Program in some detail.  In 2013, it began with the purchase and resale of a completed venue.  (¶ 100).  Acquiring a fully built venue was always important to TIC investors, who were routinely assured that even if Noah failed, they would have a valuable building that they could sell or re-let.  (¶¶ 179, 181, 220, 227, 237, 280, 315, 318).  As time went on, however, Rockwell began selling Construction TIC properties, where construction would occur after closing.  Plaintiffs all invested in Construction TICs.  (*See* FA Defendants' Motion, Exhibits 1-45, at p. 1).  While Rockwell sometimes misrepresented that these projects were complete or very nearly complete, (*see, e.g.,* Complaint, ¶¶180, 182, 228, 235, 255, 279), in most cases, TIC investors were told that under the Construction TIC program, invested funds would be held in escrow and disbursed only when construction was actually completed.  (¶¶ 134, 150, 154, 159, 168, 189, 203, 209, 225, 246, 268, 290, 298, 325).  This was critical to 1031 investors because applicable rules allowed them to invest only in completed construction, and they had to make their investment within a 180-day window.  (*See, e.g.* PSA, at ¶ 3).  The Construction TIC escrow was thus critical to 1031 investors, who were moved to the the front of the queue to meet the 180-day requirement, but no less critical to non-1031 investors, whose money would be pushed to the back of the queue, but still held in escrow to pay actual construction expenses. (¶¶ 154, 159).

4

The Complaint adequately alleges that the FA Defendants knew and understood the Construction TIC program. The Court may infer that understanding from the long and close business relationship of the parties and the 500 transactions that the FA closed, but should also note that in many instances, Rockwell specifically identified First American as the escrow agent that would protect the Plaintiffs' money. (¶¶ 225, 203, 225). More directly, Parkin herself told Plaintiff Tracy Adame that she was very familiar with Rockwell and Noah, that she had closed numerous transactions, and that TIC investors were all happy with their investments. (¶ 294). In fact, she told Plaintiff John Michael Lalli, III that his escrowed money would only be paid out when construction was completed, adding that his money would likely be used "for windows." (¶ 300). In this statement, Parkin acknowledged that she understood the Construction TIC program and her role as escrow agent.

As to the claim for breach of fiduciary duty, the FA Defendants undertook the role of escrow agent and assumed a fiduciary duty. (¶ 386). In the absence of written escrow instructions (in itself a breach) (¶ 385), the scope of that duty was defined by the PSA, (¶¶386, 389 (c)), and the requirements of the Noah TIC Program, including the obligation to release escrow money only for actual construction expenses. (¶¶ 386, 389 (b)). The FA Defendants breached that duty by releasing the escrow money (¶ 389), causing Plaintiffs substantial losses.

With respect to the claim for aiding and abetting, the Complaint alleges multiple acts that the FA Defendants carried out to substantially assist in the underlying scheme. (¶ 404(a)). In addition to the allegations elsewhere in the Complaint, including those discussed above, it specifically alleges that the FA Defendants' knew of the underlying tortious conduct based on familiarity with the Noah TIC Program and Noah's operations and based on specific knowledge of Noah's failures to perform. (¶ 405(b)). The claim ultimately alleges that the FA Defendants' conduct and the underlying torts proximately caused injury to the Plaintiffs. (¶ 406).

5

The same is true for the civil conspiracy claim.  It includes allegations of a meeting of the minds between the Defendant parties, including the FA Parties.  (¶¶ 409, 410).  It alleges one or more unlawful acts, including acts described in the claim for breach of fiduciary duty.  (¶ 411). It alleges proximate cause and injury based on the losses that Plaintiffs suffered by reason of the conspiracy to perpetuate the scheme.  (¶ 412).

As to Plaintiffs' claim for materially aiding violations of state securities laws, the Complaint alleges that the FA Defendants "provided information, services, labor or funds that significantly advanced the [perpetrator's] unlawful conduct."  (¶ 461(b)).  Indeed, the FA Defendants closed every TIC transaction, released the funds, and did so more than 500 times.  (¶ 389(b)).  While many applicable statutes reserve the issue of knowledge as an affirmative defense, the Complaint nevertheless alleges that the FA Defendants acted knowingly or in reckless disregard of the facts (¶ 462), an allegation easily inferred from the long relationship of the parties detailed elsewhere in the Complaint.

As to the Fourteenth and Fifteenth Claims for Relief, the Complaint alleges sufficient facts to state claims for relief for both unjust enrichment and abuse of vulnerable adults, particularly when read together with all other factual allegations of the Complaint, which are expressly incorporated.  (¶¶465, 473).  Drawing all inferences in Plaintiffs' favor, these claims adequately state a factual basis for claims that must be resolved at trial.

## **LEGAL STANDARD**

"A rule 12(b)(6) motion to dismiss may be granted only if it appears beyond a doubt that the plaintiff is unable to prove any set of facts entitling [plaintiff] to relief under the theory of recovery." *Gray v. Oracle Corp.*, 2005 WL 3132344, *1 (D. Utah 2005) (quoting *Ruiz v. McDonnell*, 299 F.3d 1173, 1181 (10th Cir. 2002)).  "All well-pleaded facts, as distinguished from conclusory allegations, must be taken as true." *Id*.  "The court must view all reasonable

6

inferences in favor of the plaintiff, and the pleadings must be liberally construed." *Id.*  "In

reviewing the sufficiency of a complaint the issue is not whether the plaintiff *will prevail*, but

whether the plaintiff is entitled to offer evidence to support [his or her] claims." *Id.*  Put another

way, pleading requirements "do not require that the complaint include all facts necessary to carry

the plaintiff's burden." *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012)

