Reid W. Lambert, #5744
R. Jesse Davis, #16032
**STRONG & HANNI, P.C.**
102 S. 200 E. Suite 800
Salt Lake City, UT 84111
Telephone: (801) 532-7080
Email: rlambert@strongandhanni.com

*Attorney for the Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| CHRISTOPHER C. FUCCI, an individual; AMBLESIDE PARK, INC. a New Hampshire corporation; RICHARD AND SUSAN HARDER, trustees of the RICHARD AND SUSAN HARDER LIVING TRUST; NINA D. JOHANNESSEN, trustee of the NINA D. JOHANNESSEN LIVING TRUST; EUGENE AND SUSAN SPIRITUS, trustees of THE SPIRITUS REVOCABLE TRUST; JOSIE AND BARNEY ADDAMO, trustees of THE ADDAMO 12/9/04 FAMILY TRUST; ROSS R. AND LINDA M. GRECO individuals; E & H JACKSON, LLC, a Florida limited liability company; G. SCOTT COLEMAN, trustee of the G. SCOTT COLEMAN TRUST (12/1/04), an individual; ANSON AND GENEVIEVE SMITH, individuals; LIEM QUANG LE an individual; BERNIE BROMBERG, trustee of THE BROMBERG TRUST; GARY R NEIL, an individual; AMFIL REALTY, LLC; a New York limited liability company; W. MARK MCKOY, trustee of THE W. MARK MCKOY IRREVOCABLE TRUST OF 2012; BP412, LLC an Ohio limited liability company; THOMAS B. TARBET, an individual; PAUL AND LOUIS | **AMENDED COMPLAINT**<br><br>Case No. 2:20-cv-00004-DBB-DBP<br><br>District Judge: David Barlow<br>Magistrate Judge: Dustin B. Pead<br><br><br>(JURY TRIAL DEMANDED) |

ZAMBITO, Trustees of THE JOSEPH AND
GRACE ZAMBITO FAMILY TRUST
(6/26/15); PRUDENCE AND TIMOTHY D.
MAXON, individuals; MAXON-
MULTILINE, LLC, a Florida limited
liability company; LINDA AND MARTIN
TIERNEY, trustees of THE TIERNEY
REVOCABLE LIVING TRUST u/t/d
8/20/18; THE REAL MINT, LLC, a Virginia
limited liability company; GERTRAUDE
WINKLER, an individual; RYAN V. AND
ALENA C. ANDREASEN, individuals;
NORMAN L. AND ARMENAY FAYE
MERRITT, individuals; JEAN M.
BONETTI, an individual; HENRY NOAHS
DUBLIN, LLC, a New York limited liability
company; VOYNOVICH VENTURES LTD,
a New York limited company; JEAN
PIERRE AND JENNIFER SAMSON,
individuals; LAWRENCE H. TALBOT
AND RUSSELL M. TALBOT, individuals;
CARL A. AND DONNA M. LILLMARS
JR., individuals; CRAIG A. COUSINS,
trustee of THE CRAIG A. COUSINS
TRUST, UTD 5/29/2014; HENRYK
SARAT, an individual; MICHAEL AND
LINDA DIGIACOMO, trustees of THE
MICHAEL DIGIACOMO AND LINDA
DIGIACOMO REVOCABLE TRUST
(3/20/2001); ROCK NOAH OH, LLC, an
Ohio limited liability company; TRACY L
ADAME, an individual; JOHN MICHAEL
LALLI, III, an individual, WILLIAM G.
AND SUSAN M. WRIGHT, individuals;
EC9 HOLDINGS, LLC, a Florida limited
liability company; PETER BOLI, trustee of
the BOLI FAMILY TRUST DATED
5/13/1987; IVY S. FASKO, an individual;  R
& J STECK INVESTMENTS, LLC,  a Utah
limited liability company; ALAN AND
ALMA SESHIKI, trustees of THE 2016

SESHIKI FAMILY TRUST; MERLE L.
STEINMAN, JR., an individual; THOMAS
E. FUNK, trustee of the STEPHEN W.
FUNK T/U/A DATED 3/18/2005 TBO
THOMAS E FUNK; JUDY HENDRIX,
trustee of THE HENDRIX LIVING TRUST;
OAK HILL MANAGEMENT, INC. a
Vermont corporation; THEODORE E. AND
DENA A. KEITH, individuals; HARVEY A.
PAUL, an individual; DONALD P. AND
ROSEMARY B. SMITH, individuals;
LUANN PROPERTIES, LLC, a Georgia
limited liability company;

Plaintiffs

v

WILLIAM BOWSER, an individual;
WALBY, INC., a Utah corporation;
GABRIEL MANAGEMENT
CORPORATION, a Utah corporation; J & J
CUBIT CONSTRUCTION, a Utah
corporation; BRANDON M JENSEN, an
individual; SCOTT JENSEN, an individual,
KATE JENSEN, an individual; CHRIS
WINKLE, an individual; ROCKWELL
DEBT FREE PROPERTIES, INC., a Utah
corporation; ROCKWELL TIC, INC.,  a
Utah corporation; CHRISTOPHER J.
ASHBY, an individual; JORDAN S.
NELSON, an individual; SCOTT W.
BEYNON, an individual; FIRST
AMERICAN TITLE INSURANCE
COMPANY, a Nebraska corporation;
KIRSTEN PARKIN, an individual;
EDMUND & WHEELER, INC. a New
Hampshire corporation; O'TOOLE
ENTERPRISES, LLC, a New Hampshire
limited liability company; JOHN D.

HAMRICK, an individual; CHRIS BROWN,
an individual; MARY O'TOOLE; TM 1031
EXCHANGE, a California corporation; TIM
MARSHALL, an individual; EASTERN
1031 STARKER EXCHANGE, L.L.C., a
Pennsylvania limited liability company;
EASTERN 1031 STARKER EXCHANGE,
LLP, a Pennsylvania limited liability general
partnership; CONNIE GREENAWALT, an
individual; INVESTORS 1031
EXCHANGE, INC., a California
corporation; THOMAS WILLIAM HINSON
III, an individual; JOHN DOES 1 through
10, individuals; and ROE ENTITIES I
through X, business entities.

Defendants.

## AMENDED COMPLAINT

The above-named Plaintiffs hereby appear through counsel and complain of the above-named Defendants as follows.

## INTRODUCTION

1.      The Plaintiffs are individuals or family entities located throughout the United States who purchased tenant-in-common ("TIC") interests in real estate leased to Noah Corporation ("Noah").  In many cases, the source of a Plaintiff's investment was commercial real estate that had been held for many years, which Plaintiff sought to exchange for income producing property in a like-kind exchange under Section 1031 of the Internal Revenue Code (a "1031 Exchange").  In almost all cases, Plaintiffs made the investment to provide income for retirement.

2.     The named Defendants in this case include several individuals and entities associated with Noah and with Rockwell Debt Free Properties, Inc., the primary seller of the relevant TIC investments.  Between approximately 2013 and Noah's bankruptcy filing on May 28, 2019, these Defendants worked together to sell TIC Interests in Noah event venues to investors, including the Plaintiffs (the "Noah TIC Program").

3.     At some point in approximately 2015, Rockwell Debt Free Properties, Inc. and its affiliates ("Rockwell") began to sell TIC interests in a format that they called a "Construction TIC."  Rockwell designed (or attempted to design) the Construction TIC program to allow TIC investors to use money from 1031 Exchanges to purchase TIC interests in properties where construction was not yet completed.  Since applicable rules required that 1031 Exchange money be used only for completed construction, the Construction TIC program proposed to hold TIC investor money in escrow until it could be disbursed to pay for land purchases or to reimburse the costs of completed construction.  Rockwell sold several properties under the Construction TIC program, including the four properties which are the subject of this Amended Complaint.

4.     By the end of 2016, Noah was hopelessly insolvent and had begun to function as a Ponzi scheme, with funds from new investors being used each month to pay obligations to prior investors, including TIC investors.  The Noah TIC program—and particularly the Construction TIC program—became a key element of the Noah scheme.  It financed several new event venues, perpetuating the illusion that Noah was a growing and successful company, but also raised millions of dollars from new TIC investors that were used primarily to pay prior investors and keep Noah afloat.

5.     For a typical property in the Construction TIC Program, the process began with Noah identifying land for a new event venue, and Rockwell acquiring the land in the name of a

newly formed affiliate.  Noah would then provide Rockwell with a statement of its projected

construction costs, although the projection was typically inflated well above the actual projected

costs.  Rockwell would add another huge cushion—generally over $1.0 million per property—

and set a final price for the sale of the TIC interests.

6.     Using a network of 1031 exchange specialists, real estate agents, and financial

planners, Rockwell sold the Construction TIC interests to investors, including Plaintiffs.  For

each property, between approximately 7 and 20 investors paid between $6.0 and $6.5 million for

100 percent of the TIC ownership interest.  In each case, Noah executed a lease promising to pay

rent based on a specified return on the TIC investment, usually explained as a "cap rate" of

approximately 7 percent.

7.     Under the Construction TIC program, proceeds of the TIC sales were supposed to

be escrowed with First American Title Insurance Co. ("First American") and used to pay for land

acquisition and reimbursement of the cost of completed construction.  For the properties at issue

in this lawsuit, however, First American disbursed the full proceeds to Rockwell almost

immediately after closing.  From those proceeds, Rockwell first took approximately 20 to 25

percent for itself and its upstream network of referring parties.  This "Rockwell Commission,"

which was never disclosed to the TIC investors, was generally as much as 20 to 25 percent of the

total proceeds of all TIC sales.  Rockwell also used proceeds of the TIC sales to pay the first

several months of rent payments to the TIC investors, although TIC investors were never told

that they were being paid with their own money.

8.     The remaining proceeds were intended to pay the projected costs of developing

the project, but instead of remaining escrowed with First American, these proceeds were released

to Rockwell and paid over to Noah almost immediately after closing.  For each project, Noah

received an amount at least equal to its stated projected costs, but which was actually more than $1.0 million greater than the true projected costs.

9.      Unfortunately, the millions of dollars generated by the Noah TIC Program, were not enough to satisfy Noah's voracious appetite for cash.  Thus, Defendant William Bowser ("Bowser"), Noah's President, routinely diverted TIC investment money away from the projects for which it was intended to other purposes, including payments to or for the benefit of himself and family members, payments to prior investors, and payments of operating expenses of the company, including salary for Bowser and several of his family members.

10.      As the situation became critical in early 2017, Rockwell attempted to bail out Noah with a $6.0 million loan "for the sole purpose of acquiring, developing, and/or constructing commercial properties."  Things did not improve.  Through 2017 and 2018, Noah also raised millions of dollars for a bride finance program that did not finance any brides, but was instead entirely consumed in Noah's increasingly hopeless vortex of insolvency.

11.      Meanwhile, Rockwell was using its upstream network of financial planners, 1031 Exchange specialists, real estate brokers and other salespeople to aggressively promote and sell the Noah TIC Program to new investors, including the Plaintiffs.  Plaintiffs received glossy brochures, often in electronic format, with pictures of beautiful, finished buildings and equally impressive projected returns; Plaintiffs received encouragement, assurances, promises, explanations, and excuses; Plaintiffs received documents, contracts, title policies, and in some but not all cases, their deeds.

12.      Unfortunately, the one thing Plaintiffs did not receive was a completed building. Their invested funds were used instead to pay Rockwell, pay Bowser, and pay interest and rent payments to Noah's prior investors.  With no buildings ever completed on their properties, the

Plaintiff's instead became known as the "Unbuilt TIC Owners" and were among the largest claim holders in Noah's bankruptcy, filed on May 28, 2019.  On August 5, 2019, Noah, as a Chapter 11 debtor-in-possession, rejected Plaintiffs' leases, leaving Plaintiffs with nothing but a vacant plot of land, substantial unpaid property taxes, a handful of mechanics' liens, and the claims set forth below.  In aggregate, Plaintiffs' losses are in the range of approximately $20.0 million.

13.     This Complaint is Plaintiffs' effort to recover their losses from those who actively participated with Noah in the Noah TIC scheme.  Defendants include employees, agents, and affiliates of Noah or Rockwell who received, diverted, and spent Plaintiffs' money with no benefit to the Plaintiffs.  Defendants also include Rockwell's associated parties, including parties from its up-stream network who earned substantial commissions selling the TIC investments to Plaintiffs based on misleading and incomplete information.  Defendants also include First American Title Insurance Company and its agent, Kirsten Parkin, who despite their fiduciary duties as escrow agent for the Construction TIC program, enabled Rockwell and Noah to take and squander Plaintiffs' investments without completing construction.

**PARTIES**

14.     Each Plaintiff owns a tenant-in-common interest in one or more of four different unbuilt Noah TIC Properties: Jacksonville, Florida; Independence, Ohio; Dublin, Ohio; and Toledo, Ohio (the "Unbuilt Properties").

**The Jacksonville Plaintiffs**

15.     Plaintiff Christopher C. Fucci is a resident of Vermont.

16.     Plaintiff Ambleside Park, Inc. is a New Hampshire corporation with its principal place of business in New Hampshire.

17.     Richard and Susan Harder are individuals residing in California and serving as trustees of the Richard and Susan Harder Living Trust, which has its principal place of operation in California.

18.     Nina D. Johannessen is an individual residing in New Hampshire and serving as trustee of the Nina D. Johannessen Living Trust, which has its principal place of operation in New Hampshire.

19.     Eugene and Susan Spiritus are individuals residing in California and serving as trustees of The Spiritus Revocable Trust (3/29/93), which has its principal place of operation in California.

20.     Josie and Barney Addamo are individuals residing in California and serving as trustees of The Addamo 12/9/04 Family Trust, which has its principal place of operation in California.

21.     Ross R. and Linda M. Greco are individuals residing in Nevada.

22.     E&H Jackson LLC is a Florida limited liability company with its principal place of business in New York.

23.     G. Scott Coleman is an individual residing in Utah and serving as the trustee of the G. Scott Coleman Trust (12/1/04), which has its principal place of operation in Utah.

24.     Anson and Genevieve Smith are individuals residing in New Hampshire.

25.     Liem Quang Le is an individual residing in Missouri.

**The Independence Plaintiffs**

26.     Bernie Bromberg is an individual residing in California and serving as trustee of the Bromberg Trust, which has its principal place of operation in California.

27.     Gary R. Neil is an individual residing in Vermont.

28.     AmFil Realty, LLC is a New York limited liability company with its principal place of business in New York.

29.     W. Mark McCoy is an individual residing in Florida and serving as the trustee of The W. Mark McKoy Irrevocable Trust of 2012, which has its principal place of operation in Florida.

30.     BP412, LLC is an Ohio limited liability company with its principal place of business in Ohio.

31.     Thomas B. Tarbet is an individual residing in Idaho.

32.     Paul and Louis Zambito are individuals residing in New York and serving as trustees of the Joseph and Grace Zambito Family Trust (6/26/15), which has its principal place of operation in New York.

33.     Maxon-Multiline, LLC is a Florida limited liability company with its principal place of business in Florida.  Prudence and Timothy D. Maxon are individuals residing in Florida.

34.     Linda Tierney is an individual residing in Vermont and serving as trustee of The Tierney Revocable Living Trust u/t/d 8/20/18, which has its principal place of operation in Vermont.  Since the filing of the Complaint, Martin Tierney has passed away, but Linda Tierney continues as the sole trustee of the Tierney Revocable Living Trust u/t/d 8/20/18.

35.     The Real Mint, LLC is a Virginia limited liability company with its principal place of business in Virginia.

36.     Gertraude Winkler is an individual residing in California.

37.     Plaintiffs Ryan V. and Alena C. Andreasen are individuals residing in Utah.

38.     Plaintiffs Norman L. and Armenay Faye Merritt are individuals residing in New York.  They are owners of TIC interests in both the Independence, Ohio property and the Toledo, Ohio property.

39.     Plaintiff Jean M. Bonetti is an individual residing in Massachusetts.

**<u>The Dublin Plaintiffs</u>**

40.     Plaintiff Henry Noahs Dublin LLC is a New York limited liability company with its principal place of business in New York.

41.     Plaintiff Voynovich Ventures LTD. is a New York limited company with its principal place of business in New York.

42.     Plaintiffs Jean Pierre and Jennifer Samson are individuals residing in California.

43.     Plaintiffs Lawrence H. Talbot and Russell M. Talbot are individuals residing in California.

44.     Plaintiff Carl A. Lillmars, Jr. is an individual residing in Florida; Plaintiff Donna M. Lillmars is an individual residing in Pennsylvania.

45.     Craig A. Cousins is an individual residing in California and serving as the trustee of Plaintiff The Craig A. Cousins Trust, UTD 5/29/2014, which has its principal place of operation in California.

46.     Plaintiff Henryk Sarat is an individual residing in California.

47.     Michael and Linda DiGiacomo are individuals residing in California and serving as trustees of the Plaintiff, Michael DiGiacomo and Linda DiGiacomo Revocable Trust (3/20/2001), which has its principal place of operation in California.

48.     Plaintiff Rock Noah OH, LLC is an Ohio limited liability company with its principal place of business in Ohio.  Rock Noah OH, LLC holds an interest in the Dublin, Ohio

property and the claims relating to that interest as transferee and assignee of the interest and claims of W&CG Investments LLC, a Texas limited liability company.

49.     Plaintiff Tracy L. Adame is an individual residing in Texas.

50.     Plaintiff John Michael Lalli, III is an individual residing in New York.

51.     Plaintiffs William G. and Susan S. Wright are individuals residing in Utah.

52.     Plaintiff EC9 Holdings, LLC is a Florida limited liability company with its principal place of business in Florida.

53.     Peter Boli is an individual residing in Nevada and serving as trustee of the Plaintiff, Boli Family Trust dated 5/13/1987, which has its principal place of operation in Nevada.

54.     Plaintiff Ivy S. Fasko is an individual residing in Pennsylvania.

55.     Plaintiff R & J Steck Investments, LLC is a Utah limited liability company with its principal place of business in Utah.

56.     Plaintiffs Alan and Alma Seshiki are individuals residing in California, and are trustees of the 2016 Seshiki Family Trust, which has its principal place of operation in California.

57.     Plaintiff Merle L. Steinman, Jr. is an individual residing in Washington.

58.     Thomas E. Funk is an individual residing in Vermont and serving as trustee of the Plaintiff, Stephen W. Funk T/U/A dated 3/18/2005 FBO Thomas E. Funk, which has its principal place of operation in Vermont.

59.     Judy Hendrix is an individual residing in Oregon and serving as trustee of Plaintiff, The Hendrix Living Trust, which has its principal place of business in Oregon.

**The Toledo Plaintiffs**

60.     Plaintiff Oak Hill Management, Inc. is a Vermont corporation with its principal place of business in Vermont.  Oak Hill Management, Inc. intends to pursue claims against Defendants Edmund & Wheeler, John Hamrick and Chris Brown in a separate action.  To serve the interest of judicial economy, Oak Hill Management, Inc. has elected not to assert claims against these Defendants in this case.  Oak Hill Management, Inc. joins in the claims against all other Defendants, and reserves the right to amend the Complaint to add its claims against additional Defendants as circumstances may dictate.

61.     Plaintiffs Theodore E. and Dena A. Keith are individuals residing in Vermont.

62.     Plaintiff Harvey A. Paul is an individual residing in Maine.

63.     Plaintiffs Donald P. and Rosemary B. Smith are individuals residing in California.

64.     Plaintiff Luann Properties, LLC is a Georgia limited liability company with its principal place of business in Georgia.

**The Defendants**

65.     Defendant William Bowser ("Bowser") is an individual residing in Utah.

66.     Defendant Walby, Inc. ("Walby") is an expired Utah corporation with its principal place of business in Utah.

67.     Defendant Gabriel Management Corporation ("Gabriel") is a Utah corporation with its principal place of business in Utah.

68.     Defendant J & J Cubit Construction, Inc. ("J & J Cubit") is a Utah Corporation with its principal place of business in Utah.

69.     Defendant Brandon M. Jensen is an individual residing in Utah.

70.     Defendant Scott Jensen is an individual residing in Utah.  Defendants J & J Cubit, Brandon M. Jensen, and Scott Jensen are referred to herein collectively as the "J & J Defendants."

71.     Defendant Kate Jensen is an individual residing in Utah.

72.     Defendant Chris Winkle is an individual residing in Utah.  Defendants Bowser, Walby, Gabriel, Kate Jensen, Chris Winkle, and the J & J Defendants are referred to herein collectively as the "Noah Affiliate Parties."

73.     Defendant Rockwell Debt Free Properties, Inc. is a Utah corporation with its principal place of business in Utah.

