UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

| | |
|---|---|
| CHRISTOPHER C. FUCCI, et al, <br><br> Plaintiffs, <br><br> v. <br><br> WILLIAM BOWSER, et al., <br><br> Defendants. | **MEMORANDUM AND ORDER DENYING FIRST AMERICAN TITLE INSURANCE COMPANY AND KIRSTEN PARKIN'S RENEWED MOTION TO COMPEL ARBITRATION (DOC. NO. 219) AND OVERRULING FIRST AMERICAN TITLE INSURANCE COMPANY AND KIRSTEN PARKIN'S OBJECTION TO EVIDENCE (DOC. NO. 228)** <br><br> Case No. 2:20-cv-00004 <br><br> District Judge David Barlow <br><br> Magistrate Judge Daphne A. Oberg |

On March 3, 2023, Defendants First American Title Company and Kirsten Parkin (the "FA Defendants") filed a renewed motion to compel arbitration pursuant to the Federal Arbitration Act ("FAA").[1] The FA Defendants seek to compel arbitration pursuant to (1) arbitration clauses contained in Purchase and Sale Agreements memorializing Plaintiffs' (various individuals and entities) purchase of interests in real property in Florida and Ohio,[2] or

---

[1] (Renewed Mot. to Compel Arbitration by Defs. First American Title Insurance Company and Kirsten Parkin ("Mot."), Doc. No. 219); *see also* 9 U.S.C. §§ 1–14.

[2] (*See* Mot. 1, Doc. No. 219 (detailing the specific location for each property); Pls.' Mem. in Opp'n to Renewed Mot. to Compel Arbitration ("Opp'n"), Doc. No. 225 at 6 (same).) Because Plaintiffs filed their opposition brief and supporting exhibits as a single document, citations to page numbers in this document refer to the court's page numbers affixed to the document upon filing—not the internal page numbers in the opposition brief.

(2) arbitration clauses contained in the title insurance policies First American issued in connection with the property purchases.  Plaintiffs oppose the motion.[3]

The court held a hearing on this motion on June 20, 2023.[4]  As explained below, the FA Defendants cannot compel arbitration under the Purchase and Sale Agreements because they were not parties to these agreements and they have not shown that any alternative theories for compelling arbitration under Ohio or Florida law apply.  The FA Defendants cannot compel arbitration under the title policies because the Ohio plaintiffs did not assent to arbitration under the policies.  Accordingly, the FA Defendants' renewed motion to compel arbitration is denied.[5]

BACKGROUND

This case began after Plaintiffs purchased tenant-in-common interests in real estate development projects located in Florida and Ohio.[6]  Defendant Rockwell Debt Free Properties,

---

[3] (Opp'n, Doc. No. 225.)

[4] (*See* Minute Entry, Doc. No. 243.)

[5] On April 30, 2020, District Judge David Barlow referred this case to Magistrate Judge Furse under 28 U.S.C. § 636(b)(1)(A).  (Doc. No. 47.)  The case was reassigned to the undersigned magistrate judge on May 18, 2020.  (Doc. No. 56.)  Although motions to compel arbitration are not expressly excepted from a magistrate judge's authority, courts are divided on the issue of whether such motions are dispositive.  *See Beattie v. TTEC Healthcare Sols., Inc.*, No. 18-cv-03098, 2019 U.S. Dist. LEXIS 64191, at *3 (D. Colo. Apr. 15, 2019) (unpublished), *R&R rejected on other grounds*, 2019 U.S. Dist. LEXIS 85370 (D. Colo. May 21, 2019) (unpublished).  And this issue is undecided in the Tenth Circuit.  *See Santich v. VCG Holding Corp.*, No. 17-cv-00631, 2018 U.S. Dist. LEXIS 140756, at *7 (D. Colo. Aug. 20, 2018) (unpublished).  In light of this, the district judge may choose to evaluate any objections to this order under the standards for a Report and Recommendation, which provide for de novo review. *See, e.g.*, *Auto-Owners Ins. Co. v. Clayton*, No. 2:21-cv-92, 2021 U.S. Dist. LEXIS 199201, at *10 n.2 (D. Utah Oct. 13, 2021) (unpublished) (citing 28 U.S.C. § 636(b)(1)(B)).

[6] (Am. Compl. ¶ 14, Doc. No. 122.)

2

Inc., and related entities (collectively, "Rockwell") sold those interests to Plaintiffs, and each sale was memorialized in a Purchase and Sale Agreement.[7]

According to the amended complaint, before Plaintiffs purchased their tenant-in-common interests, First American issued a standard Owner's Policy of Title Insurance to Rockwell for the Florida and Ohio properties.[8]  As Plaintiffs purchased their respective interests in the developments, First American amended the underlying title policies by adding each plaintiff as a "named Insured" through an individual endorsement.[9]  According to the endorsements, each plaintiff's coverage was equal to her proportional ownership interest, as set forth in each respective sales agreement.[10]  Ms. Parkin, a First American employee, acted as the escrow agent for all the transactions.[11]

When the development projects failed, Plaintiffs filed suit against numerous defendants, including First American and Ms. Parkin, in an effort to recover their investments.[12]  On August 17, 2021, Plaintiffs filed the operative amended complaint, adding more factual allegations against the FA Defendants.[13]  In this amended complaint, Plaintiffs raise six claims against the

---

[7] (*See id.* ¶ 3; *see also* Exs. 1–46 to Decl. of Steven J. Nielson in Support of Renewed Mot. to Compel Arbitration ("First Nielson Decl."), Purchase and Sale Agreements, Doc. Nos. 220-1–220-9; *see also* Mot. 1, Doc. No. 219.)

[8] (*See* Exs. 46–49 to First Nielson Decl., Insurance Policies, Doc. No. 220-10.)

[9] (*See* Mot. 2, Doc. No. 219; Opp'n, Doc. No. 225 at 8; *see also* Exs. 50–53 to First Nielson Decl., Terms and Conditions of Endorsements, Doc. No. 220-11.)

[10] (*See* Exs. 50–53 to First Nielson Decl., Terms and Conditions of Endorsements, Doc. No. 220-11.)

[11] (Am. Compl. ¶¶ 13, 127, 129, Doc. No. 122.)

[12] (Compl., Doc. No. 2.)

[13] (Am. Compl., Doc. No. 122.)

FA Defendants: breach of fiduciary duty, aiding and abetting tortious conduct, conspiracy to engage in tortious conduct, materially aiding state-law securities fraud, unjust enrichment, and abuse of vulnerable adults.[14]

Plaintiffs' claims arise out of the FA Defendants' handling of the escrow account in which Plaintiffs' purchase money was placed.  According to Plaintiffs, the FA Defendants promised the invested money would be held in escrow by First American and disbursements would be made only for land purchases and for incremental completion of event centers which were to be built on the properties.[15]  Instead, Ms. Parkin and First American immediately disbursed all invested funds to Rockwell, which spent the money and performed no construction.[16]  Plaintiffs allege First American and Ms. Parkin had a fiduciary duty to safeguard and preserve the escrow money for the mutual benefit of the parties and to disburse funds as authorized by the express agreement of all parties to the escrow, including Plaintiffs.[17]  Instead, First American and Ms. Parkin disbursed funds to Rockwell without Plaintiffs' consent, contrary to the terms of the sales agreements and other governing rules, and concealed their actions from Plaintiffs.[18]

In response to the original complaint, the FA Defendants moved to compel Plaintiffs to resolve their claims through arbitration.[19]  That motion was dismissed without prejudice when

---

[14] (*Id.* ¶¶ 86, 91, 94, 106, 108, 112.)

[15] (*See id.* ¶¶ 110–11, 130, 132.)

[16] (*See id.* ¶¶ 7, 13, 367–69.)

[17] (*See id.* ¶ 130.)

[18] (*See id.* ¶ 433(b).)

[19] (Mot. to Compel Arbitration, Doc. No. 126.)

the case was stayed pending the appeal of a related issue in a different case.[20]  After the stay was

lifted, the FA Defendants filed a renewed motion to compel arbitration.[21]  The FA Defendants

contend two arbitration clauses are enforceable against Plaintiffs—one in the sales agreements

and the other in the title policies.[22]

<u>LEGAL STANDARDS</u>

"Federal courts have a liberal federal policy favoring arbitration agreements."[23]  But

"[d]etermining whether to compel claims to arbitration is a two-step inquiry.  First, the court

must determine whether a valid agreement to arbitrate exists; and then, whether the dispute in

question falls within the scope of that agreement."[24]  Because arbitration is strictly "a matter of

consent, not coercion,"[25] the "existence of an agreement to arbitrate is a threshold matter which

---

[20] (*See* Docket Text Order, Doc. No. 149.)

[21] (*See* Docket Text Order, Doc. No. 214; Mot., Doc. No. 219.)

[22] (*See generally* Mot., Doc. No. 219.)

[23] *Reeves v. Enter. Prods. Partners, LP*, 17 F.4th 1008, 1011 (10th Cir. 2021) (internal quotation marks omitted).

[24] *Carter v. C.R. Eng., Inc.*, No. 2:21-cv-00102, 2021 U.S. Dist. LEXIS 87454, at *4 (D. Utah May 5, 2021) (unpublished) (citing *Soc'y of Prof'l Eng'g Emps. in Aerospace, Local 2001 v. Spirit Aerosystems, Inc.*, 681 F. App'x 717, 721 (10th Cir. 2017) (unpublished)).

[25] *Lamkin v. Morinda Props. Weight Parcel, LLC*, No. 2:10-cv-00852, 2012 U.S. Dist. LEXIS 99170, at *15 (D. Utah July 16, 2012) (unpublished) (quoting *Equal Emp. Opportunity Comm'n v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002)).

must be established before the FAA can be invoked."[26]  Courts look to state contract formulation

principles to determine whether parties have agreed to arbitrate.[27]

If an agreement to arbitrate exists, the court must then determine whether the dispute in

question falls within the scope of that agreement.[28]  "The scope of [an] arbitration agreement,

including the question of who it binds, is a question of state contract law."[29]  "If the arbitration

clause is clear, [the] inquiry is over, but if the arbitration clause is ambiguous about whether it

covers the dispute, [courts] apply a rebuttable presumption of arbitrability."[30]  "[A]ny doubts

concerning the scope of arbitrable issues should be resolved in favor of arbitration."[31]

<u>ANALYSIS</u>

The FA Defendants argue they can compel arbitration under the sales agreements as

parties to those agreements—or under equitable estoppel, agency, and third-party beneficiary

theories, which permit nonsignatories to compel arbitration.[32]  In the alternative, the FA

---

[26] *DiTucci v. Ashby*, No. 2:19-cv-277, 2021 U.S. Dist. LEXIS 39247, at *12 (D. Utah Mar. 1, 2021) (unpublished) (quoting *Avedon Eng'g, Inc. v. Seatex*, 126 F.3d 1279, 1287 (10th Cir. 1997)).

[27] *See Nature's Sunshine Prods. v. Kumets*, No. 2:20-cv-658, 2021 U.S. Dist. LEXIS 68852, at *10 (D. Utah Apr. 7, 2021) (unpublished) (quoting *Avedon Eng'g, Inc.*, 126 F.3d at 1287).

[28] *See Carter*, 2021 U.S. Dist. LEXIS 87454, at *4 (citing *Spirit Aerosystems, Inc.*, 681 F. App'x at 721).

