THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| CHRISTPHER C. FUCCI, et al.,<br><br>        Plaintiffs,<br><br>v.<br><br>WILLIAM BOWSER, et al.,<br><br>        Defendants. | **MEMORANDUM DECISION AND ORDER OVERRULING [263] OBJECTION TO MAGISTRATE JUDGE'S MEMORANDUM AND ORDER DENYING RENEWED MOTION TO COMPEL ARBITRATION**<br><br>Case No. 2:20-cv-00004-DBB-DAO<br><br>District Judge David Barlow |

Before the court is First American Title Insurance Company and Kristen Parkin's ("FA Defendants") Objection to the Magistrate Judge's Memorandum and Order Denying FA Defendants' Renewed Motion to Compel Arbitration.[1] The FA Defendants present seven objections to the magistrate judge's Memorandum and Order.

## BACKGROUND

This matter concerns a commercial real estate investment gone wrong. Plaintiffs purchased tenant-in-common interests in real estate development projects in Florida and Ohio.[2] After their investments soured, Plaintiffs sued the seller of these interests, Rockwell Debt Free Properties, Inc., and related parties ("Rockwell").[3] Plaintiffs also sought recovery from First

---

[1] Obj. to Mag. Judge's Oct. 2, 2023 Mem. & Order Den. First Am. Title Ins. Co. and Kristen Parkin's Renewed Mot. to Compel Arb., ECF No. 263, filed Nov. 3, 2023 [hereinafter Obj.].

[2] Am. Compl. ¶ 14, ECF No. 122, filed Aug. 17, 2021; Decl. of Steven J. Nielsen in Supp. of Renewed Mot. to Compel Arb., ECF No. 220, filed Mar. 1, 2023 [hereinafter First Decl. Steven J. Nielsen].

[3] Am. Compl. ¶¶ 12–13.

American Title Insurance Company ("First American").[4] First American served as escrow agent and title insurer in closing each of the tenant-in-common sales.[5] Each plaintiff transacted under separate purchase sales agreements ("PSAs"), and Ms. Parkin acted as the escrow agent for every transaction.[6]

Plaintiffs contend that the FA Defendants were entrusted with their invested money, which would be held in escrow.[7] Capital would only be disbursed for land purchases and for incremental completion of event centers to be built on the properties.[8] Plaintiffs allege that the FA Defendants instead disbursed the entirety of the fund to Rockwell, which spent the money and failed to complete any of the planned projects.[9]

The FA Defendants moved to compel Plaintiffs to arbitrate their claims under the Federal Arbitration Act ("FAA").[10] However, the motion was dismissed without prejudice when the case was stayed pending the appeal of a related issue in another case.[11] After the stay was lifted, the FA Defendants filed a renewed motion to compel arbitration on March 1, 2023.[12] On March 29, Plaintiffs filed their objection.[13] On April 12, the FA Defendants filed their reply in addition to a

---

[4] *Id.* ¶ 13. Plaintiffs allege that the FA Defendants improperly managed their escrow account, giving rise to six claims in their Amended Complaint. These include breach of fiduciary duty, aiding and abetting tortious conduct, conspiracy to engage in tortious conduct, materially aiding state-law securities fraud, unjust enrichment, and abuse of vulnerable adults. Am. Compl. ¶¶ 86–89, 91–96, 106–111.

[5] *Id.*

[6] *Id.* ¶ 12.

[7] *Id.* ¶¶ 129–30.

[8] *Id.* ¶ 130; Mem. and Order Den. First Am. Title Ins. Co. and Kirsten Parkin's Renewed Mot. to Compel Arb. and Overruling Their Obj. to Evid. 4, ECF No. 258, filed Oct. 2, 2023 [hereinafter Order].

[9] Am. Compl. ¶ 433(b).

[10] FA Defs.' Mot. to Compel Arb., ECF No. 126, filed Sept. 16, 2021.

[11] Docket Text Order, ECF No. 149, entered Dec. 9, 2021. The other case is *DiTucci v. Ashby*, No. 2:19-cv-00277, 2021 WL 778579 (D. Utah March 1, 2021).

[12] FA Defs.' Renewed Mot. to Compel Arb., ECF No. 219, filed Mar. 1, 2023 [hereinafter Mot. to Compel Arb.].

[13] Pls.' Obj. to Renewed Mot. to Compel Arb., ECF No. 225, filed Mar. 29, 2023.

second Declaration of Steven J. Nielsen, and an objection to evidence presented in Plaintiffs' objection.[14]

The magistrate judge held a hearing on the pending motion and objections on June 20, 2023.[15] During the hearing, Plaintiffs' counsel presented new evidence and legal authority to support their argument relating to Ohio arbitration law.[16] A "briefing odyssey" ensued.[17] The magistrate judge granted leave to the FA defendants to file a supplemental brief to respond to the new information presented during the hearing.[18] That brief was filed on June 27, 2023, which added the new information to the record.[19] Plaintiffs sought and obtained leave to file their own supplemental response to FA Defendants' brief.[20] Without seeking leave, FA Defendants then filed another supplemental brief and a fourth Steven J. Nielsen Declaration on July 19, 2023.[21] Plaintiffs filed an evidentiary objection on July 26, 2023,[22] and FA Defendants responded once more on July 31, 2023.[23] The parties' supplementary filings concluded with the FA Defendants' Notice of Supplementary Authority on September 12, 2023.[24]

On October 2, 2023, the magistrate judge entered the Memorandum Decision and Order Denying FA Defendants' Renewed Motion to Compel Arbitration (the "Order").[25] FA

---

[14] FA Defs.' Reply to Resp. to Mot. to Compel Arb., ECF No. 226, filed Apr. 12, 2023; Second Decl. Steven J. Nielsen, ECF No. 227, filed April 12, 2023; Obj. to Evid., ECF No. 228, filed Apr. 12, 2023.
[15] Minute Entry, ECF No. 243, entered June 20, 2023.
[16] Pls.' Resp. to FA Defs.' Obj. to Mag. Judge's Oct. 2, 2023 Mem. and Order 4, ECF No. 268, filed Dec. 22, 2023 [hereinafter Pls.' Resp.].
[17] Id.
[18] Minute Entry, ECF No. 243, entered June 20, 2023.
[19] FA Defs.' Suppl. Brief in Supp. of Renewed Mot. to Compel Arb., ECF No. 244, filed June 27, 2023.
[20] Pls.' Supp. Resp. to Mot. to Compel Arb., ECF No. 250, filed July 12, 2023.
[21] FA Defs.' Resp. to Pls.' Suppl. Mem. and Obj. to Evid., ECF No. 251, filed July 19, 2023; Decl. Steven J. Nielsen, ECF No. 252, filed July 19, 2023 [hereinafter Fourth Decl. Steven J. Nielsen].
[22] Pls.' Obj. to Fourth Decl. of Steven J. Nielsen and Obj. to FA Defendants' July 19, 2023 Resp., ECF No. 253, filed July 26, 2023.
[23] FA Defs.' Resp. to Pls' Objs., ECF No. 254, filed July 31, 2023.
[24] FA Defs.' Notice of Supp. Auth. ECF No. 255., filed Sept. 12, 2023.
[25] Order 1.

Defendants objected to the Order on November 3, 2023.[26] Plaintiffs filed their response on December 22, 2023.[27]

## STANDARD

Under Fed. R. Civ. P. 72, orders of a magistrate judge on non-dispositive matters are reviewed based on a "clearly erroneous or contrary to law" standard, while dispositive matters are reviewed de novo. FA Defendants argue that "the court should review the order *de novo* because it is the functional equivalent of a dispositive motion expressly excepted under 28 U.S.C. § 636(b)(1)(A)."[28] Courts in the Tenth Circuit have applied both standards on a motion to compel arbitration.[29] The court need not decide this issue because the result here is the same under either standard.

## DISCUSSION

The Federal Arbitration Act allows federal courts to enforce arbitration agreements.[30] To that end, courts may issue "an affirmative order to engage in arbitration."[31] In deciding a motion to compel arbitration, a court must determine whether there is a valid agreement to arbitrate, and whether the dispute in question falls within the scope of that agreement.[32] Regarding whether there is a valid agreement to arbitrate, courts utilize framework "similar to summary judgment

---

[26] Obj.

[27] Pls.' Resp.

[28] Obj. 4.

[29] *Judd v. KeyPoint Gov't Sols., Inc.*, No. 18-cv-00327, 2018 WL 3526222, at *1 n.1 (D. Colo. July 23, 2018), *R. & R. adopted*, 2018 WL 6603888 (D. Colo. Dec. 4, 2018); *see also Smith v. AHS Okla. Heart, LLC*, No. 11-CV-691, 2012 WL 3156878, at *1 n.1 (N.D. Okla. June 6, 2012), *R. & R. adopted*, 2012 WL 3156877 (N.D. Okla. Aug. 3, 2012) (citing *Vernon v. Qwest Commc'ns Int'l, Inc.*, 857 F. Supp. 2d 1135, 1140–41 (D. Colo. 2012), *aff'd*, 925 F. Supp. 2d 1185 (D. Colo. 2013)) ("The Tenth Circuit has not resolved the issue.").

[30] 9 U.S.C. § 4.

[31] *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 22 (1983).

