UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| CHRISTOPEHR C. FUCCI, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>WILLIAM BOWSER, et al.,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING [312] FA DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT**<br><br>Case No. 2:20-cv-00004-DBB-DAO<br><br>District Judge David Barlow |

This matter is before the court on Defendants First American Title Insurance Company ("First American") and Kirsten Parkin's (collectively, "FA Defendants") Motion to Dismiss Plaintiffs' Amended Complaint.[1] Having reviewed the briefing and relevant law,[2] and for the reasons that follow, the court GRANTS the Motion.

## BACKGROUND[3]

This is an action where numerous defendants are alleged to have participated in a Ponzi scheme to defraud Plaintiffs regarding the purchase of tenant-in-common ("TIC") interests in real estate.[4]

Plaintiffs are purchasers of TIC interests in real estate from Defendant Rockwell Debt Free Properties ("Rockwell").[5] As part of that arrangement, Noah Corporation ("Noah") leased

[1] FA Defendants' Mot. to Dismiss Amend. Compl. ("Mot."), ECF No. 312, filed Mar. 13, 2026.
[2] The court finds that oral argument is not necessary to resolve the Motion. *See* DUCivR 7-1(g).
[3] Because this matter is before the court on a motion to dismiss, the court takes the well-pleaded facts from Plaintiffs' Amended Complaint as true. *See, e.g.*, *McNellis v. Douglas Cnty. Sch. Dist.*, 116 F.4th 1122, 1127 n.2 (10th Cir. 2024).
[4] *See generally* Amend. Compl. ("Compl."), ECF No. 122, filed Aug. 7, 2021.
[5] *Id.* ¶¶ 1–2.

the properties and managed them as event venues, which would result in payment to Plaintiffs for rent tied to a specific return on the TIC investment, the "Noah TIC Program."[6]

In 2015, Rockwell and Noah sold properties to Plaintiffs pursuant to the "Construction TIC" program.[7] Under this program, the investment would fund the construction of new event venues at those locations.[8] "Rockwell designed (or attempted to design) the Construction TIC program to allow TIC investors to use money from 1031 Exchanges to purchase TIC interests in properties where construction was not yet completed."[9] As alleged, those funds were to be placed into escrow, held, and then only disbursed to pay or reimburse land acquisition and construction costs.[10]

Plaintiffs allege that pursuant to a scheme, none of the parties did what they were obligated to do with the investment funds. Instead, the funds at issue were almost immediately disbursed to Rockwell after closing, rather than on a reimbursement basis.[11] Rockwell then took a 20-25% cut and passed the remaining funds to Noah.[12] Thereafter, Noah used those funds to pay its own expenses and the returns of previous investors, as opposed to using the funds to construct new event venues.[13] After the dust settled, Plaintiffs never had their event venues constructed.[14]

---

[6] *Id.* ¶¶ 1–2, 6.
[7] *Id.* ¶ 3.
[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] *Id.* ¶ 7.
[12] *Id.*
[13] *Id.* ¶¶ 8–9.
[14] *Id.* ¶ 12.

After Noah filed for bankruptcy in 2019, Plaintiffs filed this case seeking to recover losses from those they allege to have actively participated with Noah and Rockwell in the Ponzi scheme.[15] One set of these defendants are the movants here, First American and Ms. Parkin as the escrow agent—the FA Defendants. Plaintiffs generally allege that FA Defendants took actions to further the Ponzi scheme through their handling of the escrow funds.[16]

The Amended Complaint alleges that FA Defendants, acting as escrow agents, closed the purchase and sale of TIC interests involving the Noah TIC program.[17] FA Defendants closed and issued title insurance policies for at least 500 TIC sales on at least 40 properties.[18] In doing so, FA Defendants did not provide a formal escrow agreement.[19] Instead, Plaintiffs or their agents would deliver the funds to FA Defendants at closing, and FA Defendants would then release those funds to Rockwell almost immediately, and "without regard to the state of construction at the property."[20]

However, Plaintiffs do not allege there was no written agreement setting the FA Defendants' obligations in handling the escrow funds.[21] Rather, the Purchase and Sale Agreements ("PSA") entered into between individual Plaintiffs and Rockwell set forth the responsibilities tied to the escrow funds.[22] The Amended Complaint incorporates section 3.2 of the PSA, which provides:

[15] *Id.* ¶¶ 12–13.
[16] *Id.* ¶ 13.
[17] *Id.* ¶¶ 127, 361.
[18] *Id.* ¶¶ 127–28, 427.
[19] *Id.* ¶ 362.
[20] *Id.* ¶¶ 129, 366–67.
[21] *Id.* ¶ 131.
[22] *Id.* ¶¶ 362–65.

> Buyer hereby acknowledges and agrees that Accommodator shall periodically transfer the 1031 Funds to First American Title Company, in one or more installments, which funds shall be applied toward either (i) the purchase of an undivided interest in the Property or (ii) the construction of the improvements on the Property on a reimbursement basis (i.e., the 1031 Fund will be used to reimburse Seller for costs that is has incurred in constructing improvements on the Property). Seller shall periodically provide statements to [First American] detailing the construction costs that Seller has incurred and seeking reimbursement of such costs via transfer(s) of 1031 Funds.[23]

The Amended Complaint also includes Ms. Parkin's specific interactions with some of the Plaintiffs. For example, on or around October 2017, Ms. Parkin told Plaintiff Tracy Adame that she had closed many transactions with Rockwell and Noah, that she was very familiar with the Noah and Rockwell's business, and that everyone was happy with their Noah TIC investments.[24] Before the closing of an Ohio property, Ms. Parkin told Plaintiff John Michael Lalli that his money would be held in escrow until construction was complete and that his money would likely be used for windows.[25]

Against this backdrop, Plaintiffs bring several claims against FA Defendants: (1) breach of fiduciary duty;[26] (2) aiding and abetting tortious conduct, which encompasses aiding and abetting (a) fraud/negligent misrepresentation, (b) conversion, and (c) breach of fiduciary duty; (3) conspiracy to engage in tortious conduct;[27] (4) materially aiding state-law securities fraud;[28] (5) unjust enrichment;[29] and (6) abuse of vulnerable adults.[30]

---

[23] *Id.* ¶¶ 365, 408; Purchase and Sale Agreement ("PSA") § 3.2, ECF No. 35-1, filed Mar. 20, 2020.
[24] Compl. ¶ 312.
[25] *Id.* ¶ 318.
[26] *Id.* ¶¶ 405–16.
[27] *Id.* ¶ 424; *see also id.* ¶¶ 383–422.
[28] *Id.* ¶¶ 472–77.
[29] *Id.* ¶¶ 478–85.
[30] *Id.* ¶¶ 486–91.