(citation omitted). Courts must use caution to carry out the spirit of the liberal rules of pleading

and to protect the interests of justice.  Indeed, "motions to dismiss for failure to state a claim

[are] viewed with disfavor, and therefore are rarely granted." *Jenkins v. Security Sav. Bank of

Mich.*, 1993 WL 669270, *3 (10th Cir. 1994).[2]

## ARGUMENT

The FA Motion begins and ends with the bold assertion that the FA Defendants owed no

duty to Plaintiffs, an assertion which, if carried to its logical end, would mean escrow agents

could steal money at will.  Fortunately, the law is otherwise.  As escrow agents, the FA

Defendants owed a fiduciary duty to Plaintiffs which they breached by releasing funds to

Rockwell before construction was complete.  The Complaint lays out the FA Defendants breach

of that duty and their knowing combination with Rockwell and Noah in a fraudulent scheme.

I.       THE COMPLAINT STATES A CLAIM FOR BREACH OF FIDUCIARY
         DUTY BASED ON THE FA DEFENDANTS' MISHANDLING OF FUNDS IN
         ESCROW.

Part I of the FA Motion asserts that the FA Defendants' had no fiduciary duty to

Plaintiffs.  Plaintiffs contend, however, that the Complaint adequately pleads the three essential

---

[2] If a Motion to Dismiss is granted, the court should afford an opportunity to amend, unless amendment would be futile.  *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1126 (10th Cir. 1997).  Liberally allowing amendment "when justice so requires," Fed. R. Civ. P. 15 (a)(2), provides "the maximum opportunity for each claim to be decided on its merits rather than on procedural niceties." *Hardin v. Manitowoc-Forsythe Corp.*, 691 F.2d 449, 456 (10th Cir. 1982).

elements of a claim for breach of fiduciary duty: fiduciary duty, breach, and damages.  *See Shaw Res. v. Pruitt, Gushee & Bachtell*, 2006 UT App 313, ¶ 22, 142 P.3d 560.

### A.      The FA Defendants owed Plantiffs a fiduciary duty as escrow agents.

The FA Defendants cite a single case, *Orlando Millenia, LC v. United Title Services of Utah, Inc.*, 2015 UT 55, for the proposition that absent a written agreement, escrow agents owe no fiduciary duty.  (*See* FA Motion, at 7).  *Orlando Millenia* stands for no such proposition.  In that case, the question was whether a lender could assert claim for breach of fiduciary duty based on an escrow agreement to which it was not a party.  *Id.,* at ¶32.  The Court ultimately held that the lender was a third-party beneficiary to the escrow agreement, and that the escrow agent thus owed a fiduciary duty to the lender with respect to the escrowed funds.  *Id.,* at ¶40.

The court's analysis upon which the FA Defendants apparently rely is as follows:

> Fiduciary duties are implicated by certain special relationships. *See Hal Taylor Assocs. v. Unionamerica, Inc.*, 657 P.2d 743, 749 (Utah 1982). A "fiduciary relationship" exists between two parties when one of them "is required to act for the benefit of [the other] on all matters within the scope of their relationship." BLACK'S LAW DICTIONARY 702 (9th ed.2009) (defining fiduciary). Because, for instance, attorneys are required to represent their clients' interests diligently, they are considered fiduciaries of their clients. The same goes for a principal's agent, who is required to act solely for the benefit of the principal in matters connected with the agency. See RESTATEMENT (SECOND) OF AGENCY §§ 13, 387 (1958).

> Escrow agents are often considered fiduciaries, too, and most commonly as to the parties to the escrow agreement. This makes sense because the relationship between them is similar to those relationships mentioned above. Thus, while we have long held that an escrow agent "assumes the role of the agent of both parties to the transaction," *Freegard*, 738 P.2d at 616, this appears to be rooted in the nature of this relationship. By agreement, the escrow agent is required to perform essential functions on behalf of the parties, like receiving and disbursing funds. The agent's mishandling of those funds, then, can give rise to a claim for breach of fiduciary duty. *Id.*

*Orlando Millenia*, 2015 UT 55, ¶¶ 35, 36.

As a start, Plaintiffs note that the closest that the *Orlando Millenia* court came to supporting Defendants' assertion was a mention in passing that an escrow agent's duties arise "most commonly" as to parties to the escrow agreement.  That comment is not only silent as to the form—written, oral, implied—of such agreements, but also affirms by implication the possibility of perhaps less common circumstances where an escrow agent's duties might arise absent an agreement, perhaps from the escrow relationship alone.  Nothing in the analysis or holding of *Orlando Millenia* forecloses Plaintiffs' allegation that as escrow agent, the FA Defendants owed them a fiduciary duty.

If anything, *Orlando Millenia* supports a fiduciary duty in this case based on two principals addressed in the opinion.  First, as with most fiduciary obligations, the duties of an escrow agent ultimately arise from the relationship of the parties.  In the court's language, the escrow agent "assumes the role of the agent of both parties to the transaction," and the duty "appears to be rooted in the nature of this relationship."  *Id.* at ¶ 35.  In this case, the relationship between the FA Defendants as escrow agent and Plaintiffs as buyers created a necessarily dependent relationship.  While a factual debate may loom regarding the scope of the duty assumed, the *Orlando Millenia* opinion supports only the conclusion that the FA Defendants' relationship with Plaintiffs as their escrow agent gives rise to a fiduciary duty.