74.     Defendant Rockwell TIC, Inc. is a Utah corporation with its principal place of business in Utah.  Rockwell Debt Free Properties, Inc. and Rockwell TIC, Inc. and any affiliates thereof are referred to herein collectively as "Rockwell."  Rockwell and all of its known affiliates filed bankruptcy on September 2, 2020, and the matter is stayed against Rockwell pursuant to 11 U.S.C. § 362 (a).  Allegations regarding these defendants are included in this Amended Complaint only as a basis for the assertion of claims against the remaining defendants.

75.     Defendant Christopher J. Ashby ("Ashby") is an individual residing in Utah. Plaintiffs have entered a settlement agreement with this defendant, pursuant to which claims against this defendant have been dismissed with prejudice.  Allegations regarding this defendant are included in this Amended Complaint only as a basis for the assertion of claims against the remaining defendants.

76.     Defendant Jordan S. Nelson ("Nelson") is an individual residing in Utah. Plaintiffs have entered a settlement agreement with this defendant, pursuant to which claims against this defendant have been dismissed with prejudice.  Allegations regarding this defendant

are included in this Amended Complaint only as a basis for the assertion of claims against the remaining defendants.

77.     Defendant Scott W. Beynon ("Beynon") is an individual residing in Utah. Plaintiffs have entered a settlement agreement with this defendant, pursuant to which claims against this defendant have been dismissed with prejudice.  Allegations regarding this defendant are included in this Amended Complaint only as a basis for the assertion of claims against the remaining defendants.

78.     Defendants Rockwell, Ashby, Nelson, and Beynon are referred to herein as the "Rockwell Parties."

79.     Defendant First American Title Insurance Company ("First American") is a Nebraska corporation with its principal place of business in California.  Personal jurisdiction is appropriate over this Defendant because it regularly does business in the District of Utah and the claims alleged herein arose from the Defendants' acts within the District of Utah.

80.     Defendant Kirsten Parkin ("Parkin") is an individual residing in Utah.

81.     Defendant Edmund & Wheeler, Inc. ("E&W") is a New Hampshire corporation with its principal place of business in New Hampshire.  Personal jurisdiction is appropriate over this defendant because it conducted substantial business in Utah and the claims alleged herein arose from Defendants' acts directed toward Utah, including the sale of the TIC investments through Rockwell.  E&W's acts that are the subject of this action were performed under a contract with Rockwell directed toward transactions having a nexus in Utah.

82.     Defendant O'Toole Enterprises, LLC ("O'Toole Enterprises") is a New Hampshire limited liability company with its principal place of business in New Hampshire. Personal jurisdiction is appropriate over this defendant because it conducted or was otherwise

involved in substantial business in Utah from which it received over $3.0 million in payments from Utah, including payments associated with transactions which are the subject of this Complaint.  The claims against O'Toole Enterprises set forth in this Complaint arise from its acts directed toward Utah, including the sale of TIC investments through Rockwell.  The fraudulent transfer claims asserted against O'Toole Enterprises herein involve its receipt of funds paid from Utah in connection with transactions that were closed in Utah.

83.     Defendant John D. Hamrick ("Hamrick") is an individual residing in New Hampshire.  Personal jurisdiction is appropriate over this Defendant because he is the principal and control person of Defendant E&W and maintained substantial business ties and associations in Utah, including substantial on-going communication and business with principals of Rockwell and Noah.

84.     Defendant Chris Brown ("Brown") is an individual residing in New Hampshire. Personal jurisdiction is appropriate over this Defendant because he is a principal and control person of Defendant E&W and maintained substantial business ties and associations in Utah, including substantial on-going communication and business with principals of Rockwell and Noah.

85.     Defendant Mary O'Toole ("O'Toole") is an individual residing in New Hampshire.  Personal jurisdiction is appropriate over this Defendant because she is a principal of E&W and O'Toole Enterprises and her activities for each included substantial business ties and associations in Utah, including substantial on-going communication and business with Rockwell and Noah and the receipt of money from Utah in connection with transactions that closed in Utah.  Defendants E&W, O'Toole Enterprises, Hamrick, Brown and O'Toole are referred to herein as the "E&W Defendants."

86.     Defendant Belle Isle Enterprises, LLC dba 1031 Placement ("Belle Isle") is a Florida limited liability company with its principal place of business in Florida.  Plaintiffs have entered a settlement agreement with this defendant, pursuant to which claims against this defendant have been dismissed with prejudice.  Allegations regarding this defendant are included in this Amended Complaint only as a basis for the assertion of claims against the remaining defendants.

87.     Defendant Results Real Estate Partners, L.L.C. ("Results Real Estate") is a Florida Limited Liability Company with its principal place of business in Florida.  Plaintiffs have entered a settlement agreement with this defendant, pursuant to which claims against this defendant have been dismissed with prejudice.  Allegations regarding this defendant are included in this Amended Complaint only as a basis for the assertion of claims against the remaining defendants.

88.     Defendant Greg DeSalvo ("DeSalvo") is an individual residing in Florida. Plaintiffs have entered a settlement agreement with this defendant, pursuant to which claims against this defendant have been dismissed with prejudice.  Allegations regarding this defendant are included in this Amended Complaint only as a basis for the assertion of claims against the remaining defendants.

89.     Defendant TM 1031 Exchange Inc. ("TM 1031") is a California corporation with its principal place of business in California.  Personal jurisdiction is appropriate over this defendant because it conducted substantial business in Utah and the claims alleged herein arose from Defendants' acts directed toward Utah, including its contract with Rockwell related to the subject matter of the action.

90.     Defendant Tim Marshall ("Marshall") is an individual residing in California. Personal jurisdiction is appropriate over this Defendant because he is the principal and control person of Defendant TM 1031 and maintained substantial business ties and associations in Utah, including substantial on-going communication and business with principals of Rockwell and Noah.  Defendants TM 1031 and Marshall are referred to herein as the "Marshall Defendants."

91.     Defendant Eastern 1031 Starker Exchange, L.L.C. is a Pennsylvania limited liability company with its principal place of business in Pennsylvania.  Personal jurisdiction is appropriate over this defendant because it conducted substantial business in Utah and the claims alleged herein arose from Defendants' acts directed toward Utah, including its contract with Rockwell related to the subject matter of the action.

92.     Defendant Eastern 1031 Starker Exchange, LLP is a Pennsylvania limited liability general partnership with its principal place of business in Pennsylvania.  Personal jurisdiction is appropriate over this defendant because it conducted substantial business in Utah and the claims alleged herein arose from Defendants' acts directed toward Utah, including its contract with Rockwell related to the subject matter of the action.

93.     Defendant Connie Greenawalt ("Greenawalt") is an individual residing in Pennsylvania.  Personal jurisdiction is appropriate over this defendant because she is a principal and control person of Defendants Eastern 1031 Starker Exchange, L.L.C. and Eastern 1031 Starker Exchange, LLP and maintained substantial business ties and associations in Utah, including substantial on-going communication with principals of Rockwell and Noah. Defendants Eastern 1031 Starker Exchange, L.L.C.; Eastern 1031 Starker Exchange, LLP, and Greenawalt are referred to herein as the "Greenawalt Defendants."

94.     Defendant Investors 1031 Exchange, Inc. ("Investors 1031") is a California corporation with its principal place of business in California.  Personal jurisdiction is appropriate over this defendant because it conducted substantial business in Utah and the claims alleged herein arose from Defendants' acts directed toward Utah, including its contract with Rockwell related to the subject matter of the action.

95.     Defendant Thomas William ("Tommy") Hinson, III ("Hinson") is an individual residing in California.  Personal jurisdiction is appropriate over this Defendant because he is the principal and control person of Defendant Investors 1031 and maintained substantial business ties and associations in Utah, including substantial on-going communication and business with principals of Rockwell and Noah.  Defendants Investors 1031 and Hinson are referred to herein as the "Hinson Defendants."

96.     Defendants JOHN DOES 1 through 10 and ROE ENTITIES I through X are individuals and business entities the identity of which is not currently known to the Plaintiffs, but who contributed to the Plaintiffs' losses which are the subject of this Complaint.  Plaintiffs are actively investigating the matter and anticipate that these parties will be added when they are discovered.

## JURISDICTION AND VENUE

97.     Pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78aa, this Court has original subject matter jurisdiction over the claims alleged in this action arising under the laws of the United States, including specifically the Plaintiffs' claims asserted under 15 U.S.C. § 78j(b) (including S.E.C. Rule 10b-5 promulgated thereunder and codified at 17 C.F.R. §240.10b-5), 15 U.S.C. §78t(a), and 15 U.S.C. §77l.

98.     The Court has supplemental jurisdiction over the claims asserted herein under state law pursuant to 28 U.S.C. § 1367 because such claims are so related to the claims arising under the laws of the United States that they form part of the same case or controversy under Article III of the United States Constitution.

99.     Venue is appropriate in this forum pursuant to 28 U.S.C. § 1391 (b)(2) and 15 U.S.C. § 78aa.

## FACTUAL BACKGROUND

### A.     Noah Corporation.

100.     Defendant William "Bil" Bowser founded Noah Corporation in approximately 2003.

101.     In 2007, Noah opened its first events venue in Lindon, Utah.  It opened its second venue in South Jordan, Utah in 2009.

102.     Between 2009 and 2012, Noah opened three additional venues in Chandler, Arizona; Westminster, Colorado; and Irving, Texas.

103.     Through approximately 2012, Noah financed a substantial portion of its operations and development by the sale of stock.  Although Noah was operating five venues by 2012, the company was not profitable, had not returned any money to shareholders, and had little if any cash flow to finance any further expansion.  By any measure, the value of the entire Noah enterprise in 2012 was substantially less than the amount of invested capital Noah had received from sale of stock.

104.     By no later than 2013, the company began raising money by selling "Convertible Promissory Notes."  These notes had a stated interest rate and maturity date and provided for

monthly interest payments.  The notes were unsecured, but at the holder's option, could be converted to stock in Noah.

105.    Noah raised millions of dollars by the sale of Convertible Promissory Notes and became obligated to make substantial monthly interest payments to noteholders.

106.    Also, in 2013, Noah sought to sell and lease back its Chandler, Arizona venue as a way to raise money for operations.  Rockwell appeared as a prospective buyer, and ultimately purchased the venue, which it leased back to Noah.  In turn, Rockwell sold the Chandler, Arizona venue to TIC investors, who each purchased undivided fractional interests and became the landlords under the Lease.

107.    The sale of the Chandler, Arizona venue was the first transaction in what became the "Noah TIC Program."  Thereafter, Rockwell and Noah began aggressively marketing the Noah TIC Program not only for existing properties, but for new Noah locations as well.

108.    For each new project for the Noah TIC Program, Noah would identify and Rockwell, through a newly formed affiliate, would acquire land for development.  Noah would set a "Noah Price" for the project, based on a stated estimate of projected construction and development costs, although the stated estimate was typically more than $1.0 million greater than the actual amount estimated for completion of the project.  Rockwell would then resell the project to TIC investors based on a total price that was more than $1.0 million greater than the Noah Price (the "Rockwell Price").  Rockwell's principals often described the process as akin to purchasing a pizza and then selling it by the slice.  By 2017, the spread between the Noah Price and the Rockwell Price became so great that Rockwell and its network of upstream parties were receiving more than 20 percent of the total TIC purchase price as a commission, a fact that was never disclosed to investors.

109.   After closing, Rockwell would pay Noah the full Noah Price, which money was nominally intended for completion of construction of the relevant venue building.  Since the full Noah Price was substantially more than the actual cost of completion, however, Noah received not only sufficient funds to complete the new venue, but also a windfall of at least $1.0 to $2.5 million per project, which was never disclosed to the TIC investors.

110.  In approximately 2015, Rockwell and Noah began using the Construction TIC program to sell TIC interests in properties that were under construction, or in some cases, had not yet commenced construction.  Since most TIC investors were investing money from 1031 Exchanges, the Construction TIC program was designed to allow investors to purchase property still under construction without violating applicable laws and regulations.  To accomplish that purpose, the Construction TIC program was designed to include at least the following elements:

(a)   Rockwell would form a single-member LLC entity to serve as the property owner and developer of the TIC project.

(b)   Rockwell and Noah would identify and acquire land, Noah would set the Noah Price for the completed project, and Rockwell would set the Rockwell Price for the completed project.

(c)   Rockwell would sell the TIC interests to investors, most of which were 1031 investors.  All TIC investment money would be paid into escrow with First American.

(d)   Noah and the Noah Affiliate Parties would provide all construction services to construct the venue on the property.

(e)   To ensure compliance with rules requiring 1031 money to be invested in a replacement property within a 180-day period, money from 1031 investors would be placed at

the front of the escrow queue and disbursed from escrow to pay for the acquisition of the land and the earliest completed construction.

(f)     Non-1031 investment money would be held in the back of the escrow queue behind the 1031 money and would be disbursed to pay for the later stages of construction.

(g)     The money disbursed from escrow would always be used to pay for construction that was already completed, and thus, construction would be completed before the escrowed TIC investment money was fully disbursed.

(h)     Holding the non-1031 investment money at the back of the queue would maximize the chance of using the 1031 Exchange money to pay for completed work within the 180-day period allowed to complete a valid 1031 Exchange.

111.     Rockwell, the Upstream Parties, First American, and the Noah Affiliate Parties were all familiar with the rules requiring 1031 Exchange money to be invested in a completed replacement property within 180 days.  These parties were also familiar with Rockwell's unique Construction TIC program, and its requirement that all TIC investment money be held in escrow, with 1031 Exchange money being used first to pay for land acquisition and construction, and non-1031 money being disbursed later.  The individual Rockwell Parties, Scott Rutherford, John Hamrick, Kirsten Parkin, and others affirmatively represented to Plaintiffs and others that the Construction TIC program ensured that their investment would be used to complete construction on their Noah TIC Properties and that the Construction TIC program would meet all applicable requirements for a valid 1031 exchange.

112.     Unfortunately, during the period of Plaintiffs' TIC investments, Rockwell, Noah, First American and all other Defendants ignored the requirements of the Construction TIC program.  Investment money—including proceeds of the Plaintiffs' 1031 Exchanges—was paid

into escrow with First American, but instead of reserving the escrow funds to pay for land acquisition and completed construction, the funds were paid to Rockwell shortly after closing. Not only did this failure expose Plaintiffs to risk that their money would be stolen, but it also meant that their 1031 Exchanges did not comply with applicable rules and were likely invalid.

113. Pressured by Noah's ever-worsening financial circumstances, Bowser began diverting money received through the Construction TIC program to purposes other than completing the relevant project. He used the money to pay interest payments to prior noteholders, to pay rent payments to prior TIC investors, to pay the general operating expenses of Noah, including his own salary and the salary of several family members, and to pay his own personal expenses. By 2017, the situation reached a crisis, as Noah had no money to build the venues that Rockwell had already sold in the Construction TIC program.

114. In February of 2017, Rockwell attempted to bail out Noah by loaning $6.0 million "for the sole purpose of acquiring, developing and/or constructing commercial properties." At Noah's request, Rockwell also paid past-due property taxes on at least two Noah TIC Properties that Noah was unable to pay.

115. At some point in approximately 2017, Noah also began a new program of borrowing money from investors, typically individuals or family entities, on unsecured notes, ostensibly for the purpose of extending credit to brides to finance the cost of the Noah wedding venue (the "Bride Credit Program"). Noah did not finance any brides, however, because Bowser also diverted substantially all of the millions raised through the Bride Credit Program to the payment of prior investors, operating expenses, and his personal expenses.

116. No later than February of 2017, Noah was operating as a Ponzi scheme, based on the following characteristics:

24

(a)     Noah's operations consistently failed to generate enough revenue to cover its on-going expenses, including interest and rent payments to prior investors.

(b)     Noah depended upon and used money raised from new investors—including, specifically, new investors in the Noah TIC Program and the Bride Credit Program—to pay obligations to prior investors, including interest payments to noteholders and rent payments to TIC owners.

(c)     New investment money from the Noah TIC Program and the Bride Credit Program was comingled with revenue from operations such that investment money earmarked for a particular purpose could not be identified or traced.

(d)     Noah did not maintain financial controls that would restrict or alert management to the misuse of invested funds.

(e)     Noah's finances were controlled by Bowser and a very small group of individuals who did not permit audit or review and who had unfettered control of company funds with little or no oversight.

(f)     Rather than making a full and fair financial disclosure, Noah, Rockwell, and all those selling the Noah TIC Program touted Noah's track record of making payments, promised an above-market rate of return, and perpetuated the illusion that the investment was safe because of the underlying real estate.

**B.     Rockwell and the Construction TIC Program.**

117.     Rockwell TIC, Inc. was incorporated in 2006, with the following directors:  Joel Hinckley, Brian Taylor, Paula Peterson, Ashby, and Beynon.  In 2007, Ashby was designated as President of the company, and Nelson was added as a director.

118.   Rockwell Debt Free Properties, Inc. was founded in 2009 as Investment Property Solutions, Inc. and changed its name to Rockwell Debt Free Properties, Inc. in December of 2009.  The original directors of Rockwell Debt Free Properties Inc. were Ashby, Rutherford Family Living Trust (Scott Rutherford), Nelson, Brian Taylor, and Beynon.

119.   The relationship between Rockwell Debt Free Properties, Inc. and Rockwell TIC, Inc. is uncertain, and the entities were not distinctly identified to Plaintiffs.  As set forth above, these entities, together with their affiliates, are referred to herein collectively as "Rockwell."

120.   Prior to 2013, Rockwell engaged in a business of selling TIC interests in property. Rockwell was the architect of the Construction TIC program used to sell Noah TIC Properties, and during the time relevant to this Complaint, a substantial amount of Rockwell's business depended on selling Noah TIC Properties to investors using funds from 1031 Exchanges.

121.   In 2013, Rockwell purchased Noah's Chandler, Arizona venue, and in turn sold it to TIC investors.  From that time forward Rockwell actively participated in marketing and executing Noah's TIC Program.  By 2015, Rockwell was actively using the Construction TIC program to sell Noah TIC Properties.

122.   Rockwell was the primary seller of the TIC interests in the Unbuilt Properties which are the subject of this Complaint.

**C.**   **The Upstream Parties.**

123.   Rockwell's primary source of business was referrals from persons providing services to individual investors, particularly in connection with 1031 Exchanges.  These service providers included at least real estate agents, financial planners, attorneys, and 1031 Exchange specialists.

124.     In some cases, these service providers merely referred people to Rockwell without receiving any consideration and without any significant knowledge of Rockwell's operations or its relationship with Noah.  These service providers are not named in this Complaint.

125.     In other cases, service providers referred people to Rockwell based on a significant on-going business relationship and in exchange for substantial consideration.  These persons are referred to herein as the "Upstream Parties," and include the following: the E&W Defendants, the DeSalvo Defendants, the Marshall Defendants, the Greenawalt Defendants, and the Hinson Defendants.

126.     The Upstream Parties received substantial compensation for their participation in the sale of TIC interests through Rockwell, as follows:

(a)     The E&W Defendants received over $3.5 million from 2015 through 2018, including approximately $486,641.00 from sales of TIC interests in the Unbuilt Properties to Plaintiffs.

(b)     The Marshall Defendants received over $2.3 million from 2015 through 2018, including approximately $304,561.00 from sales of TIC interests in the Unbuilt Properties to Plaintiffs.

(c)     The Greenawalt Defendants received over $375,000.00 from 2015 through 2018, including approximately $25,420.00 from sales of TIC interests in the Unbuilt Properties to Plaintiffs.

(d)     The Hinson Defendants received over $101,000.00 from 2015 through 2018, including approximately $16,701.00 from sales of TIC interests in the Unbuilt Properties to Plaintiffs.

D.   **First American Title Insurance Company.**

127.   First American is one of the oldest and largest title companies in the United States and conducts business in Utah from, among other places, its office in Salt Lake City, Utah. Rockwell selected and used First American and its agent, Parkin, to close the purchase and sale of TIC interests in Noah TIC Properties.  First American and Parkin participated in Rockwell's acquisition of approximately 40 properties and hundreds of sales of TIC interests to investors. Through its long and close relationship with Rockwell and Noah, First American and Parkin were familiar with Rockwell's Construction TIC program and all aspects of Rockwell's business of selling TIC interests in Noah TIC Properties.  First American and Parkin also knew that Noah had failed to meet obligations to pay property taxes on other Noah TIC Properties.

128.   For each Noah TIC Property, First American issued a policy of title insurance to Rockwell when Rockwell acquired the property.  After TIC Investors closed their purchase, First American issued an endorsement of the policy, although TIC Investors did not sign the endorsement, did not see the policy, did not pay for the endorsement, and did not receive the endorsement until after the closing.

129.   First American and Parkin also served as escrow agent for each sale of TIC interest.  Each TIC buyer paid the purchase price for their TIC interest to First American, and the funds were deposited into an escrow account controlled by First American and Parkin.