[29] *Reeves*, 17 F.4th at 1011 (citing *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630–31 (2009)).  The parties agree Ohio and Florida law governs the arbitration provisions at issue in this case.  (*See generally* Mot., Doc. No. 219; Opp'n, Doc. No. 225.)

[30] *Carter*, 2021 U.S. Dist. LEXIS 87454, at *4 (quoting *Spirit Aerosystems, Inc.*, 681 F. App'x at 721).

[31] *Reeves*, 17 F.4th at 1011 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983)).

[32] (Mot. 6, Doc. No. 219.)

Defendants contend they can compel arbitration under the Ohio title policies so long as the insurance amount is below $2,000,000.[33]

For their part, Plaintiffs argue the FA Defendants cannot compel arbitration under the sales agreements because (1) the arbitration rights in the agreements have been waived, (2) the FA Defendants' equitable estoppel, agency, and third-party beneficiary arguments fail, and (3) the FA Defendants are not parties to the agreements (meaning they fall outside the scope of the arbitration provisions).[34]  With respect to the title policies, Plaintiffs contend the FA Defendants cannot compel arbitration because the Ohio plaintiffs did not agree to arbitrate under the policies and the insurance amount under the Ohio policies exceeds $2,000,000—meaning mutual consent is required to arbitrate.[35]

The parties' arguments regarding arbitration under the sales agreements are addressed first, followed by their arguments regarding arbitration under the title policies.

I.      **Arbitration Under the Sales Agreements**

The parties acknowledge the sales agreements contain an arbitration provision.  But they disagree as to the scope of that provision, whether arbitration rights under the provision have been waived, and whether equitable estoppel, agency, or third-party beneficiary doctrines apply to allow the FA Defendants to compel arbitration under the sales agreements.  As explained

---

[33] (*Id.* at 9.)

[34] (Opp'n, Doc. No. 225 at 10–15.)

[35] (*Id.* at 15–22.)  The parties agree the FA Defendants cannot compel the Florida plaintiffs to arbitrate under the title policies because the Florida arbitration clause requires mutual assent to submit a dispute to arbitration.  (Mot. 3 n.3, Doc. No. 219; Opp'n, Doc. No. 225 at 15.)  The parties also agree the insurance amount of Ohio plaintiff Oak Hill Management exceeds $2,000,000, meaning it is not subject to arbitration absent mutual assent.  (*See* Mot. 3–4, 9, 14, Doc. No. 219; Opp'n, Doc. No. 225 at 22 n.17.)

below, the FA Defendants cannot compel arbitration under the sales agreements because they are

not parties to the sales agreements and they have not established equitable estoppel, agency, and

third-party beneficiary theories for compelling arbitration under Ohio and Florida law apply.

> a.  *The Arbitration Clause in the Sales Agreements Does Not Apply to Disputes Between Plaintiffs and the FA Defendants Because the FA Defendants Are Not Parties to the Agreements.*

The arbitration clause in the sales agreements provides that any "dispute *between the*

*parties* will be submitted to binding arbitration."[36]  The FA Defendants contend they are parties

to the agreements because "'party' is ordinarily defined as 'someone who takes part in a

transaction.'"[37]  They argue the sales agreements "contemplated that the FA Defendants would

participate in the transactions in specified roles delegated solely and expressly to First

American" by acting as the escrow agent and issuing individual endorsements insuring

Plaintiffs.[38]

Plaintiffs argue the FA Defendants are not parties to the sales agreements and the

arbitration provision in the sales agreements applies only to disputes "between the parties."[39]

Plaintiffs contend the FA Defendants "attempt to characterize themselves as parties by subtly

transforming the . . . definition of a party—'one who takes part in a transaction'—into anyone

who might 'participate' in a transaction."[40]  According to Plaintiffs, the FA Defendants

---

[36] (*See, e.g.*, Ex. 1 to First Nielson Decl., Purchase and Sale Agreement ("Lillmars PSA") ¶ 9, Doc. No. 220-1 at 6 (emphasis added).)

[37] (Mot. 6, Doc. No. 219 (citing Black's Law Dictionary (11th ed. 2019)).)

[38] (*Id.*)

[39] (*See* Opp'n, Doc. No. 225 at 13–15.)

[40] (*Id.* at 14–15.)

"repeatedly insist[ed] that they were not 'parties'" to the sales agreements in their motion to dismiss and cannot argue otherwise now.[41]

Disputes regarding the scope of an agreement, "including the question of who it binds, is a question of state contract law."[42]  As outlined below, the plain language of a contract controls under Ohio and Florida law.  With this legal backdrop, the FA Defendants are not "parties" under the plain language of the sales agreements.

     i. <u>Ohio Law</u>

Under Ohio law, the scope of an arbitration clause "is a question for the court to decide upon examination of the contract."[43]  Although questions regarding the scope of an arbitration clause "should be resolved in favor of arbitration," "courts must not 'override the clear intent of the parties, or reach a result inconsistent with the plain text of the contract, simply because the policy favoring arbitration is implicated.'"[44]  In Ohio, a "contract, such as an arbitration agreement, that is clear and unambiguous[] requires no real interpretation or construction and will be given the effect called for by the plain language of the contract."[45]  The sales agreements at issue here are unambiguous—their language is sufficiently clear, definite, and not "reasonably

---

[41] (*Id.* at 15.)

[42] *Reeves*, 17 F.4th at 1011 (citing *Arthur Andersen LLP*, 556 U.S. at 630–31).  The parties agree Ohio and Florida law govern the arbitration provisions at issue in this case.  (*See generally* Mot., Doc. No. 219; Opp'n, Doc. No. 225.)

[43] *Duff v. Christopher*, No. 2021-L-122, 2023-Ohio-349, ¶ 9, 2023 Ohio App. LEXIS 330 (Ohio 11th Dist. Ct. App. Feb. 6, 2023) (unpublished).

[44] *Taylor v. Ernst & Young, LLP*, 130 Ohio St. 3d 411, 417, 2011-Ohio-5262, 958 N.E.2d 1203 (Ohio 2011) (quoting *Waffle House*, 534 U.S. at 294).

[45] *Locum Med. Grp., LLC v. VJC Med.*, LLC, No. 102512, 2015-Ohio-3037, ¶ 11, 2015 Ohio App. LEXIS 3048 (Ohio 8th Dist. Ct. App. July 30, 2015) (unpublished) (citing *Aultman Hosp. Ass'n. v. Cmty. Mut. Ins. Co.*, 46 Ohio St. 3d 51, 55, 544 N.E.2d 920 (Ohio 1989)).

subject to dual interpretations or of such doubtful meaning that reasonable minds could disagree as to [their] meaning."[46]  Accordingly, the reach of the arbitration clause can be resolved by looking at the plain language of the sales agreements.

The arbitration clause in the sales agreements provides that "[a]ny dispute between the parties will be submitted to binding arbitration according to the Commercial Rules of the American Arbitration Association."[47]  By its plain terms, each sales agreement was "made and entered into" "by and between Rockwell Dublin, LLC" as the seller and each individual plaintiff as the buyer.[48]  The agreements consistently reference the seller and buyer throughout, and the final page of each sales agreement is signed exclusively by Rockwell Dublin, LLC as the seller and each individual plaintiff as the buyer.[49]  In other words, the parties to the agreements are Rockwell Dublin, LLC and the individual buyers, and the plain text of the arbitration provision binds only these parties to arbitration.  Where the FA Defendants are not parties to the sales agreements (as they were neither the seller nor buyer), they fall outside the reach of the arbitration provision.

---

[46] *Murral, Inc. v. Shevetz Enters., LLC*, No. 15 MA 0189, 2016-Ohio-7040, ¶ 32, 2016 Ohio App. LEXIS 3900 (Ohio 7th Dist. Ct. App. Sept. 6, 2016) (unpublished) (quoting *Beverly v. Parilla*, 165 Ohio App. 3d 802, 808, 2006-Ohio-1286, 848 N.E.2d 881 (Ohio 7th Dist. Ct. App. 2006)).

[47] (*See, e.g.*, Ex. 1 to First Nielson Decl., Lillmars PSA ¶ 9, Doc. No. 220-1 at 6.)

[48] (*See, e.g.*, *id.* at 1.)

[49] (*See, e.g.*, *id.* at 9.)

This finding is consistent with the ruling of another court in this district in a sister case,[50] and with the FA Defendants' own argument in their motion to dismiss.[51]  At the hearing on the instant motion, the FA Defendants argued their change of position is justified by Plaintiffs' augmented allegations in the amended complaint regarding the relationships and the operation of the sales agreements.  This argument is unavailing.  Nothing about the factual allegations in the amended complaint alters the plain language of the sales agreements.  And this language makes clear the arbitration provision applies only to the parties to the sales agreements.  Where the FA Defendants are not parties to the sales agreements under Ohio law, they cannot compel arbitration on this basis.

### ii.   Florida Law

Under Florida law, the FA Defendants are also not parties to the sales agreements.  In Florida, "[a]rbitration clauses are construed according to basic contract interpretation principles."[52]  "The plain language of the agreement containing the arbitration clause is the best evidence of the parties' intent" and "must be read together with the other provisions in the contract."[53]  Per the plain language of the sales agreements, as described above, the FA Defendants are not parties to the sales agreements under Florida law.  Accordingly, they cannot compel arbitration on these grounds.

---

[50] *See DiTucci*, 2021 U.S. Dist. LEXIS 39247, at *11.  The *DiTucci* court concluded the FA Defendants were not parties to the sales agreements, based on nearly identical sales agreements and arbitration clauses.

[51] (*See* FA Defs.' Mot. to Dismiss 4, 8, 9, Doc. No. 23; FA Defs.' Reply to Mot. to Dismiss 4 n.6, 5, Doc. No. 58.)

[52] *Bari Builders, Inc. v. Hovstone Props. Fla., LLC*, 155 So. 3d 1160, 1162 (Fla. 4th Dist. Ct. App. 2014) (citing *Seifert v. U.S. Home Corp.*, 750 So. 2d 633, 636 (Fla. 1999)).

[53] *Id.*

      b.   *Where the FA Defendants Fall Outside the Intended Reach of the Arbitration Agreements, They Cannot Rely on Equitable Estoppel to Compel Arbitration Under Ohio or Florida Law.*

Even if deemed to be nonparties to the sales agreements, the FA Defendants argue they can still compel arbitration under Ohio and Florida law pursuant to equitable estoppel theories.[54] The FA Defendants contend equitable estoppel applies where Plaintiffs' claims are "firmly rooted" in the terms of the sales agreements and allege "substantially interdependent conduct between the FA Defendants and Rockwell."[55]  Plaintiffs argue the FA Defendants' reliance on equitable estoppel is misplaced because Plaintiffs' claims exceed the scope of the arbitration provision in the sales agreements, the authority cited by the FA Defendants is unpersuasive,[56] and equitable estoppel is only applied in rare cases (which this is not).[57]  Where the FA Defendants fall outside the intended and explicit reach of the arbitration clauses, they may not rely on equitable estoppel to compel arbitration under either Ohio or Florida law.

      i.   <u>Ohio Law</u>

In Ohio, "[w]hen a complaint has been brought against both parties and nonparties to an arbitration agreement, arbitration can only be ordered as to the parties who agreed to the

---

[54] (*See* Mot. 6–8, Doc. No. 219.)

[55] (*Id.* at 7.)