[32] *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986).

practice."[33] Where "the parties dispute the existence of an agreement to arbitrate, a court may

grant a motion to compel arbitration if 'there are no genuine issues of material fact regarding the

parties' agreement.' Courts 'should give to the opposing party the benefit of all reasonable

doubts and inferences that may arise.'"[34] The moving party must present "evidence sufficient to

demonstrate the existence of an enforceable agreement."[35] If sufficient evidence of an

enforceable agreement is presented, the burden then shifts to the nonmoving party to "raise a

genuine dispute of material fact regarding the existence of an agreement."[36]

Once it is determined that there is a valid agreement to arbitrate, a court must determine

whether the dispute in question falls within the scope of the agreement. When addressing

whether a dispute is arbitrable "any doubts concerning the scope of arbitrable issues should be

resolved in favor of arbitration."[37]

Under this framework, the Order denied FA Defendants' Motion to Arbitrate. FA

Defendants do not object to the Order's findings that the court has the authority to determine the

validity of the Arbitration Agreement and its enforceability on Plaintiffs.[38] The parties also do

not dispute that the PSAs contain valid arbitration clauses.[39] Their disagreements center on

whether the FA Defendants were parties to the agreement and, in the alternative, whether they

---

[33] *Hancock v. American Tel. & Tel. Co., Inc.*, 701 F.3d 1248, 1261 (10th Cir. 2012).

[34] *Id.* (quoting *Avedon Eng'g, Inc. v. Seatex*, 126 F.3d 1279, 1283 (10th Cir. 1997); *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd.*, 636 F.2d 51, 54 (3d Cir. 1980)).

[35] *Id.*

[36] *Id.*

[37] *Belnap v. Iasis Healthcare*, 844 F.3d 1272, 1281 (10th Cir. 2017) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983)).

[38] Obj. 4–5.

[39] Order 7.

can enforce the arbitration agreements as nonsignatories under equitable estoppel, agency, or third-party beneficiary theories.[40]

## I.       Whether the FA Defendants Were Parties to the PSAs.

FA Defendants first object to the magistrate judge's conclusion that they are not parties to the PSAs. The Order ruled that under Ohio and Florida law, the FA Defendants were not "parties" under the plain language of the sales agreements.[41]

FA Defendants contend that they are parties to the arbitration agreement despite the fact they did not sign the PSAs. They instead argue that both Ohio and Florida law provide "that a nonsignatory is deemed a party to a contract so long as the signatory assents to its obligations under the contract."[42] Thus, FA Defendants contend that Plaintiffs and the Rockwell defendants assented to an agreement to allow FA Defendants to arbitrate any disputes under the PSA. In doing so, they point to the text of the arbitration clause. It encompasses "[a]ny dispute between the parties."[43] FA Defendants reason that because Black's Law Dictionary defines "party" as "someone who takes part in a transaction," the Rockwell Defendants and the Plaintiffs intended that the FA Defendants were included in the meaning of the term "parties" in the arbitration clause because of their role in the sale.[44] This includes acting as the escrow agent and by insuring each Plaintiff in the amount of the purchase price. Thus, under their theory, the FA Defendants can compel Plaintiffs to arbitrate because the PSAs "contemplated that the FA Defendants would participate in the transactions."[45]

---

[40] Obj. 5–14.
[41] Order 9–11.
[42] Obj. 5.
[43] *E.g.*, First Decl. Steven J. Nielsen Ex. 27 ¶ 9.
[44] *Id.*
[45] Obj. 6.

The Supreme Court has held that "arbitration is a matter of contract, and a party cannot be required to submit to arbitration any dispute which he [or she] has not agreed so to submit."[46] This is because "arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration."[47] If there is a question as to whether a party did not agree to submit to arbitration, state contract law controls. This is because the Federal Arbitration Act "does not alter background principles of state contract law regarding the scope of agreements . . . including the question of who is bound by them."[48]

State law applies here because the parties raise an issue regarding whether the Plaintiffs agreed to arbitrate with the FA Defendants.[49] Each of the PSAs contains a choice of law provision that specifies which state's law governs their construction. The PSAs for the Ohio Properties are governed by Ohio law,[50] and the PSAs for the Florida Property are governed by Florida law.[51]

### A.  Ohio Law

Under Ohio law, signatures are not required to enforce or be bound by arbitration contracts.[52] "It is only necessary that the provision be in writing and it is not required that such writing be signed."[53] Ohio courts have held that an arbitration clause in a contract is enforceable regardless of whether the party seeking to compel arbitration signed the agreement.[54]

---

[46] *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (quotation and citation omitted).
[47] *Id.*
[48] *Arthur Anderson LLP v. Carlisle*, 556 U.S. 624, 630 (2009).
[49] *See, e.g.,* Pls.' Resp. 4.
[50] *E.g.*, First Decl. Steven J. Nielsen Ex. 27 ¶ 18.
[51] *E.g.*, First Decl. Steven J. Nielsen Ex. 25 ¶ 18.
[52] *Brumm v. McDonald & Co. Securities*, 603 N.E.2d 1141, 1145–46 (Ohio Ct. App. 1992).
[53] *Id.*
[54] *See, e.g., Id.*; *Ross v. Bridgewarter Constr. Inc.*, 2003 WL 22736578, at *2 (Ohio Ct. App. Nov. 21, 2003).

"Arbitration is a matter of contract and a party cannot be required to submit a dispute to arbitration when it has not agreed to do so. Therefore, a court is required to 'look first to whether the parties agreed to arbitrate a dispute, not to general policy goals to determine the scope of the agreement.'"[55]

"A valid and enforceable contract requires an offer by one party and an acceptance of the offer by another party."[56] Offer and acceptance requires a meeting of the minds.[57] "In order for a meeting of the minds to occur, both parties to an agreement must mutually assent to the substance of the exchange."[58]

Here, the issue centers on whether a meeting of the minds occurred between the three groups of individuals, the Rockwell Defendants, the FA Defendants, and the Plaintiffs. In order for the FA Defendants to enforce the arbitration agreement under the PSAs, there must be some manifestation that the relevant individuals and entities agreed to arbitrate any disputes stemming from the PSAs. This is a question of contract interpretation.

Under Ohio law regarding the interpretation of contracts, it is the court's role "to give effect to the intent of the parties to the agreement."[59] Intent is presumed to reside in the agreed upon contractual language.[60] "Common words will be given their ordinary meaning unless manifest absurdity results or unless some other meaning is clearly evidenced from the face or overall content of the contract. If the language in a contract is clear and unambiguous, the court

---

[55] *One Lifestyle, Ltd. v. Mohiuddin*, 172 N.E.3d 507, 513 (Ohio Ct. App. 2021) (quoting *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002)).
[56] *Mohiuddin*, 172 N.E.3d at 513.
[57] *Id.*
[58] *Id.* (citations omitted).
[59] *Kellie Auto Sales, Inc. v. Rahbars & Ritters Ents., L.L.C.*, 876 N.E.2d 1014, 1019 (Ohio Ct. App. 2007).
[60] *Id.* (citing *Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146 (Ohio 1978)).

cannot create a new contract by finding an intent not expressed in the clear language employed by the parties."[61]

Here, the text of the PSAs does not support a finding that there was a meeting of the minds between the three groups of individuals and entities that the FA Defendants agreed to arbitrate. The signature block states that the "parties have set their hands" to the document, and the only signers are the Rockwell Seller and Plaintiff Buyer.[62] The agreements also state that they are "made . . . by and between" each seller and buyer with no mention of any other parties.[63] The terms "buyer" and "seller" consistently refer exclusively to Rockwell and each Plaintiff throughout the PSAs.[64] Thus, the plain text of the agreement is clear that only the Rockwell entities and each individual plaintiff agreed to arbitrate disputes under the PSA. This finding is consistent with FA Defendants' own argument in another filing before the court where they argued that they were not parties to the PSAs.[65]

FA Defendants further object that because the "FA Defendants were an integral part of the transactions under the PSAs," the parties must have intended to arbitrate. They point to several instances where the PSAs delegated "specific and exclusive duties" to First American as evidence that they "manifested their intent to be bound as a party to the PSAs."[66] However, none of these obligations delegated to First American indicate that they also intended to arbitrate.

---

[61] *Id.* (citing *Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146 (Ohio 1978).
[62] *E.g.*, First Decl. Steven J. Nielsen Ex. 1, at 9. The Seller in this contract is Rockwell Dublin, a Utah limited liability company.
[63] *E.g.*, *id.* at 3.
[64] *See* First Decl. Steven J. Nielsen.
[65] FA Defs.' Reply in Supp. of Mot. to Dismiss 4 n.6, 5, ECF No. 58, filed May 20, 2020.
[66] Obj. 5. FA Defendants point to paragraphs 2.2, 3.2, 3.4, and 3.5 of the PSAs.

Indeed, the court cannot look to general policy goals, such as the parties' alleged implied intent to bind First American to the arbitration clause, to override the plain language of the PSAs. However "integral" First American's role was in the transactions, the fact remains that the text makes clear that First American was not a "party" to the PSAs. The court also similarly rejects the notion that the court may look to extrinsic sources, such as Black's Law Dictionary or a title insurance treatise, to change the clear intent of the parties to the PSAs.

The text of the PSAs does not indicate that the FA Defendants were "parties" to the agreement. Accordingly, they are not entitled to compel arbitration under this theory.