## STANDARD

"In evaluating a motion to dismiss, the court must take as true all well-pleaded facts, as distinguished from conclusory allegations, view all reasonable inferences in favor of the nonmoving party, and liberally construe the pleadings."[31] "Still, . . . [a] complaint cannot rely on labels or conclusory allegations—a 'formulaic recitation of the elements of a cause of action will not do.'"[32] "An allegation is conclusory where it states an inference without stating underlying facts or is devoid of any factual enhancement."[33] Such conclusory allegations lose the "assumption of truth" and are "disregarded" when weighing a complaint against the pleading standard.[34]

Instead, the "complaint 'must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"[35] Under the plausibility inquiry, the court reads "[P]laintiff[s'] allegations . . . in the context of the entire complaint" to consider whether Plaintiffs have "nudge[d] their claim across the line from conceivable to plausible."[36] But "plausibility refers to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs have not nudged their claims across the line from conceivable to plausible."[37] This standard disfavors broad and collective pleading. Allegations that attribute actions collectively, vaguely, or without "concrete

---

[31] *McNellis*, 116 F.4th at 1130–31 (citation modified).
[32] *Greer v. Moon*, 83 F.4th 1283, 1292 (10th Cir. 2023) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).
[33] *Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1281 (10th Cir. 2021).
[34] *Id.* (citation modified).
[35] *Greer*, 83 F.4th at 1292 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).
[36] *Id.* (citation modified).
[37] *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (citation modified).

examples" are insufficient.[38] The allegations must show "which defendant is alleged to have done what," to whom, and "what the misconduct was."[39]

At bottom, "[d]ismissal under Rule 12(b)(6) is appropriate only if the complaint, viewed in the light most favorable to the plaintiff, lacks enough [well-pleaded] facts to state a claim to relief that is plausible on its face."[40]

## DISCUSSION

FA Defendants move the court to dismiss the claims against them on several grounds. The court addresses these arguments in turn.

### I. Breach of Fiduciary Duty[41]

FA Defendants move to dismiss Plaintiffs' breach of fiduciary duty claim against them, arguing that the allegations fail to support that FA Defendants were in breach of their duties as escrow agents.[42]

In the Amended Complaint, Plaintiffs allege that FA Defendants owed them a fiduciary duty to ensure that the "invested funds were protected for the benefit of the parties and were disbursed according to the agreements and instructions of the parties."[43] FA Defendants

---

[38] *See Burnett v. Mortg. Elec. Registrations Sys., Inc.*, 706 F.3d 1231, 1240 (10th Cir. 2013).
[39] *Id.*
[40] *Abdi v. Wray*, 942 F.3d 1019, 1025 (10th Cir. 2019) (citation modified).
[41] For this claim and others, FA Defendants assume Utah law applies without analyzing the potential choice-of-law issues. *See generally* Mot. 6–21. Plaintiffs in response either assume Utah law applies or, for certain claims (such as their claim for breach of fiduciary duty), note the issue but assert no conflict between laws exists. *See* Plaintiffs' Mem. in Opp'n to FA Defendants Mot. to Dismiss ("Opp'n") 7 n.4, 15–20, 22, ECF No. 326, filed May 1, 2026. As such, the court will assume Utah law applies to the claims for purposes of this Motion, unless otherwise specified. *See, e.g.*, *Atain Specialty Ins. Co. v. R. White Constr., Inc.*, No. 1:21-cv-00104-RJS-DAO, 2022 WL 4290098, at *6 n.61 (D. Utah Sept. 16, 2022) (assuming Utah law applies for purposes of a motion because "[t]he parties did not address the choice of law issue"); *Rupp v. Transcon. Ins. Co.*, 627 F. Supp. 2d 1304, 1314 (D. Utah 2008) (reasoning under Utah choice-of-law jurisprudence that where no conflict exists "the court may apply Utah's law regardless of which state has the most significant relationship").
[42] Mot. 6.
[43] Compl. ¶ 409.

allegedly breached that duty by (a) failing to provide or require an escrow agreement; (b) failing to communicate that Plaintiffs' funds would be immediately disbursed; (c) disbursing funds from escrow at the request of Rockwell without ensuring that the funds would be applied to the intended purpose or TIC property; (d) failing to follow the express requirements of the PSA between Rockwell and Plaintiffs, specifically PSA section 3.2; (e) disbursing the escrow funds to Rockwell without Plaintiffs' consent; and (f) otherwise failing to exercise due care and loyalty to safeguard Plaintiffs' funds.[44]

In their Motion, FA Defendants note that the thrust of Plaintiffs' claim is that FA Defendants disbursed the funds on a non-reimbursement basis and prior to construction being completed, which is allegedly inconsistent with the PSA between Plaintiffs and Rockwell.[45] FA Defendants assert, however, that the PSA expressly authorized it to disburse the funds in the manner alleged and, as a result, Plaintiffs cannot sustain a claim for breach of fiduciary duty.[46]

To resolve this issue, the court must first determine whether the PSA permitted FA Defendants to disburse the funds in the manner alleged. Under Utah law, courts interpret a contract by "first look[ing] at the plain language of the contract to determine the parties' meaning and intent."[47] "If the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law."[48] Only where a "term or provision is

---

[44] *Id.* ¶ 412.
[45] Mot. 6–7.
[46] *Id.*
[47] *Brady v. Park*, 2019 UT 16, ¶ 53, 445 P.3d 395 (internal brackets omitted) (quoting *Meadow Valley Contractors, Inc. v. State Dep't of Transp.*, 2011 UT 35, ¶ 64, 266 P.3d 671).
[48] *Id.* (quoting *Cent. Fla. Invs., Inc. v. Parkwest Assocs.*, 2002 UT 3, ¶ 12, 40 P.3d 599).

ambiguous as to what the parties intended," does the question "become[] a question of fact to be determined by the fact-finder."[49] So where an interpretation is disputed, the court "must determine whether the contract as a whole unambiguously supports one interpretation over the other."[50] If the court deems a provision ambiguous—"it is capable of more than one *reasonable* interpretation"[51]—then the "ambiguity must be resolved by considering extrinsic evidence of the parties' intent."[52]

The court agrees that the PSA's plain language unambiguously allowed FA Defendants to disburse the funds for either the purchase of a property interest or construction of improvements.[53]

To begin, the PSA provision at issue reads, "Buyer hereby acknowledges and agrees that Accommodator shall periodically transfer the 1031 Funds to [First American], in one or more installments, which funds shall be applied to *either* (i) the purchase of an undivided interest in the Property *or* (ii) the construction for the improvements on the Property on a reimbursement basis (i.e., the 1031 Funds will be used to reimburse Seller for costs it has incurred in constructing the improvements on the Property)."[54] The court gives terms in a contract their "plain and ordinary meaning."[55] The term "either" is understood to be "used as a function word

[49] *Id.*
[50] *Id.*
[51] *Id.* ¶ 54 (quoting *Meadow Valley Contractors*, 2011 UT 35, ¶ 64).
[52] *Id.* ¶ 53.
[53] FA Defendants' Reply in Support of Mot. to Dismiss Amend. Compl. ("Reply") 2, ECF No. 329, filed June 5, 2026.
[54] PSA § 3.2 (emphases added).
[55] *Mind & Motion Utah Invs., LLC v. Celtic Bank Corp.*, 2016 UT 6, ¶ 27, 367 P.3d 994.

before two or more coordinated words, phrases, or clauses joined usually by or to indicate that what immediately follows is the first of two or more alternatives."[56]

Here, there are two alternatives for which FA Defendants could have applied the funds—for purchase of interest in the property or on a reimbursement basis for constructing improvements. Section 3.2's plain language simply contemplates a choice between those two alternatives. It is certainly a reasonable interpretation of the PSA that FA Defendants were authorized to apply Plaintiffs' funds towards "the purchase of an undivided interest in the Property" in "one . . . installment" upon Rockwell's request, as an alternative to periodic reimbursement for construction costs. This understanding is consistent with the allegations made against FA Defendants in the Amended Complaint.

Further, such an interpretation is supported by reading the release of the funds under section 3.2 with other provisions. The PSA itself contemplates a 180-day window for funds to be transferred for a "1031 Exchange."[57] If the parties hit that deadline without all applicable funds being transferred "all remaining funds shall be transferred and Closing shall occur."[58] But this same mechanism can trigger prior to that deadline. Section 3.4 contemplates that if "all of the 1031 Funds have been transferred by the Accommodator[59] to [First American] pursuant to

---

[56] *Either*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/either [https://perma.cc/PM3X-AUT7] (last visited Nov. 25, 2026).
[57] PSA § 3.4.
[58] *Id.*
[59] Under the PSA, the buyer "assigns to Accommodator all of its rights under th[e] Agreement and . . . instructs Accommodator to transfer 1031 Funds to [First American] as described in Section 3.2." *Id.* § 3.5.