Second, *Orlando Millenia* held that one need not be a party to an escrow agreement to assert a claim for breach of fiduciary duty.  In *Orlando Millenia*, the lender was not a party, but the Utah Supreme Court found a fiduciary duty where it was a third-party beneficiary.  *Id.* at ¶ 40.  That holding is consistent with the allegation that the FA Defendants' owed a fiduciary duty to Plaintiffs as first parties to the escrow, even though no formal written agreement was prepared.  Plaintiffs submit that *Orlando Millenia*—the only case upon which the FA Defendants rely—actually endorses the legal basis for Plaintiffs' claim for breach of fiduciary duty.

9

Beyond *Orlando Millenia*, Plaintiffs submit that ample case law supports the imposition

of a fiduciary duty on escrow agents.  The function of an escrow agent it to "hold documents and

funds until the conditions of the purchase agreement are met whereupon the escrow agent

releases the documents and funds." *Saad v. Rodriguez*, 506 N.E.2d 1230, 1233 (Ohio Ct. App.

1986); *Lone Star Ind., Inc. v. Horman Family Trust*, 960 F.2d 917, 920 (10th Cir. 1992).  This

means that "an escrow agent assumes the role of the agent of both parties to the transaction, and

as such, a fiduciary is held to a high standard of care in dealing with its principals." *Freegard v.

First Western Nat'l Bank*, 738 P.2d 614, 616 (Utah 1987); 2 Title Ins. Law *Title companies'

duties as escrow and closing agents* § 20:9 (2019 ed.).

The absence of a formal written escrow agreement does not mean that an agreement does

not exist.  Under Utah law, an escrow agreement can be either express or implied.  *Schoepe v.

Zions First Nat'l Bank*, 750 F.Supp. 1084, 1088 (D. Utah 1990);  *see also,* 28 Am.Jur.2d *Escrow*

§ 5; *Gorsha v. Clark*, 2019 WL 4917096, *6 (S.D. Ohio 2019) (acknowledging the existence of

an implied escrow agreement and that obligated the escrow agent to ensure the terms of the

purchase agreement were fulfilled).  Indeed, Utah Code Ann. §7-22-101(1)(a) defines escrow as

"an agreement, express ***or implied***, that provides for one or more parties to deliver or entrust

money . . . to be held, paid, or delivered in accordance with the terms and conditions prescribed

in the agreement."  Thus, where the terms are not expressly stated in a formal written agreement,

the terms "are inferred from the conduct of the parties and the circumstances of the case." 17A

Am.Jur.2d *Contracts* § 11; 28 Am.Jur.2d *Escrow* § 6; *Steward Title Guar. Co. v. Summit Escrow

& Title Agency, LLC*, 2012 WL 2368214, *6 (D. Utah 2012) ("The conduct of both parties may

also be considered in determining whether they entered into an agreement." (citation omitted)).

In the end, a "contract implied in fact has the same legal effect as an express contract; it carries

as much weight and is as binding as an express contract."  *Id.*

In this case, the Complaint adequately alleges an escrow arrangement in which First American owed a fiduciary duty to Plaintiffs to handle their escrowed funds "in a manner which will reasonably preserve *and protect from loss, theft, or damage*, and which will otherwise comply with all duties and responsibilities of a fiduciary or bailee generally." Utah Code Ann. § 7-22-108(2); *accord Cooper Enters., PC v. Brighton Title Co., LLC*, 2010 UT App 135, ¶ 11, 233 P.3d 548. That arrangement required the FA Defendants to adhere to a high standard of care in exercising "reasonable skill and ordinary diligence in disbursing the funds which came into its hands by virtue of its status as escrow agent." *Freegard*, 738 P.2d at 616.

The FA Motion suggests that even if a fiduciary duty arose, it did not compel them to hold Plaintiffs' money for actual construction expenses, as clearly set forth in §3.2 of the PSA. At best, the argument gives rise to a factual dispute regarding the terms of the escrow or the scope of the FA Defendants' duties. While that factual dispute cannot be resolved on this motion, Plaintiffs contend that in the absence of a written escrow agreement, the escrow agent is obligated at a minimum to act based on the agreement between the parties. *See, Meridian Title Corp. v. Pilgrim Financing, LLC*, 947 N.E.2d 987, 991-92 (Ind. App. 2011).

As a final issue bearing on the scope of the duty in this case, Plaintiffs dispute the FA Defendants' assertion that they owed no duty to report the Rockwell/Noah fraud based on language in *Pyper v. Reil*, 2018 UT App 200, 437 P.3d 493. (FA Motion, at 10). While the law may not impose an affirmative duty of investigation, it does impose a duty on escrow agents to disclose material facts acquired in the course of their relationship, including known or apparent fraud.[3] *Schoepe v. Zions First Nat'l Bank*, 750 F.Supp. 1084, 1089 (D. Utah 1990). Moreover,

---

[3] *See also, Berry v. McLeod*, 604 P.2d 610, 616 (1979) (escrow agent has fiduciary duty to disclose known fraud committed on a party to an escrow); *American State Bank v. Adkins*, 458 N.W.2d 807, 810 (S.D. 1990) (same); *see also,* Restatement (Second) of Agency § 389 (1958)

11

"[c]onsistent with the purpose and rationale of the escrow agency" escrow agents carry "a duty

to disclose information to its principals." *Id.*

> This duty has been held to include an obligation to disclose information about a
> *known* fraud being committed on a party to the escrow agreement . . . as well as a
> duty to communicate to his principal knowledge acquired in the course of his
> agency with respect to material facts which might affect the principal's decision
> as to a pending transaction, particularly where . . . he knows the principal is
> looking to him for protection as to those very facts of which he has knowledge.