130.   Consistent with the laws of Utah and most other states and based on standard practices in the title/escrow business, on First American's internal policies and procedures, and on Parkin's specific understanding acknowledged to third parties, First American and Parkin were obligated to handle the escrow account consistent with a fiduciary duty to the parties to the escrow, including Plaintiffs, and consistent with the agreement between the parties to the escrow.

28

First American was obligated to safeguard and preserve the escrow money for the mutual benefit of the parties, and not to disburse the funds from escrow except as authorized by the express agreement of all parties to the escrow, including Plaintiffs.

131.    At the time First American closed Plaintiffs' purchase of TIC interests in the Unbuilt Properties, First American and Parkin were familiar with all of the documents involved in the purchase and sale of the TIC interests in the Unbuilt Properties, including the purchase agreements between Plaintiffs and Rockwell.  First American and Parkin were also aware of rules relating to 1031 Exchanges and particularly rules requiring that 1031 Exchange funds be used to purchase completed property within 180 days.  First American and Parkin were also aware of Rockwell's Construction TIC program and Rockwell's use of the Construction TIC to comply with rules applicable to 1031 Exchanges.  First American and Parkin were also aware that the Unbuilt Properties were unbuilt at the time of the Plaintiffs' investment, having closed Rockwell's acquisition of the raw land shortly prior to the TIC transactions.  First American and Parkin were also aware that the purchase price that Plaintiffs paid was based on a completed event venue project.  And First American and Parkin also knew and understood that the funds that Plaintiffs paid into escrow were intended to be used to complete the event venue project.

132.    Plaintiffs did not expressly authorize First American to disburse the escrow money to Rockwell without regard to the completion of any amount of construction at the Unbuilt Properties.

<u>**MISREPRESENTATIONS AND OMISSIONS**</u>

133.    Plaintiffs purchased their TIC interests based on misrepresentations and omissions made by Rockwell and the Upstream Parties, including but not limited to the following:

A.   **Misrepresentations to all Plaintiffs.**

134.   Rockwell and Noah created and provided to Plaintiffs and other potential TIC investors written marketing materials for the Noah TIC program, including materials in electronic form.  The marketing materials included a brochure with the heading, "Noah's," with sections titled "Executive Summary," "Property Description," and "Lease Profile."

135.   Rockwell also provided a property-specific summary, including a description of each property, a summary of property information and lease information, and a table of average returns based on the given total purchase price.  The brochure and the property-specific summaries are referred to herein as the "Marketing Materials."

136.   Rockwell developed the Marketing Materials with input from Bowser and Winkle, and Bowser and Winkle were aware of and approved, either expressly or tacitly, all of the content of the Marketing Materials.

137.   Hamrick, Brown, Marshall, Greenawalt, and Hinson reviewed and were aware of the information contained in the Marketing Materials.  Marshall used the Marketing Materials, among other things, to develop and distribute his own rating of the relevant investments. Hamrick, Brown, Marshall, Greenawalt, and Hinson distributed the Marketing Materials to each Plaintiff with whom they had contact by means including but not limited to contacting Rockwell to provide the materials, emailing the materials, or directing Plaintiffs to the materials through the Rockwell website.

138.   The Marketing Materials misrepresented that the TIC interests were not "securities" and that the TIC interest were not subject to federal or state laws regulating the sale of securities.  With respect to this misrepresentation, Plaintiffs allege as follows:

(a)     The representation is false, because the TIC interests are securities under federal law and under the laws of almost all of the states in which the interests were sold.

(b)     The representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including specifically, information concerning the requirements for Defendants' compliance with the law.

139.    The Marketing Materials misrepresented that Noah was a profitable business and would be a stable, reliable tenant for the TIC owners.  In particular, the Marketing Materials represented that Noah had "demonstrated [the] ability to examine and modify [its] business to achieve maximum profitability," and that "Noah's anticipates revenues to well exceed the debt service and operating cost with their breakeven well below their currently operating occupancy levels."  The Marketing Materials further stated that "operations at this facility are very recession-resistant," and that Noah was "poised to execute an innovative business model that is meeting a previously underserved need and is ideally positioned for sustainable success at this location now and in the future."  With respect to these misrepresentations, Plaintiffs allege as follows:

(a)     These representations were false, because Noah was hopelessly insolvent, in substantial financial distress, unable to generate a profit, and operating as a Ponzi scheme. Moreover, at the time of the sales to Plaintiffs, no Defendant had reliable financial information from Noah supporting the statements made in the Marketing Materials.

(b)     The representations concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including specifically, information concerning Noah's ability to perform under the Lease.

140.   The Marketing Materials misrepresented that Noah would pay taxes and all triple-net expenses on the Noah venues.  With respect to this misrepresentation, Plaintiffs allege as follows:

(a)   This representation was false, because Noah had historically failed to pay property taxes on TIC properties and was financially unable to make current property tax payments in 2017 and 2018.

(b)   The representation concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including specifically, information concerning Noah's ability to meet its obligations under the lease.

141.   The Marketing Materials misrepresented that the venue was completed or very close to completion by including pictures of finished building without indicating that they were not pictures of the subject property, and by describing the building in detail and in present tense as if it were completed.  With respect to this misrepresentation, Plaintiffs allege as follows:

(a)   This representation was false, because the buildings were not built or even under construction, and construction was not assured, since Noah had and was continuing to divert money intended for construction to other purposes, including the payment of interest payments to noteholders and rent payments to prior TIC owners.

(b)   The representations concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including specifically, the assurance that their investment would result in ownership of a building that could be used as an event venue.

142.   In addition to the Marketing Materials, the Defendants represented to all Plaintiffs that their money would be paid into escrow with First American title and disbursed only to

purchase an undivided interest in the property or to pay for the construction of improvements on the property on a reimbursement basis.  With respect to this misrepresentation, the Plaintiffs allege as follows:

(a)     This representation was false, as Defendants regular and on-going practice was to disburse funds to the control of Rockwell and ultimately Noah without regard to the use for which the funds were intended.

(b)     The representations concerned an issue of material fact, in that it altered the mix of information available to Plaintiffs in making their investment decisions, including specifically, information concerning the safety of the invested funds and regarding the risk that Defendants would fail to build a building on the designated property.

       **B.**    **<u>Misrepresentations to the Jacksonville, Florida Plaintiffs</u>.**

143.     In addition to the above misrepresentations, the Defendants made misrepresentations to specific Plaintiffs in connection with the sale of TIC interests which are too numerous to fully describe in this Complaint and which are the subject of Plaintiffs' continuing investigation.  Such misrepresentations to the Jacksonville, Florida Plaintiffs include at least the following:

<u>Chris Fucci</u>

144.     In or around the summer of 2018, Hamrick of E&W represented to Fucci he could provide a unique opportunity to invest in the Noah TIC Program through Rockwell.

145.     Shortly thereafter, Hamrick and Fucci flew to Dallas to meet with Defendant Bowser and to inspect existing Noah properties.  During the visit, Hamrick and Bowser represented that an investment in a Noah TIC would be a safe investment that would provide a

good return, that Noah had never missed a payment, and that Noah provided a corporate

guaranty of at least a 7% return on the investment.

146.    Hamrick and Bowser further represented that Noah's business was healthy and

growing.

147.    Hamrick and Bowser further represented that Fucci's investment would be in a

similar property in Jacksonville, Florida.

148.    Bowser represented that Noah had outfitted a facility to pre-build walls and other

framing segments of the buildings, which was false.

Ambleside Park, Inc.

149.    In the early spring of 2018, Hamrick of E&W represented to Michael Roberts of

Ambleside Park, Inc. that Rockwell was a good company and that an investment in a Noah TIC

property would be a good investment.  He assured them that Noah's had faithfully paid all of its

rents, that the property was fully funded, and that time was of the essence because the investment

was filling up fast.

150.    Around that same time, Ashby of Rockwell represented to Roberts that the

Jacksonville property was not yet built but would be built immediately and that the money would

not be distributed until construction was done.  Hamrick represented to Roberts that the monies

would be held in an escrow account, and Noah would make requests for the money to reimburse

construction expenses.  Hamrick represented that by using this process, Noah would not have to

get a construction loan, which would keep the costs of the building down.

151.    Roberts expressed concerns that the transaction would not qualify as a 1031

exchange because there was no building, but Hamrick assured him that they had done many of

these transactions and that they all qualified.  Hamrick explained that the system Rockwell and Noah used would satisfy the requirement of purchasing completed property within 180 days.

152.    Around that same time, Ashby and Hamrick represented to Roberts that Hamrick was to receive a flat fee of $2,000 for the paperwork, and that Hamrick and Rockwell would split a commission on the sale of 1%-2%.

153.    Ashby and Hamrick further represented to Roberts that they had confidence in the investment, that the investment would be solid and profitable, and that Noah had a solid reputation and that its business was flourishing and growing.  Ashby and Hamrick indicated that they had both invested with Noah.

Richard and Susan Harder Trust

154.    In the spring of 2018, Richard Harder and Susan Harder of the Richard and Susan Harder Trust had conversations with agents of Rockwell including primarily Ashby and, to a lesser extent, Nelson about investing in a 1031 Exchange.  In these conversations, Ashby represented that the investment in a Noah TIC property would be safe because it was debt free. He further represented that the investment would provide a reliable return and that Noah would take care of taxes, insurance, and maintenance.  Ashby and Nelson also represented that in the event of a default by Noah, the TIC owners would own a valuable building, thus minimizing the investment risk.

155.    During the same time-period, Ashby and Nelson represented that the building was under construction and would be completed within the 180-day requirement for a 1031 Exchange.  They further stated that all rents would be paid during the construction period beginning at closing, and that Noah had abundant cash reserves.

Nina D. Johannessen Living Trust

156.     In the first half of 2018, Hamrick of E&W represented to Nina Johannessen of the Nina D. Johannessen Living Trust that Rockwell was a good company and that an investment in a Noah TIC property would be a good investment.  He assured Johannessen that Noah's had faithfully paid all of its rents for many years and that the investment was safe and suitable for her.

157.     Hamrick represented that construction on the Jacksonville, Florida project was underway and that it would be completed in January of 2019.  Hamrick further represented that the Construction TIC would be completed within 180 days in a manner that would qualify as a 1031 Exchange.

158.     Upon Johannessen's request for financial statements for Noah, Hamrick represented that financial statements could not be provided, because Noah was a private company, but that he had seen the financial statements and that they were fantastic, and that Noah had plenty of cash and no debt.  He also represented that the investment was safe, that Noah was going to be the "Home Depot of event venues," and that in a worst-case scenario, the investment would give her an ownership share in a new and beautiful building and a valuable piece of land.

159.     Hamrick further represented to Johannessen that his fee would include a $1,000.00 base fee for the 1031 exchange, plus a $750.00 fee for the first Noah transaction and $350.00 per transaction after that.  Hamrick did not disclose that he would also be earning a substantial commission on the transaction from Rockwell.

The Spiritus Revocable Trust

160.     In approximately May of 2017, The Spiritus Revocable Trust purchased a TIC interest in a Noah property located in Oklahoma City, Oklahoma.  From the time of closing

through early 2019, the Spiritus Revocable Trust received rent payments on that property, which created a perception that the investment was performing and the business at the property was successful.

161.    In connection with the Oklahoma City, Oklahoma investment and again in early 2018, Marshall of TM 1031 Exchange represented to Eugene Spiritus of The Spiritus Revocable Trust that an investment in Noah TIC properties would be safe and profitable.  He represented that Noah's business was successful and growing and that Noah had never missed a rent payment to any TIC Owner.

162.    In early 2018, Marshall further represented that the Jacksonville, Florida property was then under construction and that it would be finished by the end of 2018 and that reservations were already being made for the property.

163.    During the same period, Nelson of Rockwell represented to Spiritus that the building at the Jacksonville, Florida location was under construction.  He represented that rent would be paid from the closing date because there were reservations being made at the property. He further represented that the Jacksonville, Florida property was a prime and coveted location.

164.    During the same period in 2018, Marshall represented that an investment with Rockwell guaranteed a 7% return that would go up an additional .2% each year.

165.    Upon Spiritus's request for financial statements, Nelson of Rockwell represented that he would provide financial statements for Noah but did not do so.  He did assure Spiritus that Noah was a successful and growing company.

166.    In December 2018, Spiritus contacted Scott Lefevre, the property manager, and asked about the status of construction.  Lefevre said that he did not know what the status was, although construction had obviously not yet begun.

The Addamo 12/9/04 Family Trust

167.     In 2018, Tommy Hinson of Investors 1031 Exchange, Inc. referred Barney and

Josie Addamo of the Addamo 12/8/04 Family Trust to Rockwell and specifically to an

investment in a Noah TIC property in connection with a 1031 Exchange.

168.     At that time, Hinson encouraged Barney and Josie Addamo to invest in the Noah

TIC Property at Jacksonville, Florida.  He represented that the building at the Noah Property

located at Jacksonville, Florida Noah was under construction and would be completed with

investor money.  He told them that all investments made were going to be held in escrow to be

used for the construction, and that First American Title Company would disburse the funds from

escrow to pay for construction when it was completed.

169.     Hinson further represented to the Addamos that the investment would be safe and

would provide dependable income.  He represented that they would not have to do anything, but

that they would collect 7% to 8% in the first year and an increasing amount every year thereafter.

170.     During the same time-period, Nelson of Rockwell represented to the Addamos

that the investment would be safe and reliable because the Jacksonville, Florida property would

be debt free.  He further represented that Noah was a successful and growing business and had an

excellent track record making rent payments.

Ross R. and Linda M. Greco

171.     In approximately the early spring of 2018, Ashby and Nelson from Rockwell

solicited Ross Greco to invest in the Jacksonville Property.  Ashby and Nelson represented that

the Jacksonville, Florida investment was filling up fast and that the Grecos should not miss this

opportunity.

172.     Ashby and Nelson further represented that the building at the Jacksonville, Florida property would be finished in early 2019.  They represented that all of the investment money of the TIC investors would be used to pay the construction costs.

173.     Nelson further represented that the investment would be safe and reliable.  He represented that Noah was a successful, thriving business and that it had never missed a rent payment.  Nelson further told the Grecos that all they needed to do was collect their rent check every month.

### E&H Jackson, LLC

174.     In the Spring of 2018, Marshall of TM 1031 Exchange referred Emilia Bonder of E&H Jackson, LLC to Rockwell.

175.     Marshall represented to Bonder that investment in a Rockwell property would be a safe, suitable investment, and directed her to Rutherford of Rockwell.

176.     During this same period, Rutherford represented to Bonder that an investment in a Noah TIC Property would be a safe.  He stated that Noah had never missed a payment and said that Noah was a successful and growing business.

177.     Rutherford told Bondar that the building at the Jacksonville, Florida property was currently under construction and that all funds from the investment would go to completing the building.  Rutherford spoke about the status of construction in a manner that lead her to believe that it was approximately 70 to 80 percent completed.

### The G. Scott Coleman Trust

178.     David Cracroft of Lincoln Financial Securities Corp. referred Scott Coleman of the G. Scott Coleman Trust to Rockwell, representing that Rockwell would provide a good safe place to invest inheritance money that would provide a good return.

179.    Nelson at Rockwell represented to Scott Coleman that a TIC investment with Rockwell would be a solid, dependable investment that would generate reliable income.

180.    Nelson also represented that Noah was a successful business and would be a good, solid tenant.  He represented that Noah had never missed a rent payment, was expanding its business, and was doing great things.

Anson V. and Genevieve C. Smith

181.    In approximately spring of 2018, Brown of E&W represented to Anson and Genevieve Smith that Noah had a property available in Jacksonville, Florida that would be a great opportunity for a 1031 Exchange.

182.     After the Smiths visited the site, Brown represented to Anson and Genevieve Smith that construction was to be completed before the end of the year, and that there would be bookings by the first quarter of 2019.

183.    Brown also represented that the investment was safe and would provide reliable income because it was a valuable property and the lease was guaranteed by a corporation, specifically, Noah.  Brown represented that Noah was a successful, growing business and that it had never missed a rent payment.

Liem Quang Le

184.    In the Spring of 2018, Marshall of TM 1031 Exchange referred Liem Quang Le to Rockwell.

185.    During the same time-period, Rutherford of Rockwell contacted Le and solicited his investment in a TIC interest in the Jacksonville, Florida property.   Rutherford represented to Le that an investment in a Noah TIC Property was safe because the property would be debt free

as it had already sold out to investors.  He represented that Noah had not missed a payment for at least 10 years, and that Noah was a good, successful business.

186.     Mr. Rutherford also told Le that all funds would be safe in escrow and would only be distributed on the Jacksonville, Florida project for construction.

187.     In response to Le's inquiry, Rutherford represented to Le that there was no relationship between Rockwell and Noah, except that Noah was an excellent tenant.

188.     Rutherford further represented to Le that the investment was particularly safe because in the worst-case scenario, Le would have an interest in a beautiful, valuable building.

**C.     Misrepresentations to the Independence, Ohio Plaintiffs.**

189.     Specific misrepresentations to the Independence, Ohio Plaintiffs include at least the following:

Bromberg Trust

190.     In the fall of 2018, Rutherford of Rockwell contacted Bernard Bromberg of the Bromberg Trust based on a referral from Marshall at TM 1031 Exchange.  He represented that Rockwell would be a perfect investment because it would provide reliable passive income.  He represented that the investment had a perfect track record and would be safe and dependable.

191.     After Bromberg had a few telephone conversations with Rutherford, Marshall began contacting Bromberg to ask about the status of the investment.  He vouched for Rutherford and Rockwell and represented that the investment would be safe and secure and would provide dependable income.

192.     Rutherford and Marshall both represented that the investment would provide a guaranteed 7% return on investment, plus an additional .2% each year.

193.     Defendant Bowser of Noah spoke to Bromberg about the construction of the building and informed him that Noah had identified a new contractor that would be less expensive, but that there may be a delay based on a new liquor law.  He assured Bromberg that there was nothing to worry about and that the building would be completed shortly.

Gary Neil

194.     In the summer of 2018, the Pomerleau Real Estate Agency referred Gary Neil to E&W in connection with a 1031 Exchange.

195.     Shortly thereafter, Neil met with Brown of E&W in Stowe, Vermont.  At that meeting, Brown recommended three different investments, all through Rockwell, but stated that only an investment in a Noah TIC Property was available at that time.  Brown provided the Noah brochure to Neil and represented that an investment in a Noah TIC Property would be among the most reliable investments available.  He emphasized that all that Neil would have to do is go to the mailbox every month to pick up the check.

196.     Brown further represented to Neil that Noah was a strong and successful business that had a long history of success over a decade.  He represented that Noah had always paid rents to investors on time.  He represented that Noah's event venue business would soon be well-known nationwide, similar to Home Depot.

197.     Brown later met with Neil at a Massachusetts Noah TIC Property, where Neil toured the building.  Brown represented that bookings were always very strong at Noah properties and that Noah's business would be recession-resistant because people will always be getting married and businesses will always need venues to meet.  He also represented that the investment was backed by value and was safe because of the value of the building.

198.    Brown represented that Neil's investment would be in a completed building, or if that was sold out, it would be in a property that would be completed within four months.  He represented that the buildings were modular and could be assembled and completed very quickly.  He also stated that Neil's investment money would be escrowed and handled in strict compliance with rules for 1031 Exchanges.  He also represented that rent payments would begin upon closing but did not state that initial rent payments would be made from investment money paid to Rockwell.

Amfil Realty, LLC

199.    In the late summer of 2018, Ashby of Rockwell represented to Andrew Lippman of Amfil Realty, LLC that an investment in a Noah TIC property would be safe, primarily because it was debt free.  He further represented that the investment would provide a reliable return and that Noah would take care of taxes, insurance, and maintenance.  He further represented that in the event of a default by Noah, the TIC owners would own a valuable building, thus minimizing the investment risk.

200.    In the same conversations, Ashby and Nelson of Rockwell did not immediately acknowledge that the building at the Independence, Ohio property was not yet constructed.  On further questioning, however, they represented that the building was under construction and would be completed in just a few months.  They further stated that the timeline of construction did not matter because rents would be paid during the construction period beginning at closing, although they omitted to state that the initial rent payments would be made directly from TIC investment money paid to Rockwell.

The W. Mark McKoy Irrevocable Trust of 2012

201.    In approximately the fall of 2018, Hamrick of E&W represented to W. Mark McKoy and Cynthia Chester McKoy that Rockwell was a good company and that an investment in a Noah TIC property would be a good investment.  He assured them that Noah's had faithfully paid all of its rents for twelve years.

202.    Also, in approximately the fall of 2018, Ashby represented to the McKoys that although the Independence, Ohio building was not yet built, it would be built immediately because there was excess demand on the nearby Mentor, Ohio property.

203.    During the same time-period, Ashby also represented that an investment in a Noah TIC property would be a very safe investment that would provide a good and reliable return.