[56] Plaintiffs contend the cases cited by the FA Defendants establishing Ohio and Florida's equitable estoppel theories (*Kolsky v. Jackson Square, LLC*, 28 So. 3d 965 (Fla. 3d Dist. Ct. App. 2010); *Discovery Resources, Inc. v. Ernst & Young U.S. LLP*, 2016-Ohio-1283, 62 N.E.3d 714 (Ohio 9th Dist. Ct. App. 2016); *Riggs v. Patriot Energy Partners, LLC*, No. 11 CA 877, 2014-Ohio-558, 2014 Ohio App. LEXIS 541 (Ohio 7th Dist. Ct. App. Feb. 13, 2014) (unpublished)) are "uncertain precedent based on federal holdings that have been abrogated by the U.S. Supreme Court" in *Carlisle*, 556 U.S. 624.  (Opp'n, Doc. No. 225 at 12.)  This argument holds no weight where *Kolsky*, *Discovery Resources*, and *Riggs* were decided after *Carlisle* and, therefore, could not have been abrogated by it.  Accordingly, they are relied on below.

[57] (Opp'n, Doc. No. 225 at 12–15.)

arbitration provision."[58]  In other words, "generally, '[a]n arbitration clause is only binding upon the specific parties to the agreement.'"[59]  However, Ohio courts have recognized "certain circumstances" where "non-signing third parties may enforce arbitration agreements."[60]  One such circumstance has become known as the "alternate estoppel theory."[61]  This approach permits a nonsignatory to compel arbitration where the signing and nonsigning parties have a sufficiently "close relationship" and "the dispute is intertwined with the underlying contract."[62]  The FA Defendants' reliance on this theory fails for several reasons, addressed in turn below.

> (1) <u>The FA Defendants Were Not Within the Intended Reach of the Arbitration Agreements.</u>

Even under Ohio's alternate estoppel theory, arbitration provisions still "must not be so broadly construed as to encompass *claims and parties* that were not intended by the original

---

[58] *See Duff*, 2023-Ohio-349, at ¶ 12 (alteration in original) (citation omitted).

[59] *Id.* (alteration in original) (quoting *Glenmoore Builders, Inc. v. Kennedy*, No. 2001-P-0007, 2001-Ohio-8777, 2001 Ohio App. LEXIS 5449, at *14–15 (Ohio 11th Dist. Ct. App. Dec. 7, 2001) (unpublished)).

[60] *Id.* at ¶ 13 (quoting *Knight v. Altercare Post-Acute Rehab. Ctr., Inc.*, 2017-Ohio-6946, ¶ 21, 94 N.E.3d 957 (Ohio 11th Dist. Ct. App. 2017)); *see also Riggs*, 2014-Ohio-558, at ¶ 41.

[61] *See Peabody Landscape Constr., Inc. v. Welty Bldg. Co., Ltd.*, 198 N.E.3d 589, 598 (Ohio 5th Dist. Ct. App. 2022); *Short v. Res. Title Agency, Inc.*, No. 95839, 2011-Ohio-1577, ¶ 15, 2011 Ohio App. LEXIS 1332 (Ohio 8th Dist. Ct. App. Mar. 31, 2011) (unpublished); *see also Riggs*, 2014-Ohio-558, at ¶ 41 (referring to this approach as the "alternative estoppel theory").

[62] *Knight*, 2017-Ohio-6946, at ¶ 36.

contract."[63]  This is because a party "should not be forced to proceed to arbitration unless she expressly agreed to do so."[64]

As discussed above, the arbitration provision at issue subjects any "dispute between the parties" to binding arbitration.[65]  The parties to the sales agreements expressly limited the reach of the arbitration provision to disputes between the parties themselves.  If the sales agreements had simply noted that *any* disputes related to the property sales would be subject to arbitration, a nonsignatory might be able to use Ohio's alternate estoppel theory to enforce arbitration.  But where the parties to the agreements expressly limited the reach of the arbitration clauses to the parties themselves, it would be contrary to their intent to apply this provision to nonparties like the FA Defendants.

### (2) Plaintiffs' Claims Are Not Intertwined With the Sales Agreements.

Even if the scope of the arbitration provision were not expressly limited to the parties—such that the parties clearly intended to exclude others from its reach—alternative equitable estoppel still would not apply because Plaintiffs' claims against the FA Defendants do not rely entirely on the sales agreements.  Ohio's alternate estoppel theory "has been extended to 'intertwined claims,'" such as when a signatory to an agreement containing an arbitration clause "must rely on the terms of the written agreement in asserting [its] claims" against a

---

[63] *I Sports v. IMG Worldwide, Inc.*, 157 Ohio App. 3d 593, 598, 2004-Ohio-3113, 813 N.E.2d 4 (Ohio 8th Dist. Ct. App. 2004) (emphasis added); *cf. Duff*, 2023-Ohio-349, at ¶ 15 (analyzing whether an arbitration clause was "otherwise enforceable" by considering whether an agreement to arbitrate existed, and the scope of that agreement—even after determining a nonsignatory could rely on an alternative theory to enforce an arbitration agreement).

[64] *Duff*, 2023-Ohio-349, at ¶ 16 (quoting *Scharf v. Manor Care of Willoughby, OH, LLC*, No. 2019-L-062, 2020-Ohio-1322, ¶ 22, 2020 Ohio App. LEXIS 1294 (Ohio 11th Dist. Ct. App. Apr. 6, 2020) (unpublished)).

[65] (*See, e.g.*, Ex. 1 to First Nielson Decl., Lillmars PSA ¶ 9, Doc. No. 220-1 at 6.)

nonsignatory.[66]  It is not "sufficient that the plaintiff's claims 'touch matters concerning the agreement' or that the claims are 'dependent upon' the agreement."[67]  Instead, "each of a signatory's claims against a nonsignatory [must] make[] reference to or 'presume[] the existence of the written agreement,"[68] which is not the case here.

For example, in *I Sports v. IMG Worldwide, Inc.*,[69] a plaintiff brought claims for defamation, interference with contractual relations, unfair and deceptive trade practices, and engaging in the unauthorized practice of law against two nonsignatory defendants.[70]  The nonsignatory defendants sought to compel arbitration under an alternate estoppel theory, arguing the plaintiff's claims arose from the underlying agreement—which contained an arbitration clause.[71]  The court found the claims did not "arise from" and were not "so intertwined with[] the [underlying] agreement to justify the imposition of arbitration."[72]  Instead, the court determined the claims merely "relate[d] to alleged actions" taken by the nonsignatory defendants which "affected the business relationship and obligations created by the [underlying] agreement."[73] The court found this distinction important because it meant the plaintiff did not "need to rely

---

[66] *I Sports.*, 157 Ohio App. 3d at 598–99.

[67] *Id.* (quoting *Hill v. G.E. Power Sys., Inc.*, 282 F.3d 343, 348–49 (5th Cir. 2002)).

[68] *Norberg v. Iprecheck, LLC*, No. 1:22-cv-00177, 2023 U.S. Dist. LEXIS 16341, at *9 (S.D. Ohio Jan. 30, 2023) (unpublished) (applying Ohio law) (quoting *Orcutt v. Kettering Radiologists, Inc.*, 199 F. Supp. 2d 746, 752 (S.D. Ohio 2002)).

[69] 157 Ohio App. 3d 593, 2004-Ohio-3113, 813 N.E.2d 4 (Ohio 8th Dist. Ct. App. 2004).

[70] 157 Ohio App. 3d at 596.

[71] *Id.* at 598.

[72] *Id.* at 599.

[73] *Id.*

upon the terms within the agreement to assert its claims"; instead, the claims were "dependent upon the business relationship created by the agreement."[74]

Similarly, here, Plaintiffs' claims merely touch the sales agreements rather than arise from them. Plaintiffs bring claims for breach of fiduciary duty, aiding and abetting tortious conduct, conspiracy to engage in tortious conduct, materially aiding state law securities fraud, unjust enrichment, and abuse of vulnerable adults against the FA Defendants. Like in *I Sport*, these claims allege the FA Defendants violated fiduciary responsibilities and other obligations related to the parties' business relationship—but Plaintiffs need not rely on the terms of the sales agreement to advance each claim. Plaintiffs' claims are not so intertwined with the sales agreements as to mandate arbitration under Ohio's alternate estoppel theory.

> (3) The "Concerted Misconduct" Exception Is Inapplicable Where Plaintiffs Raise Independent Claims Against the FA Defendants and Rockwell Waived the Arbitration Clause.

Ohio's alternate estoppel theory may also be applied "when the signatory to the contract [containing the arbitration clause] alleges substantially interdependent and concerted misconduct by both the non-signatory and one or more of the signatories to the contract."[75] But this circumstance does not squarely apply in this case. Although Plaintiffs do raise allegations of concerted misconduct between the Rockwell parties and the FA Defendants,[76] they also raise

---

[74] *Id.*

[75] *Id.* at 600 (internal quotation marks omitted); *see also Discovery Res.*, 2016-Ohio-1283, at ¶ 23.

[76] (*See* Mot. 7 n.5, Doc. No. 219 (citing Am. Compl. ¶ 127, Doc. No. 122 ("First American and Parkin participated in Rockwell's acquisition of approximately 40 properties and hundreds of sales of [tenant-in-common] interests to investors."); *id.* at ¶ 412 (stating the FA Defendants "breached their fiduciary duty by . . . [d]isbursing funds from the escrow at the request of Rockwell, without ensuring that the funds would be used in connection with the intended [tenant-in-common] Property"); *id.* at ¶ 427(a) ("First American and Parkin participated and

independent claims against the FA Defendants—and many other parties—which fall outside the sales agreements.[77]

Moreover, the policy underlying the "concerted misconduct" exception is inapplicable here. The purpose of this exception is to prevent "arbitration proceedings between the two signatories" from being "rendered meaningless," thereby thwarting "the federal policy in favor of arbitration."[78] But in this case, the arbitration provision has already been rendered meaningless as to the signatories because Rockwell, the only other signatory to the sales agreements, waived any right to arbitrate. Specifically, Plaintiffs presented evidence that Rockwell's Chapter 7 trustee expressly waived the arbitration clause in the sales agreements.[79] In a letter signed by the trustee and Plaintiffs' counsel, the trustee waived arbitration "on behalf of the Debtor entities, the estate, and all agents, assigns, employees, and representatives thereof."[80] Where none of the signatories to the arbitration agreements have opted to pursue

---

[77] (*See* Am. Compl. 78–113, Claims for Relief, Doc. No. 122.)

[78] *Grigson v. Creative Artists Agency, LLC*, 210 F.3d 524, 527 (5th Cir. 2000) (emphasis omitted) (quoting *MS Dealer Serv. Corp. v. Franklin,* 177 F.3d 942, 947 (11th Cir. 1999)). Although *Grigson* and *MS Dealer* are not Ohio decisions, they are frequently relied on by Ohio courts for establishing the "concerted misconduct" aspect of Ohio's alternate estoppel theory. *See, e.g.*, *Fields v. Herrnstein Chrysler, Inc.*, No. 12CA827, 2013-Ohio-693, ¶ 18, 2013 Ohio App. LEXIS 609 (Ohio 4th Dist. Ct. App. Feb. 7, 2013) (unpublished); *I Sports*, 157 Ohio App. 3d at 599.

[79] (*See* Ex. A to Opp'n, Letter from Reid W. Lambert to Steven R. Bailey (Oct. 20, 2021), Doc. No. 225 at 26–27.)

[80] (*Id.*)

arbitration, and Rockwell has expressly waived the right to arbitrate, the policy considerations underlying the "concerted misconduct" exception do not apply.