### B.  Florida Law

Under Florida law, "[a]rbitration clauses are construed according to basic contract interpretation principles."[67] "An obligation to arbitrate is based on consent, 'and for this reason a non-signatory to a contract containing an arbitration agreement ordinarily cannot compel a signatory to submit to arbitration.'"[68] "The plain language of the agreement containing the arbitration clause is the best evidence of the parties' intent. The arbitration clause must be read together with other provisions in the contract."[69]

Thus, because the analysis again focuses on the plain language of the PSAs, the result is the same under Florida law as it is under Ohio law. As noted above, the plain language of the PSAs does not indicate that there was a meeting of the minds that the parties to the agreements agreed to arbitrate disputes with the FA Defendants.

---

[67] *Bari Builders, Inc. v. Hovstone Props. Fla., LLC*, 155 So. 3d 1160, 1162 (Fla. Dist. Ct. App. 2014) (citing *Seifert v. U.S. Home Corp.*, 750 So. 2d 633, 636 (Fla. 1999)).

[68] *Marcus v. Florida Bagels*, 112 So. 3d 631, 633 (Fla. Dist. Ct. App. 2013) (quoting *Roman v. Atl. Coast Constr. & Dev., Inc.*, 44 So. 3d 631, 633 (Fla. Dist. Ct. App.  2010)).

[69] *Bari Builders*, 115 So. 3d at 1162.

## II.        Whether the FA Defendants Were Third Party Beneficiaries of the PSAs

FA Defendants argue that they can compel arbitration because they were third-party beneficiaries of the agreements. They contend that this court should follow the reasoning in a recent Utah appellate decision, *First American Title Insurance Company v. Barron*.[70] FA Defendants correctly point out that *Barron* applied Colorado law, not Ohio or Florida law. It thus has little bearing here.[71]

FA Defendants further contend that the analysis in *Barron* applies here because Ohio and Florida courts have similar standing requirements for a third-party beneficiary to those the Utah court of appeals found to apply under Colorado law.[72] This is too attenuated. Ohio and Florida courts hold that a third party must have something more than an incidental or inconsequential benefit from the contract. FA Defendants conclude that the PSAs clearly benefitted First American because the PSAs designated it as the escrow agent and issuer of the title policies.[73]

The court first notes that review of a magistrate judge's decision is compelled when a timely objection is filed, but "issues raised for the first time in objections to a magistrate judge's recommendation are deemed waived."[74] *Plaintiffs* first raised the issue of third-party beneficiary status in their objection to FA Defendants' Motion to Compel Arbitration. They stated that "FA does not directly assert that it is a third-party beneficiary of the PSA, and certainly there is no

---

[70] 540 P.3d 623 (Utah Ct. App. 2023).

[71] As stated before, state law is applicable here because the Tenth Circuit has held that the issue of whether a non-signatory can compel arbitration under an arbitration agreement is governed by state law. *Belnap v. Iasis Healthcare*, 844 F.3d 1272, 1293 (10th Cir. 2018) (citing *Arthur Anderson LLP v. Carlisle*, 556 U.S. 624, 630–31 (2009).

[72] Obj. 6. FA Defendants quote a holding from *Barron* and ask the court to compare that holding to similar holdings in Ohio and Florida cases, *Huff v. FirstEnergy Corp.*, 957 N.E.2d 3, 7 (Ohio 2011) and *Germann v. Age Inst. of Fla., Inc.*, 912 So. 2d 590, 592 (Fla. Dist. Ct. App. 2005).

[73] Mot. to Compel Arb. 9.

[74] *Marshall v. Chater*, 75 F.3d 1421, 1426 (10th Cir. 1996).

serious argument that they could be."[75] In their reply, FA Defendants failed to respond to the allegation that they did "not directly assert that [they] are a third-party beneficiary."[76] The court notes that this argument was likely waived.  Regardless, the court addresses the substance of this argument.

Under Florida law, the party claiming third-party beneficiary status bears the burden of demonstrating that it was a beneficiary of the contract.[77] The party must demonstrate that it received something more than "an incidental or inconsequential benefit from the contract."[78] This is apparent "only if the parties to the contract clearly express, or the contract itself expresses, an intent to primarily and directly benefit the third party . . . ."[79]

Similarly, Ohio law also requires that a party must demonstrate that a "contract was entered into directly or primarily for the benefit of that person."[80] "If the promisee intends that a third-party should benefit from the contract, then that third party is an 'intended beneficiary' who has enforceable rights under the contract."[81] "If the promisee demonstrates no intent to benefit a third party, then any third party beneficiary to the contract is merely an 'incidental beneficiary,' who has no enforceable rights under the contract."[82] "The mere conferring of some benefit on the supposed beneficiary by the performance of a particular promise in a contract is insufficient;

---

[75] Pls.' Obj. to Renewed Mot. to Compel Arb., ECF No. 225, filed Mar. 29, 2023.
[76] *See* FA Defs.' Reply to Resp. to Mot. to Compel Arb., ECF No. 226, filed Apr. 12, 2023.
[77] *Williams v. Tony*, 319 So. 3d 653, 657 (Fla. Dist. Ct. App. 2021).
[78] *Id.* (quoting *Caretta Trucking, Inc. v. Cheoy Lee Shipyards, Ltd.*, 647 So. 2d 1028, 1030–31 (Fla. Dist. Ct. App. 1994)).
[79] *Id.* (quoting *Caretta Trucking*, 647 So. 2d at 1031).
[80] *Caruso v. Natl. City Mtge. Co.*, 931 N.E.2d 1167, 1171–72 (Ohio Ct. App. 2010).
[81] *Hill v. Sonitrol of Sw. Ohio, Inc.*, 521 N.E.2d 780, 784 (Ohio 1988) (quoting *Norfolk & W. Co. v. United States*, 641 F.2d 1201, 1208 (6th Cir. 1980)).
[82] *Id.* at 784–85.

rather, the performance of that promise must also satisfy a duty owed by the promisee to the beneficiary."[83]

The analysis is the same under Ohio or Florida law.[84] Under both states' law, courts look first to the terms of the contract at issue to determine whether a party is an intended third-party beneficiary.[85] The PSAs only reference First American four times. The first reference states that "the balance of the purchase price shall be wired . . . to First American Title Company within twenty-four hours of closing."[86] The next three references only apply "in the event the Buyer desires to . . . [pay] any portion of the Purchase price . . . with funds Buyer desires to qualify as a 1031 Exchange" under Section 1031 of the I.R.S. Code of 1986.[87]

References to First American in the PSAs do not establish that the parties owed a duty to the FA Defendants.  For example, the parties' agreement that "the balance of the purchase price" was to be transferred to First American does not indicate that the performance of that provision satisfied a duty owed to First American. Regarding the other references in the agreements to First American, a plaintiff's option to utilize a 1031 Exchange does not demonstrate intent to benefit First American at all, much less "primarily and directly." Moreover, the PSAs do not state whether or how much First American should be compensated. Because the PSAs do not establish

---

[83] *Id.* at 85.
[84] *See Huff v. FirstEnergy Corp.*, 957 N.E.2d, 3, 7 (Ohio 2011); *Williams*, 319 So. 3d at 657.
[85] *See Huff v. FirstEnergy Corp.*, 957 N.E.2d, 3, 7 (Ohio 2011); *Williams*, 319 So. 3d at 657.
[86] First Decl. Steven J. Nielsen, Ex. 1, ¶ 2.2.
[87] *Id.* ¶ 3. If the buyer chooses to pay with 1031 funds, the PSAs state that the "Eastern 1031 Starker Exchange" should periodically transfer the 1031 funds to First American Title Company, who then is required to apply the funds either towards the purchase of an undivided interest in the property or the construction of improvements on the property on a reimbursement basis. *Id.* ¶ 3.2. The Seller (Rockwell) has the duty to provide statements to First American to provide statements indicating the costs for which it should be reimbursed. *Id.*

that First American was owed any duties by the signatories, Defendants failed to demonstrate

that they are third-party beneficiaries under either state's law.

### III.   Enforceability of the Arbitration Provisions under FA Defendants' Agents of Rockwell Theory[88]

FA Defendants object to the magistrate judge's determination that they are not agents of

Rockwell under Ohio or Florida law.[89] Under Ohio law "[a]n agency relationship is created when

a principal has the right to control the actions of its agent, and when the agent's actions are in

furtherance of an objective that the principal seeks."[90] "The basic test is whether the principal has

the right of control over the manner and means of the work being done."[91] Similarly, Florida law

provides that "'[e]ssential to the existence of an actual agency relationship is (1)

acknowledgment by the principal that the agent will act for him, (2) the agent's acceptance of the

undertaking, and (3) control by the principal over the actions of the agent.'"[92] In Florida too,

"[w]hen one considers an action based on actual agency, it is the right to control, rather than

actual control, that may be determinative."[93]

As the magistrate judge noted, Plaintiffs' description of FA Defendants as being the

"escrow agent" or "closing agent" describes FA Defendants' role in the transaction, not the legal

status of a common-law agent. "An escrow holder is not a common-law agent because the holder

does not act subject to the control of the parties to the escrow agreement."[94] Here, the PSAs do

---

[88] FA Defendants assert their equitable estoppel argument as their third objection, then their agency theory objection fourth, and the waiver issue fifth. The court responds to the objections out of the order presented to simplify the analysis. The court addresses the agency objection, then waiver, and then equitable estoppel.