Section 3.2," then "Closing shall occur."[60] As pointed out by FA Defendants, these triggers occur regardless of pending construction or other considerations.[61]

On the other hand, Plaintiffs offer their own interpretation of the PSA.[62] Plaintiffs contend that under section 3.2 "[t]he purchase money paid to First American was to be applied *per directions or consent of buyer and seller*, such that each buyers [sic] funds are applied to *property acquisition and completed construction* . . . ."[63] This reading is not supported by the text. Section 3.2 says nothing about the buyer and seller providing additional "directions or consent." Plaintiffs' proposed reading also requires the court to swap out "purchase of an undivided interest" in favor of "property acquisition," replace "construction of the improvements" with "completed construction," and change the section's "or" to an "and."[64] This is a proposed rewrite, not a reasonable reading.

Plaintiffs also argue that their proposed reading is reasonable because the "passive language" in section 3.2 is "less than crystal clear about which party gets to decide how funds are applied," and FA Defendants' interpretation "renders the entirety of paragraph 3.2 meaningless."[65] But the proffered arguments are insufficient. For example, section 3.2's language requiring Rockwell to "periodically provide statements to [First American] detailing the construction costs that [it] has incurred and seeking reimbursement of such costs via

---

[60] *Id.* § 3.4.
[61] *See* Reply 2.
[62] Opp'n 8–11.
[63] *Id.* at 10 (emphases added).
[64] *Cf.* PSA § 3.2 ("Buyer hereby acknowledges and agrees that Accommodator shall periodically transfer the 1031 Funds to [First American], in one or more installments, which funds shall be applied to either (i) the purchase of an undivided interest in the Property or (ii) the construction for the improvements on the Property on a reimbursement basis (i.e., the 1031 Funds will be used to reimburse Seller for costs it has incurred in constructing the improvements on the Property).").
[65] Opp'n 9–10.

transfer(s) of 1031 Funds" would apply only when funds are being applied pursuant to section 3.2(ii), which that language immediately follows.[66] Indeed, section 3.1 of the PSA outlines that "[t]he Seller [Rockwell] agrees to reasonably cooperate in a 1031 Exchange transaction," which is the closest provision to suggesting that Rockwell (not Plaintiffs) could dictate how the funds are disbursed.[67] Further, Plaintiffs (through their Accommodators) expressly provided discretion under the PSA to transfer funds to First American "periodically . . . in one or more installments."[68] Plaintiffs have pointed to nothing in the plain language of the PSA that suggests section 3.2 requires their consent for their chosen methods of disbursal. As such, the court finds that Plaintiffs' proffered interpretation is not reasonable.

Plaintiffs also cite *Ward v. Intermountain Farmers Association*[69] for the proposition that the court should go beyond the plain text to consider "any relevant evidence," such as extrinsic evidence or surrounding circumstances, to determine whether the PSA is ambiguous.[70] However, the court agrees with previous decisions in this district that have concluded "[t]he Utah Supreme Court's more recent cases demonstrate that it has, at least *sub-silentio*, rejected the *Ward* test as applied to questions of facial ambiguity."[71] As such, the court considers "the writing alone" to

---

[66] *See* PSA § 3.2.
[67] *Id.* § 3.1.
[68] *Id.* § 3.2.
[69] *Ward v. Intermountain Farmers Ass'n*, 907 P.2d 264 (Utah 1995).
[70] Opp'n 11 (quoting *Ward*, 907 P.2d at 268).
[71] *Russell v. Mass. Mutual Life Ins. Co.*, No. 4:24-cv-00098-AMA-PK, 2026 WL 483193, at *5 (D. Utah Feb. 20, 2026) (quoting *Lifevantage Corp. v. Domingo*, 208 F. Supp. 3d 1202, 1215 (D. Utah 2016)). For example, the Utah Supreme Court more recently stated the "if the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language." *Mind & Motion Utah Invs., LLC*, 2016 UT 6 ¶ 24 (citation modified).

determine whether the PSA is ambiguous.[72] Plaintiffs' appeal to considerations outside of the PSA's four corners cannot support its proffered interpretation of section 3.2.[73]

Accordingly, the court concludes that the PSA is unambiguous as a matter of law and does not consider Plaintiffs' extrinsic evidence to interpret section 3.2. The court, therefore, agrees that Plaintiffs allege conduct by FA Defendants that is authorized under section 3.2.[74]

Because FA Defendants acted consistently with the asserted escrow agreement, Plaintiffs cannot sustain a claim based on actions taken pursuant to that agreement. As the Utah Court of Appeals reasoned, "it would be illogical if following the instructions of the one to whom you owe a fiduciary duty could constitute a breach of that same duty."[75] The Amended Complaint ties fiduciary duties owed by FA Defendants to the PSA countless times by equating it to the governing escrow agreement.[76] And, under the assumption that FA Defendants violated section

---

[72] *See Lifevantage Corp.*, 208 F. Supp. 3d at 1216 (quoting *Giusti v. Sterling Wentworth Corp.*, 2009 UT 2, ¶ 44, 201 P.3d 966); *see also Russell*, 2026 WL 483193, at *5 (same).

[73] For example, Plaintiffs' argument points the court to Ms. Parkin's "express statements" made to some of the plaintiffs, the "well-pleaded allegations of the Amended Complaint" regarding FA Defendants' knowledge of the Construction TIC program, and its understanding of the parties' general intention under the PSA. Opp'n 9–11. Because those considerations are outside the four corners of the PSA, the court would not consider them unless it found the plain language ambiguous.

[74] Compl. ¶¶ 366–67 (alleging that "[a]t closing, each Plaintiff, or an accommodator . . . delivered the full purchase price to First American" and "First American released the purchase funds to Rockwell almost immediately after closing, without regard to the state of construction at the property or any condition precedent for the release of the funds"); *see also id.* ¶ 412 (asserting breaches on similar allegations).

[75] *Posner v. Equity Title Ins. Agency, Inc.*, 2009 UT App 347, ¶ 19, 222 P.3d 775, *abrogated on other grounds by Coroles v. State*, 2015 UT 48, 349 P.3d 739.

[76] *See* Compl. ¶ 130 ("[FA Defendants] were obligated to handle the escrow account consistent with a fiduciary duty to the parties to the escrow . . . and consistent with the agreement between the parties to the escrow. First American was obligated . . . not to disburse the funds from escrow except as authorized by the express agreement of all parties to the escrow."); *id.* ¶ 131 ("[FA Defendants] were familiar with all of the documents involved in the purchase and sale of the TIC interests in the Unbuilt Properties, including the purchase agreements between Plaintiffs and Rockwell."); *id.* ¶ 409 ("As escrow agents . . . [FA Defendants] owed a fiduciary duty . . . including the duty to ensure that the invested funds were . . . disbursed according to the agreements and instruction of the parties."); *id.* ¶ 412 (asserting a failure by FA Defendants to "follow the express requirements of the [PSA] between Rockwell and [Plaintiffs], including specifically, paragraph 3.2"); *see also id.* ¶¶ 362–68 (alleging that because there was no "written escrow agreement," the agreement between the parties (the PSA) governed FA Defendants' disbursal of the escrowed funds).