*Id.*

Unlike *Pyper*, this case does not involve a single transaction in which the escrow agent

had little opportunity to deduce the potential fraud. First American had a long and close

relationship with Rockwell, participated in hundreds of transactions, and understood the Noah

TIC Program.  It closed Rockwell's acquisitions of raw land and turned around and sold the

same land days later at exponentially higher prices.  As escrow agents, the FA Defendants at a

minimum were obligated to notify Plaintiffs that their funds would not be held for construction.

### B.      The Complaint alleges facts establishing a breach of fiduciary duty.

The FA Defendants argue that the Complaint fails to allege a breach.  Mysteriously, they

assert that they followed the requirements of the PSA, which "specifically authorized"

immediate release of the escrow funds.  (FA Motion, at 9).  Apart from the irony of the FA

Defendants seeking solace in the very agreement that they deny has any force, this argument fails

because the Complaint adequately states that the Noah TIC Program and the PSA both required

First American to disburse escrowed funds only for completed construction.

The relevant language from the PSA is as follows:

> Buyer hereby acknowledges and agrees that Accommodator shall
> periodically transfer the 1031 Funds to First American Title Company, in one or
> more installments, which funds shall be applied toward either (i) the purchase of

---

("Unless otherwise agreed, an agent is subject to a duty not to deal with his principal as an adverse
party in a transaction connected with his agency without the principal's knowledge.").

> an undivided interest in the Property or (ii) the construction of the improvements
> on the Property on a reimbursement basis (i.e., the 1031 Funds will be used to
> reimburse Seller for costs it has incurred in constructing the improvements on the
> Property). Seller shall periodically provide statements to First American Title
> Company detailing the construction costs that Seller has incurred and seeking
> reimbursement of such costs via transfer(s) of 1031 Funds.

The FA Defendants knew what this meant, as it was the heart of the Construction TIC program.

The FA Defendants were expected to use escrow funds only to reimburse actual costs for

property acquisition and construction, applying 1031 funds before non-1031 funds where

necessary to meet 1031 deadlines.  The FA Defendants needed no investigation to understand

that immediately releasing funds to Rockwell would contravene the PSA and the Noah TIC

Program and subject the Plaintiffs to unanticipated risk.  The Complaint fairly alleges that the FA

Defendants complete failure in this regard was a breach of fiduciary duty.  (Complaint, ¶ 389).

> ### C.   <u>The Complaint adequately alleges causation and damages</u>.

The FA Defendants contend that the facts do not show that their breach directly or

proximately caused Plaintiffs' injury. (FA Motion, at 12).  The Complaint alleges, however, that

as a result of the FA Defendants' breach, Plaintiffs' funds were released to Rockwell, diverted by

Noah, and lost in the Noah Ponzi scheme.  Thus, paragraph 392 of the Complaint adequately

alleges that this "defalcation and breach of fiduciary duty directly and proximately caused" the

injury.  Plaintiffs submit that the language of the Complaint, including reasonable inferences to

be drawn therefrom, are sufficient to allege causation and Plaintiffs' injury.

> ## II.   THE COMPLAINT STATES A CLAIM FOR AIDING AND ABETTING
> TORTIOUS CONDUCT BASED ON THE SUBSTANTIAL ASSISTANCE
> THAT THE FA DEFENDANTS KNOWINGLY PROVIDED IN SUPPORT OF
> THE ROCKWELL/NOAH SCHEME.

Plaintiffs' Sixth Claim for Relief alleges that the FA Defendants aided and abetted

Rockwell and Noah's underlying fraud, breach of fiduciary duty, and conversion.  The FA

Defendants argue first that their general familiarity with the underlying facts is not enough and that the Complaint fails to plead sufficient facts to establish knowing participation.  (FA Motion, at 13).  Plaintiffs submit that the FA Motion misstates the standard and fails to acknowledge clear inferences to be drawn from the allegations of the Complaint.

"The elements of a claim for aiding and abetting are: (1) the existence of an independent primary wrong; (2) actual knowledge by the alleged aider and abettor of the wrong and of his or her role in furthering it; and (3) substantial assistance in the wrong." *Dahl v. Gardner*, 583 F.Supp. 1262, 1267 (D. Utah 1984) (citations and internal quotation marks omitted); 18 Am.Jur.2d *Conversion* § 59.  "[T]he knowledge and substantial assistance elements are linked in a somewhat inverse relationship—the more knowledgeable the alleged aider and abettor is of the fraudulent conduct, the less blatant the conduct assisting that scheme must be in order to amount to substantial assistance." *S.E.C. v. Woodruff*, 778 F.Supp.2d 1073, 1090 (D. Colo. 2011).

In this case, numerous allegations in the Complaint allow the inference that the FA Defendants knew of the underlying torts.  Over a period of at least six years, the FA Defendants closed more than 40 Rockwell acquisitions and more than 500 TIC sales.  (Complaint ¶¶ 119, 343.)  Rockwell told numerous Plaintiffs that First American would hold their money until construction was completed.  Parkin's statements to Tracy Adame and John Michael Lalli, III demonstrated without qualification that she understood this component of the Noah TIC Program.  (Complaint, ¶¶294, 300).  Plaintiffs submit that the Court may infer from these allegations that the FA Defendants were more than merely familiar with the Rockwell/Noah scheme.  Their Participation necessarily involved in-depth understanding of the Noah TIC Program, the particulars of Rockwell and Noah's business, the financial challenges that Noah faced (manifested in part in its consistent failure to pay property taxes), and the risk to Plaintiffs of the continuing scheme.  In that light, paragraph 404 (b) of the Complaint adequately alleges

14

the FA Defendants' knowledge of Noah's business operations, financial weakness, and failures to perform as a basis for their knowing participation in the Rockwell/Noah scheme.