204.    During the same time-period, Ashby also represented that Noah operated a great business, and that its business was recession-proof, and that it had remained profitable through downturns in the economy before.  He further represented that Noah's business had been very good in the Midwest and that there was immediate demand for the Independence, Ohio building.

BP412, LLC

205.    In approximately July and August of 2018, DeSalvo of Belle Isle referred Richard Vollhardt of BP412, LLC to Rockwell.  DeSalvo represented that Rockwell had excellent investments opportunities with Noah, but that investors need to act quickly as the Noah properties sold out quickly.  He represented that the Noah TIC investment would be safe and suitable for BP412, LLC because it would be debt free and would be guaranteed.

206.     Shortly thereafter, Nelson of Rockwell contacted Vollhardt and represented that Noah's Independence, Ohio TIC property would be debt free and would be an excellent and safe investment.

207.     After Vollhardt visited a different Noah property, DeSalvo and Nelson represented to him that the Independence, Ohio property would be a similar property and that the building would be constructed with the funds raised by the investors.

Thomas Tarbet

208.     In approximately July and August of 2018, Thomas Tarbet had conversations with agents of Rockwell including primarily Ashby and, to a lesser extent, Nelson.  In these conversations, Ashby represented that the investment in a Noah TIC property would be safe because it was debt free.  He further represented that the investment would provide a reliable return and that Noah would take care of taxes, insurance, and maintenance.  Ashby and Nelson also represented that in the event of a default by Noah, the TIC owners would own a valuable building, thus minimizing the investment risk.

209.     In the same conversations, Ashby and Nelson did not immediately acknowledge that the building at the Independence, Ohio property was not yet constructed.  On questioning, however, they represented that the building was under construction and would be completed in March or April of 2019, but that rents would be paid during the construction period beginning at closing.

210.     In response to Thomas Tarbet's questions about increases in the price of the building in the same conversations, Ashby and Nelson represented that the building would have significant value and that its value was determined primarily from the terms of the lease with Noah.

45

211.   During the same period, Thomas Tarbet specifically asked about the financial capacity of Noah.  In response, Ashby represented that Noah was growing, profitable, solid, and stable, and that it had a long track record of success in its business.

Joseph and Grace Zambito Family Trust

212.   In approximately September and October of 2018, Rutherford represented to Louis Zambito, a trustee of the Joseph and Grace Zambito Family Trust, that Noah had not defaulted in many years of doing business, and would reliably pay rent to equal a seven percent return on investment.

Maxon-Multiline, LLC/Timothy and Prudence Maxon.

213.   In January of 2018, Pamela Henley of All Florida Tax & Accounting referred Tim and Prue Maxon and Maxon-Multiline, LLC to DeSalvo of Belle Isle.

214.   In August of 2018, Tim and Prue Maxon were in the process of selling certain real property and contacted DeSalvo in connection with a possible 1031 Exchange.  DeSalvo recommended an investment opportunity in a Noah TIC Property through Rockwell.

215.   DeSalvo handled all of the interactions between the Maxons and Rockwell and controlled the information that was provided to the Maxons regarding the investment.  He discouraged the Maxons from contacting Rockwell directly.

216.   DeSalvo represented to the Maxons that an investment in a Noah TIC Property would be a suitable, solid investment that would serve their purposes of providing reliable income at a favorable rate.

217.   DeSalvo also represented that Noah's business was doing well, was growing, and was profitable, and that Noah had an excellent track record and had never missed a rent payment.

218.     The Maxons visited a different Noah facility in Lake Mary, Florida, and were told that a very well-known lawyer in the area had purchased a large interest in the Lake Mary, Florida property.

219.     The Maxons asked DeSalvo for Noah's financial statements, but DeSalvo provided them only with the Rockwell sale brochure for the Toledo, Ohio TIC Property. DeSalvo represented to them that he could not provide the financial statements, but that Noah was a successful and growing business that would be an excellent tenant. He promised that financial statements would be available after they invested.

220.     DeSalvo represented that the Independence, Ohio property was not built, but that it was underway and that it would be completed within 180 days of their investment because Noah was anxious to have the building open to meet demand.

221.     DeSalvo specifically represented that Rockwell was financially responsible for the cash outlay for construction and everything through completion of the buildings. He represented that First American would hold the investment funds paid at closing pending completion of the building, and that Noah would pay rent to the TIC owners during construction.

222.     DeSalvo further represented that in order to hold an interest in the Independence, Ohio property for the Maxons to acquire in their 1031 Exchange upon the sale of their real estate, they would need to purchase a $150,000.00 interest immediately, which they did in the name of Maxon-Multiline, LLC. They were told that when the 1031 Exchange closed, they would be able to sell their initial interest and move the 1031 Exchange interest into the LLC. The Maxons were unable to sell the initial interest or transfer the 1031 Exchange interest because their deeds were not properly and timely recorded before Noah collapsed.

<u>The Tierney Revocable Living Trust</u>

223.    In approximately summer of 2018, Steve Lipkin of Hickok & Boardman Realty referred Linda and Martin Tierney of the Tierney Revocable Living Trust to Chris Brown at E&W in connection with a 1031 Exchange.  Brown told the Tierneys that a tenant-in-common investment would be appropriate for their 1031 Exchange.

224.    Brown told the Tierneys that an investment in Fresenius dialysis centers was not available and encouraged them to invest in a Noah TIC Property.  He said that an investment in a Noah TIC Property would be safe, and that all the Tierneys would need to do was go to the mailbox and start collecting checks, because the investments were guaranteed.

225.    Brown further represented to the Tierneys that E&W would be compensated for their part in the transaction by a $2,000.00 total commission that would be paid out of closing.

226.    Very shortly prior to closing, the Tierneys received proposed closing documents and discovered for the first time that that they would be investing in the Independence, Ohio Property, that the building at the property was not yet built, and that the transaction would be a Construction TIC.  They had a telephone conversation with at least Hamrick or another agent of E&W, as well as Ashby and possibly Nelson of Rockwell.  In that conversation, Hamrick and Ashby acknowledged that the building was not completed, but insisted that this was not unusual, but was the way that things were done on Noah projects.  They further represented that the Tierneys would be protected because the lease was "corporate guaranteed," and Noah was doing very well.

227.    Hamrick and Ashby further represented that their TIC investment would be held in escrow and paid out on a draw-down disbursement basis as construction was completed.

Ashby stressed that this was the common practice for a Construction TIC and represented that the contractor was dependable and had been involved in building more than 40 Noah properties.

### The Real Mint, LLC

228.   In the fall of 2016, Marshall of TM1031 Exchange referred MaryAnn Holda of the Real Mint, LLC to Rockwell in connection with a possible 1031 Exchange.

229.   Shortly thereafter, Rutherford of Rockwell contacted Holda and represented that an investment with Rockwell would be an ideal solution for investors seeking a conservative, low-risk, dependable, passive real estate investment, due to the character and quality of the properties and tenants.  He represented that Rockwell's investments would preserve wealth and provide the highest rate of return tied to a 100% flawless record of long-term security.

230.   Rutherford later referred Holda to Patrick Wolf of Rockwell.  In the Fall of 2018, Wolf reiterated all of Rutherford's representations with respect to Rockwell investments and specifically a contemplated investment in Noah TIC Properties.  He provided her with Rockwell's brochures and represented that an investment in a Noah TIC Property would be a high-quality investment that would preserve wealth and also provide a high return.

231.   In October 2018, Ms. Holda visited the property.  Based on the appearance of the property and representations that construction would commence very shortly, Holda caused the Real Mint LLC to invest in the Independence, Ohio property.

### Gertraude Winkler

232.   In the late summer of 2018, Patrick Wolf referred Gertraude Winkler to Rockwell, recommending that Rockwell provided excellent investments opportunities in TIC properties that would guaranty at least a 7% return.

233.     Shortly thereafter, Nelson of Rockwell contacted Winkler and represented to her that Noah's Independence, Ohio TIC property and that it was a debt free property, that Noah was an excellent tenant, and that Rockwell guaranteed payments.

Ryan V. and Alena C. Andreasen

234.     In the Summer of 2017, Ryan Andreasen spoke with Beynon and Ashby of Rockwell about investing in Noah TIC Properties and the possibility of doing a 1031 Exchange in the future.  In August of 2018, Andreasen contacted Beynon in anticipation of doing a 1031 Exchange of certain property.  Andreasen later spoke with Ashby of Rockwell concerning investment in a TIC Property in approximately September of 2018.

235.     In all of the conversations, but particularly in the 2018 conversations, Beynon and Ashby represented that investment in a Noah TIC Property would be a good option for Andreasen and would provide a safe, solid investment that would pay a reliable return.  Beynon indicated that his mother-in-law had invested $2.0 million in Noah TIC Properties.

236.     Ashby represented to Andreasen that Noah was a reliable and secure tenant, and that risks would be minimal because Noah ran its properties out of a single pot, which would ensure that rents would always be paid.  Ashby emphasized that Noah had never missed a payment and was a successful and profitable business.

237.     Throughout the discussions in 2018, Beynon and Ashby assured Andreasen that the Noah building at the Independence, Ohio TIC Property would be completed very soon and that the walls would be delivered for installation any day.  He also stated that rents would begin immediately but did not disclose that the initial rents would be paid from the investment money paid to Rockwell.

238.    Ashby represented to Andreasen that the worst-case scenario would be that the tenant fails, in which case he would be left with a valuable building and land.

Norman L., Jr. and Armenay Faye Merritt

239.    On approximately April 6, 2018, Rutherford of Rockwell contacted Norman Merritt based on a referral from Marshall at TM 1031 Exchange.  He represented that Rockwell would be a perfect fit for the Merritt's investment purposes because it would provide reliable passive income.  He represented that the investment had a perfect track record and would be safe and dependable.

240.    Also, on April 6, 2018 and throughout the period between April 6, 2018 and September 28, 2018, Rutherford of Rockwell made additional representations that Noah was a robust and dependable tenant, that it had a great and innovative business model, and that it was profitable and expanding quickly.

241.    Shortly before the closing of the Merritts' TIC purchase, when the Merritts were facing time restrictions to complete their 1031 Exchange, the Merritts requested an opportunity to review Noah's financial statements.  At that time, Rutherford told the Merritt that Noah did not provide financial statements because it was a private company, but he assured Norman Merritt that Noah was a good and healthy company and was in "pristine" financial condition.

242.    During the same period, Rutherford told Merritt that he would need to split his investment between two properties.  Merritt did not want to do this, because it would mean that he held less than 25 percent of the Toledo, Ohio property, which was a threshold level for certain control features in the TIC agreement.  Rutherford told him that there was nothing that he could do about the circumstances and required him to split the investment.

243.    During this same time-period, Rutherford also represented to Merritt that his investment money would be placed in escrow with First American until construction was completed or would be used to pay construction draws for work that was completed.

244.    Also, between April 6, 2018 and September 28, 2018, Nelson and Ashby of Rockwell represented to Norman Merritt that Noah was a good and dependable tenant, had never missed a payment, and would make for a safe and reliable investment to generate dependable passive income.

<u>Jean M. Bonetti</u>

245.    In the fall of 2018, Nelson and, to a lesser extent, Ashby of Rockwell solicited investment from Jean M. Bonetti.  In these conversations, Nelson represented that the investment in a Noah TIC property would be safe because it was debt free, and the properties were going fast.  He further represented that the investment would provide a reliable return and that Noah would take care of taxes, insurance, and maintenance.  Nelson and Ashby further represented that in the event of a default by Noah, the TIC owners would own a valuable building, thus minimizing the investment risk.

246.    In the same conversations, Ashby and Nelson did not immediately acknowledge that the building was not yet constructed.  They discussed the status of the property in a manner that lead Bonetti to believe that the building was already built, particularly because she was one of the last investors.

**D.    <u>Misrepresentations to the Dublin, Ohio Plaintiffs</u>.**

247.    Specific misrepresentations to the Dublin, Ohio Plaintiffs include at least the following:

<u>Voynovich Ventures, Ltd.</u>

248.    In approximately September of 2017, Greenawalt at Eastern 1031 Starker Exchange, L.L.C. referred Chris Voynovich of Voynovich Ventures, Ltd. to Rutherford of Rockwell, and represented that Rutherford could find an appropriate replacement property for a 1031 Exchange in one or more Rockwell properties.  During this time period, Greenawalt represented to Voynovich that Rockwell's tenant-in-common properties would be better and safer than other 1031 Exchange investments.  She also represented that she did not get paid anything in connection with referring Voynovich to Rockwell other than her standard 1031 processing fee of $1,000.00.

249.    In September and October of 2017, Rutherford represented to Chris Voynovich that the Noah TIC properties would be a perfect fit for his investing goals because they provide reliable, passive income with a 100 percent flawless track record.  He emphasized that the investments had a long flawless record of long-term security, stability and reliability.

250.    In a phone call on or about September 25, 2017, Rutherford represented to Chris Voynovich that Noah's was a strong and reputable company and that it was expanding rapidly. He represented that the TIC investment would be of the quality of an institutional investment, but on a smaller scale and with a higher cap rate, due to it being a private company.

251.    In the same call, Rutherford represented that Noah did not provide financial statements since it was a private company, but that Rockwell had done extensive due diligence and determined that Noah was solid financially.

252.    In September of 2017, Rutherford also represented that the TIC interest would be easy to liquidate or transfer to a new investment, and that other investors had been successful in transferring away their Noah TIC investments.

253.     At or around the time of closing on the TIC investment in October of 2017, Nelson of Rockwell represented to Chris Voynovich that the Google Maps view of the property showing bare ground was outdated and that the building was 95 percent completed, with only interior finishes to be completed.  He further indicated that the building would be open within 30 to 60 days or by the new year.  He represented that rent would be paid from the date of closing but omitted to disclose that the rents would be paid directly from the TIC investment money paid to Rockwell.  He further represented that the contract provisions regarding construction were due to the contract being drafted before the building was built.

Henrys Noah Dublin, LLC

254.     Between November 2017 and February of 2018, Eric Brecher of City National Bank, who referred Richard Abraham of Henrys Noah Dublin, LLC to Rockwell, represented to him that he had known Ashby for over ten years, that Rockwell was a solid company offering good investments, and that by putting money in a TIC purchase he could avoid paying taxes.

255.     In conversations in November of 2017 and again in January of 2018, Ashby of Rockwell represented to Richard Abraham of Henrys Noah Dublin, LLC that an investment in a Noah TIC property would be solid, safe and profitable.  He represented that the worst-case scenario would be that the tenant would default, and you would then have a building and could find another tenant.  He stated that he put his in-laws into an investment with Noah, and strongly recommended that they put all of their investment money with Noah instead of a Fresenius dialysis center because Noah was such a strong performing investment.

256.     In the same conversations, Ashby represented that Noah had been profitable for ten years and was growing rapidly.  He said that Noah was a solid business and that it was successful because it was very data driven.

257.     In the same conversations, Ashby also represented that the property would be debt free, so you would not have any debt or taxes, or expenses to pay from your investment.

258.     In the same conversations, Ashby represented that construction was underway on the Dublin, Ohio property, and that it would be completed very shortly, as Noah had the construction process down to a science.

259.     In the same conversations, Ashby represented that the construction costs of the building were $400.00 per square foot because of the quality of the finish.  He stated that the value of the property was $5.0 million including the land.  He also said that the true value of the building would require factoring in the rents that it would generate from Noah.

Jean Pierre and Jennifer Samson

260.     In approximately September and October of 2017, Nelson represented to Jennifer Samson that an investment in a Noah TIC property was the safest thing that they could possibly do.  He further represented that Noah had never defaulted or missed a rent payment, and that it was doing amazingly well.

261.     Nelson further represented that Rockwell had done extensive research on Noah and found that it was a "robust" company and that it was rock solid financially.

262.     Nelson further represented that the Dublin, Ohio property was under construction and would be completed within six months.

263.     Nelson further represented that the Dublin, Ohio property would be self-sustaining, but that it also enjoyed a corporate guaranty from Noah, which would give added security from a nationwide corporation.

264.     Nelson further represented that the Samson's investment money would be placed in an escrow account and used for construction.

<u>Lawrence H. and Russell M. Talbot</u>

265.    In approximately May of 2017, Andrew Smith of Peabody and Smith referred Lawrence and Russell Talbot to Hamrick and E&W to explore a 1031 Exchange.

266.    Between approximately September and October of 2017, Hamrick of E&W represented to Russell and Lawrence Talbot that the Dublin, Ohio property was "almost finished" and that the building was beautiful and located on a premium site.  Hamrick further represented that the building would be completed within a six-month window.

267.    On more than one occasion, but at least on October 11, 2017 via email, Hamrick of E&W represented to Russell and Lawrence Talbot that Noah's had a successful business and actually grew the company during the 2008 recession, and that the proposed 7% cap rate lease offered reflected that Noah was successful and profitable.    Hamrick further represented that Noah had a spotless 10-year record, was led by a qualified CEO, was a lucrative business, and was expanding rapidly.

268.    In approximately September and October of 2017, Hamrick of E&W represented to Russell and Lawrence Talbot that Noah buildings were typically in desirable neighborhoods and on premium sites and would thus have good value compared to investments in other properties.  He further represented that the Dublin, Ohio property would retain its value due to location and quality of construction.

269.    In approximately September and October of 2017, Hamrick of E&W represented to Russell and Lawrence Talbot that the Noah TIC investments would be highly and easily liquid, because there was a strong secondary market for the investments.  This representation was false because there was almost no secondary market or other means to exit the TIC investment.

270.     At the same time, Hamrick initially offered Russell and Lawrence Talbot a "buyback" option, under which Rockwell would buy back the TIC interest within one year; provided, however, that the investment with the buyback option would have slightly lower 6.5% cap rate.  At closing, the Talbot's were told that the buyback was no longer available.  This left the Talbots with no option except to close without the buyback option, due to the need to comply with time periods relevant to their 1031 Exchange.

Carl A., Jr. and Donna M. Lillmars

271.     In approximately November and December of 2017, Ashby represented to Carl Lillmars that the Dublin, Ohio property would be a good investment that would provide reliable income.

272.     At the same time, Ashby also represented that Noah was a good and growing company that was able to pay a high return in rent on the property.  He said that Noah was well-run and that there was nothing to worry about with Noah's business.

273.     During the same period, Ashby and Nelson discussed the Dublin, Ohio property as a completed property and indicated that rents would begin immediately upon closing. Based on these discussions and the lack of any disclosure that the building was not complete, Carl Lillmars concluded that the building was completed.

The Craig A. Cousins Trust, UTD 5/29/2014

274.     In approximately October and November of 2017, Rockwell's Rutherford represented to Craig Cousins, Trustee of The Craig A. Cousins Trust, UTD 5/29/2014 that the Dublin, Ohio building was very nearly completed, and that the schedule would be similar to that of the Bedford, New Hampshire property.

275.     During the same time-period, Rutherford represented to Craig Cousins that no one had ever lost money on Noah unless they sold quickly after they bought, and that Noah was a good, successful, and growing business.

276.     During the same period, Rutherford represented that he and Rockwell did not make very much money from the TIC purchase transactions.

277.     In connection with the TIC investments of The Craig A. Cousins Trust, Marshall of TM1031 Exchange told Craig Cousins that the Rockwell investments in Noah properties were good investments that received a reasonable investment score of 77 based on his investigation and analysis and that the investment would provide "asset preservation" as well as dependable income.

278.     In 2018, Marshall and Rutherford made similar representations to Craig Cousins in connection with a potential investment in another Noah TIC property, and again concealed from Craig Cousins that work had still not commenced on the Dublin, Ohio property.  As a result, The Craig A. Cousins Trust invested an additional $462,500.00 in a TIC interest in Noah's Plano, Texas venue, an investment which never would have been made had Cousins known the truth.

<u>Henryk Sarat</u>

279.     On or about July 19, 2017, Tommy Hinson ("Hinson") of Investors 1031 Exchange represented to Henryk Sarat that Rockwell has a flawless track record and provides a liquid, zero-debt investment with low risk and high rewards.  He pointed Sarat to a brochure for a similar property that was no longer available but indicated that the new one would be similar.

280.     Hinson also represented that he received only $800.00 or so in fees and received no referral fee or other compensation from Rockwell.

281.    Hinson and Rutherford of Rockwell represented to Henryk Sarat that for Noah properties, Rockwell acquires and builds the properties and then sells them to TIC investors.

282.    Rutherford represented to Henryk Sarat that when a Noah project begins construction, they are able to close because rent begins immediately upon making the investment.  He clarified that this means that excavation is underway or scheduled.

283.    Rutherford also represented to Henryk Sarat that he would be able to exchange half of his interest in the Dublin, Ohio property for another proportionate interest in another Rockwell property at a future time.

284.    Rutherford also represented to Henryk Sarat that Noah's business was strong and profitable, that it was expanding but maintaining strong bookings, and that it was solid.  He stressed the long and successful track record of Noah as a reason to invest.