The FA Defendants contend Rockwell's waiver is invalid for three reasons.  First, they argue that bankruptcy trustees lack authority to waive arbitration rights because, under section 363 of the bankruptcy code, trustees "may not deal with property of the estate outside of the ordinary course of business without Bankruptcy Court participation, for which formal notice and an opportunity for a hearing is required."[81]  But the FA Defendants present no authority supporting the proposition that arbitration rights qualify as "property of the estate" for purposes of this provision—and they fail to address any factors relevant to this question.[82]  Thus, they have not demonstrated section 363 of the bankruptcy code applies to a waiver of arbitration rights.

Next, the FA Defendants argue the sales agreements require subsequent modifications to be in writing, and the letter signed by the trustee is insufficient for that purpose.[83]  But the FA Defendants fail to support this argument with relevant legal authority.[84]  Further, it is not

---

[81] (Reply 1–2, Doc. No. 226); *see also* 11 U.S.C. § 363(b)(1) ("The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate.").

[82] *See* 11 U.S.C. § 541(a)(1) (defining property of the estate as "all legal or equitable interests of the debtor *in property* as of the commencement of the case" (emphasis added)); *Colbert v. Littman (In re Wagenknecht)*, 971 F.3d 1209, 1213 (10th Cir. 2020) (stating "property interests are created and defined by state law" but informed by federal bankruptcy law, and identifying "two tests to determine whether a debtor has legal or equitable interests in the transferred property" (internal quotation marks omitted)).

[83] (Reply 2, Doc. No. 226.)

[84] The cases cited by the FA Defendants do not address what constitutes a "writing" for modification purposes.  *See Ikerd Scuba Enter. LLC v. Lakes*, No. 25704, 2014 Ohio 533, 2014 Ohio App. LEXIS 513 (Ohio 2d Dis. Ct. App. Feb. 14, 2014) (unpublished); *Lynkus Commc'ns v. Webmd Corp.*, 965 So. 2d 1161 (Fla. 2d Dist. Ct. App. 2007).

apparent the FA Defendants can rely on the written-modification provision in the sales agreements as a defense to Rockwell's waiver considering they are not parties to the sales agreements and—as set forth below—they have not established they are Rockwell's agents or third-party beneficiaries of the agreements.

Finally, the FA Defendants argue signatories to the sales agreements cannot waive a third party's rights once they have accrued.[85]  But, as explained below, the FA Defendants have not established they are third-party beneficiaries of the agreements.  Moreover, the issue here is not whether Rockwell waived the FA Defendants' rights.  The issue is whether the policy considerations underlying the "concerted misconduct" theory apply where Rockwell waived its *own* right to arbitrate.  Thus, the FA Defendants' argument regarding waiver of third-party rights is inapposite to this issue.

For these reasons, all the FA Defendants' arguments regarding invalidity of the waiver are unavailing.  Because none of the signatories to the agreements have opted to pursue arbitration, and Rockwell waived its right to arbitrate, the policy considerations underlying the "concerted misconduct" exception are inapplicable.  There are no "arbitration proceedings between the two signatories" which would be "rendered meaningless" if the FA Defendants are not permitted to compel arbitration.[86]

In sum, where the FA Defendants fall outside the intended reach of the arbitration provision, Plaintiffs' claims go beyond the terms of the sales agreements, and Rockwell waived the arbitration clause, Ohio's alternate estoppel theory is inapplicable.  This is simply not one of

---

[85] (Reply 2, Doc. No. 226.)

[86] *Grigson*, 210 F.3d at 527.

the "limited situations" under Ohio law where a nonsignatory can bind a signatory to arbitrate.[87] The FA Defendants cannot rely on this theory to compel arbitration.

ii.   <u>Florida Law</u>

In Florida, "a non-signatory to a contract containing an arbitration agreement ordinarily cannot compel a signatory to submit to arbitration."[88]   However, relying on equitable estoppel principles, Florida courts "sometimes allow a non-signatory to compel arbitration against someone who ha[s] signed an arbitration agreement."[89]   But application of this equitable estoppel doctrine does "not expand the scope of disputes subject to arbitration."[90]   Put another way, "even when a non-signatory can rely on equitable estoppel to 'access [the arbitration] clause,' the non-signatory can compel arbitration only if the dispute at issue 'falls within the scope of the arbitration clause.'"[91]   The "scope of [an] arbitration clause is a pure matter of contractual interpretation."[92]

*Kroma Makeup EU, LLC v. Boldface Licensing + Branding, Inc.*[93] is instructive on this point.   In that case, the parties to a contract agreed that "disputes arising between them concerning the validity, interpretation, termination or performance of the present Contract,

---

[87] *Short*, 2011-Ohio-1577, at ¶ 17.

[88] *Koechli v. BIP Int'l, Inc.*, 870 So. 2d 940, 943 (Fla. 1st Dist. Ct. App. 2004).

[89] *Beck Auto Sales, Inc. v. Asbury Jax Ford, LLC*, 249 So. 3d 765, 767 (Fla. 1st Dist. Ct. App. 2018) (emphasis omitted); *see also Kolsky*, 28 So. 3d at 969.

[90] *Beck Auto Sales*, 249 So. 3d at 768.

[91] *Id.* (alteration in original) (quoting *Kroma Makeup EU, LLC v. Boldface Licensing + Branding, Inc.*, 845 F.3d 1351, 1355 (11th Cir. 2017)).

[92] *Id.* at 768 (internal quotation marks omitted).

[93] 845 F.3d 1351.

should be considered [in] independent arbitration."[94]  Certain nonsignatories later sought to compel arbitration of claims related to the contract under Florida's equitable estoppel doctrine.[95] Applying Florida law, the Eleventh Circuit determined that a nonsignatory "cannot invoke the doctrine to compel arbitration of claims that are not within the scope of the arbitration clause."[96] Assessing the language of the arbitration provision, the Eleventh Circuit reasoned:

> If the parties had consented in the arbitration clause to arbitrate any disputes concerning the validity, interpretation, etc., of the contract, instead of consenting to arbitrate only 'disputes arising between them' . . . the [nonsignatories] may have been able to use equitable estoppel to require [the plaintiff] to arbitrate the dispute between it and them.  But, as the 'between them' language shows, that is not what the parties to the agreement consented to do in the arbitration provision.[97]

The Eleventh Circuit held disputes involving nonsignatories fell outside the scope of the arbitration agreement and, therefore, the nonsignatories could not compel arbitration.[98]

The arbitration provision at issue in this case is analogous to the provision considered in *Kroma Makeup*, in that its reach is expressly limited to disputes "between the parties."  The parties to the sales agreements consented only to arbitration of disputes between the parties themselves.  The parties to the agreements did not consent to arbitration of disputes with nonparties like the FA Defendants.  Accordingly, the FA Defendants are foreclosed from relying on Florida's equitable estoppel doctrine to compel arbitration.

---

[94] *Id.* at 1353 (alteration in original) (emphasis omitted).

[95] *Id.* at 1354.

[96] *Id.*

[97] *Id.* at 1356 (emphasis in original).

[98] *Id.* at 1357.

      *c.*   *The FA Defendants Have Not Shown the Existence of an Agency Relationship Under Ohio or Florida Law.*

Next, the FA Defendants contend they can compel arbitration under Ohio and Florida law because Plaintiffs "allege an agency relationship existed between the FA Defendants and Rockwell"[99] and "affirmatively plead that the FA Defendants were agents of Rockwell."[100]  In support of this argument, the FA Defendants point to statements in the amended complaint such as:

- "Rockwell selected and used First American and its agent, Parkin, to close the purchase and sale of [tenant-in-common] interests in Noah [tenant-in-common] Properties,"

- "First American and Parkin also served as escrow agent for each sale of [tenant-in-common] interest," and

- "[b]y Rockwell's choosing First American acted as the title insurer, closing agent, and escrow agent in connection with all of Plaintiffs' [tenant-in-common] Investments."[101]

Plaintiffs argue that while the FA Defendants "were involved in the overarching scheme," they were "independent actor[s] with their own unique fiduciary obligation[s]" arising from the role as escrow officer, not the sales agreements.[102]  Plaintiffs contend the FA Defendants were neither agents, directors, nor officers of Rockwell.[103]  However, neither party addresses the requirements under Ohio or Florida law for a party to be considered a common-law agent.

---

[99] (Mot. 8, Doc. No. 219.)

[100] (Reply 2 n.3, Doc. No. 226.)

[101] (Mot. 8 n.6, Doc. No. 219 (quoting Am. Compl. ¶¶ 127, 129, 361, Doc No. 122).)

[102] (Opp'n, Doc. No 225 at 13.)

[103] (*Id.*)

Under both Ohio and Florida law, an agency relationship may permit a nonsignatory to compel arbitration.[104]  In Ohio, the "agency exception may be invoked when 'the relationship between the signatory and nonsignatory defendants is sufficiently close that only by permitting the nonsignatory to invoke arbitration may evisceration of the underlying arbitration agreement between the signatories be avoided.'"[105]  An agency relationship exists only when there is a manifestation of consent, a manifestation that the agent is subject to the principal's control, and a manifestation of authority to bind.[106]  Further, "[t]he party alleging the existence of an agency relationship bears the burden of proving that such a relationship exists."[107]

Under Florida law, the following elements are "[e]ssential" for an agency relationship to exist: "(1) acknowledgment by the principal that the agent will act for him, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the actions of the agent."[108]

---

[104] *See Fields*, 2013-Ohio-693, at ¶ 16 ("[T]here are certain instances when equity demands that parties who have not agreed to arbitration may be forced to do so when ordinary principles of contract and agency require." (internal quotation marks omitted)); *Koechli*, 870 So. 2d at 944 ("Florida and federal courts have recognized that a non-signatory can compel arbitration by a signatory to an arbitration agreement when the underlying proceeding concerns actions allegedly taken by the non-signatory as an agent of a signatory.").

[105] *I Sports*, 157 Ohio App. 3d at 601 (quoting *MS Dealer*, 177 F.3d at 947).

[106] *See Eberhard v. Chicago Title Ins. Co.*, No. 1:11-cv-834, 2013 U.S. Dist. LEXIS 206797, at *9–10 (N.D. Ohio Mar. 12, 2013) (unpublished) (applying Ohio law).

[107] *Id.* at *10 (citing *Gardner Plumbing, Inc. v. Cottrill*, 338 N.E.2d 757, 760 (Ohio 1975)).

[108] *Dodaj v. Vannucci*, No. 16-2018-CA-2049, 2021 Fla. Cir. LEXIS 11767, at *14 (Fla. 4th Cir. Ct. Nov. 23, 2021) (unpublished) (quoting *Goldschmidt v. Holman*, 571 So. 2d 422, 424 n.5 (Fla. 1990)).

Further, "there must be some affirmative evidence of ownership, operation or control,"[109] and the "burden of proving the agency [relationship] belongs to the party asserting it."[110]

The FA Defendants have not met their burden of proving they were Rockwell's agents under either Ohio or Florida law.  References in Plaintiffs' pleadings to the FA Defendants as "escrow agent" or "closing agent" describe the FA Defendants' role in the real estate transactions, but do not establish their legal status as a common-law agent.  These general references do not prove the consent and control or authority to bind required under Ohio or Florida law.  The mere title of escrow agent is not enough.  According to Black's Law Dictionary, "[a]n escrow holder is not a common-law agent because the holder does not act subject to the control of the parties to the escrow agreement."[111]  This is consistent with Ohio law, which recognizes "[t]he escrow agent's involvement is limited to his duties as set forth in the escrow agreement; to hold the instrument until a certain condition is met and then to turn it over to the other party."[112]  The FA Defendants have failed to show an agency relationship existed between Rockwell and the FA Defendants.  References to the term "agent" in the amended complaint are not enough.  Accordingly, the FA Defendants cannot compel arbitration under the sales agreements based on agency theory.