[89] Obj. 9.

[90] *Wells v. Komatsu Am. Int'l Co.*, 835 N.E.2d 771, 776 (Ohio Ct. App. 2005) (citing *Hansen v. Kynast*, 494 N.E.3d 171, 173 (Ohio 1986).

[91] *Id.* (citation omitted).

[92] *Goldschmidt v. Holman*, 5 71 So.2d 422, 424 (Fla. 1990) (quoting Restatement (Second) of Agency § 1 (1957)).

[93] *Villazon v. Prudential Health care Plan, Inc.*, 843 So.2d 842, 852 (Fla. 2003).

[94] *Escrow Agent*, *Black's Law Dictionary* (11th ed. 2019).

not provide for either party having the right to control the FA Defendants. Because the FA Defendants have not shown that Rockwell had the right to control the FA Defendants, they have not established an agency relationship under Ohio or Florida law.

### IV.    Reliance on Rockwell's Purported Waiver of Arbitration Clause

FA Defendants object to the magistrate judge's finding that Rockwell's Chapter 7 trustee waived the Rockwell Defendants' arbitration rights in the PSAs. They contend that the magistrate judge improperly relied on the trustee's letter and "ignored" their briefing explaining that (1) the trustee lacked power to waive the arbitration clause, (2) the waiver did not comply with the modification clause in the PSAs, and (3) Rockwell could not waive the FA Defendants' rights after they accrued.[95] These objections lack clarity—parties are obligated to identify the specific reasons why they object to a magistrate judge's order.[96]

Objections to a magistrate judge's order must be both timely and specific.[97] An objection is sufficiently specific if it "enables the district judge to focus attention on those issues—factual and legal—that are at the heart of the dispute."[98] Without further explanation, FA Defendants conclusorily assert that the magistrate judge ignored their briefing which argued that "[t]he trustee lacked power to waive the arbitration clause because it did so without Bankruptcy Court participation."[99] They support their assertion with a footnote citation to a Colorado bankruptcy court case.[100] The court assumes that the FA Defendants object to the magistrate court's finding

---

[95] Obj. 10.
[96] A request for "the district court to reconsider the magistrate's report and recommendation based on the [filings] . . . [already] submitted to the court" is an insufficient objection. *One Parcel*, 73 F.3d at 1060.
[97] *United States v. One Parcel of Real Property Known as 2121 E. 30th St.*, 73 F.3d 1057, 1059 (10th Cir. 1996).
[98] *Id.*
[99] Obj. 10.
[100] Obj. 10 (citing *In re Stemwedel,* No. 11-39196, 2018 Bankr. LEXIS 3083 at 10 (Bankr. D. Colo. Sept. 27, 2018, *aff'd, Stemwedel v. Peak Props & Dev.*, 2019 LEXIS 159795 (D. Colo. Sept. 19, 2019)).

15

that the bankruptcy trustees had authority to waive the signatories' arbitration rights, thereby rejecting FA Defendants' argument that section 363 of the bankruptcy code denied the trustees the ability to waive arbitration rights.[101]

As explained by the magistrate judge, 11 U.S.C. § 363(b)(1) requires that bankruptcy trustees may not "deal with the property of the estate" unless formal notice and an opportunity for a hearing before the bankruptcy court are provided. FA Defendants argued in their reply briefing to their Motion to Compel Arbitration that arbitration rights are "property of the estate" and that formal notice and an opportunity for a hearing were required before the trustees waived them.[102] The magistrate judge noted that FA Defendants did not provide any authority supporting the assertion that arbitration rights are "property of the estate," nor did they address the factors used to determine what constitutes "property of the estate" under § 363(b)(1).[103] FA Defendants failed to address this flaw in reiterating the same argument in their objection.[104]

Next, FA Defendants assert that the PSAs required modifications be made "in writing and signed by the parties."[105] Because this issue deals with the scope of the contract enforced by a non-party, "traditional principles of state law" govern the issue.[106] However, FA Defendants

---

[101] Order 18.

[102] FA Defs.' Reply to Resp. to Mot. to Compel Arb 1, ECF No. 226, filed April 12, 2023.

[103] Order 18. The magistrate judge further explained that 11 U.S.C. § 541(a)(1) defines property of the estate as "all legal or equitable interests of the debtor *in property* as of the commencement of the case." Order 18 n.82 (citing *Colbert v. Littman (In re Wagenknecht)*, 971 F.3d 1209, 1213 (10th Cir. 2020) (stating "property interests are created and defined by state law" but informed by federal bankruptcy law, and identifying "two tests to determine whether a debtor has legal or equitable interests in the transferred property" (internal quotation marks omitted)).

[104] Moreover, the authority FA Defendants cited in making their objection does not address the waiver of arbitration rights as being "property of the estate." *See* Obj. 10 n.13 (citing *In re Stemwedel*, 2018 Bankr. LEXIS 3082 (Bankr. D. Utah Sept. 27, 2018)).

[105] Obj. 10.

[106] *Arthur Anderson*, 129 U.S. at 631. Under Ohio law, waiver is considered under a totality of the circumstances test to determine whether the waiving party acted inconsistently with a known right to arbitrate. *Crosscut Capital, LLC v. DeWitt*, 173 N.E.3d 536, 540 (Ohio Ct. App. 2021). A court considers "(1) whether the party seeking arbitration invoked the court's jurisdiction by filing a complaint or claim without first requesting a stay; (2) the delay, if any, by the party seeking arbitration to request a stay; (3) the extent to which the party seeking arbitration has participated in the

failed to provide any legal authority on the issue. Additionally, they failed to demonstrate how they could enforce a contractual right as a non-party—especially when the parties waived their arbitration rights in bankruptcy court.[107]

Lastly, FA Defendants contend that Rockwell lacked the ability to waive FA Defendants' arbitration rights after they "accrued."[108] In doing so, FA Defendants cite only to an unreported Northern District of Georgia decision applying "general principles of third-party beneficiary law" rather than Ohio or Florida law.[109] As explained previously, state law governs this issue.[110] Regardless, FA Defendants have failed to show that they had any rights to arbitration under the PSAs, much less rights that had "accrued."

## V.    Enforceability of the Arbitration Provisions under Equitable Estoppel

Defendants next object to the Order's conclusion that the FA Defendants "f[e]ll outside the intended and explicit reach of the arbitration clauses," precluding them from relying on principles of equitable estoppel to compel arbitration.[111] Both Ohio and Florida law allow a signatory to be estopped from "avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed."[112]

---

the litigation; and (4) whether prior inconsistent acts by the party seeking arbitration would prejudice the non-moving party." *Morris v. Morris*, 939 N.E.2d 928, 937 (Ohio Ct. App. 2010). Similarly, under Florida law, "the essential question is whether, under the totality of the circumstances, the defaulting party has acted inconsistently with the arbitration right." *Raymond James Fin. Servs., Inc. v. Saldukas*, 896 So. 2d 701, 711 (Fla. 2005).

[107] Response to Motion to Compel Ex. A, ECF No. 225, filed March 29, 2023.

[108] Obj. 10.

[109] *Regions Bank v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 2014 WL 12621478, at *18 (N.D. Ga. 2014) (citing *Manning v. Wiscombe*, 498 F.2d 1311, 1313 (10th Cir. 1974)).

[110] *Arthur Anderson*, 129 U.S. at 631.

[111] Obj. 7 (quoting Order at 12).

[112] *I Sports v. IMG Worldwide, Inc.*, 813 N.E.2d 4, 8 (Ohio Ct. App. 2004); *see Greene v. Johnson*, 276 So .3d 527, 531 (Fla. Dist. Ct. App. 2019) ("the doctrine of equitable estoppel on the basis of intertwined claims . . . applies

### A.      Ohio Law

Under Ohio law, "[a]rbitration agreements apply to nonsignatories only in rare circumstances."[113] A signatory may be estopped from "avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed."[114] There are two instances where equitable estoppel may be applied involving "intertwined claims."[115] First, a nonsignatory can compel arbitration if the "signatory must rely on the terms of the written agreement in asserting claims against a nonsignatory."[116] Second, equitable estoppel binds a signatory to an arbitration clause if "the signatory alleges substantially interdependent and concerted misconduct by both the nonsignatory and one or more signatories to the contract."[117] The court addresses whether either form of intertwined claims estoppel may apply here.

### 1.      Intertwined Claims: Reliance on Terms of Agreement

Under the first form, which requires a finding that the signatory relies on terms of the agreement in question in asserting claims against the nonsignatory, "[t]he test is whether the . . . [non-consenting litigant] has asserted claims that arise from the contract containing the arbitration clause."[118] Where the non-consenting party asserts claims against the arbitration-seeking party that arise from the contract containing the arbitration clause, that non-consenting

---

when a signatory to a contract containing the arbitration clause raises allegations of interdependent and concerted misconduct by both a non-signatory and one or more of the signatories to the agreement.").

[113] *I Sports v. IMG Worldwide, Inc.*, 813 N.E.2d 4, 8 (Ohio Ct. App. 2004).

[114] *Id.* (quoting *Thomsom-CSF, S.A. v. American Arb. Ass'n*, 64 F.3d 773, 770 (Ohio Ct. App. 1995).

[115] *I Sports*, 813 N.E.2d at 8.