3.2, the Amended Complaint asserts breaches that are authorized under the PSA—the escrow agreement.[77] Because FA Defendants did not violate the escrow agreement, Plaintiffs cannot sustain a breach of fiduciary duty based on it. Therefore, any breaches asserted upon the duty to "ensure that the invested funds . . . were disbursed according to the agreements and instructions of the parties" fail to state a claim.[78]

However, Plaintiffs also argue that FA Defendants breached duties beyond those addressed in the PSA.[79] FA Defendants disagree. They argue that because the PSA operated as the escrow agreement, it governed the entirety of its fiduciary duties to Plaintiffs under Utah law.[80]

Under Utah law "an escrow agent owes a fiduciary duty to both parties of a transaction."[81] This duty "requires the escrow agent 'to act for the benefit of another person on all matters within the scope of their relationship,' owing to another 'the duties of good faith, loyalty, due care, and disclosure.'"[82] By nature of their relationship, escrow agents are "held to a high standard of care in dealing with [their] principals."[83] That said, Utah courts recognize that "the core of the escrow agent's fiduciary duty is to follow the escrow instructions."[84] That core duty, "in general," requires maintaining assets and property held, "preserv[ing] and protect[ing] the property from loss, theft, or damage," and disbursal of funds.[85]

---

[77] *See, e.g.*, *id.* ¶ 412(d) ("Failing to follow the express requirements of the [PSA] between Rockwell and the TIC Owners, including specifically, paragraph 3.2.").
[78] *See id.* ¶ 409.
[79] Opp'n 8.
[80] Reply 4–5.
[81] *Pyper v. Reil*, 2018 UT App 200, ¶ 22, 437 P.3d 493.
[82] *Id.* (quoting *Fiduciary*, BLACK'S LAW DICTIONARY (10th ed. 2014)).
[83] *Id.* ¶ 23 (quoting *Freegard v. First W. Nat'l Bank*, 738 P.2d 614, 616 (Utah 1987)).
[84] *Id.* (quoting *Posner*, 2009 UT App 347, ¶ 19).
[85] *Id.* (citation modified).

Here, Plaintiffs recast some breaches asserted in the Amended Complaint, as well as new ones not previously pled as breaches, as falling under the "duties of care, loyalty, and disclosure."[86] But an escrow agent's general fiduciary duty is not so broad as to encompass these alleged breaches. An "escrow agent is a special or limited agent whose authority derives from the escrow agreement and which is limited by the express and implied terms of that agreement."[87] Indeed, "the scope of the escrow agent's duty is governed by the escrow agreement," which at its core encompasses "an obligation to exercise reasonable skill and ordinary diligence in following the escrow instructions."[88] For example, the Utah Court of Appeals has held that a fiduciary duty is fixed by law so obligations that go "against instructions provided and signed by the parties" can only be imposed categorically upon a proper showing.[89] Plaintiffs have not made that requisite showing. Instead, their alleged breaches attempt to hold FA Defendants liable for "following the instructions" of the escrow agreement.[90] This they cannot do.

Accordingly, Plaintiffs fail to adequately state a claim for breach of fiduciary duty against FA Defendants.[91]

---

[86] Opp'n 8. For those pled as breaches, Plaintiffs list failure to "communicate to Plaintiffs their intent to disburse funds without ensuring completion of construction, and related information" and "disbursing funds without the express consent of Plaintiffs." *Id.* For those not pled as breaches, Plaintiffs assert "knowingly violat[ing] 1031 exchange rules by disbursing sales proceeds before construction was completed," disbursing "funds in derogation of their own understanding of the Noah construction TIC program, which required funds to be escrowed and paid out upon completion of construction," and violating FA Defendants' "own internal policies and requirements for handling of escrow in disbursing the funds prematurely to Rockwell." *Id.*

[87] *Schoepe v. Zions First Nat'l Bank*, 750 F. Supp. 1084, 1088 (D. Utah 1990) (applying Utah law), *cited with approval in Pyper*, 2018 UT App 200, ¶ 24.

[88] *Id.* (listing cases); *see also Pyper*, 2018 UT App 200, ¶¶ 24 & n.2, 27 (declining to impose an "affirmative obligation to detect and halt a potentially fraudulent transaction" on an escrow agent, as well as recognizing that Utah courts have not decided "whether an escrow agent's duty includes the obligation to disclose to the parties facts indicative of fraud").

[89] *Pyper*, 2018 UT App 200, ¶¶ 23, 26 (citing *Posner*, 2009 UT App 347, ¶ 19).

[90] *See Posner*, 2009 UT App 347, ¶ 19.

[91] Plaintiffs make a single argument under this claim for a breach separate from the PSA's instructions, asserting that "the Complaint alleges that by industry standard, the FA Defendant should have required or prepared a written

## II. Secondary Liability Claims[92]

Plaintiffs bring several secondary liability claims against FA Defendants, which they move to dismiss. The court addresses these arguments on a claim-by-claim basis.

### A. Aiding & Abetting Tortious Conduct

Plaintiffs seemingly claim that FA Defendants aided and abetted the tortious conduct of several other defendants for fraud (claim 1: fraud/negligent misrepresentation, claim 3: constructive fraud), conversion (claim 5: conversion/fraudulent misappropriation), and breach of fiduciary duty (claims 2 and 4).[93] FA Defendants argue that Plaintiffs have failed to state any cognizable claim for aiding and abetting.

Generally, the elements for a claim of aiding and abetting are: "(1) the existence of an independent primary wrong; (2) actual knowledge by the alleged aider and abettor of the wrong and of his or her role in furthering it; and (3) substantial assistance in the wrong."[94]

The Amended Complaint broadly alleges that FA Defendants "knowingly aided and abetted the underlying tortious conduct" preceding the claim.[95] Plaintiffs allege substantial assistance by FA Defendants for "conducting closings, providing title insurance, acting as

---

escrow agreement to be agreed upon among the parties, and the failure to do so was a breach of duty." Opp'n 8. But Plaintiffs fail to argue that such an obligation has "previously been recognized" under Utah law. *See Pyper*, 2018 UT App 200, ¶ 24. As such, Plaintiffs would need to "demonstrate that it is appropriate to expand as a matter of law an escrow agent's fiduciary duty to encompass it." *Id.* Moreover, Plaintiffs would need to make this showing while addressing Utah Code section 7-22-101, which contemplates that escrow agreements may be "implied" rather than "express." Because Plaintiffs have not attempted to make this showing, their asserted duty cannot be found.

[92] FA Defendants make a broad argument against all secondary liability claims that Plaintiffs have not plausibly pled "actual knowledge" for them. *See* Mot. 7–9. The court, however, addresses FA Defendants' challenges on a claim-by-claim basis.

[93] Compl. ¶ 427. The parties brief these aiding and abetting claims in these three general groupings. For purposes of this Motion, the court does the same.

[94] *Dahl v. Gardner*, 583 F. Supp. 1262, 1267 (D. Utah 1984) (citation modified).

[95] Compl. ¶ 427.

escrow agent with respect to the TIC Investments, and by disbursing the Plaintiffs' TIC Investments to Rockwell and otherwise carrying out instructions from Rockwell or Noah."[96] Plaintiffs also plead knowledge. In its entirety, Plaintiffs allege the following:

> [FA Defendants] engaged in such conduct with knowledge of the underlying tortious conduct in that they were aware of the parties' disregard of the requirements of the Construction TIC program; they understood that Rockwell was not following rules applicable to 1031 Exchanges; they knew of Noah's financial weakness based on a long and close business relationship with Rockwell and Noah, including closing over 500 TIC transactions; they knew that Noah was selling unbuilt property at a purchase price for a completed venue; and they knew of Noah's failure to pay property taxes on its venues.[97]

Upon consideration of the arguments, the three categories of Plaintiffs' aiding and abetting claim fail.