The FA Defendants make a similar appeal on the element of "substantial assistance," arguing that they only dealt with Plaintiffs after each PSA was signed.  (FA Motion, at 13-14).  Paragraph 404 (a) of the Complaint alleges, however, that the FA Defendants' conduct was much more than mere participation.  It alleges that they conducted closings, received and disbursed the Plaintiffs' purchase money, provided insurance for the transactions, and communicated with and carried out instructions from Rockwell and Noah.  Certainly, the scheme could not have injured Plaintiffs as it did if the FA Defendants would not have played along.

The FA Defendants cite *Fidelity National Insurance Co. v. Worthington*, 2015 UT App 19, 344 P.3d 156, to suggest that the standard for "substantial assistance" requires more than active participation. (Motion 14.) In that case, however, the complaint failed to allege any act to support an underlying breach of duty.  *Id.*, at ¶ 23. Indeed, the complaint did not even use the term "aiding and abetting" but merely mentioned that the defendant "actively participated" without any supporting factual allegations from which to draw inferences.  *Id.* ¶¶ 22–23.

Unlike in *Fidelity*, the Plaintiffs here allege exactly how First American substantially assisted the underlying tortious conduct. First American "released the purchase funds to Rockwell almost immediately after closing, without regard to the state of construction." (Complaint ¶ 346).  It did not require or provide a written escrow agreement and failed to safeguard Plaintiffs' funds. (Complaint ¶ 389). It conducted closings, provided insurance, and carried out Rockwell and Noah's instructions regarding the transactions (Complaint, ¶ 404 (a)).

A. **The Complaint alleges a proper claim for aiding and abetting fraud.**

Turning to the specific underlying torts, The FA Defendants argue that Utah courts "'have not yet recognized a claim for aiding and abetting fraud.'" Motion 14 (quoting *Rabo*

*Agrifinance, Inc. v. Bliss*, 227 F.Supp.3d 1249, 1252 n.1 (D. Utah 2017). This does not appear to

be correct. Although it has not recently or explicitly recognized a claim for aiding and abetting

fraud, the Utah Supreme Court affirmed such a claim in *Lynch v. MacDonald*, 367 P.2d 464

(Utah 1962). In that case, which involved a fraud scheme, the court stated that it has "frequently

been held that one who knowingly aids and abets a fiduciary to make secret profits may be held

jointly with the fiduciary for such secret profits." *Id.* (citations omitted). As to fraud, the court

explained that

> the respondents were the victims of a fraud perpetrated upon them by their
> coadventurer, MacDonald, assisted by Morgan, who knowing all the facts,
> **actively aided and abetted Doc MacDonald in the consummation of this**
> **fraud. Morgan, therefore, was as much guilty as Doc MacDonald**.

*Id.* Plaintiffs submit that the logic applicable to Morgan and Doc MacDonald remains sound in

its application to the FA Defendants and Rockwell. This Court should follow the same logic and

conclude that a Utah court would impose liability for aiding and abetting fraud.

Plaintiffs acknowledge that more recent courts to look at the issue have declined to

address whether a claim for aiding and abetting fraud exists. *See, Rabo Agrifinance, Inc. v. Bliss*,

227 F.Supp.3d 1249, 1251 n.1 (D. Utah 2017)(expressly not addressing the issue because the

case was resolved on other grounds); *Coroles v. Sabey*, 2003 UT App 339, ¶¶ 36–37 & n. 19–20,

79 P.3d 974 (declining to address the issue because the case was dismissed on other grounds).

By the same token, however, these courts have not concluded that such a claim does not exist,

and Plaintiffs urge this Court to recognize such a claim.[4]

---

[4] To the extent that Utah courts have not recognized this claim, this Court must predict how
Utah courts would rule. *Johnson v. Riddle*, 305 F.3d 1107, 1118 (10th Cir. 2002). As to fraud,
Plaintiffs note that Utah courts have explicitly recognized other secondary fraud-based claims. *See*
*Gildea v. Guardian Title Co.*, 970 P.2d 1265, 1271 (Utah 1998) (recognizing civil conspiracy to
defraud). Other jurisdictions routinely this claim. *Gabriel Capital, LP v. NatWest Fin., Inc.*, 94
F.Supp.2d 491, 511 (S.D.N.Y. 2000) (recognizing the claim); *Wells Fargo Bank v. Arizona*

16

The FA Defendants argue that the Complaint fails to comply with the particularity requirements of Fed. R. Civ. P. 9(b), citing language from *Coroles v. Sabey*, 2003 UT App 339, 79 P.3d 974, which they imply requires Plaintiffs to allege aiding and abetting with particularity when the underlying tort is fraud. But *Coroles* actually states that it is the underlying fraud claim, not the aiding and abetting claim, that must be alleged with specificity. *Id.*, at ¶ 36 ("[I]nsofar as the underlying tort is fraud, the fraud must be pleaded with particularity").

Here, the underlying fraud claim is sufficiently pled, and the FA Defendants do not argue otherwise. The allegations sufficiently notify the FA Defendants of a claim that that they knew and understood the fraudulent Rockwell/Noah scheme, provided substantial assistance to that scheme, and ultimately caused substantial injury to the Plaintiffs.