285.    Rutherford also stressed that the building was valuable, and that the lease itself created the value of the building because of the favorable rate that Noah could pay.

286.    Rutherford also represented to Henryk Sarat that the building at Dublin, Ohio was underway and would be completed within a few months, and that money paid toward the purchase would be placed in escrow and used for construction.

Merle Steinman Jr.

287.    In approximately October of 2017, Philip David of Benash Real Property Exchange referred Merle Steinman Jr. to Rockwell.

288.    In approximately October of 2017, Ashby and Nelson of Rockwell represented to Merle Steinman Jr. that an investment in a Noah TIC property would be a strong and solid investment that would provide reliable income.  Ashby specifically represented that the projects it had done were performing "perfectly," and that its tenants, including Noah, were doing well.

289.    In the same conversations, Ashby and Nelson represented that the Dublin, Ohio property was under construction and would be completed on schedule.

Michael DiGiacomo and Linda DiGiacomo Revocable Trust

290.    In approximately October and November of 2017, Nelson and Ashby of Rockwell represented to Michael DiGiacomo that the Noah building at Dublin, Ohio was a "free standing" building in which Noah's was doing business, and that it would generate rents immediately.

291.    In approximately October and November of 2017, Nelson and Ashby of Rockwell represented to Michael DiGiacomo that the Dublin, Ohio property was independent and would be self-sufficient.

292.    Also, in approximately October and November of 2017, Nelson and Ashby of Rockwell represented to Michael DiGiacomo that Noah was a solid business, was "debt free," was the premiere event venue business, and had a profitable, healthy projected outlook.

Rock Noah OH LLC

293.    In approximately late 2017, DeSalvo of 1031 Placement, a division of Belle Isle, sent William Gibbs of Rock Noah Ohio LLC a brochure representing that Noah had refined its business model and was "well-positioned for robust, long-term, sustainable growth."  DeSalvo also represented that he had met personally with Bil Bowser and was confident in Noah's business.

294.    During the same time-period, DeSalvo also represented that Noah was a suitable, safe, reliable, and favorable investment and would be better than comparable investments because of the higher return.  His brochure further stated that the TIC investment would provide safe cashflow and reliable income security.

295.    Immediately prior to Rock Noah OH LLC's purchase of the TIC interests, Nelson and Ashby of Noah represented to William Gibbs of Rock Noah OH, LLC that the Dublin site was under construction, that it would generate rental income from the day of closing forward, and that construction will absolutely be completed because Rockwell was using its own capital to construct the building.

296.    At Gibbs' request, Rockwell added language to the TIC Purchase and Sale Agreement providing that the buyer did not waive the right to file a lawsuit against Rockwell in the event that Rockwell did not complete construction as described in the promotional materials.

Stephen W. Funk T/U/A dated 3/18/2005 FBO Thomas E. Funk

297.    In approximately July through October of 2017, Brown of E&W represented to Thomas Funk that there was a new Noah's property available at Dublin, Ohio.  He spoke of the property as if it were built, discussing "bookings" in the "brand new building," and he further indicated that rents would be paid from day one.

298.    During the same time-period, Hamrick of E&W represented to Thomas Funk that the downside risk was that the tenant would be unable to pay rent, but indicated that Noah was a guarantor, and if Noah disappeared, the only carrying costs of the building would be taxes and insurance because the building would have significant value due to the location and quality of construction.

299.    Brown and Hamrick also indicated that investment in a Noah TIC property would provide predictable and reliable monthly income.  He represented that Noah was a well-run, dependable company with a great track record and that Noah was growing rapidly.

300.    During the same time-period, Hamrick of E&W represented to Thomas Funk that the value of the building would come from the cap rate of the underlying lease.

301.    During the same time-period, Nelson of Rockwell represented that Noah was a good, solid company and that the investment in a Noah TIC property would be a safe, dependable investment with a good return.

302.    Due to Defendants' misrepresentations and omissions and because Funk initially received rent payments from Noah consistent with Noah's operation as a Ponzi scheme, in December of 2017, Funk invested a further $100,000.00 in Noah as part of the fraudulent bride credit program.

The Hendrix Living Trust (LM)

303.    In approximately October and November of 2017, Rutherford of Rockwell told Judy Hendrix of The Hendrix Family Living Trust (LM) that a TIC investment in the Dublin, Ohio events center property would be a good investment and would return 7 percent in rents beginning at closing.

304.    At the same time, Rutherford also represented that the property was a new building in a good location, that events were already booked in the building, and that the building was located in a desirable neighborhood near the Papa John's headquarters.

Tracy L. Adame

305.    In approximately August through October of 2017, Dave Foster of Exchange Resource Group, LLC represented to Tracy Adame that Rockwell was offering TIC investments in Noah properties that would provide dependable and reliable income and had a great track record.

306.    During the same period, DeSalvo of Bell Isle represented to Tracy Adame that Rockwell's TIC investment in Noah properties was an excellent investment option for her because it would provide dependable income to pay for college and religious mission expenses

for her children.  He represented that the investment would provide long-term safety and short-term income that would meet that objective.

307.    During the same period, DeSalvo also represented that there was a ten-year track record for Rockwell and Noah that showed it would be a good investment.  He further represented that Noah was a profitable and good business.

308.    During the same period, DeSalvo also informed Tracy Adame that the Dublin, Ohio property was already under construction and would be completed in six months.  She was assured that her money would be put in escrow and used to pay for the completion of construction.

309.    DeSalvo further told Tracy Adame that he received only a one-time referral fee for his involvement in referring her to Rockwell.

310.    During the same period, Nelson at Rockwell also represented that Noah was a profitable, dependable tenant and that the investment would be safe and would provide dependable income.

311.    During the same period, Nelson also represented that all Noah facilities functioned separately, like franchises, but that they were guaranteed by Noah as the corporate parent.

312.     At or near the time of the closing in October of 2017, Parkin of First American Title also represented to Adame that she had closed many transactions with Rockwell and Noah and was very familiar with their business and operations.  She represented that everyone was happy with their Noah TIC investments.

John Michael Lalli, III

313.    Approximately three years prior to investing in Noah's Dublin, Ohio TIC Property, John Michael Lalli, III purchased an interest in a Noah TIC Property located in Albuquerque, New Mexico.  Lalli was induced to invest in the Dublin, Ohio TIC Property in part by the regular rent payments that he received on the prior investment.

314.    Approximately six months after purchasing the Albuquerque, New Mexico TIC interest, Lalli received a notice of past-due property taxes.  He contacted Rockwell and was told that the notice was a mistake, that Lalli had no need to concern himself, and that Noah always paid the property taxes.  Had Rockwell acknowledged to Lalli that Noah frequently failed to pay property taxes on TIC Properties, he would not have invested in the Dublin, Ohio TIC Property.

315.    Shortly before he purchased the Dublin, Ohio TIC Property in approximately 2017, Lalli had a conversation with Ashby of Rockwell in which Ashby represented that the building at the Dublin, Ohio TIC Property was under construction and would be completed in "two months or three months on the outside."

316.    In the same conversations, Ashby represented to Lalli that money invested in the Dublin, Ohio TIC Property would be placed in escrow and released only to finish the building.

317.    In the same conversations, Ashby represented to Lalli that Noah had been in business for more than 10 years and had never missed a payment.  He said that Noah's business was doing great, that it was growing, and that it was making money.

318.    Shortly prior to the closing on the interest in the Dublin, Ohio TIC Property, Lalli spoke with Parkin of First American.  She represented to him that his money would be paid into escrow and would only be paid out when construction was completed.  She said that his money would likely be used "for windows."

64

William G. and Susan G. Wright

319.     In approximately September and October of 2017, Ashby of Rockwell represented to Susan Wright that the Noah building at Dublin, Ohio would generate rents immediately and that the building was built or would be completed very shortly.

320.     Between approximately July and October of 2017, Ashby of Rockwell represented to Susan Wright that Noah was a great company, was opening up all over, and was doing well financially.

EC9 Holdings, LLC

321.     In October and November of 2017, Greenawalt of Eastern 1031 Starker Exchange, LLC referred Michael Strobel and Grace Weis of EC9 Holdings, LLC to Rockwell. She recommended Rockwell highly, and represented that she had worked with Rockwell for a long time and that they had an excellent track record.

322.     In November of 2017, Rutherford of Rockwell represented to Michael Strobel and Grace Weis that an investment in Noah would be a safe, solid investment that would provide reliable income.  He further represented that the investment would be debt free, and that the tenant would pay all property taxes, maintenance, insurance, and other charges associated with the property.  He represented that Rockwell offered institutional-grade investment properties of the highest quality.

323.     During the same period, Rutherford also represented that a TIC investment in a Noah property would be an ideal solution because of the character and quality of the tenants.  He further represented that Noah was a solid, growing, profitable company and an ideal tenant.

324.     During the same period, Rutherford also represented that the building at the Dublin, Ohio property was being built and would be completed within three to six months.

Boli Family Trust dated 5/13/1987

325.     In approximately July through October of 2017, DeSalvo represented to Peter Boli, trustee of the Boli Family Trust dated 5/13/1987 that a TIC investment in a Noah property would be a suitable, dependable, safe and reliable investment.

326.     During the same time-period, DeSalvo represented that Noah was a "National Credit Tenant" and the because of the Noah corporate guaranty he would be comfortable with the purchase.

327.     In approximately September and October of 2017, Nelson of Rockwell represented to Peter Boli that Noah's was a successful and dependable tenant and that its business was growing and profitable.

328.     In the same conversations, Nelson represented that the Dublin, Ohio property was under construction and would be timely completed.

Ivy S. Fasko

329.     In approximately September and October of 2017, Ashby of Rockwell represented to Ivy Fasko that the Noah Property in Oklahoma City that she had considered was sold out, but that the Dublin, Ohio property would be essentially the same.  He referred to the marketing brochure that Fasko had received regarding the Oklahoma City property as representative of the terms of the investment in the Dublin, Ohio property.

330.     In the same conversations, Ashby also represented to Ivy Fasko that the Dublin, Ohio building was almost finished or nearing completion.  He emphasized that rents would be prorated to the closing date and would be paid beginning immediately upon closing.

331.   In the same conversations, Ashby also represented to Ivy Fasko that Noah was a great tenant, was financially sound, and would be a source of safe and reliable income through the investment.

332.   Due to Defendant's misrepresentations and omissions and because Fasko initially received rent payments from Noah consistent with Noah's operation of a Ponzi scheme, Fasko invested an additional $100,000.00 in Noah as part of the fraudulent bride credit program.

R & J Steck Investments, LLC

333.   In approximately November of 2017, Scott LeFevre of Cadence represented to Janean Steck of R & J. Steck Investments, LLC that an investment in a Noah TIC property was a safe, low-risk investment that would provide reliable income.  He represented that because the investment would involve the purchase of a building, even if there was a default by Noah, they would still have a six-million-dollar property that they could sell or get a new tenant.

334.   During the same time-period, Scott LeFevre further represented that Rockwell used the money from the TIC investors to build the building, and they then turned around and leased the building to Noah as the tenant.  He represented that the TIC owners would own 100 percent of the building because there would be no liens.

335.   At the same time, Scott LeFevre also represented that the Dublin, Ohio building was already built.  In fact, in all the discussions that took place, he discussed the building at all times as being fully built.  He represented that Noah's other properties were all performing well, and that Noah had a great business plan.

336.   In a conversation in approximately the fall of 2017, Nelson of Rockwell represented to Randy Steck that the investment in a Noah TIC property would be a minimal to no-risk investment, particularly because the rents were guaranteed by Noah Corporation.  He

further represented that even if the tenant failed, the TIC owners would own a six-million-dollar property that they could sell or re-lease.

337.   During the same conversation, Nelson represented that Noah was a good business, that its model was working perfectly, that it was expanding, and that it was profitable.

338.   During the same conversation, Nelson represented that Rockwell purchased land and built the buildings, and that Noah was only a tenant.  Shortly prior to closing, Nelson acknowledged for the first time that the building at the Dublin, Ohio property was not already built, but represented that it was being built and would be completed soon.  He further represented that rents would be paid commencing on the closing date.

<u>2016 Seshiki Family Trust</u>

339.   In the latter part of 2017, Ashby of Rockwell represented to Alan Seshiki, trustee of the 2016 Seshiki Family Trust, that Noah was a growing, successful event venue business and that an investment in a Noah TIC property would be a good place to "park" money because it would be safe and generate income.

340.   At the same time, Ashby represented that the Noah building at the Dublin, Ohio property was in the final stages of construction and was almost completed.

**E.    <u>Misrepresentations to the Toledo, Ohio Plaintiffs</u>.**

<u>Oak Hill Management, Inc.</u>

341.   As set forth above, Oak Hill Management, Inc. has elected not to pursue claims against Hamrick, Brown, E&W, Ashby, Rockwell, and other employees of E&W or Rockwell in this case.  The misrepresentations to Oak Hill Management, Inc. described herein are included as relevant background or to serve as a predicate for claims against others that are asserted by Oak Hill Management, Inc. herein.

342.     In approximately July of 2018, Hamrick of E&W and Ashby of Rockwell represented to Marc Cote that Noah's was a successful operator of wedding venues, was very profitable, and would make for a stable investment for years to come.

343.     In approximately July of 2018, Hamrick of E&W and Ashby of Rockwell represented to Marc Cote that the Toledo, Ohio venue was close to completion and that his money would be spent only on the construction of the building.

Norman L., Jr. and Armenay Faye Merritt

344.     Norman L., Jr. and Armenay Faye Merritt purchased their TIC interest in the Toledo, Ohio property at the same time that they purchased an interest in the Independence, Ohio property.  The representations made in connection with both transactions are set forth in paragraphs 239 through 244, above.

Theodore E. and Dena Keith

345.     In approximately April through August of 2019, Brown of E&W represented to Theodore E. and Dena Keith that an investment in Noah would be a good investment that would be safe and provide excellent returns.  He represented that almost all businesses lease their property, and that an investment would be safe because you are buying brick and mortar.

346.     During the same time-period, Brown represented to the Keiths that Noah was an excellent, profitable company with an aggressive growth plan, and that it had an outstanding record of never missing a payment.

Harvey A. Paul

347.     In the fall of 2018, Hamrick of E&W represented to Harvey A. Paul that an investment in a Noah TIC Property would be suitable investment for him and recommended that

he use some or all of the proceeds of a sale of property for that purpose in a tax-deferred

exchange under Section 1031 of the Internal Revenue Code.

348.    Hamrick further represented to Paul that an investment in a Noah TIC Property

would be a safe, liquid, and reliable investment that would generate good income.  In particular,

he represented that the investment would be safe because you have a deed to the property and

therefore would always have the land and building.   He further represented that Paul would be

able to easily move out of the investment by selling to another investor if he desired to do so.

349.    He represented that the investment was fail-proof, and all that Paul would have to

do was collect checks from his mailbox.  He recommended the Noah TIC investment over other

options for Fresenius kidney centers, and represented that Noah had an excellent track record,

was successful and established and was profitable.  He represented that Noah's business plan

was to grow to approximately 100 facilities and then go public.

350.    Hamrick further represented that his compensation for his involvement in the

transaction would be the $2,000.00 fee that he earned for the 1031 Exchange.

351.    Hamrick initially told Paul that his investment would be in a Jacksonville, Florida

TIC Property, but later told Paul that the Jacksonville, Florida TIC Property was already

committed, but that he could get the same deal with the Toledo, Ohio TIC Property.

352.    Hamrick also initially represented to Paul that the Toledo, Ohio Property was

fully built, but then shortly before the investment told Paul that it was almost completed, but that

rents would start immediately.

Donald and Rosemary Smith

353.    In approximately three phone calls during July of 2018, Ashby reiterated the

misrepresentations contained in the Rockwell marketing materials and represented to Donald

Smith that Noah was a great tenant who would take care of everything. He represented that he had a long-term relationship with Noah, and that Noah had always performed perfectly. He represented that Noah was growing by leaps and bounds.

354. In the same phone calls, Ashby represented that the Smiths could not have access to financial statements for Noah and that Rockwell did not have access to such information either.

355. In at least three other phone calls during July and August of 2018, Nelson confirmed to Donald Smith that Noah would be a reliable triple-net tenant and would take care of everything.

### Luann Properties, LLC

356. In approximately August and September of 2018, Ashby represented to Jeremy and Amanda Hess that the purchase of the TIC interest in Noah's Toledo, Ohio property would be a safe and reliable investment that would generate dependable income.

357. In approximately August and September of 2018, Ashby represented to Jeremy and Amanda Hess that Noah had never missed a payment in 13 years and was a growing and profitable tenant.

### F.   **Omissions of Material Facts to all Plaintiffs.**

358. In addition to the misrepresentations cataloged above, the Defendants omitted to disclose numerous material facts in connection with the sale of TIC interests to the Plaintiffs, as follows:

(a) Defendants omitted to state that Noah was in financial distress.

(b) Defendants omitted to state that Noah was not generating sufficient revenue from its operations to pay the expenses of its operations on an on-going basis.

(c)      Defendants omitted to state that they had no reliable financial information from Noah indicating that Noah would be capable of making the guaranteed rent payments under the Leases.

(d)      Defendants omitted to state that Noah had breached Lease obligations on many other Noah TIC Properties by failing to pay property taxes as they came due.

(e)      Defendants omitted to state that Noah did not have sufficient financial resources to pay all property taxes that were due and payable under Leases with TIC owners.

(f)      Defendants omitted to state that Noah was diverting funds that were earmarked or should have been earmarked for construction of a particular property to other purposes, including but not limited to rent payments to other TIC Owners, interest payments to note holders, construction on other TIC Properties, and general operating expenses.

(g)      Defendants omitted to state that Noah had sought and obtained from Rockwell a loan of $6.0 million in approximately February of 2017 in order to meet its financial obligations.

(h)      Defendants omitted to state that Rockwell had stepped in to pay past-due property tax obligations of Noah on TIC Properties in 2017.

(i)      Defendants omitted to state that Noah operated without adequate financial controls, and that its books and records had not been audited or subjected to review by outside accountants for at least three years prior to the date of Defendants' investments.

(j)      Defendants omitted to state that Rockwell and the Upstream Parties received substantial payments from the purchase of TIC interest, well in excess of customary or market rates for ordinary commissions or referral fees.

(k)     Defendants omitted to state that the amount charged to the collective TIC owners for the purchase of a given TIC property was substantially more than the cost of acquisition or the projected fair market value of the property.

(l)     Defendants omitted to state that the Construction TIC program was not being executed as described to Plaintiffs, as designed by Rockwell, or as provided in the Purchase Agreements because, among other things, (i) TIC investor money was not being held in escrow with First American and used only to pay for acquisition of the property and reimbursement of construction costs; and (ii) 1031 Exchange money was being paid out when construction was not completed.

(m)     Defendants omitted to state that Plaintiffs' 1031 Exchanges would not comply with applicable laws, regulations, and rules regarding 1031 Exchanges.

(n)     Defendants omitted to state that the rent payments under the Leases were substantially more than fair-market rents.

(o)     Defendants omitted to state that Noah was operating as a Ponzi scheme.

(p)     Defendants omitted to state that the purchase of the TIC Investment would not be a safe or appropriate investment for the typical investor but would be a risky investment dependent upon a company with no significant track record, insufficient financial controls, an inexperienced and untrained management team, and no available or reliable financial information.

## PLAINTIFFS' INVESTMENT IN THE NOAH TIC PROGRAM

359.    Plaintiffs relied upon the misrepresentations, omissions, and general deception of Rockwell, the Upstream Parties, and their principals, investing approximately $24.0 million total in Noah TIC Properties.

360.    Each Plaintiff closed the purchase of their investment in a Noah TIC Property (the "TIC Investment") by signing a Purchase and Sale Agreement, a Tenancy in Common Agreement, and a Property Administrator Agreement.  Each Plaintiff also became a TIC Owner landlord under a lease originally between Rockwell as landlord and Noah as tenant (the "Noah Lease").

361.    By Rockwell's choosing, First American acted as the title insurer, closing agent, and escrow agent in connection with all of Plaintiffs' TIC Investments.  In each case, the full amount of the TIC Investment was paid to First American into an account controlled by First American and Parkin.

362.    First American did not require or prepare a written escrow agreement.  Contrary to accepted practice in the title/escrow business, First American's own internal policies, and First American and Parkin's duties to both parties to the transaction, Parkin believed and advocated that Utah was not an "escrow state" and that written escrow agreements were not used in Utah. She believed and advocated that the terms of the escrow were determined by the agreements between the parties to the escrow.

363.    Parkin's opinion that she and First American were obligated to handle escrowed funds based on the terms of the agreements between the parties is consistent with ordinary and common standards and practices applicable to title companies functioning as escrow agents and First American's own internal procedures for instances where no separate written escrow agreement is executed by the parties.