---

[109] *Id.* at *14–15 (citing *Vermeulen v. Worldwide Holidays*, 922 So. 2d 271, 274–75 (Fla. 3d Dist. Ct. App. 2006)).

[110] *Regions Bank v. Maroone Chevrolet, LLC*, 118 So. 3d 251, 255 (Fla. 3d Dist. Ct. App. 2013).

[111] Escrow Agent, Black's Law Dictionary (11th ed. 2019).

[112] *Gove v. Jablonski*, No. 48411, 1985 Ohio App. LEXIS 5743, at *9–10 (Ohio 8th Dist. Ct. App. Feb. 7, 1985) (unpublished).

      *d.  The FA Defendants Have Not Established They Are Third-Party Beneficiaries Under Ohio or Florida Law.*

The FA Defendants also argue they can compel arbitration under the sales agreements as third-party beneficiaries.[113]  Plaintiffs contend "there is no serious argument" that the FA Defendants are third-party beneficiaries to the sales agreements.[114]  They argue that under both Ohio and Florida law, a "third-party becomes a 'third-party beneficiary' only if the contract expressly provides for a benefit to be conferred upon them."[115]  Plaintiffs contend the sales agreements simply describe the FA Defendants' "role in the construction [tenant-in-common] process, but it do[] not confer a benefit nor . . . make FA a party."[116]

Under Ohio law, "[t]o be an intended third-party beneficiary the contract must have been entered into directly or primarily for the benefit of that person.  Conferring a benefit on the beneficiary by performance of a contract is not enough to establish an intended third-party beneficiary."[117]  "[F]or a third party to acquire intended beneficiary status, it must present evidence" of the requisite intent.[118]  If a contract is "clear that the 'primary' and 'paramount' purpose seems to be to benefit the third person," only then "should [she] have an enforceable

---

[113] (Mot. 8, Doc. No. 219.)

[114] (Opp'n, Doc. No. 225 at 12 n.9.)

[115] (*Id.* (citing *Mendez v. Hampton Court Nursing Center, LLC*, 203 So.3d 146, 148 (Fla. 2016); *Huff v. FirstEnergy Corp.,* 130 Ohio St. 3d 196, 200 (2011)).)

[116] (*Id.*)

[117] *G.R.P.L. Enters. v. Sethi*, No. 09 MA 205, 2010-Ohio-6513, at ¶ 12, 2010 Ohio App. LEXIS 5441 (Ohio 7th Dist. Ct. App. Dec. 16, 2010) (unpublished) (internal citation and quotation marks omitted).

[118] *APCO Indus. v. Braun Constr. Grp., Inc.*, Nos. 19AP-430, 19AP-431, 2020-Ohio-4762, ¶ 53, 2020 Ohio App. LEXIS 3595 (Ohio 10th Dist. Ct. App. Oct. 1, 2020) (unpublished).

right."[119]  "A third party who receives a mere happenstance benefit from the performance of a

contract is only an incidental beneficiary."[120]  Similarly, under Florida law, "[a] party is an

intended beneficiary only if the parties to the contract clearly express, or the contract itself

expresses, an intent to primarily and directly benefit the third party."[121]  "In order to find the

requisite intent, it must be shown that both contracting parties intended to benefit the third party.

It is insufficient to show that only one party unilaterally intended to benefit the third party."[122]

Again, the burden falls on the asserting party to establish third-party beneficiary status.[123]

        In this case, the FA Defendants have failed to establish their third-party beneficiary

status.  The FA Defendants make only a truncated argument, failing to address the requirement

under both Ohio and Florida law that the contracts express an intent to *primarily and directly*

benefit the third party.[124]  And they cite no legal authority supporting the proposition that an

---

[119] *G.R.P.L. Enters.*, 2010-Ohio-6513, at ¶ 12 (quoting *Visintine & Co. v. New York, C & St. L. R. Co.*, 169 Ohio St. 505, 509, 160 N.E.2d 311, 314 (Ohio 1959)).

[120] *APCO Indus.*, 2020-Ohio-4762, at ¶ 53.

[121] *Dingle v. Dellinger*, 134 So. 3d 484, 488 (Fla. 5th Dist. Ct. App. 2014).

[122] *Fla. Power & Light Co. v. Road Rock, Inc.*, 920 So. 2d 201, 203 (Fla. 4th Dist. Ct. App. 2006) (emphasis omitted).

[123] *See Williams v. Tony*, 319 So. 3d 653, 657 (Fla. 4th Dist. Ct. App. 2021) ("To claim the protection of [a] contract, [a party] must establish it was an intended third-party beneficiary of it." (alterations in original)).

[124] (*See* Mot. 8, Doc. No. 219.)  On September 22, 2023, the FA Defendants filed a notice of supplemental authority indicating the Utah Court of Appeals, in *First American Title Insurance Company and Kirsten Parkin v. Dana Barron et al.*, 2023 UT App 109, determined the FA Defendants were third-party beneficiaries based on an arbitration provision in nearly identical sales agreements.  (*See* Doc. No. 255.)  That decision is inapplicable here, as it is not binding on this court and it applies Colorado law (not Ohio and Florida law).  Additionally, based on the Utah court's analysis, it appears Ohio and Florida more strictly limit third-party beneficiary status than Colorado does.  (*See Barron*, 2023 UT App 109, ¶¶ 21, 28.)

escrow agent qualifies as a third-party beneficiary under Ohio or Florida law, under the circumstances presented here.[125]   Accordingly, the FA Defendants cannot compel arbitration under the sales agreements based on a third-party beneficiary theory.

> e.  *Conclusion*

In conclusion, the FA Defendants cannot compel arbitration under the sales agreements. First, the agreements only contemplate arbitration of disputes between the parties to the agreements, and the FA Defendants are not parties.  The FA Defendants cannot compel arbitration under Ohio's or Florida's equitable estoppel doctrines where they fall outside the explicit and intended reach of the arbitration provisions, the claims against them are not so intwined with the sales agreements as to mandate arbitration, and the policy underlying the "concerted misconduct" theory is inapplicable.  The FA Defendants cannot compel arbitration under the sales agreements based on agency theory where they failed to demonstrate an agency relationship existed between them and Rockwell.  And the FA Defendants cannot compel arbitration under the sales agreements based on a third-party beneficiary theory where they failed to establish the sales agreements were intended to primarily and directly benefit them, as required under Ohio and Florida law.

## II.   **Arbitration Under the Title Policies**

The only dispute as to the title policies relates to the Ohio plaintiffs.  The parties agree the FA Defendants cannot compel the Florida plaintiffs to arbitrate under the Florida title

---

[125] The FA Defendants only cite authority supporting the general proposition that Ohio and Florida law may permit nonsignatories to enforce arbitration agreements as third-party beneficiaries.  (Mot. 8, Doc. No. 219 (citing *Knight*, 94 N.E.3d at 964; *Fla. Power & Light Co.*, 920 So. 2d at 203).)  But they cite no legal authority supporting their argument that they, as escrow agents, qualify as third-party beneficiaries under the circumstances presented here.  This is a different proposition requiring its own argument and authority.

policies because the arbitration clause in those policies requires mutual assent to submit any dispute to arbitration.[126]  With respect to the Ohio plaintiffs, the FA Defendants contend the arbitration provision in the Ohio title policies covers policies with an insurance amount below $2,000,000.[127]  Plaintiffs argue none of the Ohio plaintiffs assented to arbitration under the Ohio title policies—and mutual assent to arbitrate is required because the insurance amount for each Ohio plaintiff exceeds $2,000,000.[128]

As explained below, the Ohio plaintiffs did not agree to arbitrate under the policies under Ohio law, for two reasons.  First, the Ohio plaintiffs did not receive the actual title policies until after closing and did not receive adequate notice of the arbitration provision before closing.  Second, the arbitration provisions were not usual and customary for title policies issued by the FA Defendants when the Ohio policies were issued.  Where the Ohio plaintiffs did not assent to arbitrate under the policies, the FA Defendants cannot compel arbitration and the court need not address the insurance-amount issue.

> a.  *The Ohio Plaintiffs Did Not Agree to Arbitrate Under the Policies.*

Plaintiffs argue the Ohio plaintiffs did not assent to arbitrate under the title policies because they did not see the policies before closing on the loans.[129]  Accordingly, they were

---

[126] (*See* Mot. 3 n.3, Doc. No. 219; Opp'n, Doc. No. 225 at 15.)

[127] (Mot. 9, Doc. No. 219.)  The parties agree Plaintiff Oak Hill Management's insurance amount exceeds $2,000,000, such that it is not subject to arbitration under the title policies, absent mutual assent.  (*See id.* at 3–4, 9, 14; Opp'n, Doc. No. 225 at 22 n.17.)  But the FA Defendants contend they can compel all remaining Ohio plaintiffs to arbitrate under the title policies.  (Mot. 9–11, Doc. No. 219.)

[128] (Opp'n, Doc. No. 225 at 15–23.)

[129] (*Id.* at 15–16.)

unaware of the arbitration provision contained in the policies until after closing.[130]  In support of

this claim, Plaintiffs submit evidence in the form of declarations from forty-five plaintiffs[131] and

rely on *Henderson v. Lawyer's Title Insurance Corporation*.[132]  As an initial matter, the FA

Defendants object to the declarations submitted by Plaintiffs.[133]  The FA Defendants also argue

the Ohio plaintiffs had adequate notice of and opportunity to review the title policies, *Henderson*

is not controlling, and actual delivery of the arbitration provision was not required under Ohio

law because arbitration provisions are usual and customary for title policies.[134]

      First, the FA Defendants' objections to the declarations are overruled.  Second, where the

Ohio plaintiffs did not receive the title policies until after closing, they did not receive actual or

constructive notice of the arbitration provision.  Finally, First American's use of arbitration

agreements cannot be considered "usual and customary," and the Ohio plaintiffs did not assent to

arbitrate.  Accordingly, the FA Defendants cannot compel arbitration under the title policies.[135]

---

[130] (*Id.*)

[131] (Ex. B to Opp'n, Declarations, Doc. No. 225 at 28–117.)

[132] 108 Ohio St. 3d 265, 2006-Ohio-906, 843 N.E.2d 152 (Ohio 2006).  Plaintiffs also rely on *Henderson*'s progeny.  (*See* Opp'n, Doc. No. 225 at 20–21 (citing *Riley v. Wayne Mut. Ins. Co.*, No. 27142, 2014-Ohio-1818, 2014 Ohio App. LEXIS 1777 (Ohio 9th Dist. Ct. App. Apr. 30, 2014) (unpublished); *Eberhard*, 2013 U.S. Dist. LEXIS 206797).)

[133] (Objection to Evidence, Doc. No. 228.)

[134] (*See* Reply 5–8, Doc. No. 226.)