[116] *Id.*

[117] *Id.*

[118] *Taylor v. Ernst & Young, L.L.P.*, 958 N.E.2d 1203, 1213 (Ohio 2011); *see Atricure, Inc. v. Meng*, 12 F.4th 516, 527 (6th Cir. 2021) (applying Ohio law and reasoning that "estoppel exists to compel a *nonconsenting litigant* to the arbitration table because of its inconsistent positions about whether the contract's other terms apply as between the two litigants.").

party may not inconsistently invoke contractual terms, claiming that one term governs the relationship while the arbitration clause does not.[119] Ohio courts apply the "arising from the contract" test strictly. "[I]t is not sufficient that the plaintiff's claims 'touch matters' concerning the agreement or that the claims are 'dependent upon' the agreement."[120] And "even if a noncontract claim . . . depends on a showing of a breach of contract," Ohio courts will often reject estoppel claims.[121]

Put simply, the key to the analysis is identifying the basis of the non-consenting parties' claims against the parties seeking to compel arbitration. And under Ohio law, Plaintiffs must rely on the terms of the contract containing the arbitration clause in asserting claims against the FA Defendants.[122] Defendants point to Paragraph 412 of the Complaint, which pertains to Plaintiffs' claim that the FA Defendants breached their fiduciary duty regarding their escrowed funds.[123]

First, some context is needed. The relevant section of the Complaint begins by establishing the basis of First American's fiduciary obligations. Paragraph 408 avers that "Plaintiffs were not provided with a separate escrow agreement," but the FA Defendants still had specific fiduciary obligations for various reasons.[124] The first reason listed: FA Defendants had obligations to Plaintiffs who "carr[ied] out a 1031 Exchange" as "expressly provided" by the PSAs.[125] The other reasons provided also deal with First American's role in executing the 1031

---

[119] *Id.*
[120] *I Sports*, 813 N.E.2d at 9 (quoting *Hill v. G.E. Power Sys., Inc.*, 282 F.3d 343, 348 (5th Cir. 2002)).
[121] *Atricure, Inc. v. Meng*, 12 F.4th 516, 527 (6th Cir. 2021) (citing *Church v. Fleishour Homes, Inc.*, 874 N.E.2d 795, 806–07 (Ohio Ct. App. 2007).
[122] *I Sports*, 813 N.E.2d, at 8 ("a signatory must rely on the terms of the written agreement in asserting claims against a nonsignatory.").
[123] Obj. 8.
[124] Am. Compl. ¶ 408.
[125] Am. Compl. ¶ 408(a).

Exchange obligations.[126] For example, paragraph 408(d) explains that their failure to comply with applicable 1031 Exchange rules "would subject Plaintiffs to risk that their funds would be misappropriated, diverted, or converted from the [intended] purpose."[127]

Paragraph 412 of the Complaint alleges the various ways that the FA Defendants breached their fiduciary duty. Plaintiffs aver that FA Defendants "fail[ed] to provide or require a written escrow agreement," "fail[ed] to communicate to Plaintiffs that their payment of the TIC Investment would be immediately disbursed," "disburs[ed] funds from the escrow at the request of Rockwell without ensuring that the funds would be used in connection with the intended TIC property," "fail[ed] to follow the express requirements of the Purchase and Sale Agreement between Rockwell and the TIC Owners . . . including . . . paragraph 3.2, "disburs[ed] the escrow funds to Rockwell without any agreement or consent of the Plaintiffs," and "[o]therwise fail[ed] to exercise due care and loyalty to safeguard Plaintiff's funds."[128]

In short, Plaintiffs allege two bases for the duties FA Defendants' owed to them. First, they allege that FA Defendants' fiduciary duties stem from their role as an escrow agent, the specifics of which were established in non-PSA agreements. Second, Plaintiffs contend that the PSAs specify certain fiduciary duties regarding 1031 Exchange funds.[129] The claims, however, arise from alleged tortious conduct—the breach of fiduciary duties owed to Plaintiffs. Plaintiffs do not assert breach of contract claims against FA Defendants.[130] And to the extent the existence

---

[126] Am. Compl. ¶¶ 408(b)–(d).
[127] Am. Compl. ¶ 408(d).
[128] Am. Compl. ¶ 412.
[129] Am. Compl. ¶ 408(b), (d).
[130] *See I Sports v. IMG Worldwide, Inc.*, 813 N.E.2d. 4, 10 (Ct. App. Ohio 2004).

of some specific fiduciary duties may be dependent on terms in the PSAs, Plaintiffs' claims seek to enforce duties established in tort law, not contractual rights or obligations.

Regarding the 1031 Exchange provisions in the PSAs, these appear to overlap with what is already required by law. As Plaintiffs allege, an element of Rockwell's investment scheme was the successful implementation of 1031 Exchanges.[131] Plaintiffs allege that FA Defendants had the duty to ensure that any disbursement complied with 1031 Exchange regulations.[132] This duty, they aver, results from their knowledge of specific contractual provisions in the PSAs in addition to knowledge about 1031 Exchanges generally and associated regulations and common practices in the industry.[133] These claims are not sufficiently dependent on the PSA terms to be considered subject to Ohio's equitable estoppel doctrine. Ohio courts require something close to a finding that the arbitration-resisting party's claims are contingent upon contractual terms,[134] which is not the case here.

### 2.        Intertwined Claims: Concerted Misconduct

FA Defendants next argue that the concerted misconduct estoppel theory applies. The doctrine may be applied "where the signatory to the contract [containing the arbitration clause] alleges substantially interdependent and concerted misconduct by both the non-signatory and one

---

[131] "In many cases, the source of a Plaintiff's investment was commercial real estate that had been held for many years, which Plaintiff sought to exchange for income producing property in a like-kind exchange under Section 1031 of the Internal Revenue Code (a '1031 Exchange')." Am. Compl. ¶ 1.

[132] Am. Compl. ¶ 408(d).

[133] "Parkin and First American knew that disbursing the escrow funds before the completion of construction would not comply with applicable rules for 1031 Exchanges and would subject Plaintiffs to risk that their funds would be misappropriated, diverted, or converted from the purpose of funding the completion of construction at the relevant [property]." *Id.*

[134] *See Javorsky v. Javorsky*, 81 N.E.3d 971, 75–76 (Ohio Ct. App. 2017) (holding that estoppel applied because signatory-plaintiff's claims were "essentially contingent" on the agreement, they did not arise "unless" the contractual element of the claim succeeded).

or more of the signatories to the contract."[135] The magistrate judge found that the doctrine did not apply for two reasons. First, the Plaintiffs arguably did not allege "substantially interdependent and concerted misconduct" because they raised independent claims against the FA Defendants, who were not parties to the sales agreements.[136] Second, the magistrate judge found that the policy underlying the concerted misconduct estoppel inapplicable here.[137] The purpose of the doctrine "is to prevent 'arbitration proceedings between the two signatories' from being 'rendered meaningless,' thereby thwarting 'the federal policy in favor of arbitration.'"[138] Because the signatories waived their arbitration rights, the agreement to arbitrate was already "rendered meaningless" and the court should avoid applying the doctrine.[139]

FA Defendants only explicitly object to the magistrate judge's first rationale.[140] FA Defendants assert that the doctrine should apply because Plaintiffs' "Fourth, Sixth, Seventh, Thirteenth, Fourteenth, and Fifteenth causes of action" allege "substantially interdependent and concerted misconduct."[141] However, the magistrate judge herself acknowledged that "Plaintiffs do raise allegations of concerted misconduct between the Rockwell parties and FA Defendants."[142] She found that the concerted misconduct theory did not apply in light of the fact that the signatories waived their arbitration rights and questioned whether the allegations were sufficiently interdependent.

---

[135] *I Sports*, 813 N.E.2d at 8.
[136] Order 16.
[137] *Id.*
[138] *Id.* (quoting *Grigson v. Creative Artists Agency, LLC*, 210 F.3d 524, 527 (5th Cir. 2000).
[139] Order 19.
[140] Obj. 8.
[141] *Id.*
[142] Order at 16.

As an initial matter, it is noted that the concerted misconduct theory has not been adopted by any Ohio Supreme Court decision.[143] This court, like any federal court, is "reticent to expand state law without guidance from its highest court."[144] And "in predicting how a state's highest court would rule, federal courts must follow intermediate state court decisions, policies underlying applicable legal principles, and the doctrinal trends indicated by these policies."[145]

Only a few published Ohio appellate decisions reference the doctrine, let alone apply it.[146] Importantly, the leading case, *I Sports v. IMG Worldwide, Inc.*, applies pre-*Arthur Anderson* federal estoppel law, not Ohio contract law.[147] In doing so, it followed a Second Circuit opinion which held that a concerted misconduct claim requires that the estopped party assert "claims which are integrally related to the contract containing the arbitration clause."[148] Regardless, *I Sports* held that the concerted misconduct doctrine did not apply because there were no allegations that the nonsignatory parties were involved in concerted misconduct with a signatory party.[149]

---

[143] *AtriCure*, 12 F.4th at 530.

[144] *Taylor v. Phelan*, 9 F.3d 882, 887 (10th Cir. 1993).