First, Plaintiffs cannot state a claim for aiding and abetting fraud because Utah has not recognized such a claim.[98] Previous decisions from this district have noted that "Utah courts have not yet recognized a claim for aiding and abetting fraud."[99] As such, "the court is not convinced that aiding and abetting fraud is . . . a permissible cause of action" in Utah.[100] Plaintiffs argue that Utah has not foreclosed such a claim.[101] That is not the standard. Plaintiffs must make a showing that "such a cause of action exists under Utah law" by reasoning from "authority supporting the existence of an aiding and abetting fraud claim under Utah law" and an "indication as to what its elements might be."[102] But Plaintiffs, instead, point to a federal court

---

[96] *Id.* ¶ 427(a).
[97] *Id.* ¶ 427(b).
[98] Mot. 12.
[99] *Rabo Agrifinance, Inc. v. Bliss*, 227 F. Supp. 3d 1249, 1252 n.1 (D. Utah 2017); *see also Coroles*, 2003 UT App 339, ¶ 37 n.20 ("[W]e do not reach the issue of whether [aiding and abetting fraud] is cognizable under Utah law.")
[100] *DiTucci v. Ashby*, No. 2:19-cv-277-TC-PMW, 2020 WL 956890, at *5 (D. Utah Feb. 27, 2020).
[101] Opp'n 15.
[102] *Weber v. Colliers Int'l Grp., Inc.*, No. 2:25-cv-162-DBB-DBP, 2026 WL 1650734, at *27 (D. Utah June 8, 2026).

sitting in New York that found it "reasonable to predict" Utah would adopt the claim and, without explaining the analysis or reasoning from it, assert that the court's "analysis reinforces that Plaintiffs may plausibly assert such a claim."[103] This is insufficient. "Absent briefing explaining why this cause of action should be permitted, the court sees no reason to allow the claim to go forward."[104]

Second, Plaintiffs have not shown they can bring a claim for aiding and abetting conversion where Utah appears to have not recognized such a claim. Although Utah courts have recognized aiding and abetting liability for torts like breach of fiduciary duty,[105] "Utah courts have not specifically recognized a cause of action for aiding and abetting conversion."[106] Plaintiffs argue that *Bowe v. Palmer*[107] supports the idea of liability arising through collusion of a conversion.[108] But that 1909 case's evidentiary discussion,[109] without further argument or reasoning by Plaintiffs, does not convince the court that Utah has (or would) recognize a claim for aiding and abetting conversion. This is so particularly in light of the 117 years that have passed without further elaboration by Utah courts (or, at least, any further elaboration identified by Plaintiffs). Again, absent briefing adequately explaining why the court should permit the cause of action, the court will not permit Plaintiffs' claim for aiding and abetting conversion to proceed.

---

[103] Opp'n 15 (citing *In re Customs & Tax Admin. of the Kingdom of Denmark (SKAT) Tax Refund Litig.*, 18-md-2865 (LAK), 2023 WL 8039623, at *17 (S.D.N.Y. Nov. 20, 2023)).
[104] *DiTucci*, 2020 WL 956890, at *5.
[105] *See Mower v. Simpson*, 2012 UT App 149, ¶ 38, 278 P.3d 1076.
[106] *Albright v. Att'y's Title Ins. Fund*, No. 2:03CV517, 2008 WL 2952260, at *12 (D. Utah July 28, 2008).
[107] *Bowe v. Palmer*, 102 P. 1007 (Utah 1909).
[108] Opp'n 17.
[109] *Bowe*, 102 P. at 1110–11.

Third, Plaintiffs have not alleged sufficient facts to show that FA Defendants plausibly had the requisite knowledge for aiding and abetting breach of fiduciary duty. "Utah law recognizes a cause of action for aiding and abetting the breach of a fiduciary duty."[110] "A party aids and abets the breach of a fiduciary duty when it *knowingly* joins a fiduciary in fraudulent acts, whereby the fiduciary breaches his or her fiduciary duties."[111] But Utah courts have emphasized that "the gravamen of the claim of aiding and abetting a breach of fiduciary duty is the defendant's *knowing* participation in the fiduciary's breach."[112] Courts that have considered aiding and abetting in similar contexts have emphasized the "knowing" requirement means "actual knowledge" of the underlying breach, not just constructive knowledge that an alleged aider and abettor should have known.[113] Thus, Plaintiffs' Amended Complaint must plead sufficient facts for the court to conclude that FA Defendants plausibly had actual knowledge of the underlying Ponzi scheme and, therefore, knowingly participated in it.

FA Defendants argue, among other things, that Plaintiffs have failed to plausibly allege that First American and Ms. Parkin had actual knowledge of the Ponzi scheme because the factual allegations merely show that they were familiar with Rockwell, they were familiar with

---

[110] *Mower*, 2012 UT App 149, ¶ 38.
[111] *Hussein v. UBS Bank USA*, 2019 UT App 100, ¶ 46, 446 P.3d 96 (emphasis added) (citation modified).
[112] *Id.* (emphasis added) (quoting *Mower*, 2012 UT App 149, ¶ 37).
[113] *See, e.g.*, *In re First All. Mortg. Co.*, 471 F.3d 977, 993 (9th Cir. 2006) ("[T]he defendant must have actual knowledge of the specific primary wrong . . . ." (citation modified)); *Zamora v. FIT Int'l Grp. Corp.*, 834 F. App'x 622, 627 (2d Cir. 2020) (summary order) (unpublished) ("Mere 'constructive knowledge' of the purported misconduct does not satisfy the 'actual knowledge' inquiry as to [an aiding and abetting breach of fiduciary duty] claim[]."); *Zayed v. Associated Bank, N.A.*, 913 F.3d 709, 715 (8th Cir. 2019) ("A plaintiff must show more than awareness of the conduct in question, that it raised red flags, or even that it amounted to gross negligence, but must show that the defendant was aware of the wrongfulness of the challenged conduct." (citation modified)); *see also Real Est. Sch. of Nev. v. Kapp*, No. 2:15-cv-00043-DN, 2015 WL 4729132, at *4 (D. Utah Aug. 10, 2015) (applying Utah law and dismissing claim for failure to "allege actual knowledge of actions related to the underlying breach of the [fiduciary] duty").

the Construction TIC program, and that FA Defendants should have been suspicious of Rockwell's conduct.[114] FA Defendants argue that these allegations fall short of plausibly alleging any actual knowledge of the scheme.[115]

Plaintiffs agree that actual knowledge is the governing standard but assert that they have plausibly alleged such knowledge.[116] In support, Plaintiffs assert that the Amended Complaint first alleges that FA Defendants "were aware of the structure and requirements of the TIC and 1031 exchange transactions, including that funds were to be tied to completed construction, yet nevertheless disbursed investor funds in a manner inconsistent with those requirements" and then alleges that "FA Defendants knew that Noah was in financial distress, but continued to perpetuate the scheme by closing transactions without requiring funds to be used to pay for construction."[117] These allegations, Plaintiffs argue, "support the reasonable inference that the FA Defendants knew their conduct was facilitating the improper handling and ultimate misappropriation of investor funds"—i.e., the Ponzi scheme.[118]

Here, although the alleged facts support a reasonable inference that FA Defendants should have known of the warning signs of a Ponzi scheme, the Amended Complaint as a whole does not support a plausible inference that FA Defendants actually knew of the Ponzi scheme when they allegedly participated in it. The court finds cases discussing aiding and abetting liability of banks for Ponzi schemes persuasive. In that context, courts are clear that allegations of "'red flags' arising from suspicious activity giving rise to the presumption that [a] bank should