**B.     The Complaint adequately alleges a claim for aiding and abetting breach of fiduciary duty.**

Turning to the underlying breach of fiduciary duty claim, the FA Defendants begin by arguing that acts in the ordinary course of business cannot constitute substantial assistance. The basis for this argument appears to be language from a footnote in *Cattani v. Drake*, 2018 UT App 77, 424 P.3d 1131, that does not apply in this case. *Cattani* involved an aiding and abetting claim against an attorney. *Id.*, at ¶ 60. The footnote cites caselaw from other jurisdictions allowing such claims, and the parenthetical language cited in the FA Motion merely clarifies that the alleged assistance must actually aid in the underlying misconduct. *Id.* ¶ 60 n.13.

In any event, the law is clear that ordinary business dealings can constitute aiding and abetting when the defendant knows that his conduct assists in the underlying wrong. In *In re*

_____

*Laborers*, 38 P.3d 12, 23 (Ariz. 2002) (same); *Alleco Inc. v. Harry & Jeanette Weinberg Found., Inc.*, 665 A.2d 1038, 1050 (Md. 1995) (same); 1 Lender Liability Law, Prac. & Prevention § 6.4 (Mar. 2020 update) (describing the claim as being similar to that of aiding and abetting another's breach of fiduciary duty).

*First Alliance Mortgage Co.*, 471 F.3d 977 (9th Cir. 2006), for instance, an investment bank continued providing funds to First Alliance, despite knowing that First Alliance was involved in an underlying fraud. The investment bank claimed it assisted only "First Alliance's *business*," and not the underlying tortious conduct. *Id.* at 995. The Ninth Circuit explained that the conduct perpetuated the scheme and concluded that "where a company's whole business is built like a house of cards on a fraudulent enterprise, this is a distinction without a difference." *Id.*[5]

Plaintiffs submit that the Complaint alleges adequate facts to support the inference that the FA Defendants knew the Rockwell/Noah scheme involved misappropriating money, failing to meet obligations, and taking construction money before construction was completed. The FA Defendants continuing cooperation with these parties, and particularly its continuing to receive and immediately disburse investors' construction money, satisfies the element of substantial assistance in the scheme. *See, Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1098 (11th Cir. 2017) ("Under these particular circumstances, the Bank's failure to warn [the plaintiff] or stop [the underlying] fraud is sufficient to constitute substantial assistance.").

### C.    The Complaint adequately alleges a claim for aiding and abetting conversion.

The FA Defendants argue that Utah does not recognize a claim for aiding and abetting conversion. (FA Motion, at 16-17). However, at least one older Utah Supreme Court case appears to have recognized the cause of action. *See, Bowe v. Palmer*, 102 P. 1007, 1010-11 (Utah 1909). That court stated "[w]here there is in fact a conversion, as in this case, and another

---

[5] *See also, S.E.C. v. Nacchio*, 614 F.Supp.2d 1164, 1173 (D. Colo. 2009), rev'd on other grounds (holding that where an actor knows that his everyday business activities are assisting others to perpetuate a fraud, it is not difficult to infer the actor's complicity in the fraud by him continuing to perform those actions mindful of the consequences of doing so." *Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087 (11th Cir. 2017)(holding that routine banking services constituted aiding and abetting where allegations supported the inference that the bank knew money was being misappropriated).

is charged as having connected with the acts constituting the conversion through connivance or collusion, . . . [c]ollusion . . . must ordinarily be inferred or deduced from all the facts and circumstances." *Id.*; *see also* 18 Am.Jur.2d *Conversion* § 59 (outlining the claim and identifying various jurisdictions that have recognized the cause of action, including Utah). Plaintiffs submit that a Utah court would recognize a claim for aiding and abetting conversion.

The FA Defendants also allege that Plaintiffs have not stated facts showing a scheme to take their money. On the contrary, the whole Complaint details a scheme by which Rockwell and Noah took Plaintiffs money and diverted it away from the construction of Plaintiffs' facilities. Plaintiffs' release of the escrow money to Rockwell was an indispensable element of assistance without which the scheme could not have continued. The Complaint thus adequately states a claim for aiding and abetting conversion.

### III.   THE COMPLAINT ALLEGES A PROPER CLAIM FOR CIVIL CONSPIRACY.

The elements of a claim for civil conspiracy are as follows:

(1) a combination of two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages as a proximate result thereof.

*Harvey v. Ute Indian Tribe of Uinta & Ouray Reservation*, 416 P.3d 401, 425 (Utah 2017).

Here, the first and second elements are satisfied because Plaintiffs have alleged that the FA Defendants worked in combination with at least Rockwell, and because they have adequately alleged that the object to be accomplished was the Rockwell/Noah scheme itself. The fourth and fifth elements are satisfied because Plaintiffs have plead substantial overt acts, including the release of the escrow money itself, and they have adequately alleged that the scheme caused Plaintiffs to lose over $20.0 million. The FA Defendants principal argument, therefore, appears to be that the Complaint does not satisfy the third element by alleging a meeting of the minds.

Plaintiffs acknowledge that the claim itself does not restate in any detail the facts specific to the FA Defendants' knowledge and understanding of Rockwell/Noah scheme. However, those facts are set forth elsewhere in the Complaint and are expressly incorporated in the conspiracy claim by reference. (Complaint, ¶ 408). Without providing a complete review, Plaintiffs note that the FA Defendants had a long and close working relationship with Rockwell, closed hundreds of transactions, were familiar with the Noah TIC Program, knew of Noah's failures in meeting financial obligations, and knew that Rockwell was selling unbuilt property to TIC investors at completed prices, and immediately taking the money before construction could even begin. Based on these facts, the allegation in the Seventh Claim for Relief appropriately states that the FA Defendants' agreement to perpetuate the scheme was "evident from the acts of each party" and was "reached expressly in communications between parties . . . or was tacit or implied in the parties intent as evidenced by their conduct." Obviously, many of the facts pertaining to these allegations, including communications between the parties, are within Defendants exclusive possession. The Complaint is adequate, however, to support the inference that the FA Defendants agreed to perpetuate the scheme, particularly by releasing the escrow money.