364.    Parkin and First American also understood that they owed a fiduciary duty to both parties to the escrow with respect to the escrowed funds, and that they were obligated to hold the funds and not disburse them except with the express consent of the parties to the escrow.

74

365.     Consistent with the Rockwell Construction TIC program, the Purchase and Sale Agreement between Rockwell and each TIC investor provided that for Plaintiffs carrying out a 1031 Exchange, the proceeds would be "applied toward either (i) the purchase of an undivided interest in the Property; or (ii) the construction of the improvements on the Property on a reimbursement basis (i.e., the 1031 Funds will be used to reimburse Seller for costs it has incurred in constructing the improvements on the Property)."  The Purchase and Sale Agreement further provided that "Seller shall periodically provide statements to First American Title Company detailing the construction costs that Seller has incurred and seeking reimbursement of such costs via transfer(s) of 1031 Funds."

366.     At closing, each Plaintiff, or an accommodator or other agent acting on Plaintiff's behalf, delivered the full purchase price to First American.

367.     Rather than holding the escrowed TIC Investment as provided in the Purchase Agreement and as intended for a Construction TIC, however, First American released the purchase funds to Rockwell almost immediately after closing, without regard to the state of construction at the property or any condition precedent for the release of the funds.

368.     First American did not communicate to any Plaintiff that their TIC Investment paid into escrow would be disbursed to Rockwell immediately after closing; that their TIC Investment would be disbursed without regard to whether construction at the TIC Property was completed or even commenced; that First American would not require or receive any statements concerning construction costs; or that First American would follow only Rockwell's instructions with respect to disbursement of the escrowed funds.

369.     For each TIC Property, Rockwell received from First American the full amount of the TIC Investment, less closing costs.  It kept the difference between the total amount invested

by the TIC Owners and the Noah Price, which it paid to Noah.  In each case, the amount that Rockwell retained was greater than $1.0 million per property and is referred to herein as the "Rockwell Commission."  In the case of the TIC Property at Independence, Ohio, Rockwell also kept a 5.78 percent TIC interest in the property as part of the Rockwell Commission.

370.    Out of the Rockwell Commission, Rockwell paid a percentage commission to the Upstream Parties for each transaction that involved an Upstream Party, but Rockwell's net commission to itself was still over approximately $1.0 million for each of the Unbuilt Properties. Pursuant to express agreements with Rockwell, The E&W Defendants and the Marshall Defendants received a commission of 5 percent, and the Greenawalt Defendants and the Hinson Defendants received a commission of 3 percent on their respective sales.

371.    Without regard to the state of construction at the subject TIC Property and without receiving any assurance of performance from Noah, Rockwell then delivered the full Noah Price to Noah.

372.    When Noah received the Noah Price, the payment of the Noah Price was identifiable to the Noah TIC Property for which the payment was intended.  In each case, the total Noah Price for all TIC interests in the property was substantially more than the estimated total development costs of acquiring the land and completing a building.

373.    At Bowser's direction, however, all or almost all of the proceeds of the Noah Price was diverted to other purposes, including but not limited to the personal use of Bowser and his family, paying interest to Noah's noteholders, paying rent payments to prior TIC investors, and paying compensation to principals and employees of Noah, including Bowser and his family.

374.    Bowser's family and other insiders shared in the benefits of the Noah TIC Program.  Kate Jensen, Bowser's daughter, worked as an officer of Noah and was paid

substantial salary and benefits from the ill-gotten proceeds of the Noah TIC Program.  Kate Jensen had access to financial information and knew that Noah was in financial distress and was failing to meet obligations to TIC Owners, including the obligation to pay property taxes. Despite this knowledge, Kate Jensen frequently communicated with TIC Owners, attempting to assuage their fears or deter them from taking any action.

375.   Gabriel was Noah's captive construction company, and Bowser was its sole officer and control person.  Gabriel received substantial payments from the proceeds of Plaintiffs' TIC Investments, primarily in connection with work or purported work that did not benefit the Plaintiffs or their properties.  Gabriel functioned primarily as an alter-ego of Bowser and/or Noah and functioned without any appropriate financial controls or accountability.

376.   Bowser established Walby and used it to receive and disburse money, primarily for personal purposes.  Walby was an alter ego of Bowser because it was owned and controlled exclusively by Bowser and maintained no identity separate from Bowser, and because it would be inequitable to separate the assets of Walby from those of Bowser in light of the circumstances.  Bowser also used Walby to deposit payments from Rockwell, Gabriel or related entities for his supposed personal services beyond the scope of his employment for Noah, although all such services were rendered in connection with the Noah TIC Program.

377.   Scott Jensen was Bowser's son-in-law, who, with his brother, Brandon Jensen, owned and operated J & J.  J & J received substantial payments from Noah for construction of Noah Event venues.  J & J also received substantial payments from Noah, including funds from Plaintiffs' TIC Investments, for work done for Noah's principals, including Bowser, and other third parties on projects that were of no benefit to Noah or to Plaintiffs.

## FAILURE OF THE TIC INVESTMENTS

378.    Between the time of the Plaintiffs' TIC Investments and approximately March or April of 2019, Plaintiffs received monthly rent payments consistent with the Noah Lease.

379.    Plaintiffs generally received at least some initial rent payments directly from Rockwell, paid with money derived from Plaintiffs very TIC Investments, a fact which was never disclosed to Plaintiffs.  At least some later rent payments were paid by Noah through Plaintiffs' property manager, Cadence.

380.    None of the Rent payments paid to Plaintiff was made with funds generated by business operations at the Plaintiffs' TIC Properties.  In fact, Noah has never conducted business at these properties, since no event venues have ever been completed.

381.    In March or April of 2019, Noah failed to pay rent to the Plaintiffs and to all other TIC Owners of Noah properties.  On May 28, 2019, Noah filed bankruptcy, and effective August 5, 2019, Noah rejected and thereby terminated its leases with the Plaintiffs.

382.    By reason of Noah's failure, bankruptcy, and rejection of the Noah leases, Plaintiffs have suffered a loss of their entire investment, less only the residual value of their TIC interests in the Unbuilt Properties.  They are further burdened by unpaid property taxes, owners' association dues, and mechanics liens, and in some cases, are subject to building or use restrictions that severely limit their ability to sell the property.

## FIRST CLAIM FOR RELIEF

(Fraud/Negligent Misrepresentation – Bowser/Winkle/Rockwell Parties/Upstream Parties)

383.    Plaintiffs incorporate herein all other factual allegations of this Complaint.

384.    In connection with the Plaintiffs' investment in the Noah TIC Properties, Defendants made misrepresentations of presently existing material facts to Plaintiffs as outlined in paragraphs 133 through 357, above.

385.    In addition, Defendants omitted to state material facts which they were under a duty to disclose in order to prevent the facts that were stated from being misleading.  A summary of the omitted material facts is set forth above in paragraph 358.

386.    The representations of the Defendants were false, as set forth in the referenced paragraphs.  In addition, the representations to the Defendants set forth above were false in all respects, including but not limited to the following:

(a)     An investment in a Noah TIC Property was not a safe, stable, reliable investment that would generate dependable income, but was risky and unsuitable for any Plaintiff, particularly in light of Noah's financial condition.

(b)     Noah was not a successful business or a good tenant.  Noah was insolvent, unprofitable, financially unsustainable, and operating as a Ponzi scheme.

(c)     No Defendant conducted any actual due diligence or had any reliable financial information from Noah showing that Noah was successful.  In fact, Bowser had prevented Noah from following acceptable accounting practices or preparing reliable financial statements since no later than early 2017.  During the remainder of 2017 and 2018, no party inside or outside of Noah had made any effort to evaluate Noah's actual financial condition according to any accepted accounting standard or practice.

(d)     The buildings at the Noah TIC Properties that were the subject of the Plaintiffs' investment were not under construction or soon to be completed.  In fact, work had not commenced at the properties or was in the earliest stages, no completion date was

foreseeable, and Noah lacked the resources to complete the buildings without defaulting on other obligations to TIC Owners, investors, employees, and others.

(e)     Plaintiff's investments would not be held in escrow and disbursed upon completion of construction or to pay the expenses of construction consistent with the Construction TIC program and the PSA.  In fact, Defendants intended to and would cause the funds to be disbursed to Rockwell, and in turn to the Upstream Parties and Noah, immediately after closing, without regard to the state of construction.

(f)     Plaintiff TIC Investments would not be used in connection with the Noah TIC Property in which they had purchased an interest but would be immediately and systematically misappropriated and diverted to other purposes, including meeting obligations to prior investors.

(g)     Defendants' compensation in connection with the transactions was not as represented but was excessive and even unreasonable based on the service actually rendered.  In fact, the compensation to Rockwell was approximately 20 percent of the total TIC investment, and Upstream Parties were compensated pursuant to pre-existing agreements with Rockwell at rates between 3 and 5 percent of the relevant investment, none of which was disclosed to Plaintiffs.

(h)     Defendants were not purchasing real estate with value commensurate with their TIC Investment.  In fact, even if the venues would have been completed, the actual cost of the buildings was substantially less than the price that Plaintiffs were required to pay for their TIC interests, and the fair market value of the buildings as real estate would be only a fraction of the amount of the Plaintiffs' collective TIC Investment.

387.   The representations and omissions were made by the Defendants knowingly, or were made recklessly, with knowledge that there was insufficient information upon which to base such representations.  In particular, Plaintiffs allege as follows:

(a)   Defendants had a close business relationship with Noah lasting for several years, during which Defendants became aware of Noah's financial condition.

(b)   Defendants were aware of Noah's failure to perform certain obligations under the TIC leases, including the payment of property taxes.

(c)   Bowser told Defendants or Defendants were otherwise informed that Noah was diverting TIC funds intended for construction to other purposes.

(d)   Defendants were aware that Rockwell had loaned Noah $6.0 million in February of 2017 for the express purpose of completing construction that should have been completed with the original TIC investment money.

(e)   Defendants maintained a close relationship with Noah that included frequent communication and a substantial flow of information regarding Noah's business.

(f)   Defendants received or enjoyed substantial benefits from their participation in the Noah TIC program, including the receipt of compensation in amounts or at rates substantially greater than customary practice in similar transactions.

388.   In the alternative, the misrepresentations and omissions were made negligently by Defendants in breach of duties to the Plaintiffs arising from Defendants' superior knowledge of the material facts, from Defendants' pecuniary interest in the transactions at issue, and from Defendants affirmative statements to the Plaintiffs.

389.   Defendants made the misrepresentations and omissions for the purpose of inducing Plaintiffs to act thereon in making an investment in a Noah TIC Property.

390.    Plaintiffs did in fact rely on Defendants' misrepresentations and omissions and were thereby induced to act in purchasing TIC interests in the Noah TIC Properties.

391.    Plaintiffs in all ways acted reasonably and justifiably, in ignorance of the actual truth concealed from them.

392.    By reason of Plaintiffs' reliance on Defendants' misrepresentations and omissions and the purchase of the TIC Interests, Plaintiffs have suffered injury and damage in an amount to be proven at trial, but which may be measured by, among other things, the difference between the value of the TIC Property received and the value that it would have had if the representations were true, or in the alternative, the amount of the Plaintiffs' investment, together with interest, less the residual value of the TIC interests in the Unbuilt Properties that Plaintiffs actually received.

393.    Plaintiffs are further entitled to a full recovery of pre and post-judgment interest, costs of court, attorneys' fees where recoverable under contract or as consequential damages, and such further relief as the Court may deem appropriate under the circumstances.

## SECOND CLAIM FOR RELIEF

(Breach of Fiduciary Duty – Rockwell Parties/Upstream Parties)

394.    Plaintiffs incorporate herein all other factual allegations of this Complaint.

395.    Defendants owed Plaintiffs a fiduciary duty of care and loyalty due to circumstances of the relationships between the parties including the following:

(a)    Defendants had or held themselves out as having superior skill, knowledge, training, and experience concerning all aspects of the transactions that are the subject matter of this Complaint.

(b)      Defendants expected that Plaintiffs would place particular trust and confidence in Defendants and affirmatively invited and encouraged Plaintiffs to rely upon their judgment and skill with respect to the transactions that are the subject matter of this Complaint.

(c)      Defendants acted in the capacity of licensed real estate brokers or agents, or otherwise performed duties on behalf of the Plaintiffs consistent with acting in that capacity and for which a real estate license is required.

(d)      Defendants acted in the capacity of licensed securities agents or performed duties on behalf of the Plaintiffs consistent with acting in that capacity and for which a securities license is required.

(e)      Defendants otherwise acted as agents of the Plaintiffs in matters concerning the investment in Noah TIC properties.

(f)      Defendants received funds from Plaintiffs which were to be held, managed, and invested for the sole benefit of the Plaintiffs.

(g)      Defendants received substantial compensation from Plaintiffs or from the funds paid by Plaintiffs in connection with Plaintiffs' investments, including funds associated with the receipt and management of the proceeds of Plaintiffs' investments.

(h)      By virtue of Plaintiffs' age, experience, and abilities, Defendants and Plaintiffs were in an unequal bargaining position in circumstances where all parties would necessarily intend that Plaintiffs would put particular trust and reliance in Defendants.

396.   Defendants breached their fiduciary duties to the Plaintiffs by conduct including but not limited to the following:

(a)      Making the misrepresentations and omissions that are the subject of the First Claim for Relief.

(b)      Failing to safeguard Plaintiffs' invested funds or otherwise causing or allowing funds paid by the Plaintiffs be diverted from the TIC property for which they were intended and dissipated or used for purposes not benefiting Plaintiffs.

(c)      Allowing or causing Plaintiffs to enter into 1031 Exchange transactions which they knew or should have known would not meet the requirements to qualify as valid 1031 Exchanges.

(d)      Charging or receiving excessive commissions, referral fees or compensation, particularly without disclosing to Plaintiffs the basis or amount of their compensation.

(e)      Failing to advise or notify Plaintiffs of the commissions, referral fees, or compensation that they or others would receive in connection with Plaintiffs' investment.

(f)      Steering Plaintiffs toward investments that provided greater compensation to Defendants than other potential investments, without regard to the risks of such investments or the suitability of the investments for Plaintiffs.

(g)      Failing to conduct sufficient and reasonable due diligence inquiry concerning the investments in Noah TIC Properties prior to selling the investment to Plaintiffs.

(h)      Failing to execute the Construction TIC program in a manner that would comply with applicable law, regulations, and rules regarding 1031 Exchanges.

(i)      Failing to follow elements of the Construction TIC program that would have safeguarded Plaintiffs Investment and ensured that construction of each TIC property was completed.

397.    Defendants' breaches of fiduciary duty directly and proximately caused injury to Plaintiffs, for which Plaintiffs are entitled to a judgment awarding damages in an amount to be

proven at trial, but which may be measured by, among other things, the amount of the Plaintiffs'

total investment, together with interest, less the value of the Plaintiffs' TIC interests in the

Unbuilt Properties that Plaintiffs actually received.

398.    Plaintiffs are further entitled to a full recovery of pre and post-judgment interest,

costs of court, attorneys' fees where recoverable under contract or as consequential damages, and

such further relief as the Court may deem appropriate under the circumstances.

### THIRD CLAIM FOR RELIEF

(Constructive Fraud – Rockwell Parties/Upstream Parties)

399.    Plaintiffs incorporate herein all other factual allegations of this Complaint.

400.    For the reasons set forth in paragraph 395 above, there was a confidential

relationship between the Defendants and the Plaintiffs with respect to the transactions which are

the subject of this Complaint.

401.    As a result of the confidential relationship between the parties, Plaintiffs were

induced to relax the care and vigilance that they might ordinarily have exercised had they not

received assurances that Defendants' experience, skill, investigation, and familiarity with the

Noah TIC investments would protect their interests.

402.    Despite Defendants' duty to disclose arising from the confidential relationship

between the parties, Defendants failed to disclose material facts to Plaintiffs concerning the

transactions which are the subject of this Complaint, including those facts set forth in paragraph

358, above.

403.    Defendants' failure to disclose constitutes constructive fraud, which directly and

proximately caused injury to Plaintiffs, for which Plaintiffs are entitled to a judgment awarding

damages in an amount to be proven at trial, but which may be measured by, among other things,

the amount of the Plaintiffs' total investment, together with interest, less the value of Plaintiffs' TIC interests in the Unbuilt Properties that Plaintiffs actually received.

404.    Plaintiffs are further entitled to a full recovery of pre and post-judgment interest, costs of court, attorneys' fees where recoverable under contract or as consequential damages, and such further relief as the Court may deem appropriate under the circumstances.

## FOURTH CLAIM FOR RELIEF

(Breach of Fiduciary Duty re Escrowed Funds –
First American/Parkin/Rockwell Parties/Bowser)

405.    Plaintiffs incorporate herein all other factual allegations of this Complaint.

406.    At the closing of each Plaintiff's purchase of interest in a Noah TIC Property, the Plaintiff delivered the TIC Investment into the possession of Defendant First American and Parkin as escrow agent, consistent with the Construction TIC program.

407.    At all relevant times, Parkin acted as the escrow agent for First American and in that capacity, had full and complete control of the escrowed funds.

408.     Plaintiffs were not provided with a separate escrow agreement, but First American was obligated to hold each Plaintiffs' TIC Investment and disburse it only to pay for acquisition of the property or to reimburse actual construction costs for the following reasons:

(a)    For Plaintiffs carrying out a 1031 Exchange, Plaintiffs' Purchase Agreements with Rockwell expressly provided that First American would disburse the escrowed funds only for the purchase of the property or the construction of improvements on a reimbursement basis, as follows:

Buyer hereby acknowledges and agrees that Accommodator shall periodically transfer the 1031 Funds to First American Title Company, in one or more installments, which funds shall be applied toward either (i) the purchase of an undivided interest in the Property or (ii) the construction of the improvements on the Property on a reimbursement basis (i.e., the 1031 Funds will be used to reimburse Seller for costs it has incurred in

constructing the improvements on the Property). Seller shall periodically provide statements to First American Title Company detailing the construction costs that Seller has incurred and seeking reimbursement of such costs via transfer(s) of 1031 Funds.

(b)     For all Plaintiffs, Parkin and First American were familiar with the Rockwell Construction TIC program, which provided for all TIC proceeds to be disbursed to purchase the property or for construction expenses, with 1031 Exchange money being used first so that it would be used to pay for completed construction within the 180-day 1031 Exchange window, and non-1031 Exchange money being used to pay for later expenses to complete construction.  First American and Parkin knew that Plaintiffs did not authorize release of their TIC Investment proceeds except consistent with the design of Rockwell's Construction TIC program.

(c)     Parkin and First American knew and understood that based on the internal policies of First American, common and accepted practices among title companies serving as escrow agents, and the expectations of the Plaintiffs in the TIC Investment transactions, they were required to handle the escrow consistent with the express agreements of the parties to the escrow and that they were not to disburse money from the escrow except as expressly agreed by the parties.

(d)     At the time Plaintiffs delivered the TIC Investment funds into escrow, Parkin and First American knew that Plaintiffs were paying the full purchase price based on the completed project and also knew that construction on the subject Noah TIC Property was not complete.  Parkin and First American knew that disbursing the escrow funds before the completion of construction would not comply with applicable rules for 1031 Exchanges and would subject Plaintiffs to risk that their funds would be misappropriated, diverted, or converted from the purpose of funding the completion of construction at the relevant Noah TIC Property.

409.    As escrow agents, therefore, First American and Parkin owed a fiduciary duty to Plaintiffs with respect to the handling of Plaintiff's invested funds, including the duty to ensure that the invested funds were protected for the benefit of the parties and were disbursed according to the agreements and instructions of the parties, including Plaintiffs.

410.    The Rockwell Parties—including Rockwell and its principals Ashby, Nelson, Beynon, and Rutherford—also owed a fiduciary duty to Plaintiffs to protect Plaintiffs' TIC Investments and ensure proper application of the funds for the benefit of Plaintiffs and their respective TIC Properties.

411.    Upon receipt of payment of the Noah Price, Defendant Bowser also owed a fiduciary duty to Plaintiffs to use the funds that he received for the benefit of the Plaintiffs and their respective TIC Properties.

412.    First American and Parkin breached their fiduciary duty by conduct which allowed the escrowed funds to be disbursed to Rockwell and then diverted to uses not benefiting the subject TIC Property, including at least the following:

(a)    Failing to provide or require a written escrow agreement describing the terms of escrow and protecting the interests of the Plaintiffs in the money paid into escrow.

(b)    Failing to communicate to Plaintiffs that their payment of TIC Investment would be immediately disbursed without regard to whether construction was completed or even commenced.

(c)    Disbursing funds from the escrow at the request of Rockwell, without ensuring that the funds would be used in connection with the intended TIC Property.

(d)    Failing to follow the express requirements of the Purchase and Sale Agreement between Rockwell and the TIC Owners, including specifically, paragraph 3.2.

(e)     Disbursing the escrow funds to Rockwell without any agreement or consent of the Plaintiffs.