[135] The FA Defendants argue Ms. Parkin can independently compel arbitration under the title policies, to the extent she needs to do so separately.  (Mot. 10, Doc. No. 219.)  Specifically, they contend Ms. Parkin may compel arbitration under Ohio's alternate estoppel theory and as First American's common-law agent, since she "issued the policies and endorsement in each transaction as First American's employee."  (*Id.*)  But where the Ohio plaintiffs did not assent to arbitrate under the title policies, both First American and Ms. Parkin are precluded from compelling arbitration based on the policies, which means the theories of alternate estoppel and agency need not be addressed.

i. The FA Defendants' Objections to the Ohio Plaintiffs' Declarations are Overruled.

The FA Defendants raise procedural and substantive challenges to the forty-five declarations Plaintiffs submitted in support of their opposition to the FA Defendants' motion to compel arbitration.[136]  Procedurally, the FA Defendants argue the court should disregard Plaintiffs' response to the FA Defendants' objections because it was untimely filed—and should summarily sustain the objections and strike the declarations because of the untimely response.[137] Substantively, the FA Defendants argue the declarations are irrelevant to the issue of notice, they fail to "demonstrate the competence of the declarants," they are deficient overall because some Ohio plaintiffs failed to submit declarations, and thirteen declarations are otherwise flawed.[138] As explained below, Plaintiffs' untimely response is properly considered, as it resulted from excusable neglect.  Further, where the FA Defendants' substantive objections to the declarations are otherwise unpersuasive, they are overruled.

First, procedurally, the FA Defendants argue the court should disregard Plaintiffs' response to their objections as untimely—and should sustain their objections because the response was untimely.[139]  Plaintiffs' response was five weeks overdue, but excusable neglect exists, making it appropriate to consider.  A court "may, in its discretion, accept late filings [when] the failure to file on time was excusable neglect."[140]  In determining whether excusable

---

[136] (*See* Objection to Evidence, Doc. No. 228.)

[137] (Objection to Pl.'s Resp. to Objection to Evidence, Doc. No. 239.)

[138] (Objection to Evidence 2–5, Doc. No. 228.)

[139] (Objection to Pl.'s Resp. to Objection to Evidence, Doc. No. 239.)

[140] *See Stringfellow v. Brown*, No. 95-7145, 1997 U.S. App. LEXIS 433, at *3 (10th Cir. Jan. 10, 1997) (unpublished); *see also* Fed. R. Civ. P. 6(b)(1)(B).

neglect exists, courts consider: (i) the danger of prejudice to the opposing party; (ii) the length of the delay and its potential impact on the judicial proceedings; (iii) the reason for the delay, including whether it was within the reasonable control of the movant; and (iv) whether the movant acted in good faith.[141]

Applying these factors, where the FA Defendants have not suggested they suffered any prejudice from Plaintiffs' late filing, this first factor weighs in the Plaintiffs' favor.[142]  Second, while the length of the delay is substantial,[143] its impact on the judicial proceedings is nonexistent where the response was filed well before any hearings were held or any findings were made regarding the underlying motion or the FA Defendants' objections.[144]  The third factor weighs in the FA Defendants' favor where Plaintiffs failed to provide a reason for the delay.  However, where there is no evidence of bad faith, and the FA Defendants allege none, the fourth factor weighs in Plaintiffs' favor.  Because three of the four factors weigh in Plaintiffs' favor, their untimely response to the FA Defendants' objections constitutes excusable neglect.  Accordingly, the court considers Plaintiffs' response and finds no basis to strike the declarations on these grounds.[145]

---

[141] *See Skyline Potato Co. v. Tan-O-On Mktg.*, No. CIV 10-0698 JB/RHS, 2012 U.S. Dist. LEXIS 107949, at *7 (D.N.M. July 28, 2012) (unpublished) (citing *Schupper v. Edie*, 193 F. App'x 744, 746 (10th Cir. 2006) (unpublished)).

[142] *See Hutchinson v. Pfeil*, 211 F.3d 515, 517 n.1 (10th Cir. 2000) (stating the use of discretion to consider a late filing is "especially appropriate" when "there is no suggestion of prejudice").

[143] The FA Defendants argue Plaintiffs' response was filed "seven weeks later," but the relevant timeframe is actually five weeks considering Plaintiffs originally had fourteen days to respond to the objection.  (*See* Objection to Pls.' Resp. to Objection to Evidence 2, Doc. No. 239.)

[144] (*See* Minute Entry, Doc. No. 243.)

[145] Even if the court declined to consider Plaintiffs' response to the FA Defendants' objections, the FA Defendants cite no authority supporting their claim that their objections should be

Turning to the substantive arguments, the declarants attest they were unaware of the terms of the title policies when their respective sales agreements were executed, and they never consented or intended to consent to arbitration with First American.[146]  The declarations also indicate that some plaintiffs first received a copy of the title policy after closing on the loan, while others first received a copy after filing this lawsuit.[147]  The FA Defendants claim these declarations should not be considered because they are irrelevant to the issue of notice, they fail to "demonstrate the competence of the declarants," they are deficient overall because some Ohio plaintiffs failed to submit declarations, and thirteen declarations are otherwise flawed.[148]  Each objection is discussed below.

First, with regard to notice, the FA Defendants argue the fact that many of the declarants attest they received a copy of their title policy before filing suit shows the policy was generally available if they asked, making their declarations irrelevant.[149]  This argument falls flat.  To the extent actual notice is required, the Ohio plaintiffs' statements as to when they received that notice is relevant.  Plaintiffs assert that they did not receive the title policies until after closing

---

sustained solely based on the lack of a response.  An objection must be substantively meritorious to be sustained.

[146] (*See* Ex. B to Opp'n, Declarations ¶¶ 3–6, Doc. No. 225 at 28–117.)  One additional declaration was filed with Plaintiffs' response to the FA Defendants' objections, bringing the total number of declarations submitted to forty-five.  (*See* Ex. A to Pls.' Resp. to Objection to Evidence, Decl. of Richard Abraham, Doc. No. 236-1.)  Plaintiffs indicate this declaration was "inadvertently omitted" from its original filing.  (Pls.' Resp. to Objection to Evidence, Doc. No. 236 at 2.)

[147] (*See* Ex. B to Opp'n, Declarations ¶ 5, Doc. No. 225 at 28–117.)

[148] (*See* Objection to Evidence 2–5, Doc. No. 228.)

[149] (*See id.* at 2.)

and that the arbitration clause constitutes a nonstandard term.[150]  Where Ohio law requires

delivery of a policy in order for nonstandard terms to be binding[151]—as explained in greater

detail below—the declarations are directly relevant to the issue of notice.  Moreover, even if the

policies were generally available, the FA Defendants have not established general availability

negates the requirement of actual notice—such that the declarations should be disregarded.

Next, the FA Defendants object that the declarations fail to "demonstrate the competence

of the declarants to give the testimony offered."[152]  This argument is, likewise, unavailing.  In

support of this objection, the FA Defendants cite Rule 602 of the Federal Rules of Evidence.[153]

Under Rule 602, "[a] witness may testify to a matter only if evidence is introduced sufficient to

support a finding that the witness has personal knowledge of the matter."[154]  Although the FA

Defendants make broad claims as to various declarants' actual knowledge,[155] each declarant

attests to "personal knowledge of the facts testified to herein, which facts are true and correct to

the best of [the declarant's] knowledge and belief."[156]  The FA Defendants have failed to

sufficiently call this into question.

---

[150] (Opp'n, Doc. No. 225 at 15–22.)

[151] *See Henderson,* 108 Ohio St. 3d at 268.

[152] (*See* Objection to Evidence 4, Doc. No. 228.)

[153] (*See id.*)

[154] Fed. R. Evid. 602.

[155] (*See* Objection to Evidence 3, Doc. No. 228.)

[156] (Ex. B to Opp'n, Declarations ¶ 1, Doc. No. 225 at 28–117.)

The FA Defendants next argue the declarations are deficient overall because eight of the Ohio plaintiffs did not submit a declaration.[157]  In their response, Plaintiffs explain the omission of these declarations.  They note one of the eight declarations was "inadvertently omitted" from their original filing—an oversight corrected by submitting the declaration with Plaintiffs' response to the FA Defendants' objection.[158]  Plaintiffs further explain two Ohio plaintiffs are deceased, one was unable to provide a declaration "due to the effects of her age," and the rest are either spouses or co-trustees of individuals who filed declarations.[159]  More fundamentally, the FA Defendants have not shown how a failure to obtain a declaration from every possible declarant negates or undermines those that were filed.

Lastly, the FA Defendants claim thirteen declarations are substantively flawed for various reasons.  Specifically, they argue digital information was added to some of the declarations at the last minute, the declarants' names or the entities they represent are incomplete, and the declarations are undated.[160]

With regard to digital changes, the FA Defendants argue metadata from six declarations shows discrepancies and minor, last-minute changes (a digitally added "x" and date), making the declarations unreliable.[161]  These changes would only diminish the reliability of the declarations

---

[157] (Objection to Evidence 2 n.1, Doc. No. 228).

[158] (Pls.' Resp. to Objection to Evidence, Doc. No. 236 at 2; *see also* Ex. A to Pls.' Resp. to Objection to Evidence, Decl. of Richard Abraham, Doc. No. 236-1.)  Notably, Mr. Abraham's declaration is dated March 23, 2023—the same or similar date as several declarations filed with Plaintiffs' opposition to the motion to compel arbitration.  (*See id.*; *see also* Ex. B to Opp'n, Declarations, Doc. No. 225 at 30, 48, 63, 75, 97, 115.)

[159] (Pls.' Resp. to Objection to Evidence, Doc. No. 236 at 2–3.)

[160] (Objection to Evidence 2–4, Doc. No. 228.)

[161] (*Id.* at 4.)

if they were made without the declarants' knowledge or approval.  However, although Plaintiffs

acknowledge some of the declarations were returned to counsel incomplete, Plaintiffs' counsel

"unequivocally certifies" any changes made were expressly authorized by each declarant.[162]

Absent any reason to doubt this representation, the changes do not make the declarations

unreliable.

Next, the FA Defendants contend two declarations are deficient because the declarant's

name (John Lalli) is incomplete on one, and the other does not identify what entity the declarants

(Emilia Bonder and Tiberich Egrovich) represent.[163]  Regarding Mr. Lalli's declaration,

Plaintiffs argue the context and signature blocks make clear who made the declaration.[164]  As for

Ms. Bonder and Mr. Egrovich, Plaintiffs contend the amended complaint specifies they are

principals of E&H Jackson, LLC.[165]  The FA Defendants have not identified a sufficient basis

for striking or disregarding the declarations at issue.  As Plaintiffs suggest, although the

introductory paragraph to Mr. Lalli's declaration includes only his first name, his identity is

easily discernible where both his first and last name are included in the signature block.[166]  And

even if the entity with which Ms. Bonder and Mr. Egrovich are associated were not readily

---

[162] (Pls.' Resp. to Objection to Evidence, Doc. No. 236 at 3 & n.1.)

[163] (*See* Objection to Evidence 3–4, Doc. No. 228; *see also* Ex. B to Opp'n, Decl. of John Lalli, Doc. No. 225 at 66; Ex. B to Opp'n, Decl. of Emilia Bonder & Tiberich Egrovich, Doc. No. 225 at 38.)

[164] (Pls.' Resp. to Objection to Evidence, Doc. No. 236 at 3.)

[165] (*See* Am. Compl. ¶¶ 174–177, Doc. No. 122 ("In the Spring of 2018, Marshall of TM 1031 Exchange referred Emilia Bonder of E&H Jackson, LLC to Rockwell."); *see also id.* at ¶ 487 (identifying "Emilia Bondar [sic] and Tiberich Egrovich (E & H Jackson, LLC)" as vulnerable adults).)