[145] *Id.*

[146] *See I Sports*, 813 N.E.2d at 599; *Discovery Resources, Inc. v. Ernst & Young U.S. LLP*, 62 N.E.3d 714, 721 (Ohio Ct. App. 2016); *Fields v. Herrnstein Chrysler, Inc*., 2013 WL 772822, at *7 (Ohio Ct. App. February 7, 2013) (unpublished).

[147] *Id.*

[148] *I Sports*, 813 N.E.3d at 10 (quoting *Thomson-CSF, S.A. v. Am. Arbitration. Assn.*, 64 F.3d 773, 780 (2nd Cir. 1995)). It should be noted that many of the cases *I Sports* and *Thomson* rely upon have been overruled. *E.g. Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753 (11th Cir. 1993) (overruled by *Lawson v. Life of the South Ins. Co.*, 648 F.3d 1166, 1170–77 (11th Cir. 2011) ("Many of this Court's decisions involving the question of whether a non-party can enforce an arbitration clause against a party have not made clear that the applicable state law provides the rule of decision for that question. However, the Supreme Court's 2009 decision in *Carlisle*, which postdates all of those decisions of this Court, clarifies that state law governs that question, and to the extent any of our earlier decisions indicate to the contrary, those indications are overruled or at least undermined to the point of abrogation by *Carlisle*."))).

[149] *I Sports*, 813 N.E.3d at 9–10.

Another published Ohio case, *Discovery Resources Inc. v. Ernst & Young U.S. LLP*, is inapposite. Unlike here, it involves a signatory seeking to bind a non-signatory to an arbitration agreement.[150] Other material differences distinguish the case further. In *Discovery Resources*, a plaintiff-signatory asserted claims against a defendant-signatory and a defendant-nonsignatory, alleging a conspiracy to put the plaintiff-signatory out of business.[151] The defendant-signatory and defendant-nonsignatory moved to compel arbitration, which was opposed by the plaintiff-signatory.[152] The contract containing the arbitration agreement was a services agreement, and the defendant-signatory's denial of the plaintiff's services under the contract was the central conflict of the dispute.[153] Without much explanation, the court held that because the plaintiff-signatory's central claim was that the defendants conspired with each other to put the plaintiff out of business, the concerted misconduct theory applied.[154] In so doing, it relied on a federal case that applied pre-*Arthur Anderson* federal law, which held that "a signatory . . . may be estopped from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the underlying contract."[155]

The issues that were compelled into arbitration in *Discover Resources* were more integrally connected to the underlying contract than the dispute here. There, the conspiracy turned on what was promised to the signatories in the contract. Here, the issues that FA Defendants seek to arbitrate only partially deal with what is contained in the PSAs. It is

---

[150] 62 N.E.3d 714, 717 (Ohio Ct. App. 2016).
[151] *Id.*
[152] *Id.*
[153] *Id.*
[154] *Id.* at 721.
[155] *Id.* (quoting *Liedtke v. Frank*, 437 F. Supp. 2d 696, 699 (N.D. Ohio 2006) (citing *Javitch v. First Union Securities, Inc.* 315, F.3d 619, 629 (6th Cir. 2003))).

recognized that Plaintiffs assert a conspiracy claim against all Defendants, but the allegations against the FA Defendants center on more than just the PSAs.[156] Plaintiffs also rely on what is contained in separate escrow agreements and the FA Defendants' fiduciary duties in bringing claims against them. Accordingly, the court finds that the alleged concerted misconduct is not "integrally related to the contract containing the arbitration agreement."[157]

Moreover, the magistrate judge was correct that the underlying legal principles of the doctrine do not support its application here. First, as noted earlier, Ohio courts are clear that "[a]rbitration agreements apply to nonsignatories only in rare circumstances."[158] "Accordingly, when deciding motions to compel arbitration, the proper focus is whether the parties actually agreed to arbitrate the issue, i.e., the scope of the arbitration clause, not the general policies of the arbitration statutes."[159] Thus, the analysis centers on whether the parties agreed to the dispute, not the general policy of favoring arbitration. The question of whether the parties actually agreed to arbitrate is a state contract issue. Indeed, the Supreme Court held that in order for a non-party to an arbitration agreement to have standing to compel arbitration, state contract law must allow him to enforce the agreement.[160] Because the alternative estoppel theories

---

[156] Indeed, many of the Plaintiffs' allegations involve the improper utilization of the 1031 Exchanges and the central role the escrow account had in the investment scheme. The first paragraph of the complaint explains a common feature of most of the Plaintiffs: they often were long-time holders of commercial real estate and were attracted to the Rockwell investments to set up a 1031 Exchange in order to obtain "income producing property." Am. Compl. ¶ 1. The purpose of the 1031 Exchanges was to "hold TIC investor money in escrow until it could be disbursed to pay for land purchases or to reimburse the costs of completed construction" because 1031 Exchange money could only "be used for completed construction." Am. Compl. ¶ 3. In one of their claims for relief, Plaintiffs allege that FA Defendants "agreed to receive escrow funds in connection with each . . . transaction, but to disburse those funds to Rockwell without Plaintiff's consent and contrary to the terms of the purchase agreements." Am. Compl. ¶ 433(b). However, the conspiracy claim is only one of many claims asserted against various groups of defendants.

[157] *I Sports*, 813 N.E.3d at 10 (quoting *Thomson-CSF, S.A. v. Am. Arbitration. Assn.*, 64 F.3d 773, 780 (2nd Cir. 1995)).

[158] *I Sports*, 813 N.E.2d at 8.

[159] *Taylor*, 958 N.E.2d at 1203.

[160] *GE Energy Power Conversion France SAS, Corp v. Outokumpu Stainless USA, LLC*, 590 U.S. __, 140 S.Ct. 1637, 1643 (2020). This undermines state Federal Arbitration Act (FAA) cases that rely on federal court decisions

originate from pre-*Arthur Anderson* federal law and have only been applied sparingly in two intermediate Ohio courts, it is not clear to what extent the theories are supported by Ohio contract law. Thus, this court seeks to avoid inappropriately expanding Ohio contract law by applying alternative estoppel theories which have seldom been applied and then only in "rare circumstances."

## B.  Florida Law

Similarly, under Florida law "the doctrine of equitable estoppel . . . applies when a signatory to a contract containing the arbitration clause raises allegations of substantially interdependent and concerted misconduct by both a non-signatory and one or more of the signatories to the agreement."[161] "In such circumstances . . . equitable estoppel will apply since there exists 'a relationship among the parties of a nature that justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar dispute with the adversary which is not a party to the arbitration agreement.'"[162] Moreover, the doctrine relies on the same rationale: if a qualified non-party is not allowed to enforce an arbitration agreement "'the arbitration proceedings between the two

---

incorporating the federal interests of the FAA in determining who is bound by an arbitration agreement. Instead, state contract law should dictate who is bound. And even in federal courts, the concerted misconduct estoppel theory is "far from well-settled." *In re Merrill Lynch Trust Co. FSB*, 235 S.W.3d 185, 192–93 (Texas 2007) (analyzing federal circuit court decisions that applied the concerted-misconduct estoppel theory, finding that as of 2007, the doctrine only appeared in ten reported opinions and the theory was only relied upon in determining the outcome of two cases.). The leading Ohio appellate decision that describes the concerted misconduct theory, *I Sports*, relies mainly on federal cases and only cites to one Ohio Supreme Court case, *Gerig v. Kahn*. *Gerig* held that a signatory to a contract may enforce an arbitration provision against a nonsignatory seeking a declaration of the signatories' rights and obligations under the contract. 769 N.E.2d 381, 385-86 (Ohio 2002).

[161] *Greene v. Johnson*, 276 So. 3d 527, 531 (Fla. Dis. Ct. App. 2019) (citing *Marcus v. Florida Bagels, LLC*, 112 So. 3d 631, 633–34 (Fla. Dist. Ct. App. 2013).

[162] *Marcus*, 112 So. 3d at 634 (quoting *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 359 (2nd Cir. 2008)).

signatories would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted.'"[163]

Intertwined claims equitable estoppel has been applied in Florida's intermediate state courts more often than in Ohio courts but, like Ohio, Florida's highest court has not formally adopted it.[164] Regardless, if a party waives its right to compel arbitration through its participation in litigation or by taking action inconsistent with that right, Florida courts decline to apply estoppel to allow a nonsignatory to compel arbitration.[165] Here, as already discussed, the Rockwell Defendants waived their right to arbitration during bankruptcy court proceedings.[166] Because the doctrine is rooted in ensuring that the arbitration between the *signatories* is not rendered meaningless, a nonsignatory "may not avail himself 'of [the] arbitration provision' to which he is 'not a party by seizing upon an exception that has the primary purpose of preventing the frustration of rights that has already occurred.'"[167] Put differently, because the Rockwell Defendants already waived their arbitration rights, the FA Defendants may not utilize an exception that is centered on "preventing the frustration of rights" because that "frustration" has already occurred.

## VI.    Ohio Plaintiffs' Notice of Arbitration Agreement

FA Defendants also contend that they can compel the Ohio plaintiffs to arbitration because the FA Defendants' title policies contain arbitration agreements.[168] Each PSA required

---

[163] *Id.* (quoting *MS Dealer*, 177 F.3d at 947).
[164] *See, e.g., id.; Greene*, 276 So. 3d at 527.
[165] *Marcus v. Florida Bagels, LLC*, 112 So. 3d 631, 634–35 (Fla. Dist. Ct. App. 2013).
[166] Response to Mot. to Compel Arb. Ex. A, ECF No. 225, filed March 29, 2023.
[167] *Id.* (quoting *Ben-Yishay v. Mastercraft Dev., LLC*, No. 08-14046-CIV, 2009 WL 6387928, at *6 (S.D. Fla. Dec. 14, 2009)).
[168] Obj. 10–11.