---

[114] Mot. 10, 14–15; Reply 5–6.
[115] Mot. 15; Reply 5–6.
[116] Opp'n 12–14, 16–17.
[117] Opp'n 16.
[118] *Id.*

have known about the Ponzi scheme" are insufficient to support an inference of *actual* knowledge to sustain "aiding-and-abetting liability."[119]

The first set of allegations support an inference that FA Defendants should have known of "red flags" that "could arouse suspicions,"[120] but they do not plausibly support actual knowledge. The Amended Complaint alleges that FA Defendants knew the 1031 like-kind exchange rules and the Construction TIC program required funds to be disbursed for completed construction, but that FA Defendants nonetheless disbursed funds in a lump sum amount shortly after closing on the raw land on a non-reimbursement basis without regard for the state of construction.[121] As discussed earlier, the PSA's escrow instructions permitted this.[122] It does not give rise to a reasonable inference that FA Defendants actually knew the funds would be stolen via a Ponzi scheme. There is an absence of facts suggesting FA Defendants were ever *actually* aware that investor funds—either Plaintiffs' or those preceding them—were used to build unrelated properties, pay earlier investors, or were being stolen by different defendants. There are simply insufficient facts alleged to support that FA defendants knew anything beyond the existence of red flags and atypical transactions. As a result, these allegations do not sustain a plausible inference that FA Defendants actually knew Rockwell, Noah, and others were misappropriating investor funds through a Ponzi scheme.

---

[119] *Wiand v. Wells Fargo Bank, N.A.*, 938 F. Supp. 2d 1238, 1246 & n.4 (M.D. Fla. 2013) (emphasis omitted); *see also Perlman v. Wells Fargo Bank, N.A.*, 559 F. App'x 988, 993 (11th Cir. 2014) (unpublished) (repeating same standard for aiding and abetting breach of fiduciary duty and collecting cases).
[120] *See, e.g.*, *Perlman*, 559 F. App'x at 994; *El-Camino Res., LTD v. Huntington Nat'l Bank*, 722 F. Supp. 2d 875, 922 (W.D. Mich. 2010) ("As an initial matter, mere 'suspicions,' even of tortious conduct, are insufficient to satisfy the actual knowledge standard."), *aff'd*, 712 F.3d 917 (6th Cir. 2013).
[121] *See* Compl. ¶¶ 127, 130–31, 408, 427.
[122] *See supra* Part I.

The second set of allegations support the inference that FA Defendants should have been aware of the symptoms of a Ponzi scheme, but not that FA Defendants actually knew of it. The Amended Complaint contains allegations that: FA Defendants had a long-standing relationship with Rockwell that spanned hundreds of transactions, FA Defendants knew Noah had missed property tax payments on its venues, and that FA Defendants knew Noah was on financially shaky ground.[123] But these allegations fall short of alleging that FA Defendants actually knew Rockwell was misappropriating Plaintiffs' funds to pay off prior transactions—or that they actually were aware Rockwell was operating a Ponzi scheme. Accepting as true these allegations and inferring that FA Defendants appreciated them as "suspicious activity," these allegations only support an inference of "knowledge of the symptoms of the Ponzi scheme, not [FA Defendant's] actual knowledge of the scheme itself."[124] Without more, the Amended Complaint does not support a plausible inference that FA Defendants actually knew Rockwell and other defendants were misappropriating the investor funds. As such, Plaintiffs do not state a claim for aiding and abetting breach of fiduciary duty.

In sum, Plaintiffs' aiding and abetting claim against FA Defendants is dismissed.

**B. Conspiracy**

Next, FA Defendants move to dismiss Plaintiffs' conspiracy claim. "A claim for civil conspiracy must allege the following elements: '(1) a combination of two or more persons, (2) an

[123] *See* Compl. ¶¶ 127, 427.

[124] *See Isaiah v. JPMorgan Chase Bank, N.A.*, No. 16-CIV-21771, 2017 WL 5514370, at *4 (S.D. Fla. Nov. 15, 2017), *aff'd*, 960 F.3d 1296 (11th Cir. 2020).

object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages as a proximate result thereof.'"[125]

The Amended Complaint alleges that "First American and Parkin agreed to receive escrow funds in connection with each Construction TIC transaction, but to disburse those funds to Rockwell without Plaintiffs' consent and contrary to the [PSA]"; they "further agreed to close TIC transactions in a manner contrary to the rules governing 1031 Exchanges by disbursing funds where venues were not completed" and would not be within the required timeframe; and they "agreed to conceal from Plaintiffs the failure of all parties to carry out the Construction TIC program consistent with its design and applicable rules."[126]

Here, there are simply insufficient allegations under this claim that plausibly allege FA Defendants had a "meeting of the minds" with any of the other defendants (Rockwell, Upstream Parties, Noah Affiliate Parties) on any "object or course of action" that was unlawful. First, to the extent that the Amended Complaint suggests the meeting of minds was between First American and Ms. Parkin, that is insufficient to constitute a claim for conspiracy. That is because Utah law recognizes that an entity cannot conspire with its agents.[127]

Next, while the Amended Complaint includes the conclusory allegation that *some* agreement was reached to disburse funds prior to completed construction and conceal the manner of disbursal from Plaintiffs,[128] those are insufficient to support a plausible claim. Under Utah

---

[125] *Fid. Nat'l Title Ins. Co. v. Worthington*, 2015 UT App 19, ¶ 16, 344 P.3d 156 (quoting *Israel Pagan Est. v. Cannon*, 746 P.2d 785, 790 (Utah Ct. App. 1987)).
[126] Compl. ¶ 433(b).
[127] *See, e.g.*, *Hatfield v. Cottages on 78th Cmty. Ass'n*, Nos. 21-4035, 4042, 4045, 2022 WL 2452379, at *5 (10th Cir. July 6, 2022) (unpublished) ("[T]he Utah Court of Appeals has acknowledged the principle that an entity and its agents can't conspire with one another." (citing *Tomlinson v. NCR Corp.*, 296 P.3d 760, 768 (Utah Ct. App. 2013))).
[128] Of note, the PSA authorized the disbursal Plaintiffs reference here. *See supra* Part I.

law, "[k]nowing, intentional acts are required to form the foundation of a conspiracy."[129] Plaintiffs' conspiracy claim does not "plead[] the events which [Plaintiffs] claim g[a]ve rise to an inference of knowledge"[130]—that being, here, events that gave rise to an inference of a meeting of the minds. The allegations under this claim merely mention FA Defendants' disbursals under the PSA without "identify[ing] the relevant surrounding facts with sufficient particularity to show what facts are claimed to constitute the charges."[131] Moreover, the allegations in the claim imply facts, such as the manner in which FA Defendants executed the PSA's disbursal provision, "so general that they encompass a wide swath of conduct, much of it innocent."[132]

Finally, unlike allegations against the other defendants in this claim,[133] Plaintiffs fail to identify *who* FA Defendants had a meeting of the minds with (or who they did not) and instead plead an agreement generally. This is a particular problem where FA Defendants have pointed to

---

[129] *Catalyst Campus for Tech. & Innovation, Inc. v. Brown*, No. 1:24-cv-00059-AMA-DAO, 2025 WL 2781561, at *12 (D. Utah Sept. 30, 2025) (quoting *Jedrziewski v. Smith*, 2005 UT 85, ¶ 9, 128 P.3d 1146); *see also Applied Predictive Tech., Inc., v. MarketDial, Inc.*, 598 F. Supp. 3d 1264, 1284 (D. Utah 2022) ("[U]nder Utah law, mere knowing and intentional participation in the conspiracy is sufficient to establish a meeting of the minds." (citation modified)).