IV.     THE COMPLAINT ADEQUATELY STATES A CLAIM FOR MATERIALLY AIDING IN A VIOLATION OF STATE SECURITIES LAWS.

The Thirteenth Claim for Relief asserts a claim for materially aiding a violation of relevant state securities laws. As indicated by Plaintiffs' citation of statutes from sixteen states (Complaint, ¶ 463, n. 4), this claim presents a potential choice of law issue, which is not addressed in the FA Motion. These statutes typically impose liability on those who materially aid a seller in the accomplishing the sale of a security in violation of state law. For example, the statute for Ohio, where three of the unbuilt venues are located, provides that "every person that

has participated in or aided the seller in any way in making such sale or contract for sale, are jointly and severally liable to the purchaser."  Ohio Rev. Code. §1707.43 (A).[6]

The FA Defendants assert that they did nothing that could be characterized as aiding and abetting a securities violation.  They omit to acknowledge, however, that they closed the very sale of securities at issue.  The facts relating to the underlying securities violations are set forth in the Eleventh and Twelfth Claims for Relief and consist of the unlicensed and fraudulent sale of the TIC Interests.  As with the aiding and abetting claim, the FA Defendants knowledge concerning the transactions arises from their long and close relationship with Rockwell, their understanding of the Noah TIC Program, and their participation in hundreds of transactions. Their participation in each sale, including particularly their release of the escrow money, puts them squarely in the category of persons who "[a]s part of their employment or business or commercial activity and in exchange for payment or other compensation . . . provided information, services, labor or funds that significantly advanced the Liable Persons' unlawful conduct or purposes with respect to Plaintiffs." (Complaint, ¶ 461(b)).

The FA Defendants argument continues with a discussion of what it calls "core elements" required in certain jurisdictions.  They argue, for instance that the Complaint does not allege knowledge of a violation (FA Motion, at 20), but as discussed at length above, the Complaint contains substantial allegations from which the Court may infer knowledge.  They argue that the Complaint does not allege material aid in the sale (*id.*), but the Complaint in fact describes the FA Defendants' role as closing agent, escrow agent, and title insurer for every

---

[6] The FA Defendants point out that there is no private right of action under section 25403 of the California Corporations Code (FA Motion, at 20), which appears to be true.  Section 25504.1 of that code, however, imposes joint and several liability on "any person who materially assists in any violation" of certain provisions of the California securities laws, including registration and anti-fraud provisions.

transaction and details their wrongful release of the escrow money.  The FA Defendants argue

that the Complaint does not allege that they were more than "mere participants" (*id.*), but in fact,

it alleges that they were indispensable in accomplishing the unlawful sales and perpetuating the

fraudulent scheme.  In short, the FA Defendants' argument on this claim consists of a series of

pot-shots without meaningful analysis and does not seriously call into question the adequacy of

Plaintiffs' allegations or the inferences to be drawn therefrom.

The FA Defendants argument concludes with an assertion that the underlying securities

fraud claim is not plead with particularity, since the particulars of the statements at issue are not

restated as part of the relevant claims.  Their discussion, however, omits entirely any discussion

of paragraphs 120 through 340 of the Complaint, in which the Plaintiffs lay out in detail the

misrepresentations and omissions upon which the claims are based.  These allegations are

adequate notice of the statements upon which the underlying securities fraud claims are based.

In sum, Plaintiffs submit that their claim for materially aiding Rockwell's violations of

state securities laws is adequately plead and supported by reasonable inferences that can be

drawn from the facts stated.  The FA Motion should be denied on this claim.

V.      THE COMPLAINT STATES A VIABLE CLAIM FOR UNJUST
        ENRICHMENT AGAINST THE FA DEFENDANTS.

The FA Defendants accurately state the elements of an unjust enrichment claim and argue

that Plaintiffs have failed to allege a benefit or adequately plead circumstances which would

make the FA Defendants' retention of the benefit inequitable.  Plaintiffs submit that a benefit

conferred on the FA Defendants is not only a reasonable inference but a virtual certainty.  The

Complaint alleges the FA Defendants participated as closing agent, escrow agent, and title

insurer.  Taken together with the allegation of paragraph 467 of the Complaint that each

defendant received "a benefit from Plaintiffs in the form of . . . compensation paid from the

proceeds of the sale transaction, . . . and perpetuation of the Noah Ponzi scheme," these allegations demand the inference that the FA Defendants received a benefit.

As to inequity, Plaintiffs submit that the Complaint taken as a whole adequately pleads circumstances in which the FA Defendants should not be permitted to retain the money they received at the Plaintiffs' expense. The Complaint is a story of lies, reliance, defalcation, and deceit. It is a story of innocent Plaintiffs buying what they thought was a safe investment and learning that they actually bought a piece of a Ponzi scheme. While the dispute is best reserved until the facts are fully developed, it takes little imagination to conceive of facts inferred from the Complaint that would compel the conclusion that the Plaintiffs should get their money back.