(f)     Otherwise failing to exercise due care and loyalty to safeguard Plaintiffs' funds and ensure payment for the benefit of the Plaintiffs as purchasers of the TIC Properties.

413.    The Rockwell Parties and Bowser breached their fiduciary duties with respect to the escrowed money by paying it to Noah or diverting it in a manner that did not ensure that the funds would be used in connection with the TIC Property for which they were intended.

414.    Bowser breached his fiduciary duty with respect to the escrowed money by diverting it to purposes that did not benefit the Plaintiff TIC Owners or the Noah TIC Property for which the money was intended.

415.    Defendants' defalcation and breach of their fiduciary duty with respect to the invested funds of the Plaintiffs directly and proximately caused injury to Plaintiffs, for which Plaintiffs are entitled to a judgment awarding damages in an amount to be proven at trial, but which may be measured by, among other things, the amount of the Plaintiffs' total investment, together with interest, less the value of the Unbuilt Properties that Plaintiffs actually received.

416.    Plaintiffs are further entitled to a full recovery of pre and post-judgment interest, costs of court, attorneys' fees where recoverable under contract or as consequential damages, and such further relief as the Court may deem appropriate under the circumstances.

## FIFTH CLAIM FOR RELIEF

(Conversion/Fraudulent Misappropriation – Bowser)

417.    Plaintiffs incorporate herein all other allegations of this Complaint.

418.    Defendant Bowser received a portion of the proceeds of Plaintiffs' TIC investments with knowledge that such funds were identified to a particular Noah TIC Property and with the Plaintiff TIC Owners of that property.

419.    Consistent with his operation of Noah as a Ponzi scheme, Defendant Bowser knowing and intentionally diverted the Plaintiffs' funds to other purposes, including primarily payments to or for the benefit of himself and his family, payments to noteholders, payments of excessive and above-market rents to prior owners of other Noah TIC Properties, and payments of operating expenses of Noah, including salaries for himself and his family.

420.    Bowser's diversion of funds constitutes a conversion or fraudulent misappropriation of Plaintiffs' property, including but not limited to the funds themselves, Plaintiffs' equitable interest in the benefit of the funds, and Plaintiff's collective interest in application of the funds consistent with the investment agreements.

421.    As a result of Bowser's conversion or fraudulent misappropriation of Plaintiffs' property, Plaintiffs have suffered injury for which they are entitled to a judgment in an amount to be proven at trial, but which may be measured by, among other things, the amount of the Plaintiffs' total investment, together with interest, less the value of the Unbuilt Properties that Plaintiffs actually received.

422.    Plaintiffs are further entitled to a full recovery of pre and post-judgment interest, costs of court, attorneys' fees where recoverable under contract or as consequential damages, and such further relief as the Court may deem appropriate under the circumstances.

## SIXTH CLAIM FOR RELIEF

(Aiding and Abetting Tortious Conduct – Rockwell Parties/Upstream Parties/First American/Parkin/Noah Affiliate Parties)[1]

423.    Plaintiffs incorporate herein all other factual allegations of this Complaint.

424.    As set forth in the First through Fifth Claims for Relief above, certain Defendants have engaged in conduct constituting a tort for which Plaintiffs are entitled to recover damages.

425.    The Upstream Parties knowingly aided and abetted the underlying tortious conduct, as follows:

(a)    The Upstream Parties participated and substantially assisted in tortious conduct by distributing sales materials concerning the Noah TIC Properties, referring Plaintiffs to Rockwell and Noah, recommending investment in Noah TIC Properties, and providing assurances to Plaintiffs concerning their participation.

(b)    The Upstream Parties engaged in such conduct with knowledge of the underlying tortious conduct in that they were familiar with Noah, its operations, its financial weakness, and its failures to meet obligations by virtue of a long-term relationship with Noah that included direct collaboration, access to financial information, and observation of Noah's failures.

426.    Defendants Ashby, Nelson, Beynon and Rutherford knowingly aided and abetted the underlying tortious conduct as follows:

(a)    Defendants participated and substantially assisted in the tortious conduct by distributing sales materials concerning the Noah TIC Properties, recommending investment in Noah TIC Properties, selling and closing sales of investment transactions, causing a substantial

---

[1] For Defendants identified in the First through Fifth Claims for Relief, this Claim is asserted in the alternative.

portion of Plaintiffs' investment funds to be diverted to the payment of excessive commissions or other compensation to Rockwell and the referring Upstream Parties, and making the remaining proceeds of Plaintiffs' investments freely available to Noah without restriction as to use.

(b)      Defendants engaged in such conduct with knowledge of the underlying tortious conduct in that they were intimately familiar with Noah, its operations, its financial weakness, its failures to pay property taxes, and its failing business based on frequent and on-going communication with Noah and its principals, negotiations of loans and other inter-party transactions, and receipt of financial information.

427.      Defendants First American and Parkin knowingly aided and abetted the underlying tortious conduct as follows:

(a)      First American and Parkin participated and substantially assisted in the tortious conduct by conducting closings, providing title insurance, acting as escrow agent with respect to the TIC Investments, and by disbursing the Plaintiffs' TIC Investments to Rockwell and otherwise carrying out instructions from Rockwell or Noah with respect to the transactions which are the subject of this Complaint.

(b)      First American and Parkin engaged in such conduct with knowledge of the underlying tortious conduct in that they were aware of the parties' disregard of the requirements of the Construction TIC program; they understood that Rockwell was not following rules applicable to 1031 Exchanges; they knew of Noah's financial weakness based on a long and close business relationship with Rockwell and Noah, including closing over 500 TIC transactions; they knew that Noah was selling unbuilt property at a purchase price for a completed venue; and they knew of Noah's failure to pay property taxes on its venues.

428.     The Noah Affiliate Parties knowingly aided and abetted the underlying tortious conduct as follows:

(a)     Defendants participated and substantially assisted in the tortious conduct by participating in the operation of Noah's business, contributing to the marketing or development of the Noah TIC investment program, executing directions of Defendant Bowser that caused or permitted the diversion of TIC investment money, concealing from Plaintiffs and other parties Noah's insolvency and failures to perform obligations to TIC investors, and supporting and creating the façade of Noah's successful business when Noah was insolvent, losing money, and operating as a Ponzi scheme.

(b)     The Noah Affiliate Parties engaged in such conduct with knowledge of the underlying tortious conduct in that they were intimately involved in Noah's operations and knew that it was operating with elements of a Ponzi scheme, knew that TIC investment money was diverted, and construction projects were behind schedule, and knew that Noah was operating without adequate financial controls and at the whim of Bowser.

(c)     The Noah Affiliate Parties knowingly shared in the benefits of the Noah TIC Program, including the receipt of salary, wages, or other payments for work associated with the Noah TIC Program or with funds obtained through the Noah TIC Program.

429.     By reason of Defendants' aiding and abetting the underlying tortious conduct, Plaintiffs have suffered injury for which Defendants are jointly and severally liable and for which Plaintiffs are entitled to a judgment against Defendants awarding damages in an amount to be proven at trial, but which may be measured by, among other things, the amount of the Plaintiffs' total investment, together with interest, less the value of Plaintiffs' interests in the Unbuilt Properties that Plaintiffs actually received.

430.     Plaintiffs are further entitled to a full recovery of pre and post-judgment interest, costs of court, attorneys' fees where recoverable under contract or as consequential damages, and such further relief as the Court may deem appropriate under the circumstances.

## SEVENTH CLAIM FOR RELIEF

(Conspiracy to Engage in Tortious Conduct - Rockwell Parties/Upstream Parties/
First American/Parkin/Noah Affiliate Parties)

431.     Plaintiffs incorporate herein all other factual allegations of this Complaint.

432.     With respect to the tortious conduct alleged in the First through Fifth Claims for Relief above, Defendants entered into a combination of two or more persons who reached a meeting of the minds to accomplish the object of the tortious behavior, namely acquiring and using funds from Plaintiffs' investment in the Noah TIC Program.

433.     Defendants' agreement to participate in the conspiracy is evident from the acts of each party, as outlined in the First through Fifth Claims for Relief above, and was reached expressly in communications between the parties regarding the Noah TIC Program, or was tacit or implied in the parties intent as evidenced by their conduct.  Facts manifesting the Defendants' agreement include at least the following:

(a)     Among other things, Rockwell expressly agreed with the Upstream Parties on the terms of each Upstream Party's commissions for sales of TIC investments.  Each Upstream Party agreed with Rockwell to identify and provide prospective buyers for the Construction TIC program, to conceal from such buyers information regarding Noah's poor financial circumstances, to conceal the commissions paid to Rockwell or the Upstream Parties in connection with the TIC investments, and to conceal Noah failures to construct or even begin construction of venues the Unbuilt Properties.

(b)      First American and Parkin agreed to receive escrow funds in connection with each Construction TIC transaction, but to disburse those funds to Rockwell without Plaintiffs' consent and contrary to the terms of the Purchase Agreements.  First American and Parkin further agreed to close TIC transactions in a manner contrary to the rules governing 1031 Exchanges by disbursing funds where venues were not completed and would not be within the 180 days allowed under applicable rules, and further agreed to conceal from Plaintiffs the failure of all parties to carry out the Construction TIC program consistent with its design and applicable rules.

(c)      The Noah Affiliated Parties agreed with Bowser to allow Bowser to operate Noah as a Ponzi scheme.  The Noah Affiliated Parties further agreed to accommodate, assist, or tolerate Noah diverting TIC investment money to improper purposes, including benefits to them.  The Noah Affiliated Parties further agreed with Bowser, Rockwell, and others to provide false information for marketing the Noah TIC program, to conceal from Plaintiffs' and others Noah's poor financial condition, to conceal Noah's failures to construct or even commence construction on the Unbuilt Properties, and to continue to carry on the Noah TIC program when the ultimate failure of that program was known to be inevitable.

434.      In carrying out the conspiracy, participants in the conspiracy committed one or more unlawful acts, including the acts described in the First through Fifth Claims for Relief above.

435.      By reason of their participation in the civil conspiracy, Plaintiffs have suffered injury for which Defendants are jointly and severally liable and for which Plaintiffs are entitled to a judgment against Defendants awarding damages in an amount to be proven at trial, but

which may be measured by, among other things, the amount of the Plaintiffs' total investment, together with interest, less the value of Unbuilt Properties that Plaintiffs actually received.

436.    Plaintiffs are further entitled to a full recovery of pre and post-judgment interest, costs of court, attorneys' fees where recoverable under contract or as consequential damages, and such further relief as the Court may deem appropriate under the circumstances.

## EIGHTH CLAIM FOR RELIEF

(Sale of Unregistered Securities/Sec. 12(a)(1) of the Securities Act –
Rockwell Parties/Upstream Parties)

437.    Plaintiffs incorporate herein all other factual allegations of this Complaint.

438.    Investment in the Noah TIC Properties was a security as defined in 15 U.S.C. § 77b (a)(1) in that it involved investment in a common enterprise with the success of the venture dependent primarily upon the efforts of others, namely, Noah.

439.    The interests in Noah TIC Properties which are the subject of this Complaint were not registered by the filing of a registration statement.

440.    During the time periods alleged in paragraphs 133 through 357 above, the Defendants made use of means or instruments of communication in interstate commerce or the mails—including telephone lines, the internet, email transmissions over the internet, and the United States Postal Service—for the purpose of offering, selling, and delivering interests in Noah TIC Properties, in violation of Section 5 (a) and 5 (c) of the Securities Act (15 U.S.C. § 77e (a) and (c)).

441.    Pursuant to Section 12 (a)(1) of the Securities Act (15 U.S.C. §77l (a)(1)), by reason of Defendants' violation, Defendants are liable to Plaintiffs in an amount equal to the consideration paid for such security with interest thereon, less the amount of any income received thereon upon the tender of such security.  For purposes of this Claim for Relief only,

Plaintiffs hereby tender their investment interests in Noah TIC Properties to Defendants upon receipt of the amount specified in this paragraph, as may be proven at trial.

442.     In the alternative, Plaintiffs are entitled to an award of damages in an amount to be proven at trial.

443.     In either case, Plaintiffs are further entitled to an award of pre and post-judgment interest, attorneys' fees as provided by contract or law, costs, and such further relief as the Court may deem appropriate under the circumstances.

## NINTH CLAIM FOR RELIEF

(Federal Securities Fraud Under Section 10(b) of the Securities Exchange Act
and Rule 10b-5 – Rockwell Parties/Upstream Parties)

444.     Plaintiffs incorporate herein all other factual allegations of this Complaint.

445.     As set forth in paragraphs 133 through 358 above, Defendants made untrue statements of material facts and omitted to disclose material facts the disclosure of which was necessary to make statements that were made not misleading.  Plaintiffs specifically incorporate herein all allegations identifying representations by these Defendants as well as all allegations establishing that such representations were materially false.

446.     Defendants' misrepresentations and omissions were made in connection with the sale of interests in the Noah TIC Properties, which constitutes the sale of a security under federal law.

447.     Defendants made the misrepresentations and omissions with scienter, meaning that they knew that their communications included material misrepresentations and omissions or in the alternative, that they acted recklessly and in disregard of obvious or apparent risks that their communications included material misrepresentations and omissions.  With respect to the

individual Defendants, Plaintiffs state the following particular facts establishing or giving rise to a strong inference that each defendant acted with scienter:

(a)     John Hamrick maintained a close business relationship with Rockwell and with Noah, which included a constant flow of information regarding the Construction TIC program and the business operations of Noah.  Hamrick had entered an agreement with Rockwell for a percentage commission, and therefore knew his statements regarding commissions were false.  Hamrick received financial statements and related records for Noah, and therefore knew that Noah was in poor financial condition.  Hamrick received from Rockwell a copy of a legal opinion letter regarding the Construction TIC program, and therefore knew that representations about compliance with 1031 Exchange rules and the Construction TIC program were false.  And Hamrick knew from his long and close relationship with Rockwell and Noah that Noah had failed to make tax payments, complete buildings on time, and pay its debts as they came due, and therefore knew that representations about Noah and the safety and suitability of investment in a Noah TIC Property were false.  Hamrick created an arrangement with O'Toole Enterprises under which commissions due to E&W, Hamrick, or Brown from Rockwell were paid to O'Toole Enterprises, thus manifesting Hamrick's understanding that his dealings with Rockwell involved risks requiring a scheme to hide or transfer assets that might otherwise be available to claimants.

(b)     Defendant Chris Brown was a principal of E&W and worked closely with Hamrick at E&W.  Brown was privy to the constant flow of information between E&W and Rockwell and Noah regarding the Construction TIC program and the business operations of Noah.  Brown was compensated under E&W's agreement for the payment of a commission on Noah TIC investments, and therefore knew his statements regarding commissions were false.  Brown received and had access to financial statements and related records for Noah, and

therefore knew that Noah was in poor financial condition.  Brown received or had access to a legal opinion letter addressed to Rockwell regarding the Construction TIC program, and therefore knew that representations about compliance with 1031 Exchange rules and the Construction TIC program were false.  And Brown knew from his association with Hamrick and through his relationship with Rockwell and Noah that Noah had failed to make tax payments, complete buildings on time, and pay its debts as they came due.  Brown therefore knew that representations about Noah and the safety and suitability of investment in a Noah TIC Property were false.

(c)     O'Toole was the office manager for E&W and is in a long-term relationship with and lives with Hamrick.  O'Toole's use of her separate company, O'Toole Enterprises to receive commissions due to E&W, Hamrick and Brown for sales of Rockwell TIC interests manifests her understanding that E&W's business involved substantial risks requiring a scheme to hide or transfer assets that might otherwise be available to claimants.  O'Toole was also privy to substantial communications between Rockwell and E&W and had access to information at E&W including financial statements of Noah from which it was clear that Noah was in poor financial condition.  O'Toole communicated frequently with Hamrick regarding the business relationship with Rockwell and the Noah TIC program as it was the primary source of income for the couple.

(d)     Hamrick, Brown, and O'Toole were the principals of E&W and O'Toole Enterprises and the sole persons acting on behalf of E&W and O'Toole Enterprises with respect to the transactions relevant to this Complaint.  Their knowledge is therefore attributable to E&W and O'Toole Enterprises with respect to the claims set forth in this Complaint.

(e)      Defendant Tim Marshall maintained a close business relationship with Rockwell and with Noah, which included a constant flow of information regarding the Construction TIC program and the business operations of Noah.  Marshall had entered an agreement with Noah for a percentage commission, and therefore knew his statements regarding commissions were false.  Marshall received financial statements and related records for Noah, including but not limited to financial statements from accountants King & McCleary delivered in October of 2016, that clearly showed that Noah was in poor financial condition.  Marshall also received from Rockwell a copy of a legal opinion letter to Rockwell or a detailed description of the Construction TIC program.  Based on his experience with Rockwell and Noah and his expertise in the area of 1031 Exchanges, Marshall therefore knew that representations about compliance with 1031 Exchange rules and the Construction TIC program were false.  Marshall also knew from his long and close relationship with Rockwell and Noah that Noah had failed to make tax payments, complete buildings on time, and pay its debts as they came due.  Marshall therefore knew that representations about Noah and the safety and suitability of investment in a Noah TIC Property were false.

(f)      Marshall was the sole principal of TM 1031, and his knowledge is therefore attributable to TM 1031 with respect to the claims set forth in this Complaint.

(g)      Defendant Connie Greenawalt maintained a close business relationship with Rockwell and with Noah, which included a consistent flow of information regarding the Construction TIC program and the business operations of Noah.  Greenawalt had entered an agreement with Noah for a percentage commission, and therefore knew that her statements regarding commissions were false.  Greenawalt received periodic financial information about Noah, and therefore knew that Noah was in poor financial condition and unable to meet its

obligations with regard to the Noah TIC Properties.  Greenawalt knew that she had no information that would indicate that Noah's business was performing well or was successful on any level.  Based on her knowledge of the rules governing 1031 Exchanges and her experience and observation of the Construction TIC program, Greenawalt knew that the Rockwell Construction TIC program did not comply with the rules for such 1031 Exchanges.  Greenawalt therefore knew that representations about investing proceeds of a 1031 Exchange in property that is not completed would be unsafe and unsuitable for 1031 Exchange clients.

(h)     Greenawalt was the principal and sole control person of Eastern 1031 Starker Exchange, LLP and Eastern 1031 Starker Exchange, L.L.C. and her knowledge is therefore attributable to these entities with respect to the claims set forth in this Complaint.

(i)     Defendant Thomas William Hinson III maintained a close business relationship with Rockwell and with Noah, which included a consistent flow of information regarding the Construction TIC program and the business operations of Noah.  Hinson had entered an agreement with Noah for a percentage commission, which he did not disclose to Plaintiffs, and he therefore knew that his statements and omissions relating to commissions were materially misleading.  Hinson knew that he had received no reliable financial information showing that Noah's business was successful, and had, from time to time, received information that Noah was in poor financial condition and unable to meet its obligations with regard to the Noah TIC Properties.  Hinson had received information from Rockwell regarding the Construction TIC program, but based on his expertise regarding 1031 Exchanges and his actual observation of the Rockwell Construction TIC program, including his receipt of commissions immediately after closing, Hinson had ample information available to him from which he knew or must have known that Rockwell's Construction TIC program was not being conducted in compliance with

rules governing 1031 Exchanges.  Hinson therefore knew or must have known that representations about investing proceeds of a 1031 Exchange in property that is not completed would be unsafe and unsuitable for 1031 Exchange clients.

(j)      Hinson was the principal and sole control person of Defendant Investors 1031 Exchange, Inc., and his knowledge is therefore attributable to Investors 1031 Exchange, Inc. with respect to the claims set forth in this Complaint.

448.      Plaintiffs were all purchasers of TIC investments in the Unbuilt Properties.

449.      As to Defendants' misrepresentations, Plaintiffs relied thereon in purchasing their interests; as to Defendants' omissions, Plaintiffs' reliance is presumed because the omitted disclosures concerned matters of material fact that substantially altered the mix of information available to the Plaintiffs.

450.      Defendants' misrepresentations and omissions and Plaintiffs' reliance thereon in purchasing the securities was the direct and proximate cause of injury to Plaintiffs for which Plaintiffs are entitled to a Judgment in an amount to be proven at trial, but which is believed to be at least equal to the amount of Plaintiffs' investment plus interest, less the value of what the Plaintiffs actually received.

451.      Plaintiffs are further entitled to a full recovery of pre and post-judgment interest, costs of court, attorneys' fees where recoverable under contract, at law, or as consequential damages, and such further relief as the Court may deem appropriate under the circumstances.