[166] (*See* Ex. B to Opp'n, Decl. of John Lalli, Doc. No. 225 at 66.)

discernable from the amended complaint,[167] it's not apparent that Ms. Bonder and Mr. Egrovich's failure to identify the entity they represent constitutes a basis for striking their declaration.

Lastly, the FA Defendants contend five declarations are deficient because they are undated.[168]  It is true that declarations must generally be dated: "to have the same force and effect as an affidavit, a declaration must be 'subscribed . . . as true under penalty of perjury, and *dated*.'"[169]  But this is not the end of the inquiry.  "[T]he absence of a date does not render a declaration invalid if extrinsic evidence demonstrates . . . the period in which the declaration is signed."[170]  Plaintiffs contend it is clear from the context "that the testimony was given after the commencement of the case."[171]

Forty of the forty-five declarations submitted are dated.  And those dates demonstrate the declarations were made after this action was filed.  This fact alone tends to demonstrate the period in which the remaining five declarations at issue were signed.  Moreover, even if the lack of a date invalidated five declarations, the forty dated declarations would still be considered.  The FA Defendants have not supplied a basis for disregarding all of them based on objections to

---

[167] (*See* Am. Compl. ¶¶ 174–177, 487, Doc. No. 122.)

[168] (Objection to Evidence 3–4, Doc. No. 228; *see also* Ex. B to Opp'n, Decl. of Gertrude Winkler, Doc. No. 225 at 113; Ex. B to Opp'n, Decl. of Ivy Fasko, Doc. No. 225 at 50; Ex. B to Opp'n, Decl. of Richard Vollhardt, Doc. No. 225 at 107; Ex. B to Opp'n, Decl. of Randy Steck, Doc. No. 225 at 95; Ex. B to Opp'n, Decl. of Alan Seshiki, Doc. No. 225 at 87.)

[169] *Whitehead v. Mgmt. & Training Corp.*, No. 17-275 MV/KK, 2020 U.S. Dist. LEXIS 173108, at *64 n.36 (D.N.M. Sept. 22, 2020) (unpublished) (quoting 28 U.S.C. § 1746) (emphasis and alteration in original)).

[170] *Id.* (second alteration in original) (quoting *Richardson v. Gallagher*, 553 F. App'x 816, 827–28 (10th Cir. 2014) (unpublished)).

[171] (Pls.' Resp. to Objection to Evidence, Doc. No. 236 at 3.)

some.[172]  Where Plaintiffs allege all their experiences regarding the title policies were

substantially similar, and the FA Defendants have provided no evidence showing otherwise, it is

appropriate to consider all the declarations together.

Where Plaintiffs demonstrated excusable neglect for their untimely response and the FA

Defendants' substantive arguments are otherwise unavailing, the FA Defendants' objections to

the declarations submitted with Plaintiffs' opposition to the renewed motion to compel

arbitration are overruled and the declarations are considered.

     ii.  <u>The Ohio Plaintiffs Did Not Receive Actual or Constructive Notice of the Arbitration Agreement in the Title Policies.</u>

Next, the FA Defendants contend the Ohio plaintiffs had adequate notice of the title

policies and an opportunity to review their terms.[173]  The FA Defendants argue "[w]here, as here,

a written arbitration provision exists, and plaintiffs are provided constructive and inquiry notice

of it, they are bound by it."[174]  The FA Defendants rely on *Qualls v. Wright Pratt Credit

Union*[175] and *Rudolph v. Wright Pratt Credit Union*[176] in support of their argument.  In *Qualls*

and *Rudolph*, the plaintiffs signed banking agreements containing provisions permitting the

defendant credit union to "change the terms of [their] Agreement and other Account Documents

---

[172] The FA Defendants object to "the entirety of Plaintiffs'" declarations and request that "Plaintiffs not be allowed to rely on the [d]eclarations in opposition" to their renewed motion to compel arbitration.  (Objection to Evidence 2, 5, Doc. No. 228.)

[173] (Reply 5, Doc. No. 226.)

[174] (*Id.*)

[175] 2021 Ohio 2055, 174 N.E.3d 874 (Ohio 2d Dist. Ct. App. 2021).

[176] 2021 Ohio 2215, 175 N.E.3d 636 (Ohio 2d Dist. Ct. App. 2021).

at any time."[177]  The plaintiffs later sought to avoid arbitration, arguing they did not have actual

or constructive notice of modifications adding an arbitration clause to the agreement.[178]  The

*Qualls* and *Rudolph* courts determined the plaintiffs received constructive notice of

modifications where their underlying agreements provided "[a]ny written notice we give to you

is effective when it is deposited in the U.S. Mail," and where the  plaintiffs separately agreed to

"electronically view any changes . . . or updates to [the defendants'] products, service, and fees,"

which were routinely posted on the defendants' websites.[179]

      As an initial matter, *Qualls* and *Rudolph* are distinguishable where they involve

agreements creating ongoing banking relationships.  Such ongoing relationships differ greatly

from the relationships at issue here, especially considering the "unique characteristics" of title

insurance policies: "[t]itle insurance coverage is provided for a continuing and indefinite period

of time in exchange for a one-time premium payment, without the need to renew the policy."[180]

This case is further distinguishable where the sales agreements do not contain the strong

modification and notice provisions at issue in *Qualls* and *Rudolph*.  Quite the opposite.  The sales

agreements provide "[n]o subsequent modifications of any of the terms of this Agreement shall

be valid, binding upon the parties, or enforceable unless made in writing and signed by the

---

[177] *Qualls*, 2021 Ohio 2055, at ¶ 9; *Rudolph*, 2021 Ohio 2215, at ¶¶ 2, 26.

[178] *See Qualls*, 2021 Ohio 2055, at ¶ 37; *Rudolph*, 2021 Ohio 2215, at ¶ 1.

[179] *Qualls*, 2021 Ohio 2055, at ¶¶ 61, 77 (emphasis omitted); *Rudolph*, 2021 Ohio 2215, at
¶¶ 45–47 (emphasis omitted).

[180] *See Henderson*, 108 Ohio St. 3d at 272 (internal quotation marks omitted).

parties."[181]  They also contain no notice provisions.[182]  And the Ohio plaintiffs attest they never

saw the title policies issued pursuant to these agreements until after closing on their loans.[183]

The FA Defendants further argue the Ohio plaintiffs had notice of the policies applicable

to their purchases sufficient to "form an agreement to arbitrate" because (1) each plaintiff agreed

to be responsible for her "own due diligence, including without limitation the retention of tax and

legal counsel," and (2) each plaintiff  "specifically qualified" her request for title coverage by

insisting she "be added, by endorsement, to the specific title policy" for each respective

property.[184]  The FA Defendants rely on *DiTucci v. Ashby*[185] in support of the position that this

constitutes sufficient notice.

Specifically, the FA Defendants contend that under "nearly identical circumstances," the

*DiTucci* court ruled that "purchasers of [tenant-in-common] interests under the Rockwell [sales

agreements] were bound by the accompanying title policy arbitration clauses based on the prior

notice they had received."[186]  But this takes *DiTucci*'s ruling too far.  The *DiTucci* court engaged

in an entirely different analysis: whether issuance of the title policy endorsement was

procedurally unconscionable.[187]  The *DiTucci* court determined that because the plaintiffs "were

---

[181] (*See e.g.*, Ex. 1 to First Nielson Decl., Lillmars PSA ¶ 14, Doc. No. 220-1 at 7.)

[182] (*See generally id.*)

[183] (*See* Ex. B to Opp'n, Declarations ¶ 5, Doc. No. 225 at 28–117.)

[184] (Reply 5–6, Doc. No. 226 (citing Exs. 1–45 to First Nielson Decl., PSAs 1, 3, ¶ 4, ¶ 12, Doc. Nos. 220-1–220-9).)

[185] 2021 U.S. Dist. LEXIS 39247.

[186] (Reply 6, Doc. No. 226.)

[187] *See DiTucci*, 2021 U.S. Dist. LEXIS 39247, at *20–22.

on notice that they would receive title insurance for the property through an endorsement to an already existing policy," their failure to review the title policy's "language before executing the [sales agreements] [did] not mean the *process leading to issuance of the Policy* was unconscionable."[188]  This is a different question than at issue here.  The *DiTucci* court simply did not address whether the plaintiffs received actual or constructive notice of the arbitration provision so as to be bound by it.

    As Plaintiffs suggest, *Henderson v. Lawyer's Title Insurance Corporation*[189] is instructive on the issue of notice.  In *Henderson*, the plaintiffs signed a purchase agreement for a house and agreed with the sellers to split the cost of a title insurance policy premium.[190]  The real estate broker asked a title insurance company to issue a commitment for the title insurance, which it did.[191]  The Hendersons received their title insurance policy after closing on the property.[192]  The Hendersons ultimately sued the title insurance company, arguing they were not bound by the arbitration clause in the title policy.[193]  The Ohio Supreme Court determined that although "[a] contract of insurance is consummated upon the unconditional acceptance of the application" by the insurer (meaning delivery is not always required), a title insurance policy issued in response to an "unqualified request for coverage," which is not delivered until after the closing, is binding only with respect to "the usual and customary terms found in similar

---

[188] *Id.* at *20, 22 (emphasis added).

[189] 108 Ohio St. 3d 265.

[190] *Id.*

[191] *Id.*

[192] *Id.* at 266.

[193] *Id.* at 266–67.

insurance policies."[194]  This is because only terms "which were usual and customary[] were intended."[195]  With this legal backdrop, the Ohio Supreme Court concluded the Hendersons were not bound by the arbitration clause in the title policy.[196]

The FA Defendants contend *Henderson* does not control because it governs unqualified requests for title insurance coverage and, here, the Ohio plaintiffs made "qualified" requests for coverage.[197]  Specifically, the FA Defendants argue each plaintiff "expressly qualified" her request by insisting she be added by endorsement to the title policy for her respective property, "irrespective of whether that title policy was limited to only the 'usual and customary' terms."[198]  This argument misses the mark.  The *Henderson* court's reference to an "unqualified request," centered on whether the parties negotiated for any "special terms or conditions" in the policy or if the insurer simply issued the policy "without further negotiation."[199]  Beyond conclusory statements, the FA Defendants offer no evidence to suggest the parties negotiated anything related to the endorsements or the underlying title policies.  The "Title Insurance" provision was standard across all sales agreements and there is no indication this provision resulted from negotiation.  Indeed, each endorsement altered only the name of the insured and the insurance

---

[194] *Id.* at 268.

[195] *Id.*

[196] *Id.* at 273.

[197] (*See* Reply 6–7, Doc. No. 226.)

[198] (*Id.* at 7.)

[199] *Henderson*, 108 Ohio St. 3d at 268, 270.

amount but left all other terms of the underlying policy untouched.[200]  Where there is no evidence demonstrating the Ohio plaintiffs negotiated any specific terms of the title policies, the FA Defendants' argument is unavailing, and *Henderson* applies.