Rockwell "to pay for an endorsement to the standard-coverage owner's policy of title insurance insuring Buyer in the amount of the Purchase Price."[169] The title policy requires that "[a]ll arbitrable matters when the Amount of Insurance is $2,000,000 or less shall be arbitrated at the option of either [First American] or the Insured." All amounts in excess of that amount "shall be arbitrated only when agreed to by both [First American] and the Insured."[170]

The FA Defendants object to the magistrate judge's finding that the Ohio Plaintiffs cannot be bound by the agreement because they did not have notice of the policies.[171] The magistrate judge reasoned that because the Ohio Plaintiffs did not receive the title policies until after closing they lacked adequate notice of the arbitration provision.[172]

Under Ohio law, the "[e]ssential elements of a contract include an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and consideration."[173] "A meeting of the minds as to the essential terms of the contract is a requirement to enforcing the contract."[174] The usual rule is that a meeting of the minds can occur through constructive notice. "Constructive notice has been defined generally as knowledge of 'circumstances which ought to have excited apprehension and inquiry in the mind of a prudent and reasonable man.'"[175] Actual notice is not required.

---

[169] *E.g.*, First Decl. Steven J. Nielsen 3, ¶ 4.
[170] *E.g.,* First Decl. Steven J. Nielsen Ex. 47 ¶ 14.
[171] Obj. 11.
[172] Order 28.
[173] *Minster Farmers Coop Exchange Co., Inc. v. Meyer*, 884 N.E.2d 1056, 1062 (Ohio 2008).
[174] *Id.* (citing *Episcopal Retirement Homes, Inc. v. Ohio Dept. of Indus. Relations*, 575 N.E.2d 124, 137 (Ohio 1991)).
[175] *Rudolph v. Wright Patt Credit Union*, 175 N.E.3d 636, 649 (Ohio Ct. App. 2021) (quoting *Varwig v. Railroad Co.*, 44 N.E. 92, 94 (Ohio 1896).

However, Ohio recognizes context-specific rules in determining the validity of title insurance contracts.[176] In the absence of negotiations for special rules or conditions, such insurance contracts "are presumed to have intended that the ensuring policy would include the usual and customary provisions found in similar title insurance policies."[177] Thus, even if the policy is delivered after closing, the parties often have constructive notice because it is presumed that the usual and customary provisions would be included. "To the extent that it contains the usual and customary terms, the policy is simply a reflection of the parties' intent and a memorial of their agreement."[178] Conversely, where a title policy contains deviations from usual and customary terms, Ohio law requires delivery of a title policy prior to closing in order for nonstandard terms to be binding.[179]

Because this is a title insurance contract dispute, the determination is dependent on whether FA Defendants' policies contained terms that were "usual and customary." If the court determines that they were, Plaintiffs would be bound by assent through constructive notice.[180] The court turns to the FA Defendants' objections to the magistrate judge's finding that the arbitration clauses were not usual and customary.

---

[176] *Henderson v. Lawyers Title Ins. Co.*, 843 N.E.2d 152, 156–157 (Ohio 2006).
[177] *Id.* at 157.
[178] *Id.*
[179] *Id.*
[180] FA Defendants ask that this court follow *DiTucci v. Ashby* because the facts are similar and even involve some of the same parties. *DiTucci*, however, is a federal district court case that applied Indiana law, not Ohio law. *DiTucci v. Ashby*, 2021 WL 778579 (D. Utah March 1, 2021). The decision does not analyze the usual and customary terms doctrine, nor is it clear whether Indiana has even adopted the doctrine. The court respectfully declines to follow the reasoning provided in the case.

## VII.   Whether Arbitration Provisions are Usual and Customary Terms of Title Policies

FA Defendants first object to the magistrate judge's reliance on *Henderson v. Lawyers Title Insurance Company*, the leading Ohio Supreme Court case on constructive notice and title insurance contracts.[181] They contend that the case was limited to "run-of-the-mill 'residential real estate transactions.'"[182] Thus, they argue, because this case deals with "sophisticated tax and commercial real estate transactions" and "sophisticated real estate investors," *Henderson* should not apply.[183]

*Henderson* involved a purchase and sale agreement for a home.[184] Plaintiffs signed a purchase and sale agreement, which provided that the title insurance premium be split between the buyer and seller.[185] The real estate broker provided the title insurance company a copy of the contract and requested that a commitment for title insurance be issued to the plaintiffs.[186] The plaintiffs never received a copy of the commitment and only received their title policy after closing.[187] The court held that "a title insurance policy that is issued in response to an unqualified request for coverage, but is not delivered to the insured until after the closing, is binding to the extent that it contains the usual and customary terms found in similar policies."[188]

Far from limiting the doctrine to sophisticated, commercial transactions, *Henderson* instead ruled that for the usual and customary terms doctrine to apply, the parties must have

---

[181] Obj. 12; *see Henderson*, 843 N.E.2d at 152.
[182] Obj. 12 (quoting *Henderson*, 843 N.E.2d at 156).
[183] *Id.*
[184] *Henderson*, 843 N.E.2d at 265.
[185] *Id.*
[186] *Id.*
[187] *Id.*
[188] *Id.* at 268.

contracted for a standard policy of title insurance.[189] That is exactly what the parties contracted for here: a "standard-coverage owner's policy."[190] This is an "unqualified request for coverage," lacking requests for special terms or conditions.[191] Moreover, it is the unique features of title insurance policies that drove *Henderson*'s analysis, not the residential nature of the underlying transaction or the experience of the parties.[192] Indeed, the Ohio Supreme Court relied on amicus briefing explaining that "[t]itle insurance coverage is provided for a continuing and indefinite period of time in exchange for a one-time premium payment, without the need to renew the policy. On the other hand, property and casualty insurance coverage is provided for a relatively short specified policy period, subject to renewal for additional periods upon the agreement of the insured and the insurer and the payment of additional premiums."[193] Because the conflict centers on a contract for a standard title insurance policy, the court sees no reason why *Henderson* should not apply here.

Second, FA Defendants raise procedural objections to the magistrate judge's order. They contend that the magistrate judge "failed to recognize the April 12, 2023 Declaration of Steven J. Nielsen [ECF No. 227], which was the only evidence in the record addressing [the *Henderson*] standard before the June 20, 2023 hearing."[194] They allege that instead of only considering the April 12, 2023 Declaration, the magistrate judge allowed Plaintiffs to present new evidence and

---

[189] *Henderson*, 843 N.E.2d at 157.
[190] *See, e.g.,* First Decl. Steven J. Nielsen Ex. 1 ¶ 4.
[191] *Henderson*, 843 N.E.2d at 157.
[192] *See Henderson*, 843 N.E.2d at 160.
[193] *Id.*
[194] Obj. 12–13.

struck FA Defendants' rebuttal evidence. The new evidence presented was a "form 2021 ALTA

Owner's Policy, and . . . an Owner's Policy Comparison Chart."[195]

The court reviews the procedural history leading up to the June 20, 2023 hearing. The

events which Plaintiffs aptly describe as the "briefing odyssey" began when Plaintiffs first

identified the "usual and customary terms" issue in their objection to FA Defendants' Motion to

Compel.[196] To support their argument, they offered supplementary evidence.[197] FA Defendants

responded to these arguments in their reply briefing filed on April 12, 2023, [198] and similarly

filed a supplementary April 12, 2023 Declaration of Steven J. Nielsen.[199] The same day,

however, FA Defendants filed an evidentiary objection to the Plaintiffs' supplementary

evidence.[200] Plaintiffs responded to the objection to their evidence on May 31, 2023.[201] FA

Defendants then objected to Plaintiff's response because Plaintiffs did not meet their deadline.[202]

These motions were all addressed during the June 20, 2023 hearing before the magistrate judge.

The Order explains what happened during and after the hearing.

> As an initial matter, only the parties' original arguments, evidence, and
> briefing is considered in making this determination. At the June 20 hearing,
> Plaintiffs submitted additional evidence in support of their position that arbitration
> clauses are not usual and customary in the title policy industry. *See* Exs. Regarding
> 243 Motion Hearing, ECF No. 244. Because this evidence was presented for the
> first time at the hearing, the FA Defendants were afforded an opportunity to
> respond. *See* Minute Entry, ECF No. 243. But they were advised any response must
> be in the vein of a response to a notice of supplemental authority. *See* DUCivR 7-
> 1(c). The court did not invite new evidence. The FA Defendants ignored this
> directive, instead submitting three supplemental filings, including new evidence in

---

[195] ECF No. 244 Exs. 2 & 3.
[196] Pls.' Opp'n to Renewed Mot. to Compel Arb. 11–19, ECF No. 225, filed March 29, 2023.
[197] *Id.* Ex. B.
[198] Defs.' Reply in Support of Renewed Mot. to Compel Arb. 8–9, ECF No. 226, filed April 12, 2023.
[199] Second Decl. Steven J. Nielsen.
[200] Obj. to Evid., ECF No. 228, filed April 12, 2023.
[201] ECF No. 236.
[202] ECF No. 239.

the form of additional declarations.[203] Without court authorization, Plaintiffs responded in kind, submitting two supplemental filings with new declarations and other new evidence from web sources.[204] These supplemental filings were unauthorized by the rules and far exceed the scope of the limited supplemental briefing permitted by the court. Where this issue can be resolved on the parties' initial briefing alone, and the submission of additional briefing and evidence was unauthorized and unjustified, none of the additional evidence submitted at the hearing or with the parties' supplemental filings is considered.[205]

The court finds nothing objectionable here. The magistrate judge granted leave for supplemental briefing responding to new legal authority. The court did not invite new evidence.[206] The parties failed to comply with her order. The magistrate judge did not err by not considering briefings that were beyond the scope of the order. Moreover, the magistrate judge explicitly stated that only the parties' "original arguments, evidence, and briefing" was considered in making her determination.[207] In other words, she considered the April 12, 2023 Declaration and nothing filed thereafter.