[130] *Batson v. RIM San Antonio Acquisition, LLC*, No. 15-cv-07576 (ALC), 2018 WL 1581675, at *12 (S.D.N.Y. Mar. 27, 2018) (aiding and abetting claim); *see also Unified Container, LLC v. Mazuma Cap. Corp.*, 280 F.R.D. 632, 636 (D. Utah 2012) ("As a general rule, civil conspiracy is not one of the listed causes of action which must meet the requirements of Rule 9(b). However, where the unlawful act underlying the civil conspiracy is a fraud-based tort, both the underlying tort and the conspiracy claim must be pleaded with particularity." (citation modified)).

[131] *Coroles*, 2003 UT App 339, ¶ 40 (citation modified) (concluding that plaintiffs did not "plead[] either of their secondary fraud claims with particularity," one of which was a claim for civil conspiracy, because it "simply" incorporated the 680 preceding paragraphs as its factual basis).

[132] *See Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (citation modified).

[133] Compl. ¶ 433(a) ("Rockwell expressly agreed with the Upstream Parties"); *id.* ¶ 433(c) ("The Noah Affiliated parties agreed with Bowser . . . .").

an absence of allegations that connect them with any defendants other than Rockwell.[134] As such, this vague and general allegation is insufficient to state a plausible claim.[135]

### C. Materially Aiding State-Law Securities Fraud

Next FA Defendants move to dismiss Plaintiffs' claim that it materially aided state law securities fraud. They argue that the Amended Complaint fails to satisfy Federal Rule of Civil Procedure 8's pleading standard, let alone rule 9.[136]

In the complaint, Plaintiffs bring their claim of materially aiding state-law securities fraud against "all defendants" and largely makes allegations against those defendants collectively.[137] The complaint, however, does contain *some* specific allegations against FA Defendants regarding lack of good faith and knowledge of the underlying facts.[138] Even so, Plaintiffs plead these generally under "applicable state statutes."[139] In identifying the legal basis for their claims, the complaint merely references "applicable state law relating to those who materially aid securities violations" and drops a footnote string citing statutes from sixteen different states.[140] Plaintiffs plead in the same manner for the underlying state law securities fraud claim that they assert FA Defendants materially aided.[141]

---

[134] Mot. 10; Reply 8.
[135] *See Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1240 (10th Cir. 2013) (determining that allegations sufficient to state a plausible claim must establish "which defendant is alleged to have done what" and "what the misconduct is" (emphases omitted)).
[136] Mot. 18; Reply 8–9.
[137] *See* Compl. ¶¶ 472–77.
[138] *Id.* ¶ 475.
[139] *Id.* ¶ 473.
[140] *Id.* ¶ 476 & n.4.
[141] *Id.* ¶ 466 & n.3.

FA Defendants argue that Plaintiffs fail to state a claim because their "conclusory reference to various state statutes is insufficient to plausibly plead any claims."[142] In response, Plaintiffs argue that their pleading in this manner "reflects the potential choice-law-issues inherent in a multi-state securities case and demonstrates thorough—not deficient—pleading."[143] The court disagrees.

Plaintiffs' general appeal to "applicable state law" and string cite to statutes without identifying the elements of those state laws or connecting facts to those elements is plainly insufficient to state a claim for relief. The court cannot "simply assume" that FA Defendants' alleged conduct that is purportedly incorporated from the preceding 471 paragraphs "would automatically make it liable under all [sixteen] states' [materially aiding securities fraud] statutes."[144] Indeed, "[a] cursory listing of several states' statutes is insufficient to satisfy *Twombly* and *Iqbal*'s pleading requirements."[145]

Accordingly, the court grants FA Defendants' motion to dismiss this claim.

---

[142] Reply 8. FA Defendants also argue that the claim fails because the Amended Complaint does not make an "attempt to allege who actually did what," it makes "conclusory and contradictory" allegations, it cites to a state securities law that does not support a private claim, it fails to allege core elements required for the claim in different states, and it fails to plead the underlying securities fraud claim with rule 9(b) particularity. Mot. 18–19. Because many of these arguments rise and fall with the manner Plaintiffs plead the legal authority for their claims, the court does not address these alternative arguments.

[143] Opp'n 20.

[144] *See Adams v. Target Corp.*, No. CV 13-5944-GHK, 2014 WL 12558290, at *6 (C.D. Cal. Mar. 3, 2014) (holding that claims based on violations of 49 states' consumer protections laws were inadequately pled, despite plaintiff adequately pleading a claim under California's consumer protection law, because plaintiff merely listed the statutes).

[145] *Fed. Trade Comm'n v. Uber Techs., Inc.*, 830 F. Supp. 3d 912, 937 (N.D. Cal. 2026) (citation modified); *see also Frame-Wilson v. Amazon.com, Inc.*, 591 F. Supp. 3d 975, 994 (W.D. Wash 2022) (same); *Adams*, 2014 WL 12558290, at *6 (same).

## III. Unjust Enrichment

Next, FA Defendants move to dismiss Plaintiffs' unjust enrichment claim. They argue that the claim brought largely against "all Defendants" fails to allege a predicate element of the claim—that Plaintiffs conferred a benefit upon FA Defendants.[146]

Under Utah law, "[t]o establish a claim for unjust enrichment, a plaintiff must show: (1) a benefit conferred; (2) an appreciation or knowledge by the conferee of the benefit; and (3) the acceptance or retention of the benefit by the conferee under such circumstances as to make it inequitable for the conferee to retain the benefit without payment of its value."[147] To be liable, the benefit received must be a "direct benefit from the plaintiff."[148] The Amended Complaint must, therefore, allege sufficient facts to plausibly establish these elements.

The Amended Complaint collectively pleads a claim for unjust enrichment against "all defendants," in which it never mentions FA Defendants by name.[149] Relevant here, the complaint alleges that "Plaintiffs conferred a benefit on the Defendants by making their investments in Noah TIC Properties," and "Defendants each received a benefit from Plaintiffs in the form of commissions or other compensation paid from the proceeds of the sale transaction; access to and direct use of the identifiable proceeds of the investment; and perpetuation of the Noah Ponzi scheme."[150]

---

[146] Mot. 20.
[147] *U.S. Fidelity v. U.S. Sports Specialty*, 2012 UT 3, ¶ 12, 270 P.3d 464 (citation modified).
[148] *Jones v. Mackey Price Thompson & Ostler*, 2015 UT 60, ¶ 65, 355 P.3d 1000.
[149] Compl. ¶¶ 478–85.
[150] *Id.* ¶ 480. In stark contrast to this allegation that presumably applies to FA Defendants, Plaintiffs brought one allegation under this claim specifically to some of the defendants. The Amended Complaint alleges that "[i]n particular, affiliates of Noah including Bowser, the J & J Parties, Winkle, and Kate Jensen received benefits in the form of salary, continued employment, or other payments or consideration from Noah that they would not otherwise have received without the benefits derived from Plaintiffs." *Id.* ¶ 481.