VI.    THE COMPLAINT ALLEGES A PROPER CLAIM FOR ABUSE OF VULNERABLE ADULTS.

The FA Defendants mistakenly assume that the claim for abuse of vulnerable adults arises exclusively under Utah law. To the contrary, Plaintiffs plead the claim broadly and under "applicable laws" precisely because of the uncertainty as to governing law. Plaintiff's only reference to Utah law was with respect to the definition of vulnerable adults as persons over 65 years of age. (Complaint, ¶ 474). The balance of the allegations track general language and elements of "elder abuse" claims recognized in multiple jurisdictions and are sufficient, in that regard, to put Defendants, including the FA Defendants, on notice of the claim.

Even if Utah law were the applicable framework, however, Plaintiffs submit that the Complaint would be still state a proper claim for relief. As noted in the FA Motion, Utah Code Ann. § 61A-3-314 permits a right of action for financial loss as a result of exploitation.[7] In turn,

---

[7] The FA Defendants argue that the statute preempts all other remedies, but the statute is narrowly tailored to very specific offenses, and does not expressly exclude other possible remedies for abuse or exploitation of vulnerable adults that may exist at common law or arise from other violations of the criminal law.

23

financial exploitation is defined in the criminal code to include to include deception, Utah Code Ann. § 76-5-111 (9)(a)(i), and mismanagement, Utah Code Ann. §76-5-111 (9)(a)(iii).  Plaintiffs allegations are certainly broad enough to state a claim for under this definition.

The FA Defendants also repeat here the argument that the claim does not properly allege knowledge or intent.  Again, the Complaint as a whole, all factual allegations of which are incorporated in the Fifteenth Claim for Relief by reference, adequately sets forth the FA Defendants' knowledge concerning the Noah TIC Program and their role in the scheme.  The Fifteenth Claim for relief then contains the specific allegation that they "were motivated by purposes other than the well-being and interest of the Plaintiffs but acted with improper motives including at least greed and self-interest."  Plaintiffs submit that the allegations are sufficient to state a claim for abuse of vulnerable adults.

VII.   THE COMPLANT, WHEN PROPERLY AMENDED, WILL PROPERLY STATE CLAIMS FOR PERSONAL LIABILITY AGAINST PARKIN.

As set forth above, Plaintiffs' counsel mistakenly omitted Parkin as a named defendant on the Fourth, Sixth, and Seventh Claims for Relief.  By separate motion following the disposition of the FA Motion, Plaintiffs will seek leave to amend the Complaint to remedy that omission.  Plaintiffs have thus addressed this Motion as if Parkin was already named as a party.

As to Parkin's individual liability, the FA Defendants argument consists primarily in a restatement of its argument on each substantive claim.  Plaintiffs submit, however, that because Parkin was the primary, if not exclusive agent acting on First American's behalf, Complaint, her personal liability and First American's vicarious liability are established as a matter of law.  In Utah, an agent is personally liable for torts committed in a that capacity so long as the agent actually participated in the tortious conduct.  *d'Elia v. Rice Development*, 2006 UT App 416, ¶ 62; *Bennett v. Huish*, 2007 UT App 19, ¶ 48.  Conversely, a corporate actor such as First

American is vicariously liable for the torts of its agents, such as Parkin, if such torts were committed while acting within the scope of employment.  *Wardley Better Homes and Gardens v. Cannon*, 2002 UT 99, ¶ 19.  In that respect, while Parkin cannot exculpate herself by hiding behind the corporate entity, she can "inculpate her corporate principal."  *Bennett*, at ¶ 48 (quoting *Mecham v. Benson*, 590 P.2d 304, 308 (Utah 1979)).  Where Parkin acted within the scope of her employment as to all matters involved in the Complaint, Parkin and First American are each separately liable for all claims asserted against either in the case.

## CONCLUSION

Based on the above, Plaintiffs urge the Court to deny the Motion to Dismiss.  Plaintiffs note that an amendment is necessary to remedy the mistaken omission of Parkin's name from the Fourth, Sixth, and Seventh Claims.  If the Motion is not denied in all respects, Plaintiffs request opportunity to cure the deficiency by amending the Complaint.

DATED this 22nd day of April, 2020.

STRONG & HANNI, PC


_____*/s/ Reid W. Lambert*_____
Reid W. Lambert
Attorneys for Plaintiffs

25

## CERTIFICATE OF SERVICE

I certify that on the 22nd day of April, 2020, I caused the foregoing **PLAINTIFFS' RESPONSE TO MOTION TO DISMISS BY FIRST AMERICAN TITLE INSURANCE COMPANY AND KIRSTEN PARKIN** to be served electronically filed which delivered immediate notice to the same to the following:

- **Daniel K. Brough**
  dbrough@btjd.com, hollyv@btjd.com, docketing@btjd.com
- **Erik A. Christiansen**
  echristiansen@parsonsbehle.com, ecf@parsonsbehle.com, cgroos@parsonsbehle.com
- **Jeffrey C. Corey**
  ecf@parsonsbehle.com,jcorey@parsonsbehle.com
- **Royce B. Covington**
  rcovington@parrbrown.com, calendar@parrbrown.com
- **R. Jesse Davis**
  jdavis@strongandhanni.com
- **Jonathan O. Hafen**
  jhafen@parrbrown.com, calendar@parrbrown.com
- **Douglas W. Henkin**
  douglas.henkin@dentons.com
- **Reid W. Lambert**
  rlambert@strongandhanni.com, tlawrence@strongandhanni.com
- **Sara M. Nielson**
  snielson@parrbrown.com, acoats@parrbrown.com, calendar@parrbrown.com
- **Chad S. Pehrson**
  cpehrson@parrbrown.com, calendar@parrbrown.com

**STRONG & HANNI**

_____/s/ Tiffany B. Lawrence_____
Legal Assistant to Reid W. Lambert
Attorney for the Plaintiffs

26