## TENTH CLAIM FOR RELIEF

(Control Person Liability Under the Securities Exchange Act –
Ashby/Nelson/Beynon/Hamrick/Brown/O'Toole/DeSalvo/Marshall/Greenawalt/Hinson)

452.      Plaintiffs incorporate herein all other allegations of this Complaint.

453.    The Defendants identified in Plaintiffs' Ninth Claim for Relief above are liable to Plaintiffs under Chapter 2B of Title 15 of the United States Code, the Securities Exchanges Act of 1934, and are referred to in this Claim for Relief as the "Liable Persons."

454.    At all times relevant to this Complaint, the Defendants identified in this Tenth Claim for Relief controlled the Liable Persons, as follows:

(a)    Defendants were officers, directors, or other control people of entities that are Liable Persons.

(b)    Defendants had authority over the Liable Persons as employers, supervisors, or persons with the ability to affect the terms of the Liable Person's employment or livelihood.

(c)    Defendants exercised actual control over the Liable Persons through authority, economic influence, contractual rights, or the use of dominant bargaining power or position.

(d)    The Liable Persons willingly submitted to and complied with the instruction, direction, or authority of Defendants.

455.    With respect to their conduct and control of the Liable Persons relating to the matters addressed in the Ninth Claim for Relief, Defendants did not act in good faith and the acts of Defendants did directly or indirectly induce the acts of the Liable Persons which is the basis for the Ninth Claim for Relief.

456.    Pursuant to Section 20 (a) of the Securities Exchange Act (15 U.S.C. § 78t (a)), Defendants are jointly and severally liable with and to the same extent as the Liable Persons, and Plaintiffs are therefore entitled to a Judgment against Defendants awarding damages in an

amount to be proven at trial, but which is the equivalent of any award determined under

Plaintiff's Ninth Claim for Relief.

457.    Plaintiffs are further entitled to a full recovery of pre and post-judgment interest,

costs of court, attorneys' fees where recoverable under contract, at law, or as consequential

damages, and such further relief as the Court may deem appropriate under the circumstances.

## ELEVENTH CLAIM FOR RELIEF

(State Law Securities Violation/Sale by Unlicensed Broker or
Investment Adviser – Rockwell Parties/Upstream Parties)

458.    Plaintiffs incorporate herein all other factual allegations of this Complaint.

459.    The investments in Noah TIC Properties which are the subject of this Complaint

are within the definition of securities under applicable provisions of state law.

460.    Defendants functioned as a securities agent in selling the investment in Noah TIC

Properties to the Plaintiffs.

461.    Defendants' conduct violates provisions of applicable state law[2] which require

securities agents to be licensed.

462.    By reason of Defendants' unlicensed participation in the sale of securities to the

Plaintiffs, Plaintiffs are entitled to a judgment awarding the applicable statutory remedies, which

may be measured by the total amount of Plaintiffs' investment plus interest at statutory rates, less

the value of what Plaintiffs actually received from the investment.

---

[2] Applicable state law regarding the licensing of securities agents includes at least the following statutes:  Florida, Fla. Stat. § 517.12; Ohio, Ohio Rev. Code 1707.44; California, § 25210; Georgia, Ga. Code § 10-5-31; Idaho, Id. Stat. § 30-14-402; Maine, 32 Me. Rev. Stat. § 16402; Massachusetts, Mass. Gen. Laws. Ch. 110A § 201; Missouri, MO Rev. Stat. § 409.4-406; Nevada, NRS § 90.310; New Hampshire, NH RSA § 421-B:4-402; Oregon, OR Rev. Stat. § 59.165; Pennsylvania, 70 Pa. Stat. § 1-301; Texas, Tx. Civ. Stat. § 581-12; Vermont, 9 V.S.A. § 5402; Virginia, Va. Code. § 13.1-504; Washington, RCW § 21.20.040.

463.     Plaintiffs are further entitled to a full recovery of pre and post-judgment interest, costs of court, attorneys' fees as provided in the applicable statutes, and such further relief as the Court may deem appropriate under the circumstances.

## TWELFTH CLAIM FOR RELIEF

(State Law Securities Fraud – Rockwell Parties/Upstream Parties)

464.     Plaintiffs incorporate herein all other factual allegations of this Complaint.

465.     The investments in Noah TIC Properties which are the subject of this Complaint are within the definition of securities under applicable provisions of state law.

466.     Under applicable provisions of state securities laws,[3] Defendants were required to fully and fairly disclose all material facts that a reasonable investor would consider important in making investment decisions.

467.     In connection with the Defendants' sale and the Plaintiffs' purchase of investments in Noah TIC Properties, Defendants made untrue statements of material fact; omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or otherwise engaged in conduct that worked fraud or deceit upon the Plaintiffs in violation of applicable provisions of state law.

468.     The defendants engaged in the conduct violating the applicable laws with knowledge of their failure to make a full and fair disclosure to Plaintiffs.

---

[3] Applicable state law regarding securities fraud includes at least the following statutes: Florida, Fla. Stat. § 517.301; Ohio, Ohio Rev. Code § 1707.41; California, § 25401; Georgia, Ga. Code § 10-5-50; Idaho, Id. Stat. 30-14-501; Maine, 32 Me. Rev. Stat. § 16501; Massachusetts, Mass. Gen. Laws Ch. 110A § 101; Missouri, MO Rev. Stat. § 409.5-501; Nevada, NRS § 90-570; New Hampshire, NH RSA § 421-B:5-501; Oregon, OR Rev. Stat. § 59.135; Pennsylvania, 70 Pa. Stat. § 1-401; Texas, Tx. Civ. Stat. § 581-33; Vermont, 9 V.S.A. § 5501; Virginia, Va. Code § 13.1-502; Washington, RCW § 21.20.010.

469.     Plaintiffs did not know that Defendants' misrepresentations were false and were not aware of the material facts that Defendants omitted to disclose in connection with their purchase of securities.

470.     By reason of Defendants' violations of applicable state statutes governing securities fraud, Plaintiffs are entitled to a judgment awarding the applicable statutory remedies, which may be measured by the total amount of Plaintiffs' investment plus interest at applicable rates, less the value of what Plaintiffs actually received from the investment.

471.     Plaintiffs are further entitled to a full recovery of pre and post-judgment interest, costs of court, attorneys' fees as provided in the applicable statutes, and such further relief as the Court may deem appropriate under the circumstances.

## THIRTEENTH CLAIM FOR RELIEF

(Materially Aiding State-Law Securities Fraud – All Defendants)

472.     Plaintiffs incorporate herein all other factual allegations of this Complaint.

473.     The Defendants identified in Plaintiffs' Eleventh and Twelfth Claims for Relief above are liable to Plaintiffs under the applicable state statutes described above and are referred to in this Claim for Relief as the "Liable Persons."

474.     At all times relevant to this Complaint, the Defendants identified in this Thirteenth Claim for Relief materially aided the Liable Persons in violating the applicable state securities laws by conduct including but not limited to the following:

(a)     Defendants were officers, directors, or other control people of entities that are Liable Persons, and authorized, ratified, endorsed, or participated in the conduct constituting the violation.

(b)      As part of their employment or business or commercial activity and in exchange for payment or other compensation, Defendants provided information, services, labor or funds that significantly advanced the Liable Persons' unlawful conduct or purposes with respect to Plaintiffs.

(c)      Defendants otherwise engaged in conduct materially aiding the Liable Persons in accomplishing the unlawful sale of securities to the Plaintiffs.

475.    Defendants did not act in good faith, and Defendants knew or acted in reckless disregard of the facts and the interests of Plaintiffs in carrying out their conduct relating to the sale of securities to the Defendants.  With respect to the Upstream Parties, Plaintiffs incorporate here all allegations regarding Defendants' knowing or reckless conduct with respect to their participation, including particularly the allegations of paragraph 447.  Parkin and First American did not act in good faith in that they were aware that the Unbuilt Properties were unbuilt and also knew that Plaintiffs were paying a purchase price based on a completed event venue.  First American and Parkin also knew or were in possession of sufficient facts that they must have known that Rockwell was not following its own purchase agreement with Plaintiffs or its own Construction TIC program, and that Plaintiffs' 1031 Exchanges were likely invalid.  First American and Parkin also knew that Noah had failed to meet its obligations, including paying property taxes.  First American and Parkin also knew that the money paid into escrow was needed for construction of the venues but disbursed the money to Rockwell without Plaintiffs' consent and contrary to the terms of the purchase agreement between the parties.

476.     Pursuant to applicable state law relating to those who materially aid securities violations,[4] Defendants are jointly and severally liable with and to the same extent as the Liable Persons, and Plaintiffs are therefore entitled to a Judgment against Defendants awarding damages in an amount to be proven at trial, but which is the equivalent of any award determined under Plaintiff's Eleventh or Twelfth Claims for Relief.

477.     Plaintiffs are further entitled to a full recovery of pre and post-judgment interest, costs of court, attorneys' fees where recoverable under contract, at law, or as consequential damages, and such further relief as the Court may deem appropriate under the circumstances.

## **FOURTEENTH CLAIM FOR RELIEF**

(Unjust Enrichment of Defendants – All Defendants)

478.     Plaintiffs incorporate herein all other factual allegations of this Complaint.

479.     Plaintiffs conferred a benefit on the Defendants by making their investment in Noah TIC Properties.

480.     Defendants each received a benefit from Plaintiffs in the form of commissions or other compensation paid from the proceeds of the sale transaction; access to and direct use of the identifiable proceeds of the investment; and perpetuation of the Noah Ponzi scheme.

481.     In particular, affiliates of Noah including Bowser, the J & J Parties, Winkle, and Kate Jensen received benefits in the form of salary, continued employment, or other payments or

---

[4] Applicable state law regarding liability of those who materially aid in a securities transaction includes at least the following:  Florida, Fla. Stat. § 517.211; Ohio, Ohio Rev. Code § 1707.43; California, § 25403; Georgia, Ga. Code § 10-5-58; Idaho, § 30-14-509; Maine, 32 Me. Rev. Stat. § 16509; Massachusetts, Mass. Gen. Laws. Ch. 110A § 410; Missouri, MO Rev. Stat. § 409.5-509; Nevada, NRS § 90.660; New Hampshire, NH RSA § 421-B:5-509; Oregon, OR Rev. Stat. § 59.135; Pennsylvania, 70 Pa. Stat. § 1-503; Texas, Tx. Civ. Stat. § 581-33; Vermont, 9 V.S.A. § 5509; Virginia, Va. Code. § 13.1-522; Washington, RCW 21.20.430.

consideration from Noah that they would not otherwise have received without the benefits derived from Plaintiffs.

482.     Defendants appreciated, acknowledged, or had knowledge of the benefits conferred upon them as they directly received money from the proceeds of the Plaintiffs' TIC investments or otherwise acted in concert to perpetuate the Noah TIC Program, obtain and use funds from TIC investors, and divert invested money to purposes not benefiting Plaintiffs.

483.     Under the circumstances, equity and justice demand that Defendants not be permitted to retain the benefits conferred upon them by Plaintiffs without compensating Plaintiffs therefor.

484.     By reason of Defendants unjust enrichment, Plaintiffs are entitled to a judgment awarding an amount to be determined at trial, but which may be measured by the total amount of benefit that Plaintiffs have conferred upon Defendants, which is believed to be in excess of $24.0 million.

485.     Plaintiffs are further entitled to a full recovery of pre and post-judgment interest, costs of court, attorneys' fees where recoverable, and such further relief as the Court may deem appropriate under the circumstances.

**FIFTEENTH CLAIM FOR RELIEF**

(Abuse of Vulnerable Adults – All Defendants)

486.     Plaintiffs incorporate herein all other factual allegations of this Complaint.

487.     Under applicable state laws, including but not limited to § 76-5-111 of the Utah State Code, the following Plaintiffs were considered "vulnerable adults" at the time of their purchase of the interest in a Noah TIC Property because they were at least 65 years of age or because they had a mental or physical impairment that substantially altered their ability to

provide necessities, obtain services, carry out the activities of daily living, manage their own resources, or understand the nature and consequences of remaining in an abusive situation:  Chris Fucci, Richard Harder (Richard and Susan Harder Living Trust), Eugene Spiritus and Susan Spiritus (The Spiritus Revocable Trust), Ross Greco, Emilia Bondar and Tiberich Egrovich (E & H Jackson, LLC), Genevieve and Anson Smith, Bernie Bromberg (The Bromberg Trust), Gary Neil, Andrew and Marie Lippman (Amfil Realty, LLC), Mark McKoy (W. Mark McKoy Irrevocable Trust of 2012), Linda and Martin Tierney (The Tierney Revocable Living Trust u/t/d 8/20/18), Mary Anne Holda (The Real Mint, LLC), Gertrude Winkler, Jean Bonetti, Prudence and Timothy Maxon (Maxon-Multiline, LLC), Carl Lillmars and Donna Lillmars, Craig Cousins (The Craig A. Cousins Trust, UTD 5/29/2014), Michael DiGiacomo and Linda DiGiacomo (Michael DiGiacomo and Linda DiGiacomo Revocable Trust (3/20/2001)), William and Susan Wright, Peter Boli (Boli Family Trust Dated 5/13/1987), Ivy Fasko, Merle Steinman, Judy Hendrix (The Hendrix Living Trust),

488.    The vulnerable adult Plaintiffs put substantial trust and confidence in the Defendants, and Defendants knowingly and intentionally abused that position of trust and confidence by engaging in the conduct which is the subject of the Claims for Relief set forth above, including making all of the misstatements and omissions described in paragraphs *** through 338.

489.    In carrying out such conduct, Defendants were motivated by purposes other than the well-being and interest of the Plaintiffs but acted with improper motives including at least greed and self-interest.

490.    Under applicable state statutes and related tort principles, including the doctrine of *prima facie* tort or negligence *per se*, Defendants conduct constitutes abuse of vulnerable

persons for which the vulnerable Plaintiffs are entitled to a judgment awarding damages which may be measured by the amount of any damages recoverable under other claims asserted herein, together with additional general damages as may be determined at trial.

491.    Plaintiffs are further entitled to a full recovery of pre and post-judgment interest, costs of court, attorneys' fees where recoverable, and such further relief as the Court may deem appropriate under the circumstances.

## SIXTEENTH CLAIM FOR RELIEF

(Fraudulent Transfer – O'Toole Enterprises, E&W, Hamrick, Brown, O'Toole)

492.    Plaintiffs incorporate herein all other factual allegations of this Complaint.

493.    Within four years prior to this Complaint, E&W transferred to O'Toole Enterprises and/or its principal, O'Toole, at least $3.5 million by directing Rockwell to pay commissions due to E&W to O'Toole Enterprises or O'Toole (the "Transfers").  O'Toole, Hamrick, and Brown, among others, were subsequent transferees of the Transfers who did not take in good faith for value.

494.    E&W made the Transfers with the intent to delay, defraud, or hinder creditors of E&W, such as Plaintiffs and others who might hold similar claims.

495.    In the alternative, the Transfers were constructively fraudulent as to Plaintiffs based on the following:

(a)    At the time the Transfers were made, numerous claims against E&W, including the unliquidated claims of Plaintiffs, had accrued against E&W.

(b)    Also, at the time the Transfers were made, E&W was insolvent or became insolvent as a result of the Transfers.  Alternatively, E&W was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or

transaction or intended to incur or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they came due.

        (c)    E&W did not receive reasonably equivalent value in exchange for the Transfers.

496.    Under applicable state law, Plaintiffs are entitled to avoid the Transfers to O'Toole Enterprises, and the subsequent transfers to Hamrick, O'Toole, and Brown.  Plaintiffs are further entitled to attach or execute on the property transferred to satisfy any judgment obtained herein.

497.    Plaintiffs are further entitled to a money judgment against O'Toole Enterprises and any subsequent transferee for the full value of the Transfers received, up to the full amount of Plaintiffs' claims.

498.    Plaintiffs are further entitled to a judgment against O'Toole Enterprises and the subsequent transferees awarding costs, pre and post-judgment interest, attorneys fees where provided by statute or recoverable on the underlying claim, and such further relief as the Court may deem to be appropriate under the circumstances.

## SEVENTEENTH CLAIM FOR RELIEF

(Constructive Trust - O'Toole Enterprises, E&W, Hamrick, Brown, O'Toole)

499.    Plaintiffs incorporate herein all other factual allegations of this Complaint.

500.    O'Toole Enterprises received payment of approximately $3.5 million from Rockwell for services rendered by E&W to Rockwell in connection with investments made by Plaintiffs and other TIC investors.

501. O'Toole Enterprises subsequently transferred some or all of the payment it received from Rockwell to subsequent transferees which may include E&W, Hamrick, Brown, and O'Toole.

502. To the extent that O'Toole Enterprises and the subsequent transferees received the proceeds of commissions on the sale of TIC interests procured by E&W or its agents, Hamrick and Brown, they received the payments in constructive trust for the benefit of E&W, and are liable to Plaintiffs for their losses up to the total amount of the constructive trust based on the following:

(a) The payments to O'Toole Enterprises constitute an unjust enrichment of O'Toole Enterprises at the expense of E&W.

(b) The parties expressly intended that the payments received by O'Toole Enterprises would be held for the benefit of E&W or the subsequent transferees.

(c) The transfers of the right to payments to O'Toole Enterprises constitutes a fraudulent transfer as alleged in the Sixteenth Claim for Relief, above.

(d) Equity dictates that the separate existence of O'Toole Enterprises, E&W, and their respective principals should be disregarded such that all are liable for the debts of each with respect to claims against them set forth in this action.

503. For the reasons set forth, Plaintiffs are entitled to a judgment declaring a constructive trust or other appropriate equitable remedy and awarding a money judgment against O'Toole Enterprises, E&W, Hamrick, Brown, and O'Toole, and directing that all shall be jointly liable for any award of damages entered in this action, up to the total amount of the proceeds received in such constructive trust.

504.     Plaintiffs are further entitled to an award of costs, pre- and post-judgment interest, and such further relief as the Court may determine to be appropriate under the circumstances.

## PUNITIVE DAMAGES

505.     On each Claim for Relief set forth above, Plaintiffs allege that Defendants' conduct was willful, malicious, intentionally fraudulent, or manifested a knowing and reckless indifference toward and disregard of the rights of the Plaintiffs.  Pursuant to Utah Code Ann. § 78B-8-201 and other applicable law, Plaintiffs are therefore entitled to an award of punitive damages in an amount sufficient to punish the Defendants and to deter similar conduct by others in the future.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against all Defendants awarding the following relief:

1.     On the First through Fifteenth Claims for Relief, for an award of damages or other monetary relief to which Plaintiffs are entitled as described in each respective claim.

2.     On the Sixteenth Claim for Relief, for a judgment avoiding the transfers identified and awarding Plaintiffs a money judgment against O'Toole and the subsequent transferees equal to any award against E&W, Hamrick or Brown, up to the total amount of the transfers received.

3.     On the Seventeenth Claim for Relief, for a judgment imposing a constructive trust or other appropriate equitable remedy and awarding Plaintiffs a money judgment against O'Toole and the subsequent transferees equal to any judgment rendered against against E&W, Hamrick or Brown in this action, up to the total amount of the constructive trust.

4.      On each Claim for Relief, an award of costs of court; pre and post-judgment interest; attorneys' fees as are recoverable at law, by statute, or by contract; and such further relief as the Court may deem appropriate under the circumstances.

5.      On each Claim for Relief, to the extent that Defendants' conduct is determined to be willful and malicious, intentionally fraudulent, or to manifest a knowing and reckless indifference toward or disregard of the rights of the Plaintiffs, for an award of punitive damages in an amount sufficient to punish the Defendants' behavior and to serve as an appropriate deterrent to others.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial on all claims triable to a jury set forth above.

DATED this 17th day of August, 2021.

**STRONG & HANNI**

_____/s/ *Reid W. Lambert*_____
Attorneys for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I certify that on the 17th day of August, 2021, I caused the foregoing **AMENDED COMPLAINT** to be served electronically through the ECF system which delivered notice to the following:

- **Daniel K. Brough**
  dbrough@btjd.com, hollyv@btjd.com, docketing@btjd.com
- **Erik A. Christiansen**
  echristiansen@parsonsbehle.com, ecf@parsonsbehle.com, cgroos@parsonsbehle.com
- **Jeffrey C. Corey**
  ecf@parsonsbehle.com,jcorey@parsonsbehle.com
- **Royce B. Covington**
  rcovington@parrbrown.com, calendar@parrbrown.com
- **R. Jesse Davis**
  jdavis@strongandhanni.com
- **Jonathan O. Hafen**
  jhafen@parrbrown.com, calendar@parrbrown.com
- **Douglas W. Henkin**
  douglas.henkin@dentons.com
- **Reid W. Lambert**
  rlambert@strongandhanni.com, tlawrence@strongandhanni.com
- **Sara M. Nielson**
  snielson@parrbrown.com, acoats@parrbrown.com, calendar@parrbrown.com
- **Chad S. Pehrson**
  cpehrson@parrbrown.com, calendar@parrbrown.com

*/s/ Connie Johnson*
Legal Assistant

116