In *Henderson*, the title company argued the Hendersons had received constructive notice regarding the arbitration provision, despite not receiving their title policy until after closing, because the commitment letter identified the policy that would be issued by name.[201]  The title company argued the Hendersons, with this information, could have obtained a copy of the policy from "readily available" sources.[202]  The *Henderson* court found this argument unpersuasive because the commitment letter "merely informed" the Hendersons that the named policy would be issued, but did not contain any information as to where that policy could be obtained or examined, or that it was even accessible in preprinted form.[203]

Here, the Ohio plaintiffs had even less notice.  The sales agreements make only passing reference to an endorsement to the "standard-coverage owner's policy,"[204] without providing any information regarding the specifics of that policy, including if or where it could be obtained or examined.  Being on notice that an underlying policy exists—with no indication as to whether or how that policy may be accessed—is not the same as being on constructive notice of specific terms within that policy.  For these reasons, it cannot be said that Plaintiffs were on notice of the

---

[200] (*See, e.g.*, Ex. 51 to First Nielson Decl., Endorsement Attached to Policy No. 913032 ("Independence, Ohio Endorsement"), Doc. No. 220-11 at 4.)

[201] *Henderson*, 108 Ohio St. 3d at 271.

[202] *Id.*

[203] *Id.* at 271–72.

[204] (*See, e.g.*, Ex. 1 to First Nielson Decl., Lillmars PSA ¶ 4, Doc. No. 220-1 at 5.)

arbitration provision within the underlying title policy before their receipt of the actual policy, which did not occur until after closing.

        iii.   <u>The Arbitration Agreement in the Ohio Policies Was Not Usual and Customary.</u>

Because the Ohio plaintiffs did not receive the title policies until after closing and were not on constructive notice of the arbitration provision in the policies, they can only be bound by the provision if it is deemed to be a "usual and customary" term for title insurance policies.[205] As explained below, the FA Defendants fail to demonstrate the arbitration provision was "usual and customary" at the time the Ohio title policies were issued, where First American's use of arbitration provisions in their policies varied drastically from one transaction to another.

As an initial matter, only the parties' original arguments, evidence, and briefing is considered in making this determination. At the June 20 hearing, Plaintiffs submitted additional evidence in support of their position that arbitration clauses are not usual and customary in the title policy industry.[206] Because this evidence was presented for the first time at the hearing, the FA Defendants were afforded an opportunity to respond.[207] But they were advised any response must be in the vein of a response to a notice of supplemental authority.[208] The court did not invite new evidence. The FA Defendants ignored this directive, instead submitting three

---

[205] *See Henderson,* 108 Ohio St. 3d at 268; *see also Riley*, 2014-Ohio-1818, at ¶ 14 ("[T]he cases upon which the *Henderson* Court relied . . . stand for the proposition that an insurance contract can be formed absent delivery of the policy, but, absent proof that the parties negotiated for specific terms, the terms of an undelivered policy are those that are usual and customary.").

[206] (*See* Exs. Regarding 243 Motion Hearing, Doc. No. 244.) Plaintiffs also submitted additional legal authority on the issue of equitable estoppel.

[207] (*See* Minute Entry, Doc. No. 243.)

[208] *See* DUCivR 7-1(c).

supplemental filings, including new evidence in the form of additional declarations.[209]  Without

court authorization, Plaintiffs responded in kind, submitting two supplemental filings with new

declarations and other new evidence from web sources.[210]  These supplemental filings were

unauthorized by the rules and far exceed the scope of the limited supplemental briefing permitted

by the court.  Where this issue can be resolved on the parties' initial briefing alone, and the

submission of additional briefing and evidence was unauthorized and unjustified, none of the

additional evidence submitted at the hearing or with the parties' supplemental filings is

considered.[211]

Turning to the parties' arguments, Plaintiffs contend arbitration provisions are not usual

and customary terms in the title insurance industry.[212]  They argue the FA Defendants' "own title

insurance policies varied dramatically from the limited compulsory arbitration provision of the

Ohio policies to the non-compulsory policy issued in Florida."[213]  Plaintiffs contend such

"material differences" in the policies issued by the FA Defendants supports the "conclusion that

---

[209] (*See* FA Defs.' Suppl. Brief in Support of Renewed Mot. to Compel Arbitration, Doc. No. 245; Third Decl. of Steven J. Nielson in Support of Defs.' Suppl. Brief and Mot. to Compel Arbitration, Doc. No. 246; FA Defs.' Resp. to Pls.' Suppl. Mem. and Objection to Evidence, Doc. No. 251; Fourth Decl. of Steven J. Nielson in Support of FA Defs.' Objection to Evidence, Doc. No. 252; FA Defs' Resp. to Pls.' Objection to Fourth Decl. of Steven J. Nielson and Objection to FA Defs.' Resp., Doc. No. 254.)

[210] (*See* Pls.' Suppl. Mem. and Objection to Evidence in Opp'n to FA Defs.' Mot to Compel Arbitration, Doc. No. 250; Pls.' Objection to Fourth Decl. of Steven J. Nielson and Objection to FA Defs.' Resp., Doc. No. 253.)

[211] Generally, parties "should be given an opportunity to respond to new material," such as new evidence and legal arguments.  *Green v. New Mexico*, 420 F.3d 1189, 1196 (10th Cir. 2005). However, if the court "does not rely on the new material in reaching its decision," it may also decline to consider any response to the new material.  *Id.*

[212] (*See* Opp'n, Doc. No. 225 at 17–22.)

[213] (*Id.* at 18.)

not even [First American] has an arbitration provision that is 'standard,' let alone the industry as a whole."[214]  The FA Defendants contend arbitration provisions are usual and customary for commercial title policies, and filed a declaration from Steven J. Nielson (Vice President, Division Area Manager for First American) in support.[215]  Mr. Nielson attests it has been usual and customary for all major title companies, including First American, to include arbitration provisions in title policies since at least 2010.[216]  He notes that these title policies were "based on the most recently approved ALTA Owner's Policy," which (from 2006 through 2020) was the 2006 ALTA Owner's Policy that "at all times contained an arbitration provision."[217]  The FA Defendants also argue *Henderson* "did not make a blanket holding that 'arbitration provisions are not usual and customary terms in the title insurance industry.'"[218]  Rather, they contend *Henderson* "specifically noted" that provisions which are considered "'standard' may change over time."[219]

While the *Henderson* court did not make a blanket ruling regarding whether arbitration provisions are usual and customary in the title insurance industry as a whole, it provides guidance on how to evaluate this question on a case-by-case basis.  Under *Henderson*, a title insurance policy which is not delivered until after closing is binding only "to the extent that it

---

[214] (*Id.*)

[215] (Reply 8, Doc. No. 226; Decl. of Steven J. Nielson in Support of Renewed Mot. to Compel Arbitration (Second Nielson Decl.) ¶ 2, Doc. No. 227.)

[216] (Second Nielson Decl. ¶ 2, Doc. No. 227.)

[217] (*Id.* at ¶ 5.)

[218] (Reply 9, Doc. No. 226 (quoting Opp'n, Doc. No. 225 at 17).)

[219] (*Id.* (citing *Henderson,* 108 Ohio St. 3d at 268).)

contains the usual and customary terms found in similar insurance policies."[220]  Put another way, "any nonstandard term" in a policy delivered after closing "will be invalidated as contrary to the parties' intent."[221]  The *Henderson* court determined arbitration provisions were not usual and customary terms in the title policies issued by the defendant title company.[222]

In arriving at this conclusion, the *Henderson* court considered testimony from the title company's vice president that as a "usual and customary practice . . . title insurance policies have included arbitration provisions since at least 1987," that arbitration clauses appeared in the majority of ALTA-promulgated policies, and "it was the practice of [the title company] in 1999 to issue the most recently approved ALTA policy."[223]  The vice president confirmed that when the Hendersons received their policy, arbitration clauses were "in some policies, and [were] not in other policies," and, "as a matter of routine practice," the title company would delete an arbitration clause on request.[224]  The court found this testimony, that "use of an arbitration clause may vary from one transaction to the next, or that some title insurance policies but not others may be issued with an arbitration clause, [was] hardly sufficient evidence of a usual and customary practice."[225]  The court found "even a broadly construed definition of 'usual and customary' that tolerates some degree of practical variation would still have to include elements

---

[220] 108 Ohio St. 3d at 268.

[221] *Id.* at 270–71.

[222] *Id.* at 269.

[223] *Id.* 268–69 (first alteration in original).

[224] *See id.* at 269.

[225] *Id.*; *see also Eberhard*, 2013 U.S. Dist. LEXIS 206797, at *6 (applying this same principle).

of consistency and regularity in order to retain its essential meaning."[226]  In other words, inconsistent use of arbitration provisions by even a single defendant is enough to support a determination that such provisions are not usual and customary under *Henderson*.[227]

The instant case is highly analogous.  First American's use of arbitration clauses varied from one transaction to another at the time it issued the Ohio title policies.  Although both the Florida and Ohio title policies contain an arbitration provision, they do so in name only—the substance of the two clauses are opposite in effect.  The arbitration clause in the Ohio title policies provides, "[e]ither the Company or the Insured may demand that the claim or controversy shall be submitted to arbitration."[228]  This arbitration clause is binding.  Once one side decides to arbitrate, compliance is obligatory, and the other side has no further say in the matter—they must arbitrate.  Compare that with the arbitration clause in the Florida title policies: "arbitration . . . may be demanded if agreed to by both the Company and the Insured at the time of a controversy or claim."[229]  This provision vests both parties with the unilateral ability to avoid arbitration altogether; if one party does not want to arbitrate, it will not happen.  In effect, this is the same as including no arbitration clause, because the parties' rights were the same regardless of whether this provision was included in the Florida policy.  Even without the provision, the parties could arbitrate if both sides agreed to.  In other words, the Florida

---

[226] *Henderson*,108 Ohio St. 3d at 269.

[227] *See id.* at 268–69; *see also Eberhard*, 2013 U.S. Dist. LEXIS 206797, at *18 ("It may be that Global American issued some title insurance policies with arbitration provisions, and other title insurance policies without them.  That situation would be analogous to *Henderson*.").

[228] (*See e.g.*, Ex. 47 to First Nielson Decl., Independence, Ohio Policy ¶ 14, Doc. No. 220-10 at 19.)

[229] (Ex. 46 to First Nielson Decl., Florida Policy ¶ 14, Doc. No. 220-10 at 6.)

arbitration clause exists in name only, not in function—it is the same as no arbitration clause. Put another way, the essential meaning of the Florida arbitration clause varies greatly from the Ohio clause.

Where First American's use of arbitration provisions in their title policies varied so substantially from one transaction to another, the FA Defendants' claim that arbitration clauses were a usual and customary term at the time the Ohio title policies were issued is unsupported. Accordingly, the Ohio arbitration agreement constitutes a nonstandard term which required delivery prior to closing. Where this did not occur, the arbitration agreement within the Ohio title policies is "invalidated as contrary to the parties' intent,"[230] meaning the Ohio plaintiffs did not assent to arbitrate, and the FA Defendants cannot compel them to do so under the title policies.

<u>CONCLUSION</u>

The FA Defendants cannot compel arbitration under the sales agreements, where they were not parties to the agreements and equitable estoppel, agency, and third-party beneficiary theories under Ohio and Florida law do not apply. Likewise, the FA Defendants cannot compel arbitration under the title policies, where the Ohio plaintiffs did not receive actual or constructive notice of the arbitration provisions before closing, and arbitration provisions were not usual and customary terms at the time the Ohio title policies were issued. Because the FA Defendants

---

[230] *Henderson*, 108 Ohio St. 3d at 270–71.

cannot compel arbitration under either the sales agreements or the title policies, their renewed

motion to compel arbitration is denied.

DATED this 2nd day of October, 2023.

BY THE COURT:

_Daphne A. Oberg_

Daphne A. Oberg
United States Magistrate Judge