FA Defendants further argue that even without the later briefings, the April 12, 2023 Declaration "indisputably established that arbitration provisions were usual and customary terms

---

[203] *See* FA Defs.' Suppl. Brief in Support of Renewed Mot. to Compel Arbitration, ECF No. 245, filed June 27, 2023; Third Decl. of Steven J. Nielsen in Support of Defs.' Suppl. Brief and Mot. to Compel Arbitration, ECF No. 246, filed June 27, 2023; FA Defs.' Resp. to Pls.' Suppl. Mem. and Objection to Evidence, ECF No. 251, filed July 19, 2023; Fourth Decl. of Steven J. Nielsen in Support of FA Defs.' Objection to Evidence, ECF No. 252, filed July 19, 2023; FA Defs' Resp. to Pls.' Obj. to Fourth Decl. of Steven J. Nielsen & Obj. to FA Defs.' Resp., ECF No. 254, filed July 26, 2023.

[204] *See* Pls.' Suppl. Mem. & Obj. to Evid. in Opp'n to FA Defs.' Mot. to Compel Arb., ECF No. 250, filed July 12, 2023; Pls.' Obj. to Fourth Decl. of Steven J. Nielsen and Obj. to FA Defs.' Resp., ECF No. 253, filed July 26, 2023.

[205] In footnote 211 of the Order, the magistrate judge explained that "[g]enerally, parties 'should be given an opportunity to respond to new material,' such as new evidence and legal arguments. *Green v. New Mexico*, 420 F.3d 1189, 1196 (10th Cir. 2005). However, if the court 'does not rely on the new material in reaching its decision,' it may also decline to consider any response to the new material. *Id.*'"

[206] Defendants argue that the magistrate judge may have granted leave to respond to "[a]nything that was raised at the hearing." Obj. 2–3 (quoting Tr. 12:8–18, ECF No. 261, filed October 13, 2023). However, the court's minute entry for the proceedings at the June 20, 2023 hearing explicitly states that "Defendant may submit five pages of supplementary briefing." ECF No. 243. Leave was not granted to file new evidence, even if there was some ambiguity in the transcript due to "portions of the recording being inaudible or silent." Tr. 2:18–19.

[207] Order 48.

in Ohio title policies during the years the TIC transactions occurred" and "[t]his undisputed evidence was sufficient to compel arbitration."[208] FA Defendants contend that the magistrate judge erred by making a factual finding that the arbitration clauses in the Ohio policies were not usual and customary, contrary to what is suggested by the evidence presented in the April 12, 2023 Declaration. The court first reviews the usual and customary standard as explained in *Henderson* and then turns to the April 12, 2023 Declaration.

In *Henderson*, the Ohio Supreme Court determined that an insurance company's varying inclusion of an arbitration clause "is hardly sufficient evidence of a usual and customary practice."[209] Similar to FA Defendants' argument, the defendant in *Henderson* argued that all ALTA insurance policies included arbitration agreements "'since at least 1987.'"[210] However, the court noted that the vice president of the company testified that "an arbitration clause appears in the last three of the five form policies that were promulgated by ALTA and approved by the Ohio Department of Insurance . . .  [and] it was the practice of [the company] . . . to issue the most recently approved ALTA policy when a customer made an unconditional request for an owner's policy of title insurance."[211] All five ALTA policies were available for purchase from the title insurance company.[212] A company representative stated that it was standard practice for the company to issue the most recent ALTA policy (which contained an arbitration clause), but other older versions that lacked an arbitration clause were also sold to customers. Thus, the

---

[208] Obj. 13; *id.* at 14 ("It was clear error for her not to consider this [supplemental] evidence and deny the Motion."); *Id.* at 13 ("This undisputed evidence [referring to the April 12 Declaration] was sufficient to compel arbitration.").
[209] *Henderson*, 843 N.E.2d at 157–58.
[210] *Id.* at 157.
[211] *Id.*
[212] *Id.*

evidence was not "that the more recent ALTA policies, which contain arbitration clauses, have supplanted the previous policies."[213]

Further, the title insurance issuer in *Henderson* argued that "usual and customary does not imply unvarying use."[214] The court noted that "even a broadly construed definition of 'usual and customary' . . . tolerates some degree of practical variation" but a title insurance company still must establish some degree of "consistency and regularity in order to retain its essential meaning."[215] The court determined that because the ALTA policies variably contained arbitration clauses and because the company deleted arbitration clauses on request at no further cost, the evidence presented was "hardly sufficient evidence of a usual and customary practice."[216]

The court turns to whether FA Defendants met their burden in demonstrating that their terms were the usual and customary practice. Because FA Defendants' usual and customary terms argument is necessary to determine the existence of an enforceable arbitration agreement, FA Defendants must present "sufficient evidence to demonstrate the existence of an enforceable agreement."[217] Plaintiffs, as the non-movants, are given the benefit of all reasonable doubts and inferences that may arise.[218] If the court determines that the FA Defendants' met their initial burden, the burden shifts to the Plaintiffs to "establish[] a genuine dispute as to whether the arbitration provisions apply."[219] "This framework is similar to summary judgment practice."[220]

---

[213] *Id.*
[214] *Id.* at 158.
[215] *Id.*
[216] *Id.* at 158.
[217] *BOSC, Inc. v. Bd. of Cnty. Comm'rs of Cnty. Of Bernalillo*, 853 F.3d 1165, 1177 (10th Cir. 2017).
[218] *Hankcock v. American Tel. & Tel. Co., Inc.*, 701 F.3d 1248, 1261 (10th Cir. 2012).
[219] *Id.*
[220] *Id.*

In Defendants' April 12, 2023 Declaration, Steven J. Nielsen asserts that because it has been "the standard practice of all large title companies . . . to issue policies for commercial property transactions based on the most recently approved ALTA Owner's Policy" and because the most recently approved ALTA policy contained an arbitration provision, the inclusion of an arbitration provision was (and still is) the standard practice in the industry.[221] Thus, "when First American issued title policies that . . . included the arbitration provision just as ALTA had promulgated it in 2006," the arbitration provision included was the usual and customary practice of the industry.[222] Missing from the Declaration, however, are facts describing what the arbitration clause in the 2006 ALTA Owner's Policy provided.

Just because the 2006 ALTA Owner's Policy includes "an arbitration clause" does not mean that all arbitration clauses are usual and customary in the industry. For example, unlike First American's policies for the Ohio transactions, which allow for a unilateral demand for arbitration, the policies First American issued for the Florida transactions provide that "arbitration . . . may be demanded if agreed to by *both* the Company and the Insured at the time of a controversy or claim."[223] As the magistrate judge explained, such an arbitration clause does not add any additional rights beyond what would be permitted in its absence.[224] Thus, because one party can unilaterally avoid arbitration, the Florida agreements effectively contain no arbitration agreement.[225] The April 12, 2023 Declaration does not explain or provide what the

---

[221] Second Decl. Steven J. Nielsen ¶ 5.
[222] *Id.* ¶ 6.
[223] First Nielsen Decl. 6 ¶ 14 (emphasis added), ECF No. 220.
[224] Order 47.
[225] *Id.*

2006 ALTA Owner's Policy's arbitration clause entailed.[226] Without that information, the court cannot determine what the usual and customary terms are and whether the Ohio policies conformed to those terms.[227]

First American's provided insufficient evidence to demonstrate that their arbitration clauses in the Ohio polices conformed to the usual and customary practice sufficient to give Plaintiffs constructive notice of their existence.[228]

## ORDER

FA Defendants' Objections[229] are OVERRULED and the magistrate judge's Memorandum and Order[230] is adopted as set forth above. FA Defendants' Renewed Motion to Compel Arbitration[231] is DENIED.

---

[226] For example, it is not explained whether the ALTA arbitration clause provides for the same $2,000,000 limitation in the Ohio policies.

[227] The Declaration also does not explain why Mr. Nielsen would know the standard practices of all major title insurance companies, as opposed to First American's practices.

[228] Additionally, while the court does not consider the substance of the additional competing declarations excluded by the magistrate judge, the parties' belated efforts to supplement the record with dueling declarations strongly suggest that a decision to compel arbitration would require additional development of the evidentiary record.

[229] ECF No. 263.

[230] ECF No. 258.

[231] ECF No. 219, filed March 3, 2023.

Signed May 8, 2024.

BY THE COURT

David Barlow
United States District Judge