Plaintiffs fail to state a plausible claim for unjust enrichment against FA Defendants because they do not properly plead their claim. "[T]he Tenth Circuit has oft criticized the practice where a complaint uses 'defendants' as a collective term and fails to distinguish as to what acts are attributable to whom."[151] That is because using the "collective term 'Defendants' or a list of the defendants named individually but with no distinction as to what acts are attributable to whom," does not allow a defendant to "ascertain" the factual basis for their liability.[152] This "impermissible group pleading" does not give a defendant "fair notice of the grounds for the claim[]" made against it and often results in "failing to allege sufficient facts" to establish elements of a claim.[153] Here, the claim only refers collectively to "Defendants" without identifying factual allegations supporting that: Plaintiffs conferred a benefit to FA Defendants specifically, FA Defendants knew of the benefit, and that it would be inequitable for FA Defendants to retain the benefit. This is impermissible group pleading that cannot survive a motion to dismiss.[154]

Plaintiffs argue that the Amended Complaint supports "at least a reasonable inference" that First American received compensation in its role as escrow agent.[155] But where the claim has no factual allegations specific to FA Defendants and what benefit Plaintiffs conferred upon them, this inference is not reasonable. And even assuming such an inference could be made, the

---

[151] *Romero v. TMD Transp. Inc.*, No. 2:25-cv-00396-AMA-JCB, 2026 WL 2268709, at *3 (D. Utah. Aug. 6, 2026) (citation modified).
[152] *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008) (collecting cases holding the same); *see also Bristow Endeavor Healthcare, LLC v. Blue Cross & Blue Shield Ass'n*, 691 F. App'x 515, 519 (10th Cir. 2017) (unpublished) (same).
[153] *See Owen v. Utah Legis. Servs.*, No. 2:25-cv-00485-RJS-CMR, 2026 WL 1970584, at *6 (D. Utah July 8, 2026).
[154] *See, e.g.*, *id.*; *Romero*, 2026 WL 2268709, at *3; *Equal Employment Opportunity Comm'n v. Mile Hi Foods, Co.*, 811 F. Supp. 3d 1253, 1258 (D. Colo. 2025) ("A group pleading is insufficient to state a plausible claim implicating a particular defendant." (citation modified)).
[155] Opp'n 21.

court does not see how this vague averment plausibly alleges a "direct," not "incidental benefit."[156]

Accordingly, Plaintiffs' unjust enrichment claim is dismissed.

## IV. Abuse of Vulnerable Adults

Last, FA Defendants move to dismiss Plaintiffs' abuse of vulnerable adults claim against them on several grounds.

The Amended Complaint alleges a claim for abuse of vulnerable adults against "all Defendants."[157] Under the claim, there are allegations that some plaintiffs are considered "vulnerable adults," and lists them by name.[158] Plaintiffs then allege that they "put substantial trust and confidence in the Defendants, and Defendants knowingly and intentionally abused that position of trust and confidence. . . . In carrying out such conduct, Defendants were motivated by purposes other than the well-being and interest of the Plaintiffs but act with improper motives."[159] Then, Plaintiffs purport to bring their claim "[u]nder applicable state statutes and related tort principles, including the doctrine of prima facie tort or negligence per se."[160]

For a combination of reasons, Plaintiffs have failed to sufficiently plead a plausible claim for abuse of vulnerable adults against FA Defendants.

As a preliminary matter, Plaintiffs do not identify the state laws that form the basis for their claims. Similar to their argument on securities fraud, FA Defendants assert this is a

[156] *See Jones*, 2016 UT 60, ¶ 65.
[157] Compl. ¶¶ 486–91.
[158] *Id.* ¶ 487.
[159] *Id.* ¶¶ 488–89.
[160] *Id.* ¶ 490 (emphases omitted).

"fundamental pleading failure that requires dismissal."[161] Plaintiffs argue that the multi-state nature of their claim gives "uncertainty as to governing law," but they do not advocate for any applicable laws or brief a choice of law analysis for any portion of their claims.[162] Instead, without citing any supporting law, Plaintiffs assert the allegations they plead "track the elements of elder abuse claims recognized across jurisdictions,"[163] but those jurisdictions, other than Utah, are not identified in the claim. At best, Plaintiffs concede no conflict exists, so the court would apply Utah law.[164] At worst, this failure to identify state statutes could be grounds for dismissal.[165]

Even assuming Utah law applies (as FA Defendants do), Plaintiffs have failed to adequately plead a claim.[166] Plaintiffs argue that if Utah law applies, they have adequately stated a claim under Utah Code section 26B-6-213(1).[167] Utah law supports a private right of action for "[a] vulnerable adult who suffers harm or financial loss as a result of exploitation . . . against the

---

[161] Reply 10.
[162] *See* Opp'n 22.
[163] *Id.*
[164] *See Rupp*, 627 F. Supp. 2d at 1314 ("If no conflict exists, the court may apply Utah's law regardless of which state has the most significant relationship to the causes of action asserted in the complaint." (citing *Snyder v. Celsius Energy Co.*, 866 F. Supp. 1349, 1353, n.9 (D. Utah 1994)).
[165] *See, e.g.*, *Meltzer v. Mazda Motor of Am., Inc.*, 779 F. Supp. 3d 1120, 1128–29 (C.D. Cal. 2025) (holding that plaintiffs did not adequately plead a claim because they did not "identify under which state's law [they] are pursuing their claims" and citing cases holding the same); *Augustine v. Talking Rain Beverage Co.*, 386 F. Supp. 3d 1317, 1333 (S.D. Cal. 2019) ("In order for the Court to determine whether a claim has been adequately pled, Plaintiffs must allege the applicable law."); *see also Wilson v. Millcreek Com. Props., LLC*, No. 2:24-cv-00624-TC-CMR, 2025 WL 2256685, at *12 (D. Utah Aug. 7, 2025) (dismissing state law securities fraud claims for not indicating what state law applies).
[166] In the event Utah law governs, FA Defendants assert that the applicable Utah statute preempts the common law theories Plaintiffs plead as a basis for the claims. Mot. 20. Plaintiffs do not contend that their common law claims survive preemption. Opp'n 22.
[167] *Id*. This statute was formerly designated Utah Code section 62A-3-314 (2020).

perpetrator."[168] In support of their claim being well-pled, Plaintiffs point to their allegations, among others, that "Defendants were motivated by purposes other than the well-being and interest of the Plaintiffs."[169] But as analyzed above, this collective pleading of conclusory allegations against "all Defendants" is insufficient.[170] Without factual allegations against FA Defendants, Plaintiffs have engaged in impermissible group pleading.[171]

Accordingly, the abuse of vulnerable adults claim is dismissed against FA Defendants.

In sum, all of the claims against FA Defendants have been dismissed. FA Defendants ask that the dismissal be with prejudice, but they conduct no futility analysis or provide any other reason for dismissing with prejudice. The claims against the FA Defendants have not previously been dismissed, and no argument has been made suggesting Plaintiffs would be unable to cure the deficiencies if they sought and were granted leave to replead.[172] Therefore, the dismissal is without prejudice.

## ORDER

FA Defendants' Motion to Dismiss[173] is GRANTED. Plaintiffs' claims against FA Defendants are dismissed WITHOUT PREJUDICE.

---

[168] UTAH CODE § 26B-6-213(1). Utah Code section 76-5-111 defines "Exploitation" as the criminal offenses of "Personal dignity exploitation of a vulnerable adult," *id.* § 76-5-111.3, "Financial exploitation of a vulnerable adult," *id.* § 76-5-111.4, and "Sexual exploitation of a vulnerable adult," *id.* § 76-5b-202.
[169] Opp'n 22.
[170] *See, e.g.*, *Owen*, 2026 WL 1970584, at *6.
[171] *See* Mot. 21.
[172] *See Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006) ("A dismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) and granting leave to amend would be futile.").
[173] ECF No. 312.

Signed November 25, 2026.

BY THE COURT

David Barlow
United States